The Honorable Barbara J. Rothstein

1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF WASHINGTON

9    VANESSA VANDERBRUG, as Administrator
     of Estate of Kay Anne Vanderbrug and on          Case No. 2:22-cv-1707 BJR
10   behalf of all others similarly situated,
                                                       DECLARATION OF ASHLEY M.
11                      Plaintiff,                      LANGLEY IN SUPPORT OF
                                                       DEFENDANT 1000822913 US INC.'S
12          v.                                         MOTION FOR SUMMARY JUDGMENT

13   MAXSOLD INC.

14   and

15   1000822913 US INC.,

16                      Defendants.

17

18   I, Ashley M. Langley, declare as follows:
19
20          1.      I am an attorney of record for Defendant 1000822913 US Inc. in the above-

21   captioned matter. I am over the age of eighteen and competent to be a witness to the matters

22   stated herein. I am making this declaration based on my personal knowledge.

23          2.      Attached hereto as **Exhibit 1** is a true and correct copy of the MaxSold Motion re:

24   Stay Extension, Approval of a Sale Process, Tab 1, Bates No. US Inc 000196, paras. 12-14.

25          3.      Attached hereto as **Exhibit 2** is a true and correct copy of the Bankruptcy Court's

26   Order of March 14, 2025.

DECLARATION OF ASHLEY M. LANGLEY - 1
(CASE NO. 2:22-CV-1707 BJR)

**Miller Nash LLP**
605 5th Ave S, Suite 900
Seattle WA 98104
206.624.8300 | Fax: 206.340.9599

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

4.      Attached hereto as **Exhibit 3** is a true and correct copy of the 1000822913 Ontario, Inc. Stalking Horse Purchase Agreement.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of the MaxSold Motion re: Stay Extension, Approval of a Sale Process, Tab 2, Bates No. US Inc 000213, para. 22 and 23.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of the Bankruptcy Court's Order of April 25, 2025.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of excerpts from the (draft) transcript of the deposition of US Inc.

8.      The undersigned counsel has not yet received a copy of the certified transcript of the deposition of US Inc; this is why the draft transcript is attached hereto as **Exhibit 6**. Once received, the undersigned will supplement this declaration with the certified transcript of the same deposition.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of US Inc.'s Responses to Plaintiff's First Discovery Requests.

I declare under penalty of perjury under the laws of the state of Washington that the foregoing is true and correct.

DATED this 31st day of October, 2025.


*/s/ Ashley M. Langley*
Ashley M. Langley, WSBA No. 54032

DECLARATION OF ASHLEY M. LANGLEY
IN SUPPORT OF DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT - 2
(CASE NO. 2:22-CV-1707 BJR)

# EXHIBIT 1

6

# TAB 1

US INC_000191

Court File No. BK-24-03044331-0033
Estate File No. 33-044331

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(IN BANKRUPTCY AND INSOLVENCY)**

**IN THE MATTER OF THE *BANKRUPTCY AND INSOLVENCY ACT,* RSC 1985, c B-3, AS AMENDED**

**AND IN THE MATTER OF THE NOTICE OF INTENTION TO MAKE A PROPOSAL OF MAXSOLD INCORPORATED OF THE CITY OF KINGSTON, IN THE PROVINCE OF ONTARIO**

**NOTICE OF MOTION**
(Returnable March 14, 2024)
(RE: Stay Extension, Approval of a Sale Process, Administration Charge)

MaxSold Incorporated (the "**Company**") will make a motion to a Judge presiding over the Ontario Superior Court of Justice (Bankruptcy) at 161 Elgin Street, Ottawa, Ontario (the "**Court**") on **March 14, 2024 at 2:00 p.m. (Eastern Time),** or as soon after that time as the motion can be heard by judicial videoconference via Zoom at Ottawa, Ontario.

**PROPOSED METHOD OF HEARING**: The motion is to be heard:

☐in writing under subrule 37.12.1 (1) because it is on consent, unopposed or made without notice;

☐in writing as an opposed motion under subrule 37.12.1 (4);

☐In person;

☐By telephone conference;

☒By video conference.

At the following location:

**Virtual Courtroom 205 - ZOOM**

https://ca01web.zoom.us/j/69640208347?pwd=WWNRcFdsVjRwMzFqRU1FVG
M0ZStXdz09

**Meeting ID:** 696 4020 8347

**Passcode:** 00205

## THE MOTION IS FOR:

1.    An Order substantially in the form attached as Tab 3 of the Company's Motion
Record (the "**SISP Approval Order**") that, among other things:

a)    abridges the notice periods and service requirements pursuant to section 6
of the *Bankruptcy and Insolvency General Rules*;

b)    extends the time to file a proposal pursuant to s. 50.4(9) of the *Bankruptcy
and Insolvency Act*, RSC 1985, c B-3, as amended (the "**BIA**") for 45 days,
from March 16, 2024 up to and including April 30, 2024;

c)    approves the sale and investment solicitation process ("**SISP**") in the form
attached as Schedule "A" to the SISP Approval Order;

d)    approve the Stalking Horse Asset Purchase Agreement between the
Company and 1000822913 Ontario Inc. (the "**Stalking Horse Agreement**")
and authorizes the Company to execute the Stalking Horse Agreement for
the purpose of constituting the "stalking horse" bid in respect of the SISP;

e)    grants a first-ranking priority charge against the assets, property, and
undertakings (the "**Property**") of the Company ("**Administration Charge**"),

in the maximum amount of $75,000, as security for the payment of the professional fees and disbursements incurred and to be incurred by Dodick Landau Inc. in its capacity as the proposal trustee (the "**Proposal Trustee**"), counsel to the Proposal Trustee and counsel to the Company, in connection with this proceeding; and

   f)   authorizes the Company, with the written approval of the Proposal Trustee, to pay up to the maximum cumulative amount of $272,000.00 owing to certain suppliers for goods or services supplied to the Company prior to February 15, 2024 if, in the opinion of the Company, such payment is necessary to maintain the uninterrupted operations of the business; and

2.   Such further and other relief as this Honourable Court deems just.

**THE GROUNDS FOR THIS MOTION ARE**:

**Background**

3.   The Company is in the business of providing streamlined and efficient online auction services for large volume content sales across Canada and the United States (the "**Business**"). The Company's mission is to minimize waste and increase sustainability by making the process of selling a large volume of pre-owned items seamless, easy and quick.

4.   The Company fulfills its mission by assisting sellers with all parts of the online auction process including itemizing and photographing items, hosting the auction on its live auction website (the "**Platform**"), marketing the auction through targeted

US INC_000194

ads and the Company's extensive network of engaged and interested buyers, and organizing the payment for and pick-up of auction items.

5.    Since the Company's inception, the Company has held over 32,000 auctions that have provided a second life for over 3.5 million items. The Company's primary form of revenue is the service fees it receives from the proceeds generated in its auction.

6.    The Company's principal asset is its online auction Platform. The value of the Platform is derived from a combination of factors including the Company's market position, seller and buyer relationships, software and technology assets, and long-term supplier relationships.

**The NOI Proceeding**

7.    In late 2022, the Company began experiencing cash flow challenges due to decreasing revenues caused by extrinsic conditions including a slower housing market and rising acquisition costs from online marketing channels.

8.    In response to the Company's cash flow pressures, the Company implemented an extensive operational restructuring process to decrease the Company's operating costs and enhance the Company's product and market position. The process included decreasing the number of employees, negotiating new agreements with key suppliers, developing new online marketing approaches to acquire sellers more cost-effectively, and redeveloping and modernizing the Platform.

9.    Although the operational restructuring process created new momentum for the

US INC_000195

Company and reinvigorated its market position, it continued to suffer liquidity challenges given the Company's historical debt, its overbroad legacy contracts, the extensive capital invested in modernizing the Business, and the receipt of less than projected revenues as a result of decreased market demand and the challenges with the Company's historical advertising partners.

10.    Based on the compounding financial pressures facing the Company, it determined it required a long-term solution to restructure its Business and balance sheet. Accordingly, in and around October 2023, the Company began soliciting parties who it believed may be interested in completing a strategic transaction with the Company.

11.    In early February 2024, the Company began an official sale process with a limited number of parties for the purpose of canvassing the market for a possible sale or investment transaction.

12.    In the midst of the Company's sale efforts, the Company was unable to make its debt service payment to its principal secured lender, National Bank of Canada ("**NBC**"). As a result, on February 9, 2024, NBC delivered a demand to the Company and issued a Notice of Intention to Enforce Security under section 244 of the *Bankruptcy and Insolvency Act* (Canada).

13.    In order to preserve its ongoing operations and value, the Company filed the NOI on February 15, 2024.

14.    The purpose of this NOI proceeding is to permit the Company to conduct the SISP

while maintaining going concern operations to preserve employment, maximize recovery for stakeholders through the implementation of the SISP, and avoid the liquidation of a company that minimizes waste and promotes sustainability.

15. Since the filing of the NOI proceeding on February 15, 2024, the Company has among other things:

a) continued to operate the Business in the normal course, with the oversite of the Proposal Trustee;

b) with the assistance of the Proposal Trustee, continued to assess various restructuring options;

c) developed the SISP with a view to canvassing the market for a transaction and developing a viable proposal;

d) continued to engage in discussions with various parties interested in completing a transaction to purchase the Company, which resulted in the negotiation of the Stalking Horse Agreement;

e) engaged with its 200+ employees to address any questions about the NOI proceeding;

f) engaged with stakeholders, including its partners and NBC, to develop consensus in this restructuring proceeding; and

g) continued to maintain and foster relationships with suppliers and customers.

**Extension of the Time to File a Proposal**

16.     The initial stay of proceedings pursuant to s. 69 of the BIA expires on March 16, 2024. The stay of proceedings may be extended in increments of 45 days pursuant to s. 50.4(9) of the BIA.

17.     The Company is seeking an Order extending the stay of proceedings for a further 45 days to April 30, 2024 (the "**Stay Period**") pursuant to section 50.4(9) of the BIA. The requested extension of the Stay Period is necessary and appropriate to allow the Company to conduct the SISP in an orderly and transparent manner, protect the going-concern nature and value of the Company, and develop a viable proposal.

18.     The Company has acted and will continue to act with good faith and with due diligence. No creditors will be materially prejudiced by the requested extension.

19.     The cash flow forecast, prepared by the Company, with the assistance of the Proposal Trustee, demonstrates that the Company will have sufficient cash flow to operate over the Stay Period.

**Approval of the SISP**

20.     The Company, in consultation with the Proposal Trustee, has developed a SISP, which is a comprehensive process intended to widely canvass the market for one or more transactions to sell or invest in the Company.

21.     The Company seeks approval of the SISP as it is a critical step towards a

successful restructuring. In particular, the SISP will assist the Company to maximize its value by permitting it to continue operating while conducting a robust marketing and sale process of the going concern Business.

22.    The SISP contemplates a 30-day, single phase sale process that will be managed by the Proposal Trustee. The key milestones in the SISP, which are all anticipated to occur during the Stay Period, are as follows:

| Milestone | Deadline |
|---|---|
| Commencement of the SISP by disseminating marketing materials to potentially interested parties and populating a data room | March 15, 2024 |
| Bid Deadline - interested parties to submit a binding offer that meets at least the requirements set forth in the SISP | April 15, 2024 |
| Day to hold the auction or otherwise select the highest or otherwise best bid ("**Successful Bid**") | April 17, 2024 |
| Seek a Court order approving the Successful Bid | April 25, 2024 |
| Close the transaction contemplated in the Successful Bid | April 30, 2024 |

23.    The timeline of the SISP was designed to balance the limitations of the Company's financial position and NBC's concerns about a lengthy sale process with the need for sufficient flexibility to allow interested parties a reasonable opportunity to formulate and submit bids to maximize the Company's success in the SISP.

24.    The SISP involves a stalking horse bid in the form of the Stalking Horse

Agreement. The stalking horse bid sets the "floor" price that bidders must bet against.

25. The SISP satisfies the criteria in subsection 65.13(4) of the BIA, which the Court considers in determining whether to approve a sale.

26. The Proposal Trustee is supportive of the SISP.

**Approval of the Stalking Horse Agreement**

27. The Company seeks this Court's approval of the Stalking Horse Agreement wherein 1000822913 Ontario Inc. (the "**Stalking Horse Bidder**") has agreed to purchase substantially all of the assets of the Company, for the purpose of constituting the "stalking horse bid" in the SISP. For clarity, the Company does not seek the Court's approval of the transaction contemplated in the Stalking Horse Agreement at this time. A separate motion will be brought upon conclusion of the SISP for an approval and vesting order with respect to the Successful Bid.

28. The key terms of the Stalking Horse Agreement are as follows:

   a) **"Purchased Assets":** the purchased assets include all of the Company's assets, properties and undertakings other than the excluded assets (the "**Excluded Assets**").

   b) **"Excluded Assets":** the Excluded Assets include, among other things, the purchase price, all cash and money in bank accounts other than the Merchant Account, and the funds of customers in the Trust Account (all as defined in the Stalking Horse Agreement).

c) **"As Is, Where Is":** the assets are being purchased on an "as is, where is basis" as of the closing date.

d) **"Purchase Price":** the cash sum of $750,000.00 plus the cash sum required to pay the cure costs for all of the assumed contracts, if any.

e) **"Deposit":** an amount representing 10% of the purchase price will be paid to the Proposal Trustee within 2 business days following the execution of the Stalking Horse Agreement.

f) **"Break Fee":** the Stalking Horse Bidder is entitled to a break fee of $30,000.

g) **"Expense Reimbursement Fee":** the Stalking Horse Bidder is entitled to an expense reimbursement fee in the amount of a maximum of $20,000.

h) **"Conditions to Closing":** the conditions to closing include, among other things, the Stalking Horse Bidder being chosen as the Successful Bid and the granting of the Approval and Vesting Order by the Court.

29. It is in the best interests of the Company and its stakeholders that the Stalking Horse Agreement be approved. The Stalking Horse Agreement stimulates market interest and competition by confirming that there is already a committed buyer. It will also enhance the efficiency of the SISP by providing an objective minimum valuation of the Company and provide comfort to NBC that a reasonable transaction will result from the SISP.

30. The Proposal Trustee is supportive of the Stalking Horse Agreement.

**Administration Charge**

31. The Company seeks an Administration Charge over the Property of the Company

US INC_000201

in the amount of $75,000 to secure the fees and disbursements of counsel to the Company, the Proposal Trustee, and counsel to the Proposal Trustee incurred in connection with this NOI proceeding. The Administration Charge is proposed to rank in priority to all other security interests and charges.

32.    The Administration Charge is necessary as the Company requires the expertise, knowledge, and continued participation of its advisors and professionals during this NOI proceeding in order to complete a successful restructuring. Each of the beneficiaries of the Administration Charge has a distinct role in the Company's restructuring.

33.    The quantum of the Administration Charge is reasonable and appropriate.

34.    The Proposal Trustee supports the Administration Charge. NBC does not oppose the Administration Charge.

**Payment of Amounts Owing for Goods or Services**

35.    The Company relies on certain vendors that are necessary to preserve the Company as a going concern. Timely payment to such suppliers is critical to ensuring their continuous provision of services to the Company. These vendors cannot be replaced at a reasonable cost and in a timely manner.

36.    Given the necessity of certain suppliers, the SISP Approval Order authorizes the Company to pay, with the consent of the Proposal Trustee, amounts owing to suppliers for essential goods or services supplied to the Company prior to the date of the NOI proceeding, if in the opinion of the Company, such payment is

necessary to maintain the uninterrupted operations of the Business. For clarity, such payments will not exceed the cumulative maximum amount of $272,000.00 unless otherwise ordered by the Court.

**Other Grounds**

37.    The Company also seeks to abridge the time requirements for bringing this motion, pursuant to section 6 of the *Bankruptcy and Insolvency General Rules.*

38.    The *Rules of Civil Procedure,* RSO 1990, Reg 194, as amended, including without limitation, Rules 1.04, 2.01, 3.02, 37 and 39.

39.    The BIA including ss. 50.4, 64.2, and 65.13.

40.    The inherent jurisdiction of this Court.

41.    Such further and other grounds as counsel may advise and this Honourable Court may permit.

**THE FOLLOWING DOCUMENTARY EVIDENCE WILL BE USED ON THE HEARING OF THE MOTION:**

42.    The Affidavit of Russ Patterson, sworn March 11, 2024;

43.    The First Report of the Proposal Trustee, to be filed; and

44.    Such further and other evidence as counsel may advise and this Honourable Court may permit.

March 11, 2024

**RECONSTRUCT LLP**
Royal Bank Plaza, South Tower
200 Bay Street
Suite 2305, P.O. Box 120
Toronto, ON  M5J 2J3

**Sharon Kour** LSO No. 58328D
skour@reconllp.com
Tel: 416.613.8283

**Jessica Wuthmann** LSO No. 72442W
jwuthmann@reconllp.com
Tel: 416.613.8288

**Jared Rosenbaum** LSO No. 74769U
jrosenbaum@reconllp.com
Tel: 416.613.8284

Fax:  416.613.8290

**Lawyers for the Company**

**TO:**        **THE SERVICE LIST**

IN THE MATTER OF THE *BANKRUPTCY AND* **Court File No. BK-24-03044231-0033**
*INSOLVENCY ACT,* RSC 1985, c B-3, AS AMENDED   **Estate File No. 33-3044331**

**IN THE MATTER OF THE NOTICE OF INTENTION TO
MAKE A PROPOSAL OF MAXSOLD INCORPORATED OF THE
CITY OF KINGSTON, IN THE PROVINCE OF ONTARIO**

|  |  |
|---|---|
|  | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br><br>*Proceedings commenced at Ottawa* |
|  | **NOTICE OF MOTION**<br>(returnable March 14, 2024) |
|  | **RECONSTRUCT LLP**<br>Royal Bank Plaza, South Tower<br>200 Bay Street<br>Suite 2305, P.O. Box 120<br>Toronto, ON  M5J 2J3<br><br>**Sharon Kour** LSO No. 58328D<br>skour@reconllp.com<br>Tel: 416.613.8283<br><br>**Jessica Wuthmann** LSO No. 72442W<br>jwuthmann@reconllp.com<br>Tel: 416.613.8288<br><br>**Jared Rosenbaum** LSO No. 74769U<br>jrosenbaum@reconllp.com<br>Tel: 416.613.8284<br><br>Fax:  416.613.8290<br><br>**Lawyers for the Company** |

US INC_000205

# EXHIBIT 2

Bankruptcy Court File No. BK-24-03044331-0033
Estate File No.  33-044331

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(IN BANKRUPTCY AND INSOLVENCY)**

| THE HONOURABLE | ) | THURSDAY, THE 14TH |
| | ) | |
| JUSTICE KERSHMAN | ) | DAY OF MARCH, 2024 |

**IN THE MATTER OF THE *BANKRUPTCY AND
INSOLVENCY ACT,* RSC 1985, c B-3, AS AMENDED**

**AND IN THE MATTER OF THE NOTICE OF INTENTION TO MAKE A PROPOSAL
OF MAXSOLD INCORPORATED OF THE CITY OF KINGSTON IN THE PROVINCE
OF ONTARIO**

**ORDER**
**(Approval of SISP, Administration Charge, and Stay Extension)**

**THIS MOTION,** made by MaxSold Incorporated (the "**Company**") pursuant to the
*Bankruptcy and Insolvency Act,* R.S.C. 1985, c B-3, as amended (the "**BIA**") for an order,
among other things: (i) extending the time to file a proposal pursuant to s. 50.4(9) of the
BIA up to and including April 30, 2024; (ii) approving the sale and investment solicitation
process substantially in the form attached hereto as Schedule "A"; and (iii) granting an
Administration Charge (as defined herein), was heard on the 14th day of March, 2024.

**ON READING** the affidavit of Russ Patterson, sworn March 11, 2024 (the
"**Patterson Affidavit**"), and the exhibits thereto, and the First Report of Dodick Landau
Inc. in its capacity as proposal trustee of the Company (the "**Proposal Trustee**").

**ON HEARING** the submissions of counsel for the Company, the Proposal
Trustee, and such other counsel that were present, no one else appearing for any other
person although duly served:

2

**SERVICE**

1.    **THIS COURT ORDERS** that the time for service of the Notice of Motion and the materials filed, as set out in the Affidavit of Service of Levi Rivers sworn March 12, 2024, is hereby deemed adequate notice so that this Motion is properly returnable today and hereby dispenses with further service thereof.

**STAY OF PROCEEDINGS**

2.    **THIS COURT ORDERS** that pursuant to Section 50.4(9) of the BIA, the time for the Company to file a proposal with the Official Receiver be and is hereby extended to and including April 30, 2024 (the "**Stay Period**").

**APPROVAL OF SALE AND INVESTMENT SOLICITATION PROCESS**

3.    **THIS COURT ORDERS** that the terms of the Sale and Investment Solicitation Process ("**SISP**") attached as **Schedule "A"** to this Order (the "**SISP Terms**") are hereby approved and that the Proposal Trustee, with the assistance of the Company, is authorized and directed to immediately commence and perform the SISP in accordance with the SISP Terms.

4.    **THIS COURT ORDERS** that the Company and Proposal Trustee are hereby authorized, empowered and directed to take any and all actions as may be necessary or desirable to implement and carry out the SISP in accordance with the SISP Terms and the terms of this Order.

5.    **THIS COURT ORDERS** that the Company, the Proposal Trustee, and their respective affiliates, officers, directors, partners, employees, advisors, counsel and agents shall have no liability with respect to any and all losses, claims, damages or liability, of any nature or kind, to any person in connection with or as a result of performing their duties under the SISP, except to the extent such losses, claims, damages or liabilities result from the gross negligence or willful misconduct of the Company and the Proposal Trustee, as applicable, as determined by this Court.

6.    **THIS COURT ORDERS** that the Proposal Trustee or the Company may apply to

3

this Court for directions with respect to the SISP at any time during the term thereof.

7.    **THIS COURT ORDERS** that, pursuant to section 3(c) of the *Electronic Commerce Protection Regulations*, Reg. 81000-2-175 (SOR/DORS), the Proposal Trustee and the Company are authorized and permitted to send, or cause or permit to be sent, commercial electronic messages to an electronic address of prospective bidders or offerors and to their advisors, but only to the extent required to provide information with respect to the SISP in these proceedings.

8.    **THIS COURT ORDERS** that, pursuant to clause 7(3)(c) of the *Personal Information Protection and Electronic Documents Act*, S.C. 2000, c. 5, the Company and the Proposal Trustee are authorized and permitted to disclose personal information of identifiable individuals ("**Personal Information**") to prospective bidders or offerors and to their advisors, including human resources and payroll information, records pertaining to the Company's past and current employees, and information on specific customers, but only to the extent desired or required to negotiate or attempt to complete a transaction under the SISP. Each prospective bidder or offeror to whom any Personal Information is disclosed shall maintain and protect the privacy of such Personal Information with security safeguards appropriate to the sensitivity of the Personal Information and as may otherwise be required by applicable federal or provincial legislation. Each prospective bidder or offeror to whom any Personal Information is disclosed shall also limit the use of such Personal Information to its participation in the SISP.

**APPROVAL OF THE STALKING HORSE AGREEMENT**

9.    **THIS COURT ORDERS** that the Stalking Horse Asset Purchase Agreement between the Company and 1000822913 Ontario Inc. (the "**Stalking Horse Agreement**"), which is attached as Exhibit "E" to the Patterson Affidavit, is hereby approved, including the break fee and expense reimbursement provisions set out therein, and the Company is hereby authorized and directed to execute the Stalking Horse Agreement for purposes of constituting the "stalking horse" bid in respect of the SISP. For the avoidance of doubt, nothing contained in this Order approves the sale or the vesting of the assets as contemplated in the Stalking Horse Agreement and it is understood that this Court's

4

approval of any transaction will be considered on a subsequent motion made to this Court in accordance with the SISP.

**CONTINUATION OF SERVICES**

10.    **THIS COURT ORDERS** that during the Stay Period, all persons having oral or written agreements with the Company or statutory or regulatory mandates for the supply of goods and/or services are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Company, provided in each case that the normal prices or charges for such goods or services rendered after the date of this Order are paid by the Company in accordance with normal payment practices of the Company or other practices as may be agreed upon by the supplier or service provider and each of the Company and the Proposal Trustee, or as may be ordered by this Court.

11.    **THIS COURT ORDERS** that, except as otherwise provided to the contrary herein, the Company shall be entitled, but not required, to pay, with the written approval of the Proposal Trustee, amounts owing to its suppliers for goods or services actually supplied to the Company prior to February 15, 2024 if, in the opinion of the Company, such payment is necessary to maintain the uninterrupted operations of the business. For clarity, such payments will not exceed the cumulative maximum amount of $272,000.00 unless otherwise ordered by the Court.

**ADMINISTRATION CHARGE**

12.    **THIS COURT ORDERS** that the Proposal Trustee, counsel to Proposal Trustee and counsel to the Company shall be paid their reasonable fees and disbursements, in each case at their standard rates and charges, by the Company as part of the costs of these proceedings. The Company is hereby authorized and directed to pay the accounts of the Proposal Trustee, counsel for the Proposal Trustee and counsel for the Company as such accounts are rendered. The Proposal Trustee and its counsel shall be authorized to immediately apply any such payments made by the Company to their fees and disbursements and such amounts shall constitute advances against its remuneration and

5

disbursements when and as approved by this Court.

13.    **THIS COURT ORDERS** that, pursuant to Section 64.2 of the BIA, the Proposal Trustee, counsel to the Proposal Trustee, the Company's counsel, and in the event of a bankruptcy, the trustee in bankruptcy and its counsel, shall be entitled to the benefit of and are hereby granted a charge (the "**Administration Charge**") on all of the Company's current and future assets, undertakings and properties of every nature and kind whatsoever and wherever situate including all proceeds thereof (the "**Property**"), which charge shall not exceed an aggregate amount of $75,000, as security for their professional fees and disbursements incurred at the standard rates and charges of the Proposal Trustee, any trustee in bankruptcy, and such counsel, both before and after the making of this Order in respect of these proceedings.

14.    **THIS COURT ORDERS** that the filing, registration, or perfection of the Administration Charge shall not be required, and that the Administration Charge shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Administration Charge coming into existence, notwithstanding any such failure to file, register, record or perfect.

15.    **THIS COURT ORDERS** that the Administration Charge shall constitute a charge on the Property and shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, claims of secured creditors, statutory or otherwise (collectively, "**Encumbrances**") in favour of any individual, firm, corporation, governmental agency, or any other entities (each and any, a "**Person**").

16.    **THIS COURT ORDERS** that except as otherwise expressly provided for herein, or as may be approved by this Court, the Company shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with the Administration Charge, unless the Company obtains the prior written consent of the Proposal Trustee and the beneficiaries of the Administration Charge, or further Order of this Court.

17.    **THIS COURT ORDERS** that the Administration Charge shall not be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the

6

benefit of the Administration Charge (the "**Chargees**") shall not otherwise be limited or impaired in any way by: (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan documents, lease, sublease, offer to lease or other agreement (collectively, an "**Agreement**") which binds the Company, and notwithstanding any provision to the contrary in any Agreement:

a) the creation of the Administration Charge shall not create or be deemed to constitute a breach by the Company of any Agreement to which it is a party;

b) none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from the creation of the Administration Charge; and

c) the payments made by the Company pursuant to this Order, and the granting of the Administration Charge, do not and will not constitute preferences, fraudulent conveyances, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law.

18.    **THIS COURT ORDERS** that the Administration Charge created by this Order over leases of real property in Canada shall only be a charge in the Company's interests in such real property leases.

**GENERAL**

19.    **THIS COURT ORDERS** that this Order shall have full force and effect in all provinces and territories in Canada and as against all Persons against whom it may otherwise be enforced.

20.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal,

7

regulatory or administrative body having jurisdiction in Canada, the United States or in any other foreign jurisdiction to give effect to this Order and to assist the Company, the Proposal Trustee and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Company and the Proposal Trustee, as an officer of this Court, as may be necessary or desirable to recognize and give effect to this Order, to grant representative status to the Proposal Trustee in any foreign proceeding, or to assist the Company, the Proposal Trustee and their respective agents in carrying out the terms of this Order.

21.    **THIS COURT ORDERS** that each of the Company and the Proposal Trustee be at liberty and is hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order.

22.    **THIS COURT ORDERS** that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Time on the date of this Order.



8

**Schedule "A"**

**Sale Process**

**Sale and Investment Solicitation Process for MaxSold Incorporated**

1.    On February 15, 2024, MaxSold Incorporated (the "**Company**") filed a Notice of Intention to make a proposal (the "**NOI**") under the *Bankruptcy and Insolvency Act*, RSC 1985, c B-3, as amended (the "**BIA**"). Dodick Landau Inc. was appointed as proposal trustee of the Company (the "**Proposal Trustee**").

2.    On March 14, 2024, the Court granted an order (the "**SISP Approval Order**") that, among other things, authorizes the Company to implement a sale, refinancing and investment solicitation process ("**SISP**") in accordance with the terms hereof. Capitalized terms that are not otherwise defined herein have the meanings ascribed to them in the SISP Approval Order.

3.    This SISP sets out the manner in which: (a) binding bids for a sale or other strategic investment or transaction (a "**Transaction**") involving the business, assets and/or equity of the Company (the "**Opportunity**"), will be solicited from interested parties; (b) any such bids received will be addressed; (c) any Successful Bid (as defined below) will be selected; and (d) Court approval of a Successful Bid will be sought.

4.    The Company has received a Transaction bid from 100822913 Ontario Inc. (the "**Stalking Horse Bidder**") pursuant to a purchase agreement in substantially the form attached to the Affidavit of Russ Patterson dated March 11, 2024 (the "**Stalking Horse Agreement**") which constitutes a Qualified Bid for all purposes and at all times under this SISP (the "**Stalking Horse Bid**"). The Stalking Horse Bid shall serve as the "stalking horse" bid for the purposes of the SISP.

5.    Notwithstanding the receipt of the Stalking Horse Bid, all interested parties are encouraged to submit bids for a Transaction pursuant to this SISP.

6.    The SISP shall be conducted by the Proposal Trustee in consultation with the Company.

**Commencement of the Sale Process**

7.    The Proposal Trustee, will:

(a)    disseminate marketing materials and a copy of the SISP to potentially interested parties identified by the Company and the Proposal Trustee, or any other interested party who contacts the Company or the Proposal Trustee;

(b)    arrange for notice of the SISP (and such other relevant information as the Proposal Trustee considers appropriate) (the "**Notice**") to be published in Insolvency Insider and other such newspaper(s), publication(s) or journal(s) as the Proposal Trustee may consider appropriate;

(c)    solicit interest from interested parties with a view to such parties entering into non-disclosure agreements (each an "**NDA**"). Parties shall only obtain access to the virtual data room (the "**VDR**") and be permitted to participate in the SISP if they execute an NDA, in form and substance satisfactory to the Company and the Proposal Trustee; provided that those parties that have already executed an NDA

with the Company shall not be required to execute a further NDA provided that such prior NDA has not expired or will not expire during the SISP;

(d)    provide interested parties who have executed an NDA with access to the VDR containing diligence information in respect of the Opportunity; and

(e)    request that parties submit a binding offer that meets at least the requirements set forth in Section 9 below, as determined by the Proposal Trustee, in consultation with the Company (each a "**Qualified Bid**"), by the Qualified Bid Deadline (as defined below).

**Key Milestones**

8.    The SISP shall be conducted subject to the terms hereof and the following key milestones, each of which can be extended by up to seven (7) days by the Proposal Trustee, in consultation with the Company, or for a longer period with the consent of the Stalking Horse Bidder or by Court order:

(a)    the Court issues the SISP Approval Order approving the SISP by no later than March 14, 2024;

(b)    the Proposal Trustee, with the assistance of the Company, commences the solicitation process by no later than March 15, 2024, it being understood that the Company, in consultation with the Proposal Trustee, shall be at liberty to provide marketing materials and commence discussions with interested parties prior to such date as they consider appropriate;

(c)    deadline to submit a Qualified Bid – by no later than 5:00 p.m. (Toronto time) on April 15, 2024 (the "**Qualified Bid Deadline**");

(d)    date of the Auction (as defined below), if any – April 17, 2024;

(e)    deadline to select a Qualified Bid as the Successful Bid (as defined below) if no Auction is required – by no later than 5:00 p.m. (Toronto time) on April 17, 2024;

(f)    Approval Order (as defined below) hearing – by no later than April 25, 2024, subject to Court availability; and

(g)    closing of the Successful Bid – as soon thereafter as possible and, in any event, by no later than April 30, 2024 (the "**Outside Date**").

**Qualified Bid Requirements**

9.    In order to constitute a Qualified Bid, a bid must comply with the following:

(a)    it provides for cash consideration sufficient to pay in full on closing of the Transaction: (i) a minimum incremental amount of $10,000 in excess of the aggregate purchase price contemplated by the Stalking Horse Agreement; (ii) a break fee in the amount of $30,000; and (iii) an expense reimbursement fee in the amount of a maximum of $20,000 (inclusive of HST) as contemplated by the Stalking Horse Agreement (the "**Consideration Value**");

(b)     it includes an executed binding Transaction document(s) (a "**Definitive Agreement**"), including all exhibits and schedules contemplated thereby, together with a blackline against the Stalking Horse Agreement (which shall be posted by the Company in Word format in the VDR), describing the terms and conditions of the proposed Transaction, including any liabilities proposed to be assumed, the Consideration Value, the structure and financing of the proposed Transaction, and any regulatory or other third-party approvals required;

(c)     it contains the legal name and identity (including jurisdiction of existence) and contact information of the bidder, full disclosure of its direct and indirect principals, and the name(s) of its controlling equity holder(s);

(d)     it discloses any past or current connections or agreements with the Company, any known, potential, prospective bidder participating in the SISP, or any current or former officer, manager, director, member or known current or former equity security holder of any of the Company;

(e)     it includes or is accompanied by evidence satisfactory to the Company and Proposal Trustee of the financial ability of the bidder to consummate the Transaction;

(f)     it includes full details of the bidder's intended treatment of the Company's stakeholders under or in connection with the proposed bid, including the Company's secured creditors, unsecured creditors, employees, customers, suppliers, contractual counterparties and equity holders;

(g)     it is binding and irrevocable until the earlier of (i) the approval of the Successful Bid by the Court, and (ii) thirty (30) calendar days following the Qualified Bid Deadline, provided that if such bid is selected as a Successful Bid, it shall remain irrevocable until the closing of the Transaction contemplated by the Successful Bid;

(h)     it is not conditional upon any condition or contingency relating to due diligence, financing or an other material conditions precedent to the bidder's obligation to complete the transaction;

(i)     it does not include any request for or entitlement to any break fee, expense reimbursement or similar type of payment;

(j)     it includes an acknowledgment and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence prior to making its bid, and has relied solely upon its own independent review, investigation and inspection in making its bid; (ii) is not relying upon any written or oral statements, representations, promises, warranties, conditions, or guaranties whatsoever, whether express or implied (by operation of law or otherwise), made by any person or party, including the Company, the Proposal Trustee, and their respective employees, officers, directors, agents, advisors (including legal counsel) and other representatives, regarding the proposed Transaction, this SISP, or any information (or the completeness of any information) provided in connection therewith, except as expressly stated in the proposed Transaction documents; (iii) is making its bid on an "as is, where is" basis and without surviving representations or warranties of

any kind, nature, or description by the Company, the Proposal Trustee, or any of their respective employees, officers, directors, agents, advisors and other representatives, except to the extent set forth in the proposed Transaction documents; (iv) is bound by this SISP and the SISP Approval Order; and (v) is subject to the exclusive jurisdiction of the Court with respect to any disputes or other controversies arising under or in connection with the SISP or its bid;

(k)     it is accompanied by a cash deposit (the "**Deposit**") by wire transfer of immediately available funds in an amount equal to at least 10% of the Consideration Value, which Deposit shall be retained by the Proposal Trustee in a non-interest-bearing trust account in accordance with the terms hereof;

(l)     it includes a statement that the bidder will bear its own costs and expenses (including all legal and advisor fees) in connection with the proposed Transaction;

(m)     it contemplates closing of the Transaction by not later than the Outside Date;

(n)     it includes such other information as may be reasonably requested by the Company or Proposal Trustee; and

(o)     it is received by the Proposal Trustee, with a copy to the Company, by the Qualified Bid Deadline at the email addresses specified on Schedule "A" hereto.

**Assessment of the Bids and Selection of the Successful Bid**

10.     Following the Bid Deadline, the Proposal Trustee shall assess the bids received and determine whether such bids constitute a Qualified Bid (the "**Qualified Bidder**"). The Proposal Trustee may waive compliance with any one or more of the requirements specified in Section 9 above and deem a non-compliant bid to be a Qualified Bid.

11.     Following the receipt of any bid, the Proposal Trustee may seek clarification with respect to any of the terms or conditions of such bid and/or request one or more amendments to such bid prior to determining if such bid should be considered a Qualified Bid. Each Qualified Bidder shall comply with all reasonable requests for additional information by the Proposal Trustee regarding the Qualified Bidder or the Qualified Bid. Failure of a Qualified Bidder to comply with such requests for additional information will be a basis for the Proposal Trustee to reject a Qualified Bid.

12.     If one or more Qualified Bids has been received by the Proposal Trustee on or before the Qualified Bid Deadline, the Proposal Trustee, will consider and review each Qualified Bid based upon its consideration of the factors set out in Section 9 of the SISP and other factors including, among other things, (i) the amount of consideration being offered and, if applicable, the proposed form, composition and allocation of same, (ii) the value of any assumption of liabilities or release of liabilities not otherwise accounted for in (i) above, (iii) the likelihood of the bidder's ability to close a Transaction by not later than the Outside Date (including factors such as: the Transaction structure and execution risk; conditions to, timing of, and certainty of closing; termination provisions; availability of financing and financial wherewithal to meet all commitments; and required governmental or other approvals), (iv) the likelihood of the Court's approval of the Successful Bid, and (v) the benefit to the Company and its stakeholders, (collectively, the "**Consideration Factors**").

13.  In the event that the Proposal Trustee, in consultation with the Company, determines that there are no Qualified Bids, or that there are no Qualified Bids superior to the Stalking Horse Bid based on the Consideration Factors, the Proposal Trustee shall promptly proceed to declare the Stalking Horse Bid as the Successful Bid (as such term is defined below).

14.  If the Proposal Trustee receives one or more Qualified Bids which are superior to the Stalking Horse Bid based on the Consideration Factors, it shall proceed with an auction ("**Auction**") to select the highest or otherwise best bid in the SISP (the "**Successful Bid**" and the bidder making such bid, the "**Successful Bidder**"), and the Stalking Horse Bidder and each Qualified Bidder that submitted a Qualified Bid will be invited to attend the Auction. Each bidder invited to participate in the Auction will be deemed an "**Auction Bidder**".

15.  If an Auction is conducted, it shall be conducted in accordance with the following procedures:

(a)  The Auction shall be conducted at a time and date to be designated by the Proposal Trustee by electronic communication means (including videoconference, teleconference or such other reasonable means as the Proposal Trustee deems appropriate);

(b)  The identity of each Auction Bidder participating in the Auction will be disclosed, on a confidential basis, to each other Auction Bidder;

(c)  Except as otherwise permitted in the Proposal Trustee's discretion, only the Proposal Trustee, the Company and the Auction Bidders, and in each case their respective professional advisors, shall be entitled to attend the Auction. Each Auction Bidder shall appear at the Auction through a duly authorized representative that shall be designated by the Auction Bidder as its spokesperson;

(d)  Except as otherwise set forth herein, the Proposal Trustee may waive and/or employ and announce at the Auction additional procedures that the Proposal Trustee deems reasonable under the circumstances for conducting the Auction, provided that such procedures are (i) not inconsistent with this SISP, the Stalking Horse Agreement or any order of the Court granted in the within proceedings, (ii) disclosed to each Auction Bidder, and (iii) designed, in the Proposal Trustee's judgement, to result in the solicitation of the highest and best offer;

(e)  Not less than one (1) business day prior to the Auction, the Proposal Trustee shall: (i) identify the highest or otherwise best Qualified Bid received, which shall constitute the opening bid for purposes of the Auction (the "**Opening Bid**"), and (ii) provide the Definitive Agreement in respect of the Opening Bid to all Auction Bidders, on a confidential basis. Subsequent bidding at the Auction will continue in minimum increments of $25,000. Each Auction Bidder shall, if requested by the Proposal Trustee, provide evidence of its financial wherewithal and ability to consummate the Transaction at the increased consideration bid at the Auction;

(f)  Each Auction Bidder shall be given a reasonable opportunity to submit an overbid at the Auction to any then-existing overbids; and

(g) The Auction shall continue until the bidding has concluded and there is one remaining Auction Bidder that the Proposal Trustee has determined has submitted the highest or otherwise best bid of the Auction. At such time, the Auction shall be closed and the Auction Bidder that submitted the highest or otherwise best bid shall be designated by the Proposal Trustee as the Successful Bidder.

**Finalizing the Successful Bid and the Approval Order**

16. Following selection of the Successful Bid, if any, the Proposal Trustee, with the assistance of its advisors, and in consultation with the Company, shall seek to finalize any remaining necessary definitive agreement(s) with respect to the Successful Bid in accordance with the milestones set out in Section 8. Once the necessary definitive agreement(s) with respect to a Successful Bid have been finalized, as determined by the Company in consultation with the Proposal Trustee, the Company shall apply to the Court, on notice to the service list, for an order or orders approving such Successful Bid and/or the mechanics to authorize the Company to complete the Transaction contemplated thereby, as applicable, and authorizing the Company to: (a) enter into any and all necessary agreements and related documentation with respect to the Successful Bid; (b) undertake such other actions as may be necessary to give effect to such Successful Bid; and (c) implement the Transaction contemplated in such Successful Bid (each, an "**Approval Order**").

**Treatment of Deposits**

17. If a Successful Bid is selected and an Approval Order authorizing the consummation of the Transaction contemplated thereunder is granted by the Court, any Deposit paid in connection with such Successful Bid will be non-refundable and shall, upon closing of the Transaction contemplated by such Successful Bid, be applied to the cash consideration to be paid in connection with such Successful Bid or be dealt with as otherwise set out in the Definitive Agreement entered into in connection with such Successful Bid. Any Deposit delivered with a Qualified Bid that is not selected as a Successful Bid will be returned to the applicable bidder by the Proposal Trustee as soon as reasonably practicable (but not later than ten (10) business days) after the date upon which the Successful Bid is approved pursuant to an Approval Order or such earlier date as may be determined by the Proposal Trustee.

**General**

18. The Proposal Trustee, shall be permitted, in its discretion, to provide general updates and information in respect of the SISP to any other creditor (each a "**Creditor**") and its legal and financial advisors, if applicable, on a confidential basis, upon: (a) the irrevocable confirmation in writing from such Creditor that it will not submit any bid in the SISP; and (b) such Creditor executing a confidentiality agreement or undertaking with the Company in form and substance satisfactory to the Company and the Proposal Trustee.

19. Any amendments to this SISP may only be made by the Proposal Trustee, with the written consent of the Company, or by further order of the Court.

20. Unless otherwise set out herein, participants and prospective participants in this SISP shall not be permitted to receive any information that is not generally available to all participants relating to the number or identity of Qualified Bidders or the details of any

confidential discussions or correspondence between the Proposal Trustee and Qualified Bidders in connection with this SISP.

21.    The Proposal Trustee may, with the consent of the applicable participants, disclose such information to other bidders for the purpose of seeking to combine separate bids.

22.    At any time during this SISP, the Company or the Proposal Trustee may apply to the Court for advice and directions regarding the implementation and completion of this SISP.

**SCHEDULE "A": E-MAIL ADDRESSES FOR DELIVERY OF BIDS**

To counsel for the Company:

skour@reconllp.com; jwuthmann@reconllp.com

and with a copy to the Proposal Trustee and its counsel:

rahn.dodick@dodick.ca; pcho@weirfoulds.com

IN THE MATTER OF THE *BANKRUPTCY AND INSOLVENCY ACT,* RSC 1985, c B-3, AS AMENDED

IN THE MATTER OF THE NOTICE OF INTENTION TO MAKE A PROPOSAL OF MAXSOLD INC. OF THE CITY OF KINGSTON IN THE PROVINCE OF ONTARIO

Court File No. BK-24-03044331-0033
Estate File No. 33-3044331

*March 14/24*

*Order to go as signed*
*Motion returnon April 26/24 at 10.00AM.*

---

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**

*Proceedings commenced at Ottawa*

---

**MOTION RECORD**
(returnable March 14, 2024)

---

**RECONSTRUCT LLP**
Royal Bank Plaza, South Tower
200 Bay Street
Suite 2305, P.O. Box 120
Toronto, ON  M5J 2J3

**Sharon Kour** LSO No. 58328D
skour@reconllp.com
Tel: 416.613.8283

**Jessica Wuthmann** LSO No. 72442WS
jwuthmann@reconllp.com
Tel: 416.613.8288

**Jared Rosenbaum** LSO No. 74769U
jrosenbaum@reconllp.com
Tel:  416.613.8284

Fax:  416.613.8290

**Lawyers for the Applicant**

IN THE MATTER OF THE *BANKRUPTCY AND INSOLVENCY ACT,* RSC 1985, c B-3, AS AMENDED AND

Bankruptcy Court File No. BK-24-03044331-0033
Estate No. 33-3044331

AND IN THE MATTER OF THE NOTICE OF INTENTION TO MAKE A PROPOSAL OF MAXSOLD INCORPORATED OF THE CITY OF KINGSTON IN THE PROVINCE OF ONTARIO

---

***ONTARIO***
**SUPERIOR COURT OF JUSTICE
(IN BANKRUPTCY AND INSOLVENCY)**

Proceedings commenced at *Ottawa*

---

**ORDER
(Approval of SISP, Administration Charge and Stay Extension)**

---

**RECONSTRUCT LLP**
Royal Bank Plaza, South Tower
200 Bay Street
Suite 2305, P.O. Box 120
Toronto, ON  M5J 2J3

**Sharon Kour**  LSO No. 58328D
skour@reconllp.com
Tel: 416.613.8285

**Jessica Wuthmann** LSO No. 72442W
jwuthmann@reconllp.com
Tel: 416.613.8288

**Lawyers for MaxSold Incorporated**

# EXHIBIT 3

## STALKING HORSE ASSET PURCHASE AGREEMENT

This Agreement made this 11th day of March, 2024.

**BETWEEN:**

**MaxSold Incorporated, a corporation existing under the laws of Canada pursuant to the *Canada Business Corporations Act*, RSC 1985, c. C-44**

(the "**Company**")

- and -

**1000822913 Ontario Inc.**

(the "**Purchaser**")

**RECITALS:**

A.    The Company filed a Notice of Intention to Make a Proposal (the "**NOI**") under the *Bankruptcy and Insolvency Act*, RSC 1985, c B-3 (the "**BIA**") on February 15, 2024 (the "**Proposal Proceedings**"). Dodick Landau Inc. was appointed as proposal trustee of the Company (in such capacity, the "**Proposal Trustee**").

B.    The Company has determined it is in the best interest of the creditors and stakeholders of the Company to conduct a sale process ("**Sale Process**") pursuant to which potential offerors may submit offers to purchase the assets of the Company.

C.    The Company will bring a motion for an Order approving a stalking horse sale process (the "**Sale Process Order**") to authorize the Company, with the assistance of the Proposal Trustee conduct a Sale Process with respect to the Purchased Assets and to approve this agreement as the stalking horse bid.

D.    Subject to the conditions set forth herein, the Company has agreed to sell, convey, transfer and deliver to the Purchaser, and the Purchaser has agreed to purchase, acquire, assume and accept from the Company the Purchased Assets and Assumed Obligations, on the terms and subject to the conditions of this Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confirmed, the Parties agree as follows:

## **ARTICLE 1 – INTERPRETATION**

### 1.1.1   Definitions

In this Agreement and the Recitals herein, the following terms shall have the meanings set out below:

"**Acceptance Date**" means that date this this Agreement is executed by each of the parties hereto;

"**Affiliate**" means, with respect to any Person, any other Person who directly or indirectly controls, is controlled by, or is under direct or indirect common control with, such Person, and includes any Person in like relation to an Affiliate;

"**Agreement**" means this asset purchase agreement, including all schedules attached hereto and forming part hereof, and all written amendments and written restatements thereto from time to time;

"**Applicable Law**" means, with respect to any Person, property, transaction, event or other matter, all applicable laws, statutes, regulations, rules, by-laws, ordinances, protocols, regulatory policies, codes, guidelines, official directives, orders, rulings, judgments and decrees of any Governmental Authority;

"**Approval and Vesting Order**" means an order of the Court approving this Agreement and the transactions contemplated hereby and vesting, upon the delivery of the Trustee's  Certificate to the Purchaser, all right, title and interest of the Company to the Purchased Assets in the Purchaser, free and clear of all Claims and Encumbrances pursuant to the terms and conditions of this Agreement, substantially in the form of the model order approved by the "Ontario Commercial List Users Committee", and otherwise in form and substance acceptable to the Purchaser and the Company;

"**Article**" or "**Section**" or "**Schedule**" means the specified Article, Section of or Schedule to this Agreement and the expressions "hereof", "herein", "hereto", "hereunder", "hereby" and similar expressions refer to this Agreement and not to any particular Section or other portion of this Agreement;

"**Assignment Order**" means an order of the Court, in form and substance satisfactory to the Company, Proposal Trustee, and the Purchaser, acting reasonably, and obtained on a motion made on notice to such Persons as the Company and the Purchaser determine, to be sought by the Company, authorizing and approving the assignment to the Purchaser of any Assumed Contracts for which the consent, approval or waiver of the party or parties thereto (other than the Company) is required to assign such Assumed Contracts.

"**Assumed Contracts**" has the meaning ascribed thereto in Section 2.9;

"**Assumed Obligations**" has the meaning ascribed thereto in Section 2.7;

"**Bid Deadline**" has the meaning ascribed thereto in the Sale Procedures;

"**Books and Records**" means all of the books and records relating to the Purchased Assets, including, without limitation, all personnel files/records relating to all Transferred Employees and sales books, records, books of account, sales and purchase records, lists of suppliers and customers, business reports, projections and all other documents, surveys, plans, files, records, assessments, correspondence, and other data and information, financial or otherwise, including all data, information and databases stored on computer-related or other electronic media, excluding any of the foregoing as applicable to any Excluded Assets;

"**Break Fee**" has the meaning ascribed thereto in Section 4.1(b);

"**Business**" means the business carried on by the Company being the operating of an online platform to market and auction customer goods;

"**Business Day**" means a day on which banks are open for business in the City of Toronto, but does not include a Saturday, Sunday or statutory holiday recognized in the Province of Ontario;

"**Claims**" means any and all claims, demands, complaints, grievances, actions, applications, suits, causes of action, orders, charges, prosecutions or other similar processes, and "**Claim**" means any one of them;

"**Closing**" means the completion of the purchase and sale of the Purchased Assets, in accordance with the provisions of this Agreement;

"**Closing Date**" has the meaning ascribed thereto in Section 3.1 hereof;

"**Closing Time**" has the meaning ascribed thereto in Section 3.1 hereof;

"**Contracts**" means the right, title and interest of the Company to and in all pending and/or executory contracts, agreements, leases and arrangements Related to the Business to or by which any of the Company or any of the Purchased Assets or Business is bound or affected, and "Contract" means any one of them;

"**Court**" means the Ontario Superior Court of Justice, sitting in Bankruptcy;

"**Critical Supplier Pre-Filing Costs**" means the amounts owed by the Company to certain key suppliers, for pre-filing services, that the Company will pay, with the oversite of the Proposal Trustee, in the exact amounts identified in **Schedule "E".**

"**Critical Supplier Ongoing Costs**" means the amounts owed by the Company to the key suppliers identified in Schedule "E" from the time of filing the NOI to Closing.

"**Cure Costs**" means, save and except for the Critical Supplier Pre-Filing Costs and Critical Supplier Ongoing Costs, a payment required to cure any existing monetary defaults that exist on or before Closing in relation to an Assumed Contract, other than those arising by reason only of the Company's insolvency, the commencement of proceedings under this Proposal Proceeding, or the Company's failure to perform a non-monetary obligation;

"**Deposit**" has the meaning ascribed thereto in Section 2.3(a);

"**Effective Time**" means 12:01 a.m. on the Closing Date;

"**Employee**" means an individual who was formerly employed or engaged by the Company or, as at the Effective Time, is employed or engaged by the Company in connection with the Business, and "**Employees**" means every Employee;

"**Employee Liabilities**" means any and all Liabilities having priority over registered security interests (whether by statute, contract, common law or otherwise) owed to any of the Employees, or otherwise arising out of, or resulting from, the relationship between the Company and any of the Employees, including any Liability arising as a result of such party being deemed to be a successor employer, related employer or otherwise responsible or liable for payment of any amounts owing to, on behalf of, or in respect of, any of the Employees (including, but not limited to, the Transferred Employees), whether pursuant to the *Employment Standards Act, 2000* (Ontario), the *Pay Equity Act* (Ontario) or the *Workplace Safety and Insurance Act, 1997* (Ontario). Without limiting the foregoing, Employee Liabilities shall include:

   (a)   all salaries, wages, bonuses, commissions, vacation pay, public holiday pay and other compensation relating to the employment of the Employees (including accrued but unpaid vacation pay and any retroactive pay) and all Liabilities under employee benefit plans relating to employment of the Employees; and

   (b)   all termination pay, severance pay, damages in lieu of reasonable notice and other related Liabilities (under statute, contract, common law or otherwise) in respect of the termination and/or severance of employment of the Employees;

"**Encumbrances**" means any and all security interests (whether contractual, statutory, or otherwise), mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, leases, title retention agreements, reservations of ownership, demands, executions, levies, charges, options or other rights to acquire any interest in any assets, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise, and all contracts to create any of the foregoing, or encumbrances of any kind or character whatsoever, other than Permitted Encumbrances;

"**Equipment**" means all equipment and personal property owned by the Company wherever located, including all fixed and tangible assets, machinery, chattels, tooling, furniture, computer hardware and other tangible assets;

"**Excluded Assets**" means the following:

   (a)   all cash, bank balances, deposits, moneys in possession of banks and other depositories, term or time deposits and similar cash items of, owned or held by, or for the account of, the Company, excluding the Company's merchant account bearing Merchant ID no. MID 8032779756 with a reserve of $300,000 held with the Merchant holding reserve Elavon (the "**Merchant Account**"), which shall be transferred to the Purchaser as part of the Purchased Assets;

(b)    all cash, bank balances, deposits, moneys in possession of banks and other depositories, term or time deposits and similar cash items of, held by, or for the account of, the Company in trust for its clients in Royal Bank of Canada account 003 02382 1007095 (the "**Trust Account**");

(c)    the Purchase Price;

(d)    all minute books, share ledgers, corporate seals, capital stock, equity interests and stock certificates of the Company;

(e)    all policies of insurance or assurance (including directors' and officers' insurance and claims against insurance and insurance settlements), except for the right to receive the proceeds of insurance in respect of Purchased Assets and all Books and Records related thereto which shall not constitute Excluded Assets;

(f)    original Tax records and books and records pertaining thereto, minute books, corporate seals, taxpayer and other identification numbers and other documents relating to the organization, maintenance, and existence of the Company, in each case that do not relate to the Business or the Purchased Assets;

(g)    any Books and Records that the Company is required by Applicable Law to retain in its possession, provided however, the Purchaser shall be provided with copies of all such Books and Records that pertain to the Business; and

(h)    any other assets that the Purchaser elects to exclude in writing prior to Closing pursuant to Section 2.5.

"**Excluded Liabilities**" has the meaning ascribed thereto in Section 2.8;

"**Expense Reimbursement Fee**" has the meaning ascribed thereto in Section 4.1(b);

"**Governmental Authorities**" means governments, regulatory authorities, governmental departments, agencies, commissions, bureaus, officials, ministers, Crown corporations, courts, bodies, boards, tribunals or dispute settlement panels or other law or regulation-making organizations or entities: (a) having or purporting to have jurisdiction on behalf of any nation, province, territory, state or other geographic or political subdivision thereof; or (b) exercising, or entitled or purporting to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power, and "**Governmental Authority**" means any one of them;

"**HST**" means all of the harmonized sales tax imposed under Part IX of the *Excise Tax Act* (Canada);

"**Intellectual Property**" means any or all of the following items of the Company, wherever located, domestic or foreign: all patents and patent rights, trademarks and trademark rights, trade names and trade name rights, service marks and service mark rights, service names and service name rights, copyrights and copyright rights, brand names, trade dress, business and product names, domain names, corporate names, logos, slogans, trade secrets, inventions, processes,

formulae, industrial models, designs, specifications, data, technology, methodologies, computer programs (including all source code), confidential and proprietary information, whether or not subject to statutory registration, all related technical information, manufacturing, engineering and technical drawings, know how, all pending applications for and registrations of patents, trademarks, service marks and copyrights, including all obligations of third parties relating to the protection of the foregoing, the goodwill associated with the foregoing, and the right to sue for past payment, if any, in connection with any of the foregoing, and all documents, disks and other media on which any of the foregoing is stored, including without limitation;

**"Inventory and Supplies"** means all items that are held by the Company for sale, license, rental, lease or other distribution (and includes all supplies used by the Company in the operation of the Business) on hand at Closing;

"**Liability**" means any debt, loss, damage, adverse claim, fines, penalties, liability or obligation (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, and whether in or under statute, contract, tort, strict liability or otherwise), and includes all costs and expenses relating thereto (including all fees, disbursements and expenses of legal counsel, experts, engineers and consultants and costs of investigation), and, "**Liabilities**" means the plural thereof;

"**Licences and Permits**" means all licences, permits, filings, certificates, authorizations, approvals or indicia of authority Related to the Business or the Purchased Assets or necessary for the operation or use of the Purchased Assets;

"**Ordinary Course**" means, with respect to an action taken or omitted to be taken by a Person, that such action is reasonably practicable and generally consistent with the recent past practices of the Person having specific regard to the recent circumstances leading up to and including the transactions contemplated by this Agreement and, as applicable, subject to any Orders in the Proposal Proceeding;

"**Outside Date**" means April 30, 2024;

"**Parties**" means the Company and the Purchaser collectively, and "**Party**" means any one of them;

"**Permitted Encumbrances**" means those Encumbrances listed in **Schedule "A"** attached hereto;

"**Person**" is to be broadly interpreted and includes an individual, a corporation, a partnership, a trust, an unincorporated organization, the government of a country or any political subdivision thereof, or any agency or department of any such government, and the executors, administrators or other legal representatives of an individual in such capacity;

"**Prepaid Amounts**" means all prepayments, prepaid charges, deposits, security deposits, sums and fees Related to the Business or in respect of the Purchased Assets;

"**Proposal Trustee**" has the meaning given to that term in Recital A and shall include Dodick Landau Inc. in its capacity as trustee in bankruptcy of the Company;

"**Purchase Price**" has the meaning ascribed thereto in Section 2.2;

"**Purchased Assets**" means all of the Company's right, title and interest in all of its assets, properties and undertakings, other than the Excluded Assets, including but not limited to, the following assets:

    (a)  Assumed Contracts;

    (b)  Books and Records;

    (c)  Claims of the Company;

    (d)  Equipment;

    (e)  The Merchant Account;

    (f)  Intellectual Property, including but not limited to trademarks, copyrights, trade secrets, patents;

    (g)  All software owned by the Company including but not limited to application software, executables, databases, scripts, data backups, system software, software platforms, all related source code, object code and other code or data in any form or stage of development;

    (h)  All online access keys, accounts, admin privileges, passwords, certificates, authorities and access permissions;

    (i)  All configurations, architectural diagrams, deployment guides, setup documentation necessary for the deployment, operation and maintenance of the software and technology assets;

    (j)  Documentation related to all technology and software, including but not limited to API documentation, code comments, technical specifications and any other documents essential to the ongoing use, development and maintenance of the software assets;

    (k)  Any licenses, permissions, and authorizations necessary for the use, modification, and distribution of any third-party software or technology integrated with or used in conjunction with the software and systems of the Company, to the extent such licenses, permissions, and authorizations are transferable to the Purchaser;

    (l)  Any digital assets related to the software business, including but not limited to domain names, websites, web applications, cloud accounts, telephone and facsimile numbers, email addresses, social media accounts and the content therein, along with any associated credentials or access keys;

    (m)  Inventory and Supplies;

    (n)  Licenses and Permits;

    (o)  Prepaid Amounts;

(p) Receivables;

(q) Any and all right to receive auction proceeds from auctions that have not been completed on or before the date of Closing, including any deposits held in relation thereto;

(r) All personal information, within the meaning of applicable privacy legislation, to the extent such information can be transferred to the Purchaser without the consent of any individual which has not been obtained (it being agreed that the Company has no obligation to seek such consent);

(s) All rights and interests under or pursuant to all warranties, representations and guarantees, express implied or otherwise, of or made by suppliers or others in connection with the Purchased Assets or otherwise Related to the Business;

(t) All goodwill associated with the Business, including, without limitation, the goodwill associated all names previously and currently operating under including but not limited to "MaxSold" and any variation thereof including the right of the Purchaser to hold itself out as operating the Business as the successor to the Company; and

(u) all other property, assets and undertakings of the Company used in or Related to the Business of whatsoever nature or kind.

"**Qualified Bid**" has the meaning ascribed thereto in the Sale Procedures;

"**Receivables**" means the right, title and interest of the Company to all accounts receivable, bills receivable, trade accounts, book debts, insurance claims, and choses-in-action, now or hereafter due or owing to the Company, Related to the Business or the Purchased Assets, together with any unpaid interest accrued on such items and any security or collateral for such items, including recoverable deposits, attributable to the period prior to Closing, and without limiting the generality of the foregoing, includes all tax refunds and government subsidies. For clarity, "Receivables" shall not include revenue received by the Company in respect of auctions that are completed on or before the Closing Date;

"**Related to the Business**" means, directly or indirectly, used in, arising from, or relating in any manner to the Business;

"**Sale Procedures**" means the sale and solicitation process approved by the Sale Process Order and on terms substantially similar to those attached as **Schedule "B"** hereto;

"**Sale Process Order**" means an order of the Court approving the execution of this Agreement as a "stalking horse" asset purchase agreement and the Sale Procedures, in form and content acceptable to the Purchaser and the Company;

"**Stalking Horse Bid**" has the meaning ascribed thereto in Section 4.1(a);

"**Taxes**" means all taxes, charges, fees, levies, imposts and other assessments, including all income, sales, use, goods and services, harmonized, value added, capital, capital gains, alternative, net

worth, transfer, profits, withholding, payroll, employer health, excise, franchise, real property and personal property taxes, and any other taxes, customs duties, fees, assessments or similar charges in the nature of a tax, including, Canada Pension Plan and provincial pension plan contributions (or equivalent in the jurisdiction where the Purchased Assets may be located), employment insurance payments and workers compensation premiums, together with any instalments with respect thereto, and any interest, fines and penalties, imposed by any Governmental Authority, and whether disputed or not;

"**Transaction**" means the transaction of purchase and sale and assignment and assumption contemplated by this Agreement;

"**Transferred Employees**" means Employees who have accepted an offer of employment from the Purchaser as of the Closing;

"**Trustee's Certificate**" means a certificate from the Proposal Trustee confirming the Closing of the transactions contemplated hereby, substantially in the form attached to the Approval and Vesting Order; and

"**Winning Bidder**" has the meaning ascribed thereto in Section 4.1(c).

### 1.1.2   Section References

Unless the context otherwise, references in this Agreement to Sections are to Sections of this Agreement.

### 1.1.3   Schedules

The following Schedules shall form an integral part of this Agreement:

> **Schedule "A"** Permitted Encumbrances
> **Schedule "B"** Sale Procedures
> **Schedule "C"** Purchased Assets List
> **Schedule "D"** Assumed Contracts
> **Schedule "E"** Critical Supplier Pre-Filing Costs

## <u>ARTICLE 2 – PURCHASE AND SALE</u>

### 2.1    Purchase and Sale of Purchased Assets

At the Closing Time, subject to the terms and conditions of this Agreement and the Approval and Vesting Order, the Company shall sell, and the Purchaser shall purchase the Purchased Assets and the Purchaser shall assume the Assumed Obligations.

The Purchaser and the Company shall mutually agree upon and finalize a detailed list of the Purchased Assets to be included in **Schedule "C"** hereto (the "**Purchased Assets List**"), which shall be attached hereto and made a part hereof, no later than five (5) business days prior to the

Approval and Vesting Order. Notwithstanding the Purchaser shall retain its right to add assets to the Excluded Assets up until close.

**2.2    Purchase Price**

In consideration of the sale, assignment, transfer and conveyance of the Purchased Assets to the Purchaser, the purchase price payable by the Purchaser to the Company for the Purchased Assets shall be the cash sum of Seven Hundred and Fifty Thousand ($750,000.00) (the "**Purchase Price**") plus the cash sum required to pay the Cure Costs for all of the Assumed Contracts, if any.

In the event that the Merchant Account or the funds therein are determined by the Purchaser, in its sole and absolute discretion, to be non-transferable to the Purchaser, the Purchaser will have the option, but not the obligation, by notice in writing to the Company and the Proposal Trustee prior to Closing to reduce the Purchase Price by $300,000.00, and in such case, the Merchant Account shall form part of the Excluded Assets.

**2.3    Satisfaction of Purchase Price**

The Purchaser shall satisfy the Purchase Price by payment to the Proposal Trustee by way of a certified cheque, wire transfer or bank draft as follows:

(a)    an amount representing 10% of the Purchase Price will be paid by the Purchaser within 2 business days following the Acceptance Date. This payment will serve as a deposit (the "**Deposit**") to be held by the Proposal Trustee in trust until the Closing and will be credited toward the Purchase Price upon Closing; and

(b)    the balance on Closing.

The Proposal Trustee agrees to cause the Deposit to be placed into a non-interest-bearing account or certificate of deposit.

The Purchaser will pay the Cure Costs for all of the Assumed Contracts by electronic wire transfer to each counterparty to the Assumed Contract on the Closing Date. The wire transfer information shall be provided by the Company to the Purchaser at least three (3) days prior to Closing.

**2.4    Allocation of Purchase Price**

The Purchase Price shall be allocated among the Purchased Assets in the manner agreed to by the Purchaser and the Company (each acting reasonably) prior to the Closing Date, provided that failure of the Parties to agree upon an allocation shall not result in the termination of this Agreement but rather shall result in the nullity of the application of this section of the Agreement such that each Party shall be free to make its own reasonable allocation.

**2.5    Excluded Assets**

Save and except as otherwise expressly set out herein, the Purchaser may, at its option, exclude any of the Purchased Assets from the transaction contemplated hereby at any time prior to Closing upon delivery of prior written notice to the Company, whereupon such assets shall be deemed to form part of the Excluded Assets, provided, however, that there shall be no reduction in the Purchase Price as a result of such exclusion. Any changes, including exclusions, to the list of Purchased Assets agreed upon by the Parties shall be promptly updated in Schedule "C", with the final version to be attached to this Agreement prior to Closing.

**2.6     Taxes and Elections**

(a)     The Purchaser shall be responsible for the payment on Closing of all Taxes that are required to be paid or remitted in connection with the consummation of the transactions contemplated in this Agreement.

(b)     If applicable, at the Closing, the Receiver and the Purchaser shall jointly execute an election under Section 167 of the *Excise Tax Act* (Canada) to seek to cause the sale of the Purchased Assets to take place on an HST-free basis under Part IX of the *Excise Tax Act* (Canada) and the Purchaser shall file such election with its HST return for the applicable reporting period in which the sale of the Purchased Assets takes place.

(c)     If applicable, at the Closing, the Company and the Purchaser shall execute jointly an election in prescribed form under Section 22 of the *Income Tax Act* (Canada) in respect of the Receivables and shall file such election with their respective tax returns for their respective taxation years that include the Closing Date.

(d)     The Purchaser agrees to indemnify and save the Company harmless from and against all claims and demands for payment of all Taxes payable by Purchaser in connection with the purchase of the Purchased Assets, including penalties and interest thereon and any liability or costs incurred as a result of any failure to pay such Taxes when due.

(e)     The Purchaser shall, at all times, indemnify and hold harmless the Company's directors, officers, and employees, and the Proposal Trustee against and in respect of any and all amounts assessed by any taxing authority in the event that any Tax exemption claimed by the Purchaser was inapplicable, invalid, or not properly made, including all taxes, interest, and penalties assessed and including all reasonable legal and professional fees incurred by the Company's directors, officers, and employees as a consequence of or in relation to any such assessment. Notwithstanding anything else in this Agreement, this indemnity shall survive the Closing Date in perpetuity and shall not be subject to any caps or restrictions.

**2.7     Assumed Obligations**

At Closing, the Purchaser shall assume and be liable for the following (collectively, the **"Assumed Obligations"**):

(a)     any Liabilities in connection with the Assumed Contracts as set out in Section 2.9;

(b)     all Liabilities and Claims arising or accruing from the use of the Purchased Assets from and after the Closing; and

(c)     all Permitted Encumbrances.

**2.8      Excluded Liabilities**

Except for the Assumed Obligations, the Purchaser is not assuming, and shall not be deemed to have assumed, any Liabilities of the Company not specifically assumed (collectively, the **"Excluded Liabilities"**), which Excluded Liabilities include, but are not limited to, the following:

(a)      all Liabilities and Claims arising or accruing from the use of the Purchased Assets prior to the Closing;

(b)      all Employee Liabilities that arise out of, or result from the employment or engagement by the Company (or any predecessor to the Company) of any of the Employees (including the Transferred Employees) (unless otherwise imposed by law) and/or the termination or severance of such engagement or employment; and

(c)      all Encumbrances, other than Permitted Encumbrances.

**2.9    Assumed Contracts**

The Purchaser shall assume the Contracts which are listed and described in **Schedule "D"** (which Contracts shall be referred to as the **"Assumed Contracts"** and of which any one of them is an **"Assumed Contract"**). Save and except as hereinafter set out, the Purchaser shall be able to add or remove Contracts from Schedule "D" up until at least five (5) Business Days prior to the hearing date for the Approval and Vesting Order, by giving notice to the Company and Proposal Trustee in writing. This Agreement and any document delivered under this Agreement will not constitute an assignment or an attempted assignment of any Contract contemplated to be assigned to the Purchaser under this Agreement which is not assignable without the consent of a third Person if such consent has not been obtained and such assignment or attempted assignment would constitute a breach of such Contract, in which event, the provisions of Section 2.10 hereof shall govern.

**2.10    Assignment of Assumed Contracts**

The Company, in cooperation with the Purchaser, shall take such reasonable steps as necessary to obtain the consent of the counterparties for the assignment of the Assumed Contracts. If necessary, such steps shall include the Company making reasonable efforts to obtain an Assignment Order.

## ARTICLE 3 – CLOSING ARRANGEMENTS

**3.1    Closing**

Closing shall take place at 10:00 a.m. (Toronto, Ontario time) (the "**Closing Time**") on the third business day following the granting of the Approval and Vesting Order or such other date as the Parties may agree to in writing, but in any event shall not be later than the Outside Date, and if such date falls on a holiday or weekend, it shall be the next Business Day (the "**Closing Date**").

The Closing shall take place by electronic transmission of documents, or at such other time and location, and in such other manner, as the Parties may agree upon in writing.

**3.2    Tender**

Except as otherwise set out herein, any tender of documents or money under this Agreement may be made upon the Parties or their respective counsel and money may be tendered by official bank draft drawn upon a Canadian chartered bank, by negotiable cheque payable in Canadian funds and certified by a Canadian chartered bank or trust company, or by wire transfer of immediately available funds to the account specified by that Party.

**3.3    Company's Closing Deliveries**

At the Closing, the Company shall deliver to the Purchaser the following, each in form and substance satisfactory to the Purchaser, acting reasonably:

(a)    a copy of the Approval and Vesting Order, issued by the Court;

(b)    a copy of the Assignment Order, if any;

(c)    the Books and Records;

(d)    if applicable, the elections referred to in Section 2.6;

(e)    a general conveyance with respect to the Purchased Assets;

(f)    any assignments, transfers or bills of sale as may be requested by the Purchaser to effect the transfer of the Intellectual Property;

(g)    a bring down certificate dated as of the Closing Date, confirming that all of the representations and warranties of the Company contained in this Agreement are true and correct as of the Closing Date, with the same effect as though made on and as of the Closing Date; and

(h)    such further and other documentation as is referred to in this Agreement or as the Purchaser or its lawyers may reasonably require to complete the transactions provided for in this Agreement.

**3.4    Purchaser's Closing Deliveries**

At the Closing, the Purchaser shall deliver to the Company the following, each in form and substance satisfactory to the Company, acting reasonably:

(a)    the balance of the Purchase Price;

(b)    a bring down certificate dated as of the Closing Date, confirming that all of the representations and warranties of the Purchaser contained in this Agreement are true

and correct as of the Closing Date, with the same effect as though made on and as of the Closing Date;

(c)    a general conveyance with respect to the Purchased Assets;

(d)    a certified resolution of the Purchaser authorizing the Agreement and the purchase of the Purchased Assets;

(e)    a certificate of status of the Purchaser;

(f)    if applicable, the elections referred to in Section 2.6; and

(g)    such further and other documentation as is referred to in this Agreement or as the Company or its lawyers may reasonably require to complete the transactions provided for in this Agreement.

## 3.5    Risk

The Purchased Assets, including all software, intellectual property rights, operational functionalities, and associated services, shall remain at the risk of the Company until the Closing. From and after Closing, such risks shall be assumed by the Purchaser.

In the event that any of the Purchased Assets are subject to material impairment prior to Closing, including but not limited to operational disruptions exceeding 48 consecutive hours, intellectual property disputes that call into question the ownership and the ability to operate the service, or any other circumstances that significantly impair the business's value or operations, the Company/Seller shall notify the Purchaser in writing within twenty-four (24) hours upon becoming aware of such material impairment.

In the event of such material impairment to the Purchased Assets prior to Closing, the Purchaser shall, at its sole and absolute discretion, have the right to elect to terminate this Agreement by providing written notice to the Company, upon which, the Parties shall each be released from all obligations under this Agreement except that the Company shall promptly return the Deposit to the Purchaser without interest, subject to further written agreement of the Parties.

For purposes of this Agreement, 'material impairment' shall include any event or condition that significantly disrupts the functionality, marketability, or the Company's rights and obligations in respect of the Purchased Assets, rendering the business's continuous operation or the value of the Purchased Assets substantially compromised.

## 3.6    Conduct Prior to Closing

Prior to the Closing, the Company shall conduct the Business in the Ordinary Course, except to the extent required to allow the Company to comply with its obligations under this Agreement or as may be permitted with the written consent of the Purchaser (such consent not to be unreasonably conditioned, withheld, or delayed), subject in all cases to any Court orders granted

in the Proposal Proceedings. Without limiting the generality of, but subject to, the foregoing, the Company shall:

(a) maintain, preserve and protect the Purchased Assets in the condition in which they exist on the date hereof, other than ordinary wear and tear and other than replacements, dispositions, modifications or maintenance in the Ordinary Course;

(b) use reasonable commercial efforts in the circumstances to preserve the goodwill of the Company and maintain satisfactory relationships with suppliers and customers;

(c) not terminate any Employees without the prior written consent of the Purchaser, such consent not to be unreasonably withheld;

(d) not convey, encumber or otherwise dispose of any of the Purchased Assets except in the Ordinary Course;

(e) not amend or modify any Assumed Contract in any material respect, waive any material rights in respect of any Assigned Agreement or disclaim any Assigned Agreement;

(f) not enter into any material contract or agreement in respect of the Business without the prior written consent of the Purchaser, such consent not to be unreasonably withheld;

(g) use reasonable commercial efforts to maintain any insurance currently in effect respecting the Purchased Assets until Closing; and

(h) comply in all material respects with all Applicable Laws relating to the conduct of the Business and the ownership and use of the Purchased Assets.

## 3.7 Delivery of the Trustee 's Certificate

When the conditions set out in Article 5 below have been satisfied and/or waived by the Vendor and/or the Purchaser, as applicable, the Vendor and the Purchaser or their respective counsel will each deliver to the Proposal Trustee confirmation that such conditions of Closing, as applicable, have been satisfied and/or waived (the "**Conditions Certificates**"). Upon receipt of the Conditions Certificates, the Proposal Trustee shall: (a) issue the Trustee's Certificate to the Purchaser and the Vendor, at which time the Closing will be deemed to have occurred; and (b) file a copy of the Trustee's Certificate with the Court and provide a copy of same to the service list in the Proposal Proceedings. In the case of (a) and (b), the Proposal Trustee will be relying exclusively on the Conditions Certificates without any obligation whatsoever to verify the satisfaction or waiver of the applicable conditions. The Parties hereby acknowledge and agree that the Proposal Trustee shall have no liability to the Parties in connection with the Trustee's Certificate or otherwise in connection with this Agreement.

## ARTICLE 4 – SALE PROCEDURE

**4.1     Sale Procedures**

(a)     The Company shall bring a motion on or before March 14, 2024, for approval of the Sale Procedures. The Sale Process Order shall recognize the Purchase Price as a baseline or "stalking horse bid" (the "**Stalking Horse Bid**"), and shall also provide for a marketing process of the Purchased Assets by the Company with the potential for competitive bidding. The Purchaser acknowledges and agrees that the aforementioned process is in contemplation of determining whether a superior bid can be obtained for the Purchased Assets;

(b)     In consideration for the Purchaser's expenditure of time and money and agreement to act as the initial bidder through the Stalking Horse Bid, and the preparation of this Agreement, and subject to Court approval, the Purchaser shall be entitled to a break fee of $30,000  (the **"Break Fee"**) and an expense reimbursement fee in the amount of a maximum of $20,000 (inclusive of HST, if any) (the **"Expense Reimbursement Fee"**) payable by the Company to the Purchaser only in the event that a successful bid other than the Stalking Horse Bid is accepted by the Company, approved by the Court and completed. The payment of the foregoing amounts shall be approved in the Sale Process Order and shall be payable to the Purchaser out of the sale proceeds derived from and upon completion of the winning bid. The Parties acknowledge and agree that the foregoing amounts represent a fair and reasonable estimate of the expenses that will be incurred by the Purchaser as a result of preparing for and entering into this Agreement, and is not intended to be punitive in nature nor to discourage competitive bidding for the Purchased Assets. For certainty, the Break Fee and the Expense Reimbursement Fee do not form part of the Purchase Price.

(c)     Notwithstanding anything contained herein to the contrary, in the event that the Purchaser is not the selected winning bid in the Sale Process (the "**Winning Bidder**"), then upon the closing of a transaction with such Winning Bidder, this Agreement shall be terminated and the Purchaser shall be entitled to the Break Fee, the Expense Reimbursement Fee and a return of the Deposit and neither Party hereto shall have any further liability or obligation, except as expressly provided for in this Agreement.

(d)     If no Qualified Bids other than the Stalking Horse Bid are received by the Bid Deadline, the Company shall forthwith bring a motion to the Court to obtain the Approval and Vesting Order and, if granted, shall proceed with completing the transaction contemplated hereby forthwith.

**4.2     Approval and Vesting Order**

The Approval and Vesting Order shall approve this Agreement and the transactions contemplated hereby and vest, upon the delivery of the Trustee's Certificate to the Purchaser, all right, title and interest of the Company in and to the Purchased Assets to the Purchaser, or as it may direct, free and clear of all Claims and Encumbrances pursuant to the terms and conditions of this Agreement, other than Permitted Encumbrances.

## ARTICLE 5 – CONDITIONS PRECEDENT

**5.1    Conditions Precedent of the Purchaser**

The Purchaser shall not be obliged to complete the transactions contemplated by this Agreement unless, at or before the Closing Time, each of the following conditions has been satisfied, it being understood that the following conditions are included for the exclusive benefit of the Purchaser and may be waived, in whole or in part, in writing, by the Purchaser at any time; and the Company agrees with the Purchaser to take all such commercially reasonable actions, steps and proceedings within its reasonable control as may be necessary to ensure that the following conditions are fulfilled at or before the Closing Time:

(a)    *Execution of this Agreement*. The Company shall deliver a fully executed copy of this Agreement to the Purchaser on or before March 8, 2024;

(b)    *Representations and Warranties*. The representations and warranties of the Company in Section 6.1 shall be true and correct at the Closing Time;

(c)    *Sale Process Order*. The Sale Process Order shall have been issued by the Court, shall not be stayed, varied, superseded or under appeal, and the applicable time for appealing the Sale Process Order shall have expired;

(d)    *Winning Bidder*. The Company shall have determined in accordance with the Sale Procedure that this Agreement is a successful bid and the Purchaser is the Winning Bidder;

(e)    *Approval and Vesting Order Final*: The Approval and Vesting Order shall have been issued by the Court, shall not be stayed, varied, superseded or under appeal, and the applicable time for appealing the Approval and Vesting Order shall have expired if the hearing for the Approval and Vesting Order was contested;

(f)    *Assignment of Assumed Contracts:* The Company shall have the authorization to assign all of the Assumed Contracts whether by the terms of the Assumed Contracts, the consent, approval, waiver of the counterparty to the Assumed Contract, or the Assignment Order;

(g)    *Company's Compliance*. The Company shall have performed and complied with all of the terms and conditions in this Agreement on its part to be performed or complied with at or before the Closing Time and shall have executed and delivered to the Purchaser at the Closing Time all the deliveries contemplated in Section 3.3;

(h)    *Post-Filing Obligations*. All post-filing obligations of the Company have been paid, including but not limited to, the Critical Supplier Ongoing Costs prior to Closing; and

(i)    *No Legal Action:* No action or proceeding a will be pending or threatened by any Person (other than the Purchaser), and there is no order or notice from any Person to (or seeking to) enjoin, restrict or prohibit, on a temporary or permanent basis any of the transactions contemplated by this Agreement or imposing any terms or conditions on the transactions contemplated by this Agreement, the Business or the business of the Purchaser or otherwise limiting the right of the Purchaser to conduct the Business after Closing on substantially the basis as heretofore operated.

## 5.2    Conditions Precedent of the Company

The Company shall not be obliged to complete the transactions contemplated by this Agreement unless, at or before the Closing Time, each of the following conditions has been satisfied, it being understood that the following conditions are included for the exclusive benefit of the Company, and may be waived, in whole or in part, in writing by the Company at any time; and the Purchaser agrees with the Company to take all such commercially reasonable actions, steps and proceedings within its reasonable control as may be necessary to ensure that the following conditions are fulfilled at or before the Closing Time:

(a)    *Purchaser's Compliance*. The Purchaser shall have performed and complied with all of the terms and conditions in this Agreement on its part to be to be performed by or complied with at or before the Closing Time and shall have executed and delivered to the Company at the Closing Time all the deliveries contemplated in Section 3.4 in this Agreement;

(b)    *Sale Process Order*. The Sale Process Order shall have been issued by the Court, shall not be stayed, varied, superseded or under appeal, and the applicable time for appealing the Sale Procedure Order shall have expired;

(c)    *Approval and Vesting Order Final*: The Approval and Vesting Order shall have been issued by the Court, shall not be stayed, varied, superseded or under appeal, and the applicable time for appealing the Approval and Vesting Order shall have expired if the hearing for the Approval and Vesting Order was contested; and

(d)    *Representations and Warranties*. The representations and warranties of the Purchaser in Section 6.2 shall be true and correct at the Closing Time.

## 5.3    Non-Satisfaction of Conditions

If any condition precedent set out in Section 5.1 or 5.2 is not satisfied or performed at or before the Closing Time, the Party for whose benefit the condition precedent is inserted may:

(a)    waive compliance with the condition, in whole or in part, in its sole discretion by written notice to the other Party (but may not claim for any matter waived) and

without prejudice to any of its rights of termination in the event of non-fulfilment of any other condition in whole or in part; or

(b)   elect on written notice to the other Party to terminate this Agreement, in which event each Party shall be released from all obligations under this Agreement. Notwithstanding the foregoing, the Proposal Trustee shall retain the Purchaser's deposit if the Purchaser fails to perform or satisfy the condition precedents in Subsection 5.2(a) and/or 5.2(d). If the Company fails to perform its condition precedents in Section 5.1, the Proposal Trustee shall promptly return the Deposit to the Purchaser.

## ARTICLE 6 – REPRESENTATIONS AND WARRANTIES

### 6.1    Representations and Warranties of the Company

As a material inducement to the Purchaser entering into this Agreement and completing the transactions contemplated by this Agreement and acknowledging that the Purchaser is entering into this Agreement in reliance upon the representations and warranties of the Company set out in this Section 6.1, the Company hereby represents and warrants to the Purchaser as follows:

(a)   *Due Authorization*. Subject to the granting of the Approval and Vesting Order, the Company has all necessary authority and capacity to enter into this Agreement and all other agreements and instruments to be executed by it as contemplated by this Agreement and to carry out its obligations under this Agreement and such other agreements and instruments.

(b)   *Enforceability of Obligations*. Subject to the granting of the Approval and Vesting Order, this Agreement constitutes a valid and binding obligation of the Company, enforceable against the Company, in accordance with its terms.

(c)   *HST*. The Company is a registrant under Part IX of the *Excise Tax Act* (Canada), and its Business Number is 1 - 835321050RT0001.

(d)   *Residency*. The Company is not a non-resident within the meaning of section 116 of the *Income Tax Act* (Canada).

(e)   *Intellectual Property*. The Company has valid rights to use all intellectual property used in connection with the business, including software, trademarks, patents, and copyrights, free and clear of all liens, encumbrances, and disputes. For further clarity with respect to intellectual property of the core software assets required to run the business, the Company hereby represents and warrants that it:

(i) owns all intellectual property of the following systems: maxsold.com including subdomains (including but not limited to pages, support, static,maxsold), android and ios apps, seller portal/platform and admin site, all databases, image processing server, pzn, catgor, data warehouse, integrations/etl server, max360 service; and

(ii) licenses the auction method systems code, data and APIs from AuctionMethod and has in its possession the code, systems and data and the right to modify and use said code, data and APIs in perpetuity, subject to the terms of the Software Source Code License Agreement between the Company and AuctionMethod, Inc. dated June 12, 2020, to carry out the Business without further payment due and owing to AuctionMethod.

(f) *Critical Supplier Pre-Filing Costs.* The Critical Supplier Pre-Filing Costs will be paid by the Company prior to Closing and the amounts owed by the Company to certain key suppliers for pre-filing services, as identified in Schedule "E", are true and accurate.

## 6.2    Representations and Warranties of the Purchaser

As a material inducement to the Company entering into this Agreement and completing the transactions contemplated by this Agreement and acknowledging that the Company is entering into this Agreement in reliance upon the representations and warranties of the Purchaser set out in this Section 6.2, the Purchaser hereby represents and warrants to the Company as follows:

(a) *Incorporation of the Purchaser*. The Purchaser is a corporation duly incorporated under the laws of the jurisdiction of its incorporation and is duly organized, validly subsisting and in good standing under such laws;

(b) *Due Authorization*. The Purchaser has all necessary corporate power, authority and capacity to enter into this Agreement and all other agreements and instruments to be executed by it as contemplated by this Agreement and to carry out its obligations under this Agreement and such other agreements and instruments;

(c) *Enforceability of Obligations*. This Agreement constitutes a valid and binding obligation of the Purchaser, enforceable against the Purchaser, in accordance with its terms;

(d) *Approvals and Consents*. Except as otherwise provided herein, no authorization, consent or approval of or filing with or notice to any Governmental Authority or other Person is required in connection with the execution, delivery or performance of this Agreement by the Purchaser or the purchase of any of the Purchased Assets hereunder;

(e) *HST*. The Purchaser is or will on Closing be a registrant under Part IX of the *Excise Tax Act* (Canada); and

(f) *Residency*. The Purchaser is not a non-resident within the meaning of section 116 of the *Income Tax Act* (Canada).

## 6.3    Acquisition of Purchased Assets on "As Is, Where Is" Basis

The Purchaser acknowledges that the Company is selling the Purchased Assets on an "as is, where is basis" as they shall exist on the Closing Date, subject to the terms of the Approval and Vesting Order. The Purchaser further acknowledges that it has entered into this Agreement on the basis that the Company does not guarantee title to the Purchased Assets and that the Purchaser has conducted such inspections of the condition of and title to the Purchased Assets as it deemed appropriate and has satisfied itself with regard to these matters. No representation, warranty or condition is expressed or can be implied as to title, encumbrances, description, fitness for purpose, merchantability, condition, quantity or quality or in respect of any other matter or thing whatsoever concerning the Purchased Assets or the right of the Company to sell or assign same save and except as expressly represented or warranted herein. Without limiting the generality of the foregoing, any and all conditions, warranties or representations, expressed or implied, pursuant to the *Sale of Goods Act* (Ontario) or similar legislation do not apply hereto and have been waived by the Purchaser. The Purchaser further acknowledges that all written and oral information (including analyses, financial information and projections and studies) obtained by the Purchaser from the Company or any of its directors, officers, employees, professional consultants or advisors with respect to the Purchased Assets or otherwise relating to the transactions contemplated in this Agreement has been obtained for the convenience of the Purchaser only and is not warranted to be accurate or complete.

**6.4    No Additional Representations and Warranties**

(a)    None of the Company and the Purchaser, nor their respective Representatives, have made or shall be deemed to have made any other representation or warranty, express or implied, at law or in equity, in respect of the Company, the Purchaser, the Purchased Assets or the Transactions other than those stated expressly herein.

(b)    None of representations and warranties contained in this Article 6 shall survive Closing and, other than in the case of fraud, the Purchaser's sole recourse for any material breach of representation or warranty in this Article 6 shall be for the Purchaser to not complete the Transactions in accordance with Section 8.1 of this Agreement.

## <u>ARTICLE 7 – EMPLOYEES</u>

**7.1    Offers to Employees**

The Purchaser may offer new employment, conditional upon Closing and effective as of the Effective Time, to such of the Employees as determined by the Purchaser in its sole discretion, on such terms as the Purchaser and each of the Transferred Employees may agree.

**7.2    Transferred Employees**

The Purchaser shall provide to the Company a list five (5) Business Days before Closing, indicating:

(a)    those Employees to whom offers of employment or expressions of interest have been made;

(b)    those Employees who have accepted any such offer; and

(c)    those Employees who the Purchaser has determined will not be offered employment with the Purchaser.

The Purchaser shall assume and be responsible for all Employee Liabilities in respect of Transferred Employees following the Closing Date.

## ARTICLE 8 – TERMINATION

**8.1    Termination by the Parties**

This Agreement may be terminated:

(a)    upon the mutual written agreement of the Company and the Purchaser;

(b)    pursuant to Section 5.3(b) by either Party;

(c)    pursuant to Section 4.1(c); or

(d)    pursuant to Section 3.5.

**8.2    Deposit**

If this Agreement is terminated through no fault of the Purchaser, such as Sections 3.5 and 4.1(c), the Parties shall each be released from all obligations under this Agreement, and the Deposit shall be immediately refunded to the Purchaser by the Company without interest.

**8.3    Breach by Purchaser**

If the Purchaser fails to comply with its obligations under this Agreement, the Company may by notice to the Purchaser elect to treat this Agreement as having been repudiated by the Purchaser. In that event, other than as provided for in 8.2, the Deposit and any other payments made by the Purchaser will be forfeited to the Company on account of its liquidated damages and the Purchaser shall have no further obligations to the Company, and the Purchased Assets may thereafter be sold by the Company to any other party.

## ARTICLE 9 – POST-CLOSING MATTERS

**9.1    Post-Closing Receipts**

If, following the Closing Date, any of the Purchased Assets are paid to or otherwise received by the Company or Proposal Trustee, or if any of the Excluded Assets are paid to or otherwise received by the Purchaser, then the Company, the Proposal Trustee or the Purchaser, as the case may be, shall hold such assets in trust for the other and shall promptly deliver such assets to the Company or the Purchaser, as the case may be.

**9.2     Books and Records**

The Purchaser shall preserve and keep the Books and Records which relate to the Purchased Assets for a period of six years from the Closing Date or for any longer period as may be required by any Applicable Law or Governmental Authority. Upon reasonable advance notice, after the Closing Date, the Purchaser will grant the Company, the Proposal Trustee or any trustee in bankruptcy of the Company reasonable access during normal business hours, to use such Books and Records included in the Purchased Assets, including, without limitation, any personnel files/records of the Transferred Employees relating to the period up to the Closing and any Employees engaged by the Company at or in respect of the Purchased Assets up to and including the Closing Date, and computer systems, tapes, disks, records and software acquired as part of the Purchased Assets.

**9.3     Use of Business Name**

If requested by the Purchaser, on or promptly following the Closing Date, the Company shall discontinue use of the name "MaxSold" and any variation thereof and shall, subject to the Court's approval, as soon as is reasonably practicable file articles of amendment to change the corporate name of MaxSold to another name not confusingly similar to its present name.


## ARTICLE 10 – GENERAL CONTRACT PROVISIONS

**10.1     Headings and Sections**

The division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

**10.2     Number and Gender**

Unless the context requires otherwise, words importing the singular include the plural and vice versa, and words importing gender include all genders. Where the word "including" or "includes" is used in this Agreement, it means "including (or includes) without limitation".

**10.3     Currency**

Except as otherwise expressly provided in this Agreement, all dollar amounts referred to in this Agreement are stated in Canadian dollars.

**10.4     Statutory References**

All references in this Agreement to any statute or regulation is to that statute or regulation as now enacted or as may from time to time be amended, re-enacted or replaced and includes all

regulations made thereunder, unless something in the subject matter or context is inconsistent therewith or unless expressly provided otherwise in this Agreement.

### 10.5    No Strict Construction

The language used in this Agreement is the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party, including, without limitation, the doctrine of *contra proferentum*.

### 10.6    Entire Agreement

This Agreement and the agreements and other documents required to be delivered pursuant to this Agreement, constitute the entire agreement between the Parties and sets out all the covenants, promises, warranties, representations, conditions, understandings and agreements between the Parties relating to the subject matter of this Agreement and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written. There are no covenants, promises, warranties, representations, conditions, understandings or other agreements, oral or written, express, implied or collateral between the Parties in connection with the subject matter of this Agreement except as specifically set forth in this Agreement. Subject to the Approval and Vesting Order being issued by the Court, this Agreement is intended to create binding obligations on the part of the Company as set forth herein and on acceptance by the Purchaser, is intended to create binding obligations on the part of the Purchaser, as set out herein.

### 10.7    Expenses

Subject to Section 4.1(b), each Party shall pay their respective legal, accounting, and other professional advisory fees, costs and expenses incurred in connection with the transactions contemplated in this Agreement, and the preparation, execution and delivery of this Agreement and all documents and instruments executed pursuant to this Agreement.

### 10.8    Notices

Any notice, consent or approval required or permitted to be given in connection with this Agreement shall be in writing and shall be sufficiently given if delivered (whether in person, by courier service or other personal method of delivery), or if transmitted by email as follows:

(a)    in the case of notice to the Company at:

   Russ Patterson, email: russ.patterson@maxsold.com

   With a copy to:

   Sharon Kour, email: skour@reconllp.com

(b)    in the case of a notice to the Purchaser at:

Chris Reid, email: chris@reids.co

With a copy to:

Ian Klaiman, email: iklaiman@szklaw.ca

(d)      in the case of the Proposal Trustee at:

Rahn Dodick, email: rahn.dodick@dodick.ca

With a copy to:

Philip Cho, email: pcho@weirfoulds.com

Any notice delivered or transmitted to a Party as provided above shall be deemed to have been given and received on the day it is delivered or transmitted, provided that it is delivered or transmitted on a Business Day prior to 5:00 p.m. local time in the place of delivery or receipt. However, if the notice is delivered or transmitted after 5:00 p.m. local time or if such day is not a Business Day then the notice shall be deemed to have been given and received on the next Business Day.

Any Party may, from time to time, change its address by giving notice to the other Party in accordance with the provisions of this Section.

### 10.9    Successors and Assigns

This Agreement shall ensure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

### 10.10    Third Party Beneficiaries

Unless where provided to the contrary by the specific terms hereof, this Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

### 10.11    Time of the Essence

Time shall be of the essence in respect of the obligations of the Parties arising prior to Closing under this Agreement.

### 10.12    Amendment

No amendment, supplement, modification or waiver or termination of this Agreement and, unless otherwise specified, no consent or approval by any Party, shall be binding unless executed in writing by the Party to be bound thereby.

## 10.13    Further Assurances

The Parties shall, with reasonable diligence, do all such things and provide all such reasonable assurances as may be required to consummate the transactions contemplated by this Agreement, and each Party shall provide such further documents or instruments required by any other Party as may be reasonably necessary or desirable to effect the purpose of this Agreement and carry out its provisions, whether before or after the Closing Date, provided that the reasonable costs and expenses of any actions taken after the Closing Date at the request of a Party shall be the responsibility of the requesting Party.

## 10.14    Paramountcy

In the event of any conflict or inconsistency between the provisions of this Agreement and any other agreement, document or instrument executed or delivered in connection with this Transaction or this Agreement, the provisions of this Agreement shall prevail to the extent of such conflict or inconsistency.

## 10.15    Severability

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability and shall be severed from the balance of this Agreement, all without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

## 10.16    Governing Law

This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein and each of the Parties irrevocably attorns to the non-exclusive jurisdiction of the Courts of the Province of Ontario. The Parties consent to the jurisdiction and venue of the Court for the resolution of any disputes under this Agreement.

## 10.17    Non-Merger

The representations, warranties and covenants of each Party contained in this Agreement will not merge on and will survive the closing of the Transaction and will continue in full force and effect, notwithstanding the closing of the Transaction or any investigation or knowledge acquired by or on behalf of the other Party.

## 10.18    Independent Legal Advice

The Purchaser warrants that it has received independent legal advice in connection with this Agreement.

**10.19   Execution and Delivery**

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute one and the same instrument. Counterparts may be executed and delivered either in original form or by electronic delivery in portable document format (PDF).

**10.20   Damages**

Under no circumstance shall any of the Parties or their representatives be liable for any special, punitive, exemplary, consequential, or indirect damages (including loss of profits) that may be alleged to result, in connection with, arising out of, or relating to this Agreement or the transactions contemplated herein.

**10.21   No Brokers**

It is understood and agreed that the Purchaser shall not be liable for any commission or other remuneration payable or alleged to be payable to any broker, agent or other intermediary who purports to act or have acted for the Company. It is further understood and agreed that the Company shall not be liable for any commission or other remuneration payable or alleged to be payable to any broker, agent or other intermediary who purports to act or have acted for the Purchaser.

**[Remainder of page left blank intentionally. Signature page follows.]**

**IN WITNESS OF WHICH** the Parties have executed this Agreement.

**MaxSold Incorporated**

Per: _Russ Patterson (Mar 11, 2024 19:52 EDT)_____

      Name: Russ Patterson
      Title: President and Chief Executive
      Officer

I have the authority to bind the Corporation.

**1000822913 Ontario Inc.**

Per:_____

      Name: Chris Reid
      Title:

I have the authority to bind the Corporation.

**IN WITNESS OF WHICH** the Parties have executed this Agreement.

**MaxSold Incorporated**

Per:_____

       Name: Russ Patterson
       Title: President and Chief Executive
       Officer

I have the authority to bind the Corporation.

**1000822913 Ontario Inc.**

Per:_____

       Name: Chris Reid
       Title: CEO

I have the authority to bind the Corporation.

## SCHEDULE "A" – PERMITTED ENCUMBRANCES

None.

**SCHEDULE "B" – SALE PROCEDURES**

**Sale and Investment Solicitation Process for MaxSold Incorporated**

1.      On February 15, 2024, MaxSold Incorporated (the "**Company**") filed a Notice of Intention to make a proposal (the "**NOI**") under the *Bankruptcy and Insolvency Act,* RSC 1985, c B-3, as amended (the "**BIA**"). Dodick Landau Inc. was appointed as proposal trustee of the Company (the "**Proposal Trustee**").

2.      On March 14, 2024, the Court granted an order (the "**SISP Approval Order**") that, among other things, authorizes the Company to implement a sale, refinancing and investment solicitation process ("**SISP**") in accordance with the terms hereof. Capitalized terms that are not otherwise defined herein have the meanings ascribed to them in the SISP Approval Order.

3.      This SISP sets out the manner in which: (a) binding bids for a sale or other strategic investment or transaction (a "**Transaction**") involving the business, assets and/or equity of the Company (the "**Opportunity**"), will be solicited from interested parties; (b) any such bids received will be addressed; (c) any Successful Bid (as defined below) will be selected; and (d) Court approval of a Successful Bid will be sought.

4.      The Company has received a Transaction bid from 100822913 Ontario Inc. (the "**Stalking Horse Bidder**") pursuant to a purchase agreement in substantially the form attached to the Affidavit of Russ Patterson dated March 11, 2024 (the "**Stalking Horse Agreement**") which constitutes a Qualified Bid for all purposes and at all times under this SISP (the "**Stalking Horse Bid**"). The Stalking Horse Bid shall serve as the "stalking horse" bid for the purposes of the SISP.

5.      Notwithstanding the receipt of the Stalking Horse Bid, all interested parties are encouraged to submit bids for a Transaction pursuant to this SISP.

6.      The SISP shall be conducted by the Proposal Trustee in consultation with the Company.

**Commencement of the Sale Process**

7.      The Proposal Trustee, will:

(a)     disseminate marketing materials and a copy of the SISP to potentially interested parties identified by the Company and the Proposal Trustee, or any other interested party who contacts the Company or the Proposal Trustee;

(b)     arrange for notice of the SISP (and such other relevant information as the Proposal Trustee considers appropriate) (the "**Notice**") to be published in Insolvency Insider and other such newspaper(s), publication(s) or journal(s) as the Proposal Trustee may consider appropriate;

(c)     solicit interest from interested parties with a view to such parties entering into non-disclosure agreements (each an "**NDA**"). Parties shall only obtain access to the virtual data room (the "**VDR**") and be permitted to participate in the SISP if they execute an NDA, in form and substance satisfactory to the Company and the Proposal Trustee; provided that those parties that have already executed an NDA

with the Company shall not be required to execute a further NDA provided that such prior NDA has not expired or will not expire during the SISP;

(d)    provide interested parties who have executed an NDA with access to the VDR containing diligence information in respect of the Opportunity; and

(e)    request that parties submit a binding offer that meets at least the requirements set forth in Section 9 below, as determined by the Proposal Trustee, in consultation with the Company (each a "**Qualified Bid**" as defined below), by the Qualified Bid Deadline (as defined below).

**Key Milestones**

8.    The SISP shall be conducted subject to the terms hereof and the following key milestones, each of which can be extended by up to seven (7) days by the Proposal Trustee, in consultation with the Company, or for a longer period with the consent of the Stalking Horse Bidder or by Court order:

(a)    the Court issues the SISP Approval Order approving the SISP by no later than March 14, 2024;

(b)    the Proposal Trustee, with the assistance of the Company, commences the solicitation process by no later than March 15, 2024, it being understood that the Company, in consultation with the Proposal Trustee, shall be at liberty to provide marketing materials and commence discussions with interested parties prior to such date as they consider appropriate;

(c)    deadline to submit a Qualified Bid – by no later than 5:00 p.m. (Toronto time) on April 15, 2024 (the "**Qualified Bid Deadline**");

(d)    date of the Auction (as defined below), if any – April 17, 2024;

(e)    deadline to select a Qualified Bid as the Successful Bid (as defined below) if no Auction is required – by no later than 5:00 p.m. (Toronto time) on April 17, 2024;

(f)    Approval Order (as defined below) hearing – by no later than April 25, 2024, subject to Court availability; and

(g)    closing of the Successful Bid – as soon thereafter as possible and, in any event, by no later than April 30, 2024 (the "**Outside Date**").

**Qualified Bid Requirements**

9.    In order to constitute a Qualified Bid, a bid must comply with the following:

(a)    it provides for cash consideration sufficient to pay in full on closing of the Transaction: (i) a minimum incremental amount of $10,000 in excess of the aggregate purchase price contemplated by the Stalking Horse Agreement; (ii) a break fee in the amount of $30,000; and (iii) an expense reimbursement fee in the amount of a maximum of $20,000 (inclusive of HST) as contemplated by the Stalking Horse Agreement (the "**Consideration Value**");

- 3 -

(b)     it includes an executed binding Transaction document(s) (a "**Definitive Agreement**"), including all exhibits and schedules contemplated thereby, together with a blackline against the Stalking Horse Agreement (which shall be posted by the Company in Word format in the VDR), describing the terms and conditions of the proposed Transaction, including any liabilities proposed to be assumed, the Consideration Value, the structure and financing of the proposed Transaction, and any regulatory or other third-party approvals required;

(c)     it contains the legal name and identity (including jurisdiction of existence) and contact information of the bidder, full disclosure of its direct and indirect principals, and the name(s) of its controlling equity holder(s);

(d)     it discloses any past or current connections or agreements with the Company, any known, potential, prospective bidder participating in the SISP, or any current or former officer, manager, director, member or known current or former equity security holder of any of the Company;

(e)     it includes or is accompanied by evidence satisfactory to the Company and Proposal Trustee of the financial ability of the bidder to consummate the Transaction;

(f)     it includes full details of the bidder's intended treatment of the Company's stakeholders under or in connection with the proposed bid, including the Company's secured creditors, unsecured creditors, employees, customers, suppliers, contractual counterparties and equity holders;

(g)     it is binding and irrevocable until the earlier of (i) the approval of the Successful Bid by the Court, and (ii) thirty (30) calendar days following the Qualified Bid Deadline, provided that if such bid is selected as a Successful Bid, it shall remain irrevocable until the closing of the Transaction contemplated by the Successful Bid;

(h)     it is not conditional upon any condition or contingency relating to due diligence, financing or an other material conditions precedent to the bidder's obligation to complete the transaction;

(i)     it does not include any request for or entitlement to any break fee, expense reimbursement or similar type of payment;

(j)     it includes an acknowledgment and representation that the bidder: (i) has had an opportunity to conduct any and all required due diligence prior to making its bid, and has relied solely upon its own independent review, investigation and inspection in making its bid; (ii) is not relying upon any written or oral statements, representations, promises, warranties, conditions, or guaranties whatsoever, whether express or implied (by operation of law or otherwise), made by any person or party, including the Company, the Proposal Trustee, and their respective employees, officers, directors, agents, advisors (including legal counsel) and other representatives, regarding the proposed Transaction, this SISP, or any information (or the completeness of any information) provided in connection therewith, except as expressly stated in the proposed Transaction documents; (iii) is making its bid on an "as is, where is" basis and without surviving representations or warranties of

any kind, nature, or description by the Company, the Proposal Trustee, or any of their respective employees, officers, directors, agents, advisors and other representatives, except to the extent set forth in the proposed Transaction documents; (iv) is bound by this SISP and the SISP Approval Order; and (v) is subject to the exclusive jurisdiction of the Court with respect to any disputes or other controversies arising under or in connection with the SISP or its bid;

(k)    it is accompanied by a cash deposit (the "**Deposit**") by wire transfer of immediately available funds in an amount equal to at least 10% of the Consideration Value, which Deposit shall be retained by the Proposal Trustee in a non-interest-bearing trust account in accordance with the terms hereof;

(l)    it includes a statement that the bidder will bear its own costs and expenses (including all legal and advisor fees) in connection with the proposed Transaction;

(m)    it contemplates closing of the Transaction by not later than the Outside Date;

(n)    it includes such other information as may be reasonably requested by the Company or Proposal Trustee; and

(o)    it is received by the Proposal Trustee, with a copy to the Company, by the Qualified Bid Deadline at the email addresses specified on Schedule "A" hereto.

**Assessment of the Bids and Selection of the Successful Bid**

10.    Following the Bid Deadline, the Proposal Trustee shall assess the bids received and determine whether such bids constitute a Qualified Bid (the "**Qualified Bidder**"). The Proposal Trustee may waive compliance with any one or more of the requirements specified in Section 9 above and deem a non-compliant bid to be a Qualified Bid.

11.    Following the receipt of any bid, the Proposal Trustee may seek clarification with respect to any of the terms or conditions of such bid and/or request one or more amendments to such bid prior to determining if such bid should be considered a Qualified Bid. Each Qualified Bidder shall comply with all reasonable requests for additional information by the Proposal Trustee regarding the Qualified Bidder or the Qualified Bid. Failure of a Qualified Bidder to comply with such requests for additional information will be a basis for the Proposal Trustee to reject a Qualified Bid.

12.    If one or more Qualified Bids has been received by the Proposal Trustee on or before the Qualified Bid Deadline, the Proposal Trustee, will consider and review each Qualified Bid based upon its consideration of the factors set out in Section 9 of the SISP and other factors including, among other things, (i) the amount of consideration being offered and, if applicable, the proposed form, composition and allocation of same, (ii) the value of any assumption of liabilities or release of liabilities not otherwise accounted for in (i) above, (iii) the likelihood of the bidder's ability to close a Transaction by not later than the Outside Date (including factors such as: the Transaction structure and execution risk; conditions to, timing of, and certainty of closing; termination provisions; availability of financing and financial wherewithal to meet all commitments; and required governmental or other approvals), (iv) the likelihood of the Court's approval of the Successful Bid, and (v) the benefit to the Company and its stakeholders, (collectively, the "**Consideration Factors**").

- 5 -

13. In the event that the Proposal Trustee, in consultation with the Company, determines that there are no Qualified Bids, or that there are no Qualified Bids superior to the Stalking Horse Bid based on the Consideration Factors, the Proposal Trustee shall promptly proceed to declare the Stalking Horse Bid as the Successful Bid (as such term is defined below).

14. If the Proposal Trustee receives one or more Qualified Bids which are superior to the Stalking Horse Bid based on the Consideration Factors, it shall proceed with an auction ("**Auction**") to select the highest or otherwise best bid in the SISP (the "**Successful Bid**" and the bidder making such bid, the "**Successful Bidder**"), and the Stalking Horse Bidder and each Qualified Bidder that submitted a Qualified Bid will be invited to attend the Auction. Each bidder invited to participate in the Auction will be deemed an "**Auction Bidder**".

15. If an Auction is conducted, it shall be conducted in accordance with the following procedures:

    (a) The Auction shall be conducted at a time and date to be designated by the Proposal Trustee by electronic communication means (including videoconference, teleconference or such other reasonable means as the Proposal Trustee deems appropriate);

    (b) The identity of each Auction Bidder participating in the Auction will be disclosed, on a confidential basis, to each other Auction Bidder;

    (c) Except as otherwise permitted in the Proposal Trustee's discretion, only the Proposal Trustee, the Company and the Auction Bidders, and in each case their respective professional advisors, shall be entitled to attend the Auction. Each Auction Bidder shall appear at the Auction through a duly authorized representative that shall be designated by the Auction Bidder as its spokesperson;

    (d) Except as otherwise set forth herein, the Proposal Trustee may waive and/or employ and announce at the Auction additional procedures that the Proposal Trustee deems reasonable under the circumstances for conducting the Auction, provided that such procedures are (i) not inconsistent with this SISP, the Stalking Horse Agreement or any order of the Court granted in the within proceedings, (ii) disclosed to each Auction Bidder, and (iii) designed, in the Proposal Trustee's judgement, to result in the solicitation of the highest and best offer;

    (e) Not less than one (1) business day prior to the Auction, the Proposal Trustee shall: (i) identify the highest or otherwise best Qualified Bid received, which shall constitute the opening bid for purposes of the Auction (the "**Opening Bid**"), and (ii) provide the Definitive Agreement in respect of the Opening Bid to all Auction Bidders, on a confidential basis. Subsequent bidding at the Auction will continue in minimum increments of $25,000. Each Auction Bidder shall, if requested by the Proposal Trustee, provide evidence of its financial wherewithal and ability to consummate the Transaction at the increased consideration bid at the Auction;

    (f) Each Auction Bidder shall be given a reasonable opportunity to submit an overbid at the Auction to any then-existing overbids; and

- 6 -

(g) The Auction shall continue until the bidding has concluded and there is one remaining Auction Bidder that the Proposal Trustee has determined has submitted the highest or otherwise best bid of the Auction. At such time, the Auction shall be closed and the Auction Bidder that submitted the highest or otherwise best bid shall be designated by the Proposal Trustee as the Successful Bidder.

**Finalizing the Successful Bid and the Approval Order**

16.     Following selection of the Successful Bid, if any, the Proposal Trustee, with the assistance of its advisors, and in consultation with the Company, shall seek to finalize any remaining necessary definitive agreement(s) with respect to the Successful Bid in accordance with the milestones set out in Section 8. Once the necessary definitive agreement(s) with respect to a Successful Bid have been finalized, as determined by the Company in consultation with the Proposal Trustee, the Company shall apply to the Court, on notice to the service list, for an order or orders approving such Successful Bid and/or the mechanics to authorize the Company to complete the Transaction contemplated thereby, as applicable, and authorizing the Company to: (a) enter into any and all necessary agreements and related documentation with respect to the Successful Bid; (b) undertake such other actions as may be necessary to give effect to such Successful Bid; and (c) implement the Transaction contemplated in such Successful Bid (each, an "**Approval Order**").

**Treatment of Deposits**

17.     If a Successful Bid is selected and an Approval Order authorizing the consummation of the Transaction contemplated thereunder is granted by the Court, any Deposit paid in connection with such Successful Bid will be non-refundable and shall, upon closing of the Transaction contemplated by such Successful Bid, be applied to the cash consideration to be paid in connection with such Successful Bid or be dealt with as otherwise set out in the Definitive Agreement entered into in connection with such Successful Bid. Any Deposit delivered with a Qualified Bid that is not selected as a Successful Bid will be returned to the applicable bidder by the Proposal Trustee as soon as reasonably practicable (but not later than ten (10) business days) after the date upon which the Successful Bid is approved pursuant to an Approval Order or such earlier date as may be determined by the Proposal Trustee.

**General**

18.     The Proposal Trustee, shall be permitted, in its discretion, to provide general updates and information in respect of the SISP to any other creditor (each a "**Creditor**") and its legal and financial advisors, if applicable, on a confidential basis, upon: (a) the irrevocable confirmation in writing from such Creditor that it will not submit any bid in the SISP; and (b) such Creditor executing a confidentiality agreement or undertaking with the Company in form and substance satisfactory to the Company and the Proposal Trustee.

19.     Any amendments to this SISP may only be made by the Proposal Trustee, with the written consent of the Company, or by further order of the Court.

20.     Unless otherwise set out herein, participants and prospective participants in this SISP shall not be permitted to receive any information that is not generally available to all participants relating to the number or identity of Qualified Bidders or the details of any

- 7 -

confidential discussions or correspondence between the Proposal Trustee and Qualified Bidders in connection with this SISP.

21.    The Proposal Trustee may, with the consent of the applicable participants, disclose such information to other bidders for the purpose of seeking to combine separate bids.

22.    At any time during this SISP, the Company or the Proposal Trustee may apply to the Court for advice and directions regarding the implementation and completion of this SISP.

## SCHEDULE "A": E-MAIL ADDRESSES FOR DELIVERY OF BIDS

To counsel for the Company:

skour@reconllp.com; jwuthmann@reconllp.com

and with a copy to the Proposal Trustee and its counsel:

rahn.dodick@dodick.ca; pcho@weirfoulds.com

### SCHEDULE "C" – PURCHASED ASSETS LIST

All of the Company's right, title and interest in all of its assets, properties and undertakings, other than the Excluded Assets, including but not limited to, the following assets:

(a)  Assumed Contracts;

(b)  Books and Records;

(c)  Claims of the Company;

(d)  Equipment;

(e)  The Merchant Account;

(f)  Intellectual Property, including but not limited to trademarks, copyrights, trade secrets, patents;

(g)  All software owned by the Company including but not limited to application software, executables, databases, scripts, data backups, system software, software platforms, all related source code, object code and other code or data in any form or stage of development;

(h)  All online access keys, accounts, admin privileges, passwords, certificates, authorities and access permissions;

(i)  All configurations, architectural diagrams, deployment guides, setup documentation necessary for the deployment, operation and maintenance of the software and technology assets;

(j)  Documentation related to all technology and software, including but not limited to API documentation, code comments, technical specifications and any other documents essential to the ongoing use, development and maintenance of the software assets;

(k)  Any licenses, permissions, and authorizations necessary for the use, modification, and distribution of any third-party software or technology integrated with or used in conjunction with the software and systems of the Company, to the extent such licenses, permissions, and authorizations are transferable to the Purchaser;

(l)  Any digital assets related to the software business, including but not limited to domain names, websites, web applications, cloud accounts, telephone and facsimile numbers, email addresses, social media accounts and the content therein, along with any associated credentials or access keys;

(m) Inventory and Supplies;

(n)  Licenses and Permits;

(o)  Prepaid Amounts;

(p)  Receivables;

(q)  Any and all right to receive auction proceeds from auctions that have not been completed on or before the date of Closing, including any deposits held in relation thereto;

(r)  All personal information, within the meaning of applicable privacy legislation, to the extent such information can be transferred to the Purchaser without the consent of any individual which has not been obtained (it being agreed that the Company has no obligation to seek such consent);

(s)  All rights and interests under or pursuant to all warranties, representations and guarantees, express implied or otherwise, of or made by suppliers or others in connection with the Purchased Assets or otherwise Related to the Business;

(t)  All goodwill associated with the Business, including, without limitation, the goodwill associated all names previously and currently operating under including but not limited to "MaxSold" and any variation thereof including the right of the Purchaser to hold itself out as operating the Business as the successor to the Company; and

(u)  all other property, assets and undertakings of the Company used in or Related to the Business of whatsoever nature or kind.

## SCHEDULE "D" – ASSUMED CONTRACTS

1. All Contracts of the Company with the following counterparties:

| |
|---|
| AuctionMethod, Inc. |
| Elavon Inc. |
| S&E Experts Infonuagique Inc. |
| Innovative Data Processing Solutions, Ltd.** |
| Marius Bucur |
| Kalpa Services Inc. |
| Nived.io |
| Flat Planet Pty Limited** |
| Algolia, Inc.** |
| Belize Virtual Center Limited |

2. All of the Seller Agreements between the Company and its sellers.

**Notwithstanding anything else contained in this Agreement, if this Contract is not assigned by the Court at the hearing scheduled for April 25, 2024, the Contract will be removed from this Schedule "D" and the Company will have no obligation to assign that Contract(s).

## SCHEDULE "E" – CRITICAL SUPPLIER PRE-FILING COSTS

| VENDOR | CDN $ |
|---|---|
| Auction Method | 14,905.05 |
| AYESHA FATIMA | 1,228.56 |
| BELIZE VIRTUAL CENTER | 17,493.80 |
| BUCUR, MARIUS (BITFORGE) | 5,066.54 |
| Datadog Inc | 5,105.13 |
| FLAT PLANET PTY LTD | 8,087.19 |
| HOMEWORK (GORDO, JANUARY) | 6,013.29 |
| INNOVATIVE SOLUTIONS | 33,555.91 |
| KALPA SERVICES | 8,142.55 |
| KPMG | 7,062.50 |
| LABARGE WEINSTEIN | 2,497.87 |
| NIVED.IO | 5,747.49 |
| Paul Vickers | 18,780.78 |
| PAUL VICKERS, CPA | 2,021.25 |
| PERIMETER 81 LLC | 1,701.46 |
| S&E CLOUD EXPERTS | 114,761.15 |
| TWILIO INC | 86.35 |
| ZENDESK | 19,317.83 |
| **Grand Total** | **271,574.70** |

# EXHIBIT 4

# TAB 2

US INC_000206

Bankruptcy Court File No. BK-24-03044331-0033
Estate No. 33-044331

**_ONTARIO_**
**SUPERIOR COURT OF JUSTICE**
**(IN BANKRUPTCY AND INSOLVENCY)**

**IN THE MATTER OF THE _BANKRUPTCY AND_**
**_INSOLVENCY ACT,_ RSC 1985, c B-3, AS AMENDED**

**AND IN THE MATTER OF THE NOTICE OF INTENTION TO MAKE A PROPOSAL**
**OF MAXSOLD INC. OF THE CITY OF KINGSTON, IN THE PROVINCE OF ONTARIO**

**AFFIDAVIT OF RUSS PATTERSON**
**(Sworn March 11, 2024)**

I, **RUSS PATTERSON**, of the City of Mississauga, in the province of Ontario, **MAKE**

**OATH AND SAY**:

1.      I am the President and CEO of MaxSold Incorporated (the "**Company**" or

"**MaxSold**"), the Company in this proceeding pursuant to the _Bankruptcy and Insolvency_

_Act_, R.S.C. 1985, c. B-3, as amended (the "**BIA**"). Accordingly, I have personal knowledge

of the matters set out below unless otherwise stated to be based on information and belief.

Where I have relied on information from others, I state the source of such information and

verily believe it to be true.

**I.      OVERVIEW**

2.      On February 15, 2024, MaxSold filed a Notice of Intention to Make a Proposal

("**NOI**") under the BIA. Dodick Landau Inc. was appointed as Proposal Trustee under the

NOI (in such capacity, the "**Proposal Trustee**"). Attached hereto and marked as **Exhibit**

**"A"** is a copy of the Certificate of Filing of a Notice of Intention to Make a Proposal.

3.    This affidavit is submitted in support of the Company's motion seeking an order ("**SISP Approval Order**") that, among other things:

a) abridges the notice periods and service requirements pursuant to section 6 of the *Bankruptcy and Insolvency General Rules*;

b) extends the time to file a proposal pursuant to s. 50.4(9) of the BIA for 45 days, from March 16, 2024 up to and including April 30, 2024;

c) approves the sale and investment solicitation process ("**SISP**") in the form attached as Schedule "A" to the SISP Approval Order;

d) approves the Stalking Horse Asset Purchase Agreement (the "**Stalking Horse Agreement**") between the Company and 1000822913 Ontario Inc. (the "**Stalking Horse Bidder"**) and authorizes the Company to execute the Stalking Horse Agreement for purposes of constituting the "stalking horse" bid in respect of the SISP;

e) grants a first-ranking priority charge against the assets, property, and undertakings (the "**Property**") of the Company ("**Administration Charge**"), in the maximum amount of $75,000, as security for the payment of the professional fees and disbursements incurred and to be incurred by the Proposal Trustee, counsel to the Proposal Trustee and counsel to the Company, in connection with this proceeding; and

f) authorizes the Company, with the written approval of the Proposal Trustee, to pay up to the maximum cumulative amount of $272,000.00 owing to suppliers for goods or services actually supplied to the Company prior to February 15,

US INC_000208

2024 if, in the opinion of the Company, such payment is necessary to maintain the uninterrupted operations of the business.

4.    The relief sought by the Company is intended to:

a)  stabilize and preserve the going concern operations of the Company for the benefit of its stakeholders (including employees, customers, suppliers, and creditors); and

b)  maximize the value of the Company for its stakeholders, including secured creditors, through the implementation of the SISP, which comprises of a stalking horse agreement that is intended to stimulate competition and optimize the efficiency of the sale process.

## II.    BACKGROUND OF THE COMPANY

5.    MaxSold is in the business of providing streamlined and efficient online auction services for large volume content sales across Canada and the United States (the "**Business**"). The Company's mission is to minimize waste and increase sustainability by making the process of selling a large volume of pre-owned items seamless, easy and quick.

6.    The Company fulfills its mission by assisting sellers with all parts of the online auction process including itemizing and photographing items, hosting the auction on its live auction website (the "**Platform**"), marketing the auction through targeted ads and the Company's extensive network of engaged and interested buyers, and organizing the payment for and pick-up of auction items.

7.    Since the Company's inception, the Company has held over 32,000 auctions in 1,900 communities across Canada and the United States. These auctions have provided a second life for over 3.5 million items, thereby preserving sustainability and minimizing waste.

8.    MaxSold's Business is robust and employs approximately 235 non-unionized employees, which consists of 46 full-time employees and 189 part-time employees.

9.    The Company's principal asset is its online auction Platform. The value of the Platform is derived from a combination of factors including the Company's market position, seller and buyer relationships, software and technology assets, and long-term supplier relationships.

10.    The Company's primary form of revenue is the service fees it receives from the proceeds generated in its auctions. As auctions close, MaxSold collects payments from winning bidders and retains its service fees from this amount. MaxSold then disburses the remaining proceeds to the seller.

11.    Historically, the Company had one primary bank account where it commingled both its operating funds as well as proceeds received in auctions that were to be paid to customers. As part of the Company's restructuring initiatives, MaxSold has opened a new segregated bank account (the "**Trust Account**") to hold auction sale proceeds payable to the Company's customers in trust pending disbursement after the completion of the auction. This new initiative by the Company is meant to protect the trust assets of customers.

US INC_000210

## A.    Financial Difficulties

12.    In late 2022, MaxSold began experiencing cash flow pressures due to decreasing revenues caused by extrinsic conditions including a slower housing market and rising acquisition costs from online marketing channels.

13.    In response to the Company's cash flow pressures, the Company implemented an extensive operational restructuring process to decrease the Company's operating costs and enhance the Company's product and market position. The process included decreasing the number of employees, negotiating new agreements with key suppliers, and developing new online marketing approaches to acquire sellers more cost-effectively.

14.    The Company also invested significant capital into redeveloping and modernizing the Platform to enhance the users' experience and decrease the Company's operating costs. The new Platform makes it easier for the Company to attract, activate and retain new bidders, which in turn reduces its online marketing costs. Although the Company is continuing to implement operation efficiencies, these efforts have already reduced the Company's operating costs and will continue to do so as new functionality is delivered through 2024.

15.    Although the operational restructuring process created new momentum for the Company and reinvigorated its market position, the Company continued to suffer liquidity challenges given the Company's historical debt, overbroad legacy contracts, and the extensive capital invested in modernizing the Business. The Company also received less than projected revenues as a result of decreased market demand and the challenges with the Company's historical advertising partners.

US INC_000211

16.     The Company received additional financing from its shareholders to sustain the Business during this time. Although the additional financing temporarily sustained the Company's operations, the Company determined it required a long-term solution to restructure its Business and balance sheet. Accordingly, in and around October 2023, the Company began soliciting parties who it believed may be interested in completing a strategic transaction with the Company.

17.     The Company's initial discussions resulted in numerous parties expressing an interest in exploring a strategic transaction with the Company. As a result, in early February 2024, the Company began a sales process for the purpose of more widely canvassing the market for a possible sale or investment transaction. To date, the sale process has involved the development of a data room and discussions with numerous interested parties.

18.     In the midst of the Company's sale efforts, the Company was unable to make its debt service payment to its principal secured lender, National Bank of Canada ("**NBC**"). As a result, on February 9, 2024, NBC delivered a demand to the Company and issued a Notice of Intention to Enforce Security under section 244 of the BIA. A copy of the demand letter and notice are appended as **Exhibit "B"**.

19.     In order to preserve its ongoing operations and value, the Company filed the NOI on February 15, 2024.

20.     The purpose of the NOI proceeding is to restructure MaxSold's balance sheet while maintaining going concern operations to preserve employment, maximize recovery for stakeholders through the implementation of the SISP, and avoid the liquidation of a

Company that minimizes waste and promotes sustainability.

21.    Since filing the NOI, the Company, in consultation with the Proposal Trustee, has continued to solicit interest for a sale of or investment in the Company. These efforts have successfully led to the Stalking Horse Agreement, as further discussed below. Several other parties have advised the Company they are interested in exploring a sale and investment transaction. Those parties will be encouraged to participate in the SISP.

## B.    Primary Creditors of MaxSold

22.    The Company has approximately $4.1 million in liabilities of which approximately $3.2 million is secured debt. A copy of the List of Creditors filed with the NOI is attached as **Exhibit "C"**.

23.    Pursuant to the Ontario Personal Property Security Registry search report for MaxSold (the "**PPSA Report**"), the Company has two main secured creditors: Royal Bank of Canada and NBC. NBC is the principal secured creditor who is owed approximately $3.1 million. A copy of the PPSA Report is appended as **Exhibit "D"**.

## III.    RELIEF SOUGHT

## A.    Extension of the Stay of Proceedings

24.    The initial 30-day stay of proceedings under s. 50.4(8) of the BIA expires at the end of the day on March 16, 2024.

25.    Since the filing of the NOI on February 15, 2024, MaxSold has acted diligently and in good faith toward maximizing realization for its stakeholders and developing a proposal

for the creditors. Among other things, the Company, with the assistance of the Proposal Trustee, has:

    a)  continued to operate the Business in the normal course, with the oversite of the Proposal Trustee;

    b)  developed the SISP with a view to canvassing the market for a transaction and developing a viable proposal;

    c)  engaged with potential bidders including maintaining a virtual data room and responding to due diligence questions;

    d)  negotiated the Stalking Horse Agreement;

    e)  engaged with stakeholders, including NBC and vendors, to build consensus on the steps contemplated in this restructuring proceeding;

    f)  engaged with employees and partners to address any questions about the NOI proceeding; and

    g)  with the assistance of the Proposal Trustee, continued to assess various restructuring options with a view to closing a transaction and developing a viable proposal.

26.    To permit MaxSold to continue operating while it implements the SISP, the Company is seeking an extension of time to file a proposal pursuant to section 50.4(9) of the BIA for a further 45 days (from the expiry of the initial stay period at the end of the day on March 16, 2024) up to and including April 30, 2024 (the "**Proposed Stay Period**").

US INC_000214

27.    The extension of the stay of proceedings until April 30, 2024 will provide stability to the Business that will permit MaxSold to continue operating, provide reassurance to MaxSold's stakeholders, and give MaxSold the breathing room to implement the SISP.

28.    The Proposed Stay Period is critical to maximizing the realization of the Business for creditors and stakeholders and avoiding the destruction of value that would result from a shut-down of operations. If the Business is forced to shut down, the Company would immediately experience a loss of its customers and market share. The Company would also suffer an irreparable loss in asset value given the Company's primary asset, the Platform, requires an operating Business to retain its value.

29.    The Company, with the assistance of the Proposal Trustee, has compiled a cash flow projection that will be filed by the Proposal Trustee with its report (the "**Cash Flow Forecast**").

30.    The Cash Flow Forecast demonstrates that MaxSold will have sufficient cash to operate over the Proposed Stay Period. In the meantime, MaxSold continues to work with due diligence and in good faith to implement the SISP, complete a transaction, and develop a proposal for the benefit of its general body of creditors.

31.    I am not aware of any creditors who would be prejudiced by the continuation of these proceedings during the Proposed Stay Period.

**B.    Approval of SISP**

***Overview of the Proposed SISP***

32.     A primary objective of the NOI proceeding is to provide the Company the breathing room necessary to develop a value-maximizing restructuring solution for stakeholders including creditors, employees, customers, and suppliers.

33.     To complement the Company's prior and ongoing operational restructuring efforts, the Company has determined that a sale and investment solicitation process is critical to developing a value-maximizing restructuring solution. Accordingly, the Company - in consultation with the Proposal Trustee, NBC, and the Stalking Horse Bidder - developed the SISP.

34.     The SISP is intended to widely expose the Company's Business to the market and provide a structured and orderly process for interested parties to perform due diligence and submit offers for a potential transaction.

35.     The SISP is a transparent and objective process that will be implemented and supervised by the Proposal Trustee as an officer of this Court. The Company will continue to operate in the normal course during the SISP in order to preserve and maximize going concern value of the Business.

36.     The SISP involves a stalking horse bid in the form of the Stalking Horse Agreement (the "**Stalking Horse Bid**"). The Stalking Horse Bid is intended to stimulate market interest by setting a "floor" price that bidders must bet against. It also provides comfort to stakeholders, such as NBC, that value will be realized through the SISP.

*The SISP Timeline*

37.    The SISP contemplates a 30-day, single phase sale process that will be managed by the Proposal Trustee. The following key milestones in the SISP are as follows:

| Milestone | Deadline |
|---|---|
| Commencement of the SISP by placing a notice in certain publications, disseminating marketing materials to potentially interested parties, and opening a data room | March 15, 2024 |
| "Bid Deadline" – interested parties to submit a binding offer that meets at least the requirements set forth in the SISP ("**Qualified Bid**") | April 15, 2024 |
| Holding of the auction, if necessary, or the selection of the highest or otherwise best bid ("**Successful Bid**") | April 17, 2024 |
| Seek court approval of the Successful Bid | April 25, 2024, subject to Court availability |
| Closing the transaction contemplated in the Successful Bid | No later than April 30, 2024 |

38.    The SISP provides that the Proposal Trustee may extend the above deadlines up to seven days or for a longer period with the consent of the Stalking Horse Bidder or by Court order. The ability to extend deadlines provides the Proposal Trustee and the Company with the necessary flexibility to maximize the Company's success in the SISP.

39.    The timeline of the SISP was designed to balance the limitations of the Company's financial position and NBC's concerns about a lengthy sale process with the need for sufficient flexibility to allow interested parties a reasonable opportunity to formulate and

US INC_000217

submit bids to maximize the Company's success in the SISP.

40.    Given the multiple expressions of interest in the Business to-date, the Company also believes that the timeline of the SISP is sufficient to canvass the market.

***Key Terms of the SISP***

41.    The main elements of the SISP are summarized below:

a) **Bid Deadline –** Potential bidders who wish to make an offer pursuant to the SISP must email a Qualified Bid by no later than 5:00 p.m. (Toronto time) on April 15, 2024, being the Bid Deadline.

b) **Determination of Qualified Bid -** To be considered a "Qualified Bid", bids must satisfy certain criteria including, among other things:

    i.    providing for cash consideration sufficient to pay in full on closing of the transaction: (i) a minimum incremental amount of $10,000 in excess of the aggregate purchase price contemplated by the Stalking Horse Agreement; (ii) a break fee in the amount of $30,000; and (iii) an expense reimbursement fee in the amount of a maximum of $20,000 (inclusive of HST) as contemplated by the Stalking Horse Agreement (the "**Consideration Value**");

    ii.    being accompanied by a deposit of at least 10% of the Consideration Value, to be retained by the Proposal Trustee in trust;

    iii.    containing an executed binding transaction document(s), including

all exhibits and schedules contemplated thereby, together with a blackline against the Stalking Horse Agreement (which shall be posted by the Company in the data room), describing the terms and conditions of the proposed transaction, including any liabilities proposed to be assumed, the Consideration Value, the structure and financing of the proposed transaction, and any regulatory or other third-party approvals required;

iv.   stating it is not conditional upon any condition or contingency relating to due diligence, financing or any other material conditions precedent to the bidder's obligation to complete the transaction;

v.    being submitted by the Bid Deadline;

vi.   providing evidence satisfactory to the Proposal Trustee of the financial ability of the bidder to consummate the transaction;

vii.  not requesting any break fee, expense reimbursement or similar type of payment;

viii. acknowledging the offer is expressly made on an "as is, where is" basis in all respects; and

ix.   describing the intended treatment of the Company's stakeholders including secured creditors, unsecured creditors, employees, customers, suppliers, and contractual counterparties.

c)  **Selection of Successful Bid –** In the event that the Proposal Trustee, in consultation with the Company, determines that there are no Qualified Bids, the Proposal Trustee shall promptly proceed to declare the Stalking Horse Bid as the Successful Bid. If the Proposal Trustee receives one or more Qualified Bids which are superior to the Stalking Horse Bid, it may proceed with an auction to select the highest or otherwise best bid in the SISP in accordance with the procedure delineated in the SISP.

d)  **Information to creditors –** The Proposal Trustee is permitted, in its discretion to provide general updates and information in respect of the SISP to any creditor on a confidential basis, provided that the creditor provides irrevocable confirmation in writing that it will not submit any bid in the SISP, and provided that the creditor executed a confidentiality agreement or undertaking with the Company in form and substance satisfactory to the Company and the Proposal Trustee.

e)  **Court Approval and Closing –** Upon selection of the Successful Bid, the Company will bring a motion to the Court on notice to the service list for an order approving the Successful Bid. The Company, with the assistance of the Proposal Trustee, will then proceed to close the transaction as soon as possible after Court approval is granted.

## C.    Approval of the Stalking Horse Agreement

42.    As noted above, the Company, in consultation with the Proposal Trustee, has negotiated the Stalking Horse Agreement wherein the Stalking Horse Bidder has agreed

to purchase substantially all of the assets of the Company. The Stalking Horse Bidder is an arms-length Company. A copy of the Stalking Horse Agreement is attached as **Exhibit "E"**.

43.     The Company seeks Court approval of the Stalking Horse Agreement for purposes of constituting the "stalking horse bid" in the SISP. For clarity, the Company does not seek the Court's approval of the transaction contemplated in the Stalking Horse Agreement at this time. A separate motion will be brought upon the conclusion of the SISP for an approval and vesting order with respect to the Successful Bid.

44.     The main terms of the Stalking Horse Agreement are as follows:

a)      **Purchased Assets:** the purchased assets include all of the Company's assets, properties and undertakings other than the excluded assets ("**Excluded Assets**") including but not limited to intellectual property, the Company's software and technology, certain contracts ("**Assumed Contracts**"), equipment, one bank account of the Company known as the "Merchant Account", and the Company's receivables.

b)      **Excluded Assets:** the Excluded Assets include, among other things, the purchase price, all cash and money in bank accounts other than the Merchant Account, and the funds of customers in the Trust Account.

c)      **"As Is, Where Is":** the assets are being purchased on an "as is, where is basis" as of the closing date.

d)      **Purchase Price:** the cash sum of Seven Hundred and Fifty Thousand

($750,000.00) plus the cash sum required to pay the cure costs for all of the Assumed Contracts, if any.

e)  **Deposit:** an amount representing 10% of the purchase price will be paid by the Stalking Horse Bidder to the Proposal Trustee within 2 business days following the execution of the Stalking Horse Agreement.

f)  **Break Fee:** the Stalking Horse Bidder is entitled to a break fee of $30,000 (the **"Break Fee"**).

g)  **Expense Reimbursement Fee:** the Stalking Horse Bidder is entitled to an expense reimbursement fee in the amount of a maximum of $20,000 ("**Expense Reimbursement Fee**").

h)  **Conditions to Closing:** the conditions to closing include, among other things, the Stalking Horse Bidder being chosen as the Successful Bid and the granting of the Approval and Vesting Order and Assignment Order by the Court.

45.    Based on my experience with the Company and the industry, I believe that the Stalking Horse Agreement represents a satisfactory monetization of the Company if it constitutes the Successful Bid at the conclusion of the SISP.

46.    I also believe that the presence of the Stalking Horse Agreement in the SISP is in the interests of stakeholders because it will stimulate competition for the Company and provide comfort to NBC that a reasonable transaction will result from the SISP. It will also enhance the efficiency of the SISP by providing an objective basis for the minimum

US INC_000222

valuation of the Company.

47.    The Stalking Horse Agreement includes a Break Fee that represents approximately 4% of the purchase price under the Stalking Horse Agreement and an Expense Reimbursement Fee for amounts actually incurred with a cap of $20,000. Both fees are only payable if the Stalking Horse Agreement is not a Successful Bid at the conclusion of the SISP.

48.    I believe both the Break Fee and Expense Reimbursement Fee are fair and reasonable in the circumstances. The Stalking Horse Bidder requires these fees in exchange for its commitment to the SISP and the fees are intended to reflect the value and stability that the Stalking Horse Agreement brings to the SISP.

**D.    Ability to Pay Pre-Filing Amounts with Approval of Proposal Trustee**

49.    The Company relies heavily on suppliers and contractors who provide specialized services and materials. These vendors are necessary to the uninterrupted operation of the Business and include, among other things, website hosting services, IT services, and software licenses. Without these services, the Company could not sustain the Business.

50.    Given the unique nature of the Company's operations, there are few vendors who can supply the specific services that MaxSold requires at reasonable cost and in a timely manner.

51.    Due to the Company's cash-flow pressures, the Company has failed to pay some of its critical suppliers prior to the filing of the NOI. On review of these pre-filing arrears with the Proposal Trustee, the Proposal Trustee and Company believe it is necessary to

pay pre-filing amounts owed to certain critical suppliers to maintain supply notwithstanding the stay of proceedings.

52.    Based on the foregoing, the Company is seeking authorization to pay pre-filing amounts to critical suppliers only with the consent of the Proposal Trustee up to a cumulative maximum amount of $272,000. As a result, the Company has reflected these payments in its cash flow projections.

**E.    Approval of Administration Charge**

53.    MaxSold seeks a Court-ordered first-priority Administration Charge over the Property of MaxSold, up to a maximum amount of $75,000, to secure the fees and disbursements incurred by the Proposal Trustee, counsel to the Proposal Trustee and counsel to the Company in connection with this NOI proceeding.

54.    The Company requests that the Administration Charge rank in priority to all other security interests, claims of secured creditors, trusts, liens, charges, and encumbrances, statutory or otherwise in favour of any person.

55.    MaxSold has relied heavily on the expertise, knowledge, and continued participation of its advisors and professionals during the NOI proceeding. Each of these professionals have contributed, and I believe will continue to contribute, significant value to the efficiency and effectiveness of the NOI proceeding and the completion of a successful restructuring.

56.    The Administration Charge is necessary to ensure that the Company has the continued expertise, knowledge and participation of the restructuring professional during

the Proposed Stay Period, including to implement the SISP, effectively liaise with creditors, and assist in other restructuring initiatives. Each of the restructuring professionals who are the beneficiaries of the Administration Charge have a critical and discrete role in the restructuring of the Company.

57.    The Company has worked with the Proposal Trustee to estimate the quantum of the Administration Charge. Based on those discussions, I believe that the quantum of the Administration Charge is fair and reasonable in the circumstances as it is commensurate with the expected complexity of the Company's Business and anticipated restructuring.

58.    I swear this affidavit in support of MaxSold's requested relief in the within motion and for no other or improper purpose.

| | |
|---|---|
| **SWORN REMOTELY by Russ Patterson** stated as being located in the City of Mississauga in the Province of Ontario before me at the City of Toronto, in the Province of Ontario, this 11th day of March 2024, in accordance with O. Reg 431/20, Administering Oath or Declaration Remotely.<br><br>*Jessica Wuthmann* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>*Russ Patterson*<br><span style="color:blue">Russ Patterson (Mar 11, 2024 17:37 EDT)</span> |
| A Commissioner for taking Affidavits.<br>Jessica Wuthmann | **RUSS PATTERSON** |

US INC_000225

# EXHIBIT 5



Bankruptcy Court File No. BK-24-03044331-0033
Estate No. 33-044331

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### (IN BANKRUPTCY AND INSOLVENCY)

| | | |
|---|---|---|
| THE HONOURABLE | ) | THURSDAY, THE 25TH |
| | ) | |
| JUSTICE KERSHMAN | ) | DAY OF APRIL, 2024 |

### IN THE MATTER OF THE *BANKRUPTCY AND INSOLVENCY ACT,* RSC 1985, c B-3, AS AMENDED

### AND IN THE MATTER OF THE NOTICE OF INTENTION TO MAKE A PROPOSAL OF MAXSOLD INC. OF THE CITY OF KINGSTON, IN THE PROVINCE OF ONTARIO

### ASSIGNMENT, APPROVAL AND VESTING ORDER

**THIS MOTION**, made by MaxSold Inc. (the "**Vendor**") pursuant to the *Bankruptcy and Insolvency Act*, R.S.C. 1985, c B-3, as amended (the "**BIA**") for an order, among other things: (a) approving the sale transaction (the "**Transaction**") contemplated by the Stalking Horse Agreement between the Vendor and 1000822913 Ontario Inc. (the "**Purchaser**") dated March 11, 2024 (the "**APA**") appended Exhibit "B" to the Supplemental Affidavit of Russ Patterson sworn April 24, 2024 (the "**Supplemental Patterson Affidavit**"); (b) vesting in the Purchaser all of the Vendor's right, title and interest in and to the assets described in the APA (the "**Purchased Assets**"); and (c) approving the assignment of the contracts listed at **Schedule "B"** of this Order (the "**Consent Required Contracts**") was heard this day by judicial videoconference via Zoom.

**ON READING** the Affidavit of Russ Patterson sworn April 19, 2024, the Supplemental Patterson Affidavit and the Second Report of Dodick Landau Inc. dated April 23, 2024 in its capacity as the proposal trustee of the Vendor (in such capacity, the "**Proposal Trustee**"), and on hearing the submissions of counsel for the Proposal Trustee, counsel for the Vendor, counsel for the Purchaser, and any other party that is present, no one appearing for any other

- 2 -

person on the service list, although properly served as appears from the affidavit of service Levi Rivers sworn April 22, 2024, filed:

**DEFINITIONS**

1.    **THIS COURT ORDERS** that the capitalized terms used but not otherwise defined herein shall have the meanings given to them in the APA.

**APPROVAL AND VESTING**

2.    **THIS COURT ORDERS AND DECLARES** that the Transaction is hereby approved, and the execution of the APA by the Vendor is hereby authorized and approved, with such minor amendments as the Vendor and Purchaser, in consultation with the Proposal Trustee, may deem necessary.  The Vendor is hereby authorized and directed to take such additional steps and execute such additional documents as may be necessary or desirable for the completion of the Transaction and for the conveyance of the Purchased Assets to the Purchaser.

3.    **THIS COURT ORDERS AND DECLARES** that this Order shall constitute the only authorization required by the Vendor and Proposal Trustee to proceed with the Transaction and that no shareholder, partner, or other approvals shall be required in connection therewith.

4.    **THIS COURT ORDERS AND DECLARES** that upon the delivery of a Proposal Trustee's certificate to the Purchaser substantially in the form attached as **Schedule "A"** hereto (the "**Proposal Trustee's Certificate**"), all of the Vendor's right, title and interest in and to the Purchased Assets described in the APA shall vest absolutely in the Purchaser, free and clear of and from any and all security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, executions, levies, charges, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise (collectively, the "**Claims**") including, without limiting the generality of the foregoing:  (i) any encumbrances or charges created by the Order of the Honourable Justice Kershman dated ~~April 26~~ March 14, 2024; and (ii) all charges, security interests or claims evidenced by registrations pursuant to the *Personal Property Security Act* (Ontario) or any other personal property registry system (all of which are collectively referred to as the "**Encumbrances**") and, for greater certainty, this Court orders that all of the Encumbrances affecting or relating to the Purchased Assets are hereby expunged and discharged as against the Purchased Assets.

- 3 -

5.     **THIS COURT ORDERS** that for the purposes of determining the nature and priority of Claims, the net proceeds from the sale of the Purchased Assets shall stand in the place and stead of the Purchased Assets, and that from and after the delivery of the Proposal Trustee's Certificate all Claims and Encumbrances shall attach to the net proceeds from the sale of the Purchased Assets with the same priority as they had with respect to the Purchased Assets immediately prior to the sale, as if the Purchased Assets had not been sold and remained in the possession or control of the person having that possession or control immediately prior to the sale.

6.     **THIS COURT ORDERS AND DIRECTS** the Proposal Trustee to file with the Court a copy of the Proposal Trustee's Certificate, forthwith after delivery thereof.

7.     **THIS COURT ORDERS** that the Proposal Trustee may rely on written notice from the Vendor and the Purchaser or their respective counsel regarding the fulfillment or waiver of conditions to Closing under the APA and shall incur no liability with respect to delivery of the Proposal Trustee's Certificate.

8.     **THIS COURT ORDERS** that, pursuant to clause 7(3)(c) of the Canada *Personal Information Protection and Electronic Documents Act*, the Vendor and Proposal Trustee, as the case may be, are each authorized and permitted to disclose and transfer to the Purchaser all human resources and payroll information in the Vendor's records pertaining to the Vendor's past and current employees.   The Purchaser shall maintain and protect the privacy of such information and shall be entitled to use the personal information provided to it in a manner which is in all material respects identical to the prior use of such information by the Vendor.

9.     **THIS COURT ORDERS** that, notwithstanding:

    (a)     the pendency of these proceedings;

    (b)     any applications for a bankruptcy order now or hereafter issued pursuant to the BIA in respect of the Vendor and any bankruptcy order issued pursuant to any such applications; and

    (c)     any assignment in bankruptcy made in respect of the Vendor;

- 4 -

the vesting of the Purchased Assets in the Purchaser pursuant to this Order shall be binding on any trustee in bankruptcy that may be appointed in respect of the Vendor and shall not be void or voidable by creditors of the Vendor, nor shall it constitute nor be deemed to be a fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue, or other reviewable transaction under the BIA or any other applicable federal or provincial legislation, nor shall it constitute oppressive or unfairly prejudicial conduct pursuant to any applicable federal or provincial legislation.

**ASSIGNMENT OF CONSENT REQUIRED CONTRACTS**

10.    **THIS COURT ORDERS** that, in addition to all obligations under the Consent Required Contracts arising from and after the close of the Transaction, for which the Purchaser shall be liable, the Purchaser shall be liable for and shall pay the counterparty (or to the Proposal Trustee in trust on Closing for distribution to the applicable counterparty as soon as practicable thereafter) under such Consent Required Contracts the Cure Costs (as defined below), if any, on the Closing date, or as otherwise agreed to by the parties. For greater clarity, the Purchaser shall not be obligated to pay any Critical Supplier Pre-Filing Costs or the Critical Supplier Ongoing Costs, which remains the liability and obligation of the Vendor to the counterparty. For the purposes of this paragraph, "**Cure Costs**" shall mean, save and except for any Critical Supplier Pre-Filing Costs and Critical Supplier Ongoing Costs, those monetary defaults in relation to the Consent Required Contracts existing prior to the Closing Date, the quantum of which shall not include defaults arising by reason only of the insolvency of the Vendor, the commencement of these BIA proceedings or the failure to perform a non-monetary obligation under the Consent Required Contracts.

11.    **THIS COURT ORDERS** that upon delivery of the Proposal Trustee's Certificate:

(a)    all of the rights and obligations of the Vendor under and to the Consent Required Contracts listed in **Schedule "B"** hereto shall be assigned, transferred, and conveyed to and assumed by the Purchaser pursuant to Section 84.1 of the BIA, and such assignment is valid and binding upon all counterparties to the Consent Required Contracts, notwithstanding any restriction, condition or prohibition contained in any such Consent Required Contracts relating to the assignment thereof, including any provision requiring the consent of any party to the assignment; and

- 5 -

(b)    the counterparties to the Consent Required Contracts are prohibited from exercising any rights or remedies under the Consent Required Contracts, and shall be forever barred and estopped from taking such action by reason of:

(i)    any default arising due as a result of this proceeding;

(ii)    any restriction, condition or prohibition contained therein relating to the assignment thereof or any change of control;

(iii)    the proposed Transaction or any parts thereof (including the assignment of the Consent Required Contracts pursuant to this Order), or

(iv)    any breach of a non-monetary obligation under a Consent Required Contract,

and are hereby deemed to waive any defaults relating thereto.

**GENERAL**

12.    **THIS COURT ORDERS AND DECLARES** that the Vendor, the Purchaser, the Proposal Trustee, or any stakeholder may apply to the Court as necessary to seek further orders and directions to give effect to this Order.

13.    **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States to give effect to this Order and to assist the Proposal Trustee and its agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Proposal Trustee, as an officer of this Court, as may be necessary or desirable to give effect to this Order or to assist the Proposal Trustee and its agents in carrying out the terms of this Order.

14.    **THIS COURT ORDERS** that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Time on the date of this Order, and this Order is enforceable without the need for entry and filing.

KERSHMAN. J

**Schedule A – Form of the Proposal Trustee's Certificate**

Bankruptcy Court File No. BK-24-03044331-0033
Estate No. 33-044331

***ONTARIO***
**SUPERIOR COURT OF JUSTICE
(IN BANKRUPTCY AND INSOLVENCY)**

**IN THE MATTER OF THE *BANKRUPTCY AND
INSOLVENCY ACT,* RSC 1985, c B-3, AS AMENDED**

**AND IN THE MATTER OF THE NOTICE OF INTENTION TO MAKE A PROPOSAL OF
MAXSOLD INC. OF THE CITY OF KINGSTON, IN THE PROVINCE OF ONTARIO**

**PROPOSAL TRUSTEE'S CERTIFICATE**

**RECITALS**

A.    On February 15, 2024, MaxSold Inc. (the "**Vendor**") filed a Notice of Intention to Make a Proposal pursuant to section 50.4(1) of the *Bankruptcy and Insolvency Act* (Canada).

B.    Dodick Landau Inc. was appointed as proposal trustee of the Vendor (in such capacity, the "**Proposal Trustee**").

C.    Pursuant to an Order of the Court dated April 26, 2024 (the "**AVO**"), the Court approved the agreement of purchase and sale dated March 11, 2024 (the "**APA**") between the Vendor and 1000822913 Ontario Inc. (the "**Purchaser**") and provided for the vesting in the Purchaser of the Vendor's right, title and interest in and to the Purchased Assets, which vesting is to be effective with respect to the Purchased Assets upon the delivery by the Proposal Trustee to the Purchaser of a certificate confirming (i) the payment by the Purchaser of the Purchase Price for the Purchased Assets and Cure Costs; (ii) that the conditions to Closing as set out in sections 5.1 and 5.2 of the APA have been satisfied or waived by the Vendor and the Purchaser; and (iii) the Transaction has been completed to the satisfaction of the Proposal Trustee.

D.    Pursuant to the AVO, the Proposal Trustee may rely on written notice from the Vendor and the Purchaser regarding the fulfillment of conditions to Closing under the APA.

- 2 -

E.    Unless otherwise indicated herein, terms with initial capitals have the meanings set out in the APA.

**THE PROPOSAL TRUSTEE CERTIFIES** the following:

1.    The Purchaser has paid and the Proposal Trustee has received the Purchase Price for the Purchased Assets payable on the Closing Date pursuant to the APA;

2.    The Purchaser had provided the Proposal Trustee with evidence that the Purchaser has paid the Cure Costs for the Consent Required Contracts (as defined in the AVO);

3.    The Vendor and Purchaser have each delivered written notice to the Proposal Trustee that the conditions to Closing as set out in sections 5.1 and 5.2 of the APA have been satisfied or waived by the Vendor and the Purchaser; and

4.    The Transaction has been completed to the satisfaction of the Proposal Trustee.

This Certificate was delivered by the Proposal Trustee at _____ [TIME] on _____, 2024.


**DODICK LANDAU INC., in its capacity as Proposal Trustee of MaxSold Inc., and not in its personal capacity**

Per:    _____

     Name: Rahn Dodick

     Title: President



**Schedule B – Consent Required Contracts**

| Contractual Counterparty | Contract |
| --- | --- |
| AuctionMethod, Inc. | Software Source Code License Agreement dated June 12, 2020 |
| AuctionMethod, Inc. | Website Services Agreement dated June 12, 2020 |
| Elavon Inc. | Payment Processor Agreement |
| Innovative Data Processing Solutions, Ltd | Managed Cloud Services Agreement dated January 12, 2022 |
| Algolia, Inc. | Standard Plan Agreement and Service Order dated January 2022 |

Court File No. BK-24-03044331-0033
Estate File No. 33-044331

IN THE MATTER OF THE *BANKRUPTCY AND INSOLVENCY ACT*, RSC 1985, c B-3, AS AMENDED

IN THE MATTER OF THE NOTICE OF INTENTION TO MAKE A PROPOSAL OF MAXSOLD INC. OF THE CITY OF KINGSTON IN THE PROVINCE OF ONTARIO

*ONTARIO*
SUPERIOR COURT OF JUSTICE
(IN BANKRUPTCY AND INSOLVENCY)

Proceedings commenced at Ottawa

ASSIGNMENT, APPROVAL AND VESTING ORDER

RECONSTRUCT LLP
Royal Bank Plaza, South Tower
200 Bay Street
Suite 2305, P.O. Box 120
Toronto, ON  M5J 2J3

**Sharon Kour**  LSO No. 58328D
skour@reconllp.com
Tel: 416.613.8283

**Jessica Wuthmann**  LSO No. 72442W
jwuthmann@reconllp.com
Tel:  416.613.8288

Fax:  416.613.8290

**Lawyers for MaxSold Inc.**

# EXHIBIT 6

1                    **UNITED STATES DISTRICT COURT**
            **OF WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

2

3

    KAY ANNE VENDERBURG, on          )  Case No. 2:22-cv-01707-BJR
4   behalf of herself and all           Hon. Judge Rothstein
    Others similarly situated,
5                    Plaintiff,      )

6   v.                               )

7                                    )

    MAXSOLD INC.
8   and 1000822913 US INC.,
                     Defendants.     )  DATE:  September 30,
9                                          2025
                                        LOCATION:  Remote Proceeding
10                                   )

11

12

13   ─────────────────────────────────────────────────

                    **DEPOSITION OF Christopher Reid**
14                       **Taken Remotely**
                     **Tuesday, January 30, 2025**
15                    **11:00 a.m. - 2:50 p.m.**

16   ─────────────────────────────────────────────────

17

                    **Job No.:  7630831**
18                  **Pages:**
                    **Reported by: Sorrell-Ann Cadsky, RCR, RPR**
19

20

21

22

23

24

25

                                    1

*** UNCERTIFIED DRAFT TRANSCRIPT ***

```
 1        MS. LANGLEY:  Objection.  Form of the question.  You
 2              can answer.
 3     A   So to my knowledge Ontario Inc. did not buy the
 4              shares in MaxSold Inc. and didn't acquire the
 5              assets of MaxSold Inc. when it purchased -- when
 6              it did it's asset purchase.
 7     BY MR. PHILLIPS:
 8     Q   Okay.  My answer -- or my question is a little
 9              bit different from that.  I'm asking about
10              US Inc., so the defendant.  Do you agree that
11              US Inc. did not pay any value for any assets
12              belonging to the US subsidiary?
13        MS. LANGLEY:  Objection.  Again, form of the
14              question.
15     A   US Inc. did not purchase any assets from
16              MaxSold Inc.
17     BY MR. PHILLIPS:
18     Q   And when you say "MaxSold Inc." you're referring
19              to the US subsidiary; correct?
20     A   Sorry.  Like, the US numbered company did not
21              purchase assets from MaxSold Inc., MaxSold Inc.
22              being, I think, the company you are suing.
23     Q   Okay.  To your -- not to your knowledge.
24              US Inc. did not pay any value at all to the US
25              subsidiary; correct?
```

*** UNCERTIFIED DRAFT TRANSCRIPT ***

```
 1          MS. LANGLEY:  Objection.  Form of the question.
 2     A    Again, to my knowledge the US numbered company
 3          did not purchase any assets.
 4     BY MR. PHILLIPS:
 5     Q    Okay.  And the same would be true for the
 6          Ontario numbered company to your knowledge;
 7          correct?
 8          MS. LANGLEY:  Objection.  Form of the question.
 9     A    Yeah, to my knowledge.
10          MS. LANGLEY:  You can answer.
11     A    To my knowledge.
12     BY MR. PHILLIPS:
13     Q    To your knowledge that's correct?
14     A    To my knowledge, you know, the Ontario corp
15          purchased assets just from MaxSold Incorporated
16          through corporate sale process.
17          MR. PHILLIPS:  I have no further questions, unless
18          you do, Ashley.
19          MS. LANGLEY:  I do not.  And I want to reserve for
20          signature.
21          (PROCEEDINGS ADJOURNED AT 2:50 P.M.)
22          (TOTAL TIME:  3 HOURS,  24 MINUTES)
23
24
25
```

# EXHIBIT 7

1

2

3

4

5

6
UNITED STATES DISTRICT COURT

7
WESTERN DISTRICT OF WASHINGTON

8
KAY ANNE VANDERBRUG, on behalf of
herself and all others similarly situated,

CASE NO. 2:22-cv-1707 BJR

9
Plaintiff,

**DEFENDANT 1000822913 US INC.'S**

10
**RESPONSES TO PLAINTIFF'S FIRST**
**DISCOVERY REQUESTS**

11
v.

12
MAXSOLD INC.

13
and

14
1000822913 US INC.,

15

16
Defendant.

17
**TO:        PLAINTIFF KAY ANNE VANDERBRUG**

18

19
**AND TO:    ALL COUNSEL OF RECORD**

20
Defendant 1000822913 US Inc. ("Defendant") respectfully submits the following Answers,

21
Responses, and Objections to Plaintiff Kay Anne Vanderbrug's Discovery Requests to Defendant.

22

23
**OBJECTION TO DEFINITIONS**

24
1.        Defendant objects to the definition of "Defendant" to the extent it is intended to refer

25
to Defendant 1000822913 US Inc. and Defendant MaxSold Inc. synonymously.

26

27

28

DEFENDANT 1000822913 US INC.'S RESPONSES TO PLAINTIFF'S
FIRST DISCOVERY REQUESTS - 1
#5800591 v1 / 77366-001

## **INTERROGATORIES**

1.      Identify, with contact information, all individuals relied on to provide and gather factual information in response to plaintiff's discovery requests.

**ANSWER:** Defendant answers as follows:

Matt Flood – contact through Defendant's counsel

Sath Dosanjh – contact through Defendant's counsel

Christopher Reid – contact through Defendant's counsel

2.      Identify all officers and executives at your company.

**ANSWER:** Defendant objects that this interrogatory is overbroad and unduly burdensome given that it requires Defendant to identify "all officers and executives," and thus, is not otherwise reasonably calculated to lead to the discovery of admissible evidence. Subject to the foregoing objection, Defendant answers as follows: Christopher Reid

3.      For all requests to admit that you do not respond to with an unqualified admission, state your grounds for refusing to admit the request.

**ANSWER**:

Request for Admission No. 7 – Defendant and 1000822913 Ontario Inc. do not have the same officers and directors.

Request for Admission No. 8 – To the best of Defendant's knowledge, 1000822913 Ontario Inc. did not purchase the Canadian Maxsold entity.

Request for Admission No. 9 – To the best of Defendant's knowledge, 1000822913 Ontario Inc. did not purchase the Canadian Maxsold entity. Defendant further denies that excluding the shares

DEFENDANT 1000822913 US INC.'S RESPONSES TO PLAINTIFF'S
FIRST DISCOVERY REQUESTS - 2
#5800591 v1 / 77366-001

of Maxsold Inc,. from the purchase of the assets of Maxsold Incorporated was specifically related to avoiding liability related to the pending lawsuit against Maxsold, Inc., but rather was consistent with 1000822913 Ontario Inc. purchasing only the assets required to run the business and avoiding the burden of any liabilities in conjunction with the purchase of assets, again under a court approved process that frees 1000822913 Ontario of any obligations.

Request for Admission No. 10 – Defendant was informed that there was a lawsuit but that no settlement was possible considering Maxsold Inc. had no monies to pay as there was a secured lender against both Maxsold Inc. and Maxsold Incorporated with a priority general security agreement that included the rights to any assets. Further, Defendant was informed that Maxsold Inc.'s assets were insufficient to pay off the secured lender. Defendant was further informed that Plaintiff chose to ignore the fact that there was no way to recoup the funds/assets of Maxsold Inc., but continued to demand payment.

Request for Admission No. 11 – Defendant did not assume all the assets.

4.    Explain your knowledge of 1000822913 Ontario Inc.'s bases for excluding Maxsold, Inc., from its purchase of the Canadian Maxsold, Inc.

**ANSWER:** Defendant objects that this interrogatory is vague and ambiguous due to the term "bases." Subject to the foregoing objection, Defendant answers as follows: 1000822913 Ontario Inc. did not purchase the Canadian entity Maxsold Incorporated, it purchased the assets required to run and operate the business. It did not purchase any liabilities of Maxsold Incorporated nor any unnecessary assets. The assets were purchased in a court-approved sale process free and clear of all liabilities. Excluding shares in the US entity Maxsold Inc. from the acquisition was consistent with the above approach.

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

5.      Detail any communications you, your officers, or agents had with Attorney Joe Goldberg, of Hogson Russ, in 2024.

**ANSWER**: Defendant objects to this interrogatory as overbroad and unduly burdensome considering it requires Defendant to detail "any communications" with Joe Goldberg regardless of the relevance of such communications to any issue, claim, or defense asserted in this case. Subject the foregoing objection, Defendant responds as follows: Pursuant to FRCP 33(d), any responsive-nonprivileged communication will be produced.

6.      Detail any communications you, your officers, or agents had with Attorney Devon McCurdy, of Lane Powell, in 2024.

**ANSWER:** Defendant objects to this interrogatory as overbroad and unduly burdensome considering it requires Defendant to detail "any communications" with Devon McCurdy regardless of the relevance of such communications to any issue, claim, or defense asserted in this case. Subject the foregoing objection, Defendant responds as follows: Pursuant to FRCP 33(d), any responsive-nonprivileged communication will be produced.

7.      Identify all your employees that previously worked for Maxsold, Inc.

**ANSWER**: Defendant answers as follows: As of February 12, 2025, there is one-full time employee—the Account Executive—and 42 part-time casual employees of 1000822913 US Inc. that previously worked for Maxsold Inc.

DEFENDANT 1000822913 US INC.'S RESPONSES TO PLAINTIFF'S
FIRST DISCOVERY REQUESTS - 4
#5800591 v1 / 77366-001

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

8.      Identify all differences between your Terms of Service as of December 2024 and Maxsold, Inc.'s terms of service (attached as Exhibit A).

**ANSWER:** Defendant objects that this interrogatory is overbroad, vague, ambiguous and unduly burdensome given that it requires Defendant to identify all differences between its Terms of Service and Maxsold, Inc.'s terms of service, both of which appear to be in Plaintiff's possession. Subject to the foregoing objection, Defendant answers that "the burden of deriving or ascertaining the answer will be substantially the same for either party" and thus, Defendant directs Plaintiff to review Maxsold, Inc.'s terms of service (attached as Exhibit A) and Defendant's terms of service.

9.      Explain whether you paid any value to Maxsold, Inc., to conduct business in the United States under the dba "Maxsold," what value you paid, and to whom, if anyone.

**ANSWER**: Defendant answers as follows: Maxsold, Inc. had no rights to the trademarks, website, or service known as Maxsold and thus no payment was required. Those rights were all owned exclusively by Maxsold Incorporated which were then transferred to 1000822913 Ontario Inc. through a court-approved sale process free of all liabilities and obligations.

10.     Explain whether you paid any value to Maxsold, Inc., to use the same website property that Maxsold, Inc., used to conduct business in the United States.

**ANSWER**: Defendant answers as follows: Defendant paid no value to Maxsold Inc. to use its website. 1000822913 US Inc.'s right to operate as Maxsold and the terms under which it is permitted to operate is dictated by its licensing agreement with 1000822913 Ontario Inc. 1000822913 Ontario Inc. owns all intellectual property related to the business including the website maxsold.com, the technology that supports the business and the trade name Maxsold in both Canada and the United

DEFENDANT 1000822913 US INC.'S RESPONSES TO PLAINTIFF'S
FIRST DISCOVERY REQUESTS - 5
#5800591 v1 / 77366-001

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1    States. These intellectual property rights were acquired by 1000822913 Ontario Inc. from Maxsold

2    Incorporated and is licensed to 1000822913 US Inc. 1000822913 US Inc. must operate under the

3    terms and conditions as defined by 1000822913 Ontario Inc.

4

5

6        11.    Detail all communications, if any, you had with representatives of Maxsold, Inc.,

7    during 1000822913 Ontario Inc.'s purchase of the Canadian Maxsold, Inc.

8        **ANSWER:** Defendant objects that this interrogatory is overbroad and unduly burdensome

9    given that it requires Defendant to detail "all communications" with any representative of Maxsold

10   Inc. during the purchase of the Canadian Maxsold, Inc. Subject to the foregoing objection, Defendant

11   answers as follows: Defendant had no discussions with representatives of Maxsold, Inc. The entire

12   Board of Directors of Maxsold Inc. resigned on January 29, 2024 and was not replaced.

13

14

15

16       12.    Detail all communications, if any, you had with representatives of Maxsold, Inc.,

17   before you started conducting business in the United States under the dba "Maxsold."

18       **ANSWER:** Defendant objects that this interrogatory is overbroad and unduly burdensome

19   given that it requires Defendant to detail "all communications" with representatives of Maxsold Inc.

20   before Defendant commenced business in the United States. Defendant objects to the extent this

21   interrogatory is duplicative of Interrogatory No. 11. Subject to the foregoing objections, Defendant

22   answers as follows: Defendant had no discussions with any representative of Maxsold, Inc.

23

24

25       13.    Explain all changes you made to the Maxsold.com website before operating it under

26   the dba "Maxsold."

27

28

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1  **ANSWER:** Defendant objects to this interrogatory as overbroad and unduly burdensome as it

2  requires Defendant to identify "all changes" it made to Maxsold.com. Subject to the foregoing

3  objection, Defendant answers as follows: As stated in Defendant's answer to Interrogatory No. 10, the

4

5  website maxsold.com was acquired by 1000822913 Ontario Inc. and is used by 1000822913 US Inc.

6  pursuant to a licensing agreement. Accordingly, 1000822913 US Inc. does not have the right to and

7  did not make any changes to the website. Changes made by 1000822913 Ontario Inc. to the website

8  immediately upon the sale and prior to operations under the dba Maxsold were limited and primarily

9  included updating corporate information such as the legal name and address of the companies.

10

11

12  14.    Explain whether you collected any revenue from customers who ordered products or

13  services from Maxsold, Inc.

14  **ANSWER:** Defendant answers as follows: Yes. Upon the sale of assets from Maxsold

15  Incorporated to 1000822913 Ontario Inc., Maxsold Inc. no longer had the right to deliver services

16  using the relevant intellectual property (website, technology, name) and therefore was incapable of

17  carrying out the contracted services. 1000822913 Ontario Inc. exclusively holds the rights to offer the

18  Maxsold service based on its court-approved purchase of the assets necessary to do so. 1000822913

19  Ontario contracted Defendant to provide said services that were solely and without obligation for

20  1000822913 Ontario to offer and provide via Defendant.

21

22

23

24  15.    State your total revenue from 2024.

25  **ANSWER:** Defendant objects that this request is beyond the scope of discovery considering

26  the parties contemplated phased discovery with the current phase being limited to whether Defendant

27  is the successor entity of Maxsold, Inc., not damages. Defendant will supplement this answer if the

28

DEFENDANT 1000822913 US INC.'S RESPONSES TO PLAINTIFF'S
FIRST DISCOVERY REQUESTS - 7
#5800591 v1 / 77366-001

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1    Court determines that Defendant is the successor entity of Maxsold, Inc. and that the settlement

2    agreement is not enforceable against Defendant.

3                                    **DOCUMENT REQUESTS**

4        1.      Please produce documents relied on to respond to plaintiff's requests to admit and

5

6    interrogatories.

7        **RESPONSE:** Defendant objects to this request as vague and ambiguous due to the phrase

8    "relied on." Subject to the foregoing objection, Defendant responds as follows: all responsive, non-

9

10   privileged documents will be produced.

11

12       2.      Please produce all communications you have with Maxsold, Inc.

13       **RESPONSE:** Defendant objects to this request as overbroad and unduly burdensome given

14   that it requires Defendant to produce all communications it had with Maxsold, Inc. regardless of the

15

16   relevance of such communications to any issue, claim, or defense asserted in this case. Subject to the

17   foregoing objection, Defendant answers as follows: After a reasonably diligent search, no responsive

18   documents have been located.

19

20

21       3.      Please produce all communications you have with the Canadian Maxsold, Inc.

22       **RESPONSE:** Defendant objects to this request as overbroad and unduly burdensome given

23   that it requires Defendant to produce all communications it had with Canadian Maxsold, Inc.

24   regardless of the relevance of such communications to any issue, claim, or defense asserted in this

25   case. Subject to the foregoing objection, Defendant answers as follows: Defendant will produce its

26   communications with the Canadian Maxsold, Inc. that are relevant to the claims and defenses asserted

27

28   in this case.

DEFENDANT 1000822913 US INC.'S RESPONSES TO PLAINTIFF'S
FIRST DISCOVERY REQUESTS - 8
#5800591 v1 / 77366-001

4.      Please produce all communications you have with Attorney Joe Goldberg, identified above.

**RESPONSE:** Defendant objects to this request as overbroad and unduly burdensome given that it requires Defendant to produce all communications it had with Goldberg regardless of the relevance of such communications to any issue, claim, or defense asserted in this case. Subject to the foregoing objection, Defendant answers as follows: All responsive, non-privileged communications will be produced.

5.      Please produce all communications you have with Attorney Devon McCurder, identified above.

**RESPONSE:** Defendant objects to this request as overbroad and unduly burdensome given that it requires Defendant to produce all communications it had with McCurdy regardless of the relevance of such communications to any issue, claim, or defense asserted in this case. Subject to the foregoing objection, Defendant answers as follows: All responsive, non-privileged communications will be produced.

6.      Please produce all documents within your access or possession related to 1000822913 Ontario Inc.'s purchase of the Canadian Maxsold, Inc., including documents related to the initiating communications, negotiations, and acquisition.

**RESPONSE:** Defendant objects to this request as overbroad and unduly burdensome given that it requests "all documents" regardless of relevancy to any claims, defenses, or issues in this case. Defendant objects to the extent this request is based on the false premise that 1000822913 Ontario

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1    Inc. purchased the Canadian Maxsold, Inc. As Defendant has explained, 1000822913 Ontario Inc.

2    purchased the assets of Canadian Maxsold, Inc. Defendant objects to this request as vague and

3    ambiguous due to the term "access." Subject to the foregoing objection, Defendant responds as

4    follows: Defendant will produce all relevant documents to 1000822913 Ontario Inc. purchase of the

5    assets of Canadian Maxsold, Inc.

6

7        7.      Produce All versions of your company's website Terms & Conditions and Privacy

8    Policies

9

10       **RESPONSE:** Defendant objects to this request as overbroad and unduly burdensome given

11   that it requests "all versions" of Defendant's Terms & Conditions regardless of relevancy to any

12   claims, defenses, or issues in this case. Defendant objects to the extent this request seeks documents

13   that are outside of Defendant's possession, custody, or control such as the Terms and Conditions of

14   Maxsold Inc. Subject to the foregoing objection, Defendant responds as follows: Defendant's Terms

15   and Conditions will be produced.

16

17       8.      Produce documents sufficient to show your annual revenue.

18       **RESPONSE:** Defendant objects to this request as vague and ambiguous due to the phrase

19   "sufficient to show." Defendant objects that this request is beyond the scope of discovery considering

20   the parties contemplated phased discovery with the current phase being limited to whether Defendant

21   is the successor entity of Maxsold, Inc., not damages. Defendant will supplement this response if the

22   Court determines that Defendant is the successor entity of Maxsold, Inc. and that the settlement

23   agreement is not enforceable against Defendant.

DEFENDANT 1000822913 US INC.'S RESPONSES TO PLAINTIFF'S
FIRST DISCOVERY REQUESTS - 10
#5800591 v1 / 77366-001

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

9.      Produce documents sufficient to show Maxsold, Inc.'s revenue before you started doing business as Maxsold in the United States.

**RESPONSE:** Defendant objects to this request as vague and ambiguous due to the phrase "sufficient to show." Defendant objects that this request is beyond the scope of discovery considering the parties contemplated phased discovery with the current phase being limited to whether Defendant is the successor entity of Maxsold, Inc., not damages. Defendant will supplement this response if the Court determines that Defendant is the successor entity of Maxsold, Inc. and that the settlement agreement is not enforceable against Defendant.

10.     Please produce all documents related to your response to Interrogatory No. 16.

**RESPONSE:** Defendant objects to this request given that there is no Interrogatory No. 16.

11.     Please produce all documents related to your response to Interrogatory No. 14.

**RESPONSE:** Defendant incorporates its objections to Interrogatory No. 14 as if fully set forth herein. Subject to the foregoing objections, Defendant responds as follows: It is unclear what documentation Plaintiff is seeking with this request. Defendant requests that Plaintiff clarifies what exactly she is asking for.

12.     Please produce all documents related to your response to Interrogatory No. 13.

**RESPONSE:** Defendant incorporates its objections to Interrogatory No. 13 as if fully set forth herein. Subject to the foregoing objection, Defendant responds as follows: After a reasonably diligent search, no responsive documents have been located.

DEFENDANT 1000822913 US INC.'S RESPONSES TO PLAINTIFF'S
FIRST DISCOVERY REQUESTS - 11
#5800591 v1 / 77366-001

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

13.      Please produce all documents related to your response to Interrogatory No. 12.

**RESPONSE:** Defendant incorporates its objections to Interrogatory No. 12 as if fully set forth herein. Subject to the foregoing objection, Defendant responds as follows: After a reasonably diligent search, no responsive documents have been located.

14.      Please produce all documents related to your response to Interrogatory No. 11.

**RESPONSE:** Defendant incorporates its objections to Interrogatory No. 11 as if fully set forth herein. Subject to the foregoing objection, Defendant responds as follows: After a reasonably diligent search, no responsive documents have been located.

15.      Please produce all documents related to your response to Interrogatory No. 10.

**RESPONSE:** Defendant incorporates its objections to Interrogatory No. 10 as if fully set forth herein. Subject to the foregoing objection, Defendant responds as follows: All responsive, non-privileged documents will be produced.

16.      Please produce all documents related to your response to Interrogatory No. 9.

**RESPONSE:** Defendant incorporates its objections to Interrogatory No. 9 as if fully set forth herein. Subject to the foregoing objection, Defendant responds as follows: All responsive, non-privileged documents will be produced.

17.      Please produce all documents related to your response to Interrogatory No. 8.

DEFENDANT 1000822913 US INC.'S RESPONSES TO PLAINTIFF'S
FIRST DISCOVERY REQUESTS - 12
#5800591 v1 / 77366-001

KARR TUTTLE CAMPBELL
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

1

**RESPONSE:** Defendant incorporates its objections to Interrogatory No. 8 as if fully set forth

2

herein. Subject to the foregoing objection, Defendant responds as follows: Defendant's terms and

3

conditions can be accessed at https://maxsold.com/terms-and-conditions.

4

5

6

18.     Please produce all documents related to your response to Interrogatory No. 7.

7

**RESPONSE:** Defendant objects to this request as overbroad and unduly burdensome given

8

that it requests "all documents" and thus, is not otherwise reasonably calculated to lead to the

9

discovery of admissible evidence. Subject to the foregoing objection, Defendant responds as follows:

10

This request seeks documents with proprietary and/or confidential information. Defendant will

11

produce such documents upon entry of an appropriate protective order.

12

13

14

15

19.     Please produce all documents related to your response to Interrogatory No. 6.

16

**RESPONSE:** Defendant incorporates its objections to Interrogatory No. 6 as if fully set forth

17

herein. Defendant objects that the documents sought in this request were already requested in Request

18

for Production No. 4.

19

20

21

20.     Please produce all documents related to your response to Interrogatory No. 5.

22

**RESPONSE:** Defendant incorporates its objections to Interrogatory No. 12 as if fully set forth

23

herein. Defendant objects that the documents sought in this request were already requested in Request

24

for Production No. 5.

25

26

27

28

DEFENDANT 1000822913 US INC.'S RESPONSES TO PLAINTIFF'S
FIRST DISCOVERY REQUESTS - 13
#5800591 v1 / 77366-001

1

**<u>REQUESTS TO ADMIT</u>**

2

    1.      Admit you have been conducting business in the United States under the "dba"

3

Maxsold.

4

5

    **<u>RESPONSE:</u>** Admit.

6

7

    2.      Admit that you derive revenue from doing business in the United States under the dba

8

"Maxsold."

9

    **<u>RESPONSE:</u>** Admit.

10

11

12

    3.      Admit you did not pay Maxsold, Inc., for the right to do business as "Maxsold" in the

13

United States.

14

    **<u>RESPONSE:</u>** Defendant can neither admit or deny this request considering it is vague and

15

16

ambiguous due to the phrase "right to do business."

17

18

    4.      Admit you have employed and employ former Maxsold, Inc., employees to work for

19

you.

20

    **<u>RESPONSE:</u>** Admit.

21

22

23

    5.      Admit you are using the same website property to do business in the United States that

24

Maxsold, Inc., used when doing business in the United States.

25

    **<u>RESPONSE:</u>** Deny.

26

27

28

K<small>ARR</small> T<small>UTTLE</small> C<small>AMPBELL</small>
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100

6.    Admit that you are aware Maxsold, Inc., had a pending lawsuit against it at the time the Canadian-based Maxsold, Inc, was purchased in bankruptcy.

**RESPONSE:** Admit.

7.    Admit that you and "1000822913 Ontario Inc." have the same officers and directors.

**RESPONSE:** Deny.

8.    Admit that you are aware 1000822913 Ontario Inc. intentionally excluded Maxsold, Inc., as an asset from its purchase of the Canadian Maxsold entity.

**RESPONSE:** Deny.

9.    Admit that you are aware 1000822913 Ontario Inc.'s purpose in excluding Maxsold, Inc., from its purchase of the Canadian-based Maxsold, Inc., was to attempt to avoid liability related to the pending lawsuit against Maxsold, Inc.

**RESPONSE:** Deny.

10.    Admit you were aware that before 1000822913 Ontario Inc. purchased the Canadian-based Maxsold, Inc., that the U.S.-based Maxsold, Inc., was negotiating a settlement with plaintiff.

**RESPONSE:**  Defendant objects to this request as vague and ambiguous due to the term "negotiating." Subject to the foregoing objection, Defendant answers as follows: Deny.

11.    Admit that you assumed all assets of Maxsold, Inc.

**RESPONSE:** Deny.

DEFENDANT 1000822913 US INC.'S RESPONSES TO PLAINTIFF'S
FIRST DISCOVERY REQUESTS - 15
#5800591 v1 / 77366-001

1    DATED this 21st day of February, 2025.

2                                                    KARR TUTTLE CAMPBELL

3                                                    *s/ Joshua R.M. Rosenberg*
4                                                    J. Dino Vasquez, WSBA #25533
                                                     Joshua R.M. Rosenberg, WSBA #58365
5                                                    701 Fifth Ave., Ste. 3300
6                                                    Seattle, WA 98104
                                                     Phone: (206) 223-1313
7                                                    Fax: (206) 682-7100
                                                     Email: dvasquez@karrtuttle.com
8                                                    Email: jrosenberg@karrtuttle.com
9                                                    *Attorneys for Defendant*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

**CERTIFICATE OF SERVICE**

3        I, Luci Brock, affirm and state that I am employed by Karr Tuttle Campbell in King County,

4    in the State of Washington.  I am over the age of 18 and not a party to the within action.  My business

5    address is 701 Fifth Ave., Suite 3300, Seattle, WA 98104.  On this day, I caused the foregoing

6
     document to be served on the party listed below in the manner indicated:
7

8    Samuel J. Strauss, WSBA #46971          ☐    Via U.S. Mail
     Alex Phillips, *pro hac vice*            ☐    Via Hand Delivery
9    Raina C Borrelli, *pro hac vice*         ☒    Via Electronic Mail
     Email: sam@straussborrelli.com           ☐    Via Overnight Mail
10   aphillips@straussborrelli.com            ☐    CM/ECF via court's website
     raina@straussborrelli.com
11   980 N. Michigan Ave., Ste. 1610
     Chicago, Illinois 60611
12   Phone: 872-263-1100
     Fax: 872-263-1109
13   *Attorneys for Plaintiff*

14

15   Anthony Paronich, *pro hac vice*         ☐    Via U.S. Mail
     Paronich Law PC                          ☐    Via Hand Delivery
16   350 Lincoln St Ste 2400                  ☒    Via Electronic Mail
     Hingham, MA 02043                        ☐    Via Overnight Mail
17   617-485-0018                             ☐    CM/ECF via court's website
     Email: anthony@paronichlaw.com
18   *Attorneys for Plaintiff*

19

20
         I declare under penalty of perjury under the laws of the state of Washington that the foregoing
21
     is true and correct.
22

23       Executed on this 21st day of February, 2025, at Seattle, Washington.

24

25                                         *s/Luci Brock*
                                           Luci Brock
26                                         Legal Assistant

27

28

DEFENDANT 1000822913 US INC.'S RESPONSES TO PLAINTIFF'S
FIRST DISCOVERY REQUESTS - 17
#5800591 v1 / 77366-001

K<small>ARR</small> T<small>UTTLE</small> C<small>AMPBELL</small>
701 Fifth Avenue, Suite 3300
Seattle, Washington 98104
Main: (206) 223 1313
Fax: (206) 682 7100