1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9

10

11

12

13

14

15

16

17

| | |
|---|---|
| VANESSA VANDERBRUG, as ADMINISTRATOR OF ESTATE OF KAY ANNE VANDERBRUG, and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>    v.<br><br>MAXSOLD INC.<br><br>and<br><br>1000822913 US INC.,<br><br>                    Defendants. | Case No. 2:22-cv-01707-BJR<br><br>Honorable Judge Barbara J. Rothstein<br><br>PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

18

**INTRODUCTION**

19

20

21

22

        Sometimes people plan their fraud over email, memorializing their intent to craft a "nice tidy situation" for themselves by deceiving someone else. This is that case. And while Defendant withholds those emails from its motion, it cannot ignore them from existence, nor can it hide its fraud from the Court.

23

24

25

        In 2024, Chris Reid wanted to buy a defunct online estate auction company called "MaxSold," a kind of eBay for estate sale property. The company was based in Canada, and it had

PL'S MEM. IN OPPOSITION TO
DEF'S MOT. FOR SUMMARY JUDGMENT -  1
Case No. 2:22-cv-01707-BJR

**STRAUSS BORRELLI PLLC**
980 N. Michigan Ave., Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100 | F: (872) 263-1109

a U.S.-based subsidiary "MaxSold Inc." for its U.S. operations. Canadian MaxSold and U.S. MaxSold separated their operations by market, with each maintaining their own employees, auction licenses, and customer contracts. But by 2023, Canadian MaxSold's solvency came into doubt, as the company was leveraged beyond what it could earn. Enter Chris Reid: a lower-level tech entrepreneur from Canada who saw opportunity in Canadian MaxSold's struggle. When the company declared bankruptcy in Canada under Canada law, he swooped in as the only "stalking horse" bidder to buy it during liquidation. And the company was happy to sell it to him, with its CEO Russ Patterson courting Mr. Reid through backchannels that excluded the Canadian trustee. But they encountered one problem: U.S. MaxSold was an asset within Canadian MaxSold's estate, and it came with a liability: Kay Vanderbrug's class action.

In 2022, Ms. Vanderbrug's son died, a tragedy that would prompt U.S. MaxSold to spam her phone with robocalls to pitch its "estate sale" services. Tactless, U.S. MaxSold never had Ms. Vanderbrug's consent to call her, causing her to sue the company in a TCPA class action and represent all those impacted by its misconduct. Given the facts, her case had strength that persuaded U.S. MaxSold to entertain a settlement—one Ms. Vanderbrug agreed to. Yet when it came time to sign the settlement and dismiss the case from this Court's docket, U.S. MaxSold ghosted her, with its counsel requesting stay extensions to close a deal their client never intended to honor. And now Plaintiff knows why.

By April 2024, Mr. Reid was buttoning up his deal to buy Canadian MaxSold but Ms. Vanderbrug's lawsuit vexed negotiations. The problem was Mr. Reid wanted U.S. MaxSold's assets, including its pending customer contracts, employees, U.S. auction licenses, and company "goodwill." But he did not want the lawsuit liability that came with it—a problem he and Mr. Patterson decided to solve through fraud.

PL'S MEM. IN OPPOSITION TO
DEF'S MOT. FOR SUMMARY JUDGMENT - 2
Case No. 2:22-cv-01707-BJR

STRAUSS BORRELLI PLLC
980 N. Michigan Ave., Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100 | F: (872) 263-1109

By email that month, Mr. Reid had proposed a plan to "abandon" U.S. MaxSold as a "zombie company attached to a Canadian shell that will be bankrupted as part of [an] orderly process… to ensure all liabilities are left behind." That way, the "US class action would have no path forward." But Mr. Reid would still strip U.S. MaxSold of its assets—including its "employee agreements" "licenses" and pending customer agreements—and put them in a "new" U.S. entity to run his U.S. operations, all without paying U.S. MaxSold for those assets. At the same time, Mr. Patterson planned to execute U.S. MaxSold's settlement with Ms. Vanderbrug but never fulfill it: "From that point, I think we can abandon it. By signing the deal and making that first payment, we ensure that the opposing counsel can now only attempt to chase the liability across to the Canadian entity or to a new US entity to get the rest of the settled amount, they can't chase us for the full potential of the class action lawsuit." Even so, he knew it was "quite possible for a determined and clever legal team to chase [Canadian MaxSold] or [a new U.S. entity], but for $200k or so, there is pretty much zero chance opposing counsel will bother. This is a nice tidy situation for the acquirer. Can freely set up a new [entity], or not, and leave the settlement behind either way."

But fraud is never "tidy" and Plaintiff's counsel was indeed "determined." Because while Defendants planned to make one payment on the settlement before "abandoning" it, they did not even do that. They abandoned it altogether, stripped U.S. MaxSold of its assets, and dumped them into "1000822913 US INC.," acting as if they could run the same company under the same dba name with the same assets but avoid its liabilities by changing its *legal* name. They cannot.

Washington law imposes "successor" liability in cases like this, and the Court should decline to dismiss this case for three reasons, all raising "material disputes of fact" preventing summary judgment. ***First***, Defendant collected its assets through fraud to escape liability and without paying consideration. ***Second***, Defendant is at minimum a "mere continuation" of U.S.

MaxSold. And **third**, even if Washington law does not apply (it does), federal common law establishes successor liability under its own elements.

Defendant's motion fails in part because it tries to deal with the facts above and below by hiding them from the Court, never mentioning them in its summary judgment motion. But all those facts are "material" to the issues before the Court and Defendant cannot ignore them from existence. That aside, Defendant speaks at length about U.S. bankruptcy law, when this case does not involve a U.S. bankruptcy, nor was U.S. MaxSold impacted by its parent's Canadian bankruptcy. The Court can thus dismiss those arguments on their face.

## BACKGROUND

### A.    The original MaxSold entities

From the start, Plaintiff emphasizes that Defendant is misconstruing the entity names in its motion. *See* Dkt. No. 76. While Defendant uses "MaxSold" throughout its motion, it is at times using that name to refer to any one of four entities. *Id.* For clarity, Plaintiff defines them as follows: Plaintiff refers to the original, pre-bankruptcy MaxSold entities as "Canadian MaxSold" for the Canadian parent company and "U.S. MaxSold" for the U.S. subsidiary that Ms. Vanderbrug originally sued. Plaintiff refers to the post-bankruptcy entities as "MaxSold Ontario" for the Canadian company that bought Canadian MaxSold and "Defendant" for the U.S. company Plaintiff seeks to impose "successor liability" on.

Canadian MaxSold was a Canadian corporation headquartered in Ontario. *See* Exhibit A. Canadian MaxSold operated estate sales throughout Canada. *See* Exhibit B, Deposition of Edward Durnil ("Durnil Dep."), 6:22–24. For context, Mr. Patterson was the President and CEO of Canadian MaxSold. *See* Exhibit C. To do business in the United States, Canadian MaxSold operated through its wholly owned subsidiary MaxSold Inc. ("U.S. MaxSold"), which was a Delaware corporation headquartered in New York. *See* Exhibit D.

STRAUSS BORRELLI PLLC
980 N. Michigan Ave., Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100 | F: (872) 263-1109

1    To do business in the United States, U.S. MaxSold held its own assets—including US

2 customer contracts, numerous US auction licenses, vendor contracts, customer goodwill and

3 reputation, at least 43 employees, the ability to collect and remit state and municipal sales taxes,

4 and the "setups for state filing requirements[.]" *See, e.g.,* Ex. C (discussing "US Seller contracts"

5 and "US Auction licenses" and the "auction license and setups for state filing requirements" and

6 that "I am not sure how we will collect and remit all the state and municipal sales taxes without a

7 US operating company"); Exhibit E (discussing "customers holding contracts with [U.S. MaxSold]

8 for post sale auctions" and that "I don't want to buy an impaired asset where the customers,

9 partners and brand have hundreds of auctions being unfulfillable"); Exhibit F (discussing the

10 importance of reputation and goodwill insofar as "[U.S. MaxSold] and [MaxSold Ontario] do not

11 want to destroy the value of the maxsold asset - eg screwing up not being able to deliver the service

12 offered to 100s of sellers"); Exhibit G, ¶ 7 (discussing the "one-full time employee . . . and 42

13 part-time casual employees" that were transferred from U.S. MaxSold to MaxSold Ontario);

14 Exhibit H ("The purpose of the US entity is to hold employment contracts and auction licenses for

15 our US-based full and part-time employees and for our US operations.").

16    **B.    Ms. Vanderbrug's class action & the parties' settlement**

17    Over three years ago, Plaintiff Kay Anne Vanderbrug sued U.S. MaxSold for numerous

18 violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. *See* Dkt. No. 1,

19 ¶¶ 1, 26–44. The case started after Ms. Vanderbrug's son passed away in April 2022. *Id*. ¶ 34.

20 Thereafter, U.S. MaxSold flooded her with telemarketing calls—including as early as 5:30 a.m.—

21 and solicited her "to retain MaxSold for an estate sale." *Id*. ¶¶ 35–44. However, Ms. Vanderbrug's

22 telephone number was listed on the National Do-Not-Call Registry for several years. *Id*. ¶ 29. For

23 that reason, she filed suit in this Court on December 2, 2022. *Id*. ¶ 1.

24

25 PL'S MEM. IN OPPOSITION TO
DEF'S MOT. FOR SUMMARY JUDGMENT - 5
Case No. 2:22-cv-01707-BJR

1    After over one year of litigation, Plaintiff and U.S. MaxSold successfully negotiated—and

2    agreed upon—an individual settlement. *See* Dkt. No. 27. Thus, on March 6, 2024, the parties filed

3    a Joint Notice of Settlement. *Id*. ("The parties file this notice to advise the Court that the parties

4    have reached a settlement in principle in this matter and expect to finalize the parties' settlement

5    agreement and file a stipulation of dismissal within forty-five (45) days.").

6    ### C.    Defendant's plan to defraud Ms. Vanderbrug

7    In April 2024, Canadian MaxSold filed for bankruptcy in Canadian court. *See* Exhibit I.

8    During the bankruptcy process, Canadian MaxSold created a "stalking horse bid" which proposed

9    that 1000822913 Ontario Inc. ("MaxSold Ontario") would purchase both Canadian MaxSold and

10   U.S. MaxSold. *See* Exhibit J. For context, Mr. Reid is the CEO of MaxSold Ontario *See* Exhibit

11   K, Deposition of Chris Reid, 72:25, 73:1–7. On April 26, 2024, Mr. Reid created 1000822913 US

12   Inc. ("Defendant") which is a Delaware corporation headquartered in Canada. *See* Exhibit L. Mr.

13   Reid is also the CEO of Defendant *See* Ex. G.

14   Unbeknownst to Plaintiff, Canadian MaxSold was planning to file for bankruptcy—and

15   sell all assets to MaxSold Ontario. *See* Ex. C. Specifically, MaxSold Ontario submitted a "stalking

16   horse bid" of $750,000.00 to the Canadian bankruptcy court. *See* Exhibit M, ¶ 2.2. Through the

17   bankruptcy sale, Mr. Patterson (the CEO of Canadian MaxSold) and Mr. Reid (the CEO of

18   MaxSold Ontario) schemed "to abandon" the settlement agreement with Plaintiff Vanderbrug. *See*

19   Ex. C. In fact, during his deposition, Mr. Reid admitted that the plan for "the class action

20   settlement" was that "plaintiffs would get nothing." *See* Ex. K, 116:21–24.

21   Initially, the stalking horse bid provided that MaxSold Ontario would purchase both

22   Canadian MaxSold and U.S. MaxSold. *See* Ex. J. But in April 2024, Mr. Reid began "considering

23   filing a change to exclude [U.S. MaxSold] from the purchase[.]" *Id*. Mr. Reid admitted that

24   MaxSold Ontario "intended to acquire all the assets necessary to run a business" and that "[i]t did

25

STRAUSS BORRELLI PLLC
980 N. Michigan Ave., Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100 | F: (872) 263-1109

1    not acquire any liabilities that would be a burden on it." *See* Ex. K, 103:11–15. Furthermore, Mr.

2    Reid confirmed that he "made the suggestion to abandon [U.S. MaxSold]" *Id.* 107:8–13.

3      The following excerpts—of emails between Mr. Patterson and Mr. Reid—reveal their

4    fraudulent intent:

5

6       **Mr. Patterson**: I had an opportunity to discuss the [U.S. MaxSold],
   situation further with our insolvency counsel.

7       The news is good. Assuming you don't acquire [U.S. MaxSold], if

8       we were to abandon it in the way you suggested, it would be a
   zombie company attached to a Canadian shell that will be

9       bankrupted later on as part of the orderly process Rahn has laid out
   to ensure the liabilities are left behind. She is of the opinion that the

10      US class action and any other claims would have no path forward.

11      . . .

12      **Mr. Patterson**: I don't see a scenario where [U.S. MaxSold], will
   be acquired by the purchaser. Either the purchaser will want to

13      operate in the US and already have their own company to take on
   employee agreements and licenses, or they will want to work in the

14      US on the basis you have in mind, leaving a heap of debt behind, or
   they will not want to operate in the US. . . . I can't think of a scenario

15      where a new owner would want to keep the [U.S. MaxSold], or
   where I would recommend that they do so.

16      . . .

17      **Mr. Reid**: glad to see everyone agrees the burden in [U.S. MaxSold]
   isn't worth the cost.

18      . . .

19

20      **Mr. Patterson**: On the [U.S. MaxSold], the final class action suit
   settlement is now in my hands for signature. Pending approval from

21      Trustee and lawyers, I will sign it, and we will try to make the first
   payment out of the pre-purchase funds assuming I can get the trustee

22      to approve. . . .

23      When the first payment is made, we get a release against [U.S.
   MaxSold], [Canadian MaxSold], and directors and officers. From

24      that point, I think we can abandon it. By signing the deal and making
   that first payment, we ensure that the opposing counsel can now only

25

attempt to chase the liability across to the Canadian entity or to a new US entity to get the rest of the settled amount, they can't chase us for the full potential of the class action lawsuit.

Our US GCs believe that it is quite possible for a determined and clever legal team to chase [Canadian MaxSold] or new [U.S. MaxSold], but for $200k or so, there is pretty much zero chance opposing counsel will bother. This is a nice tidy situation for the acquirer. Can freely set up a new [U.S. MaxSold], or not, and leave the settlement behind either way.

. . .

**Mr. Patterson**: Do you have a perspective re me signing a class action settlement agreement during this sales period? . . . We have already delayed and dragged this along as much as we can.

The way I see it, signing the agreement is not a decision, it's just preserving optionality. If we don't sign, we lose the option to make the first payment, the settlement vapourizes, and the plaintiff can still in theory try to pursue what they believe can be a large class action. If we do sign, we can still decide to make the first payment or not.

While the class action may be left behind in the old [U.S. MaxSold], it's better to leave a settlement in dispute than to leave the entire class action in dispute, since it changes the risk/reward for opposing counsel to try to chase the liability to the new Canadian company or the new US company.

. . .

**Mr. Reid**: Russ it's pretty reliable to say I don't see any reason to purchase the shares of [U.S. MaxSold] at this point[.]

*See* Ex. C. Mr. Reid and Mr. Patterson would execute that plan but with one change: they would not even make the first payment under the settlement, instead "abandoning" it altogether while plundering U.S. MaxSold's assets.

Ultimately, U.S. MaxSold was excluded from the bankruptcy sale—and the conspirators succeeded in transforming U.S. MaxSold into "a zombie company attached to a Canadian shell that will . . . ensure the liabilities are left behind[.]" *See* Ex. C; Ex. G (confirming that U.S.

**STRAUSS BORRELLI PLLC**
980 N. Michigan Ave., Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100 | F: (872) 263-1109

MaxSold was excluded from the sale). And on March 14, 2024, the bankruptcy court approved the sale of Canadian MaxSold to MaxSold Ontario. *See* Ex. I. Thus, both the assets and liabilities of U.S. MaxSold were abandoned. *See id*. But Plaintiff stresses there is *no evidence* Mr. Reid or Mr. Patterson ever informed the trustee or bankruptcy court about their plan to take U.S. MaxSold's assets anyway, nor is that intent reflected anywhere in the bankruptcy filings.

Thereafter, U.S. MaxSold disappeared. *See* Dkt. Nos. 30, 31, 43. First, U.S. MaxSold declined to execute the settlement agreement with Plaintiff Vanderbrug. *See* Dkt. No. 30. And U.S. MaxSold refused to confirm whether it would eventually execute the settlement agreement. *Id*. Then, U.S. MaxSold refused to pay its defense attorneys. *See* Dkt. No. 31, at 2. And then, U.S. MaxSold failed to appear before the Court on August 8, 2024. *See* Dkt. No. 43.

In sum, Defendants "delayed" and "dragged [] along" the settlement with Plaintiff Vanderbrug, as was their plan. *See* Ex. C ("Do you have a perspective re me signing a class action settlement agreement during this sales period? . . . We have already delayed and dragged this along as much as we can."). And Ms. Vanderbrug sadly passed away 408 days after the parties filed the Joint Notice of Settlement. *Compare* Dkt. No. 27 *with* Dkt. No. 72 (notifying the Court that Plaintiff Kay Anne Vanderbrug passed away).

### D.    Defendant fraudulently transfers assets to itself.

Defendant then plundered the corpse of U.S. MaxSold for its assets—assets from a company that was supposed to be excluded from the Canadian bankruptcy. *See, e.g.,* Ex. C; Ex. K, 102:3–6 (admitting that Defendant was "set up . . . for the express purpose of being an employment org and holding auction licenses"). Thereafter, Mr. Reid created Defendant to hold the assets that were plundered from U.S. MaxSold. *See* Ex. L; Ex. K, 74:6–75:7, 78:5–79:8. Notably, in its Motion for Summary Judgment, Defendant confirmed the continuity of ownership between the relevant entities—explaining that Sath Dosanjh is a "related party between the

1   purchaser and MaxSold" and that he "owns a 1.73% interest in [MaxSold Ontario]." *See* Dkt. 76,

2   at 3.

3        For one, the preexisting customer contracts were transferred from U.S. MaxSold to

4   Defendant. *See* Ex. K, 132:20–24. Indeed, Mr. Reid explained that contracts "will then be assigned

5   to new [Defendant] at close" and "[s]ince we'll be assuming all auction contracts we'll be

6   responsible for all auctions post close: credits, refunds, commission payments, paying sellers,

7   etc[.]" *See* Ex. J; Exhibit N. Furthermore, "one-full time employee . . . and 42 part-time casual

8   employees" were transferred from U.S. MaxSold to Defendant. *See* Ex. G.

9        The auction licenses were also transferred from U.S. MaxSold to Defendant. *See* Ex. K,

10  132:20–24. Historically, U.S. MaxSold had contracted with Ed Durnil, a U.S.-based auctioneer, to

11  use his various auction licenses. *See* Exhibit O. These auction licenses were highly valuable to

12  U.S. MaxSold—and Mr. Patterson explained that "Ed Durnil . . . is the one who holds our auction

13  licenses in the United States . . . [b]y permitting us to operate under his auction licenses, he's

14  exposing himself to a little bit of risk and liability[.]" *Id*. Before the bankruptcy sale, U.S. MaxSold

15  was using the auction licenses of Ed Durnil pursuant to a 2017 contract. *See* Ex. B, 42:15–20.

16       After the bankruptcy sale, the auction licenses were seamlessly transferred from U.S.

17  MaxSold to Defendant. *Id*. In fact, Defendant declined to execute a new contract with Ed Durnil.

18  *Id*. And as of August 7, 2025, Ed Durnil admitted that he was "still operating under the 2017

19  contract" with U.S. MaxSold. *Id*.; *see also* Ex. K, 19:8–21 (admitting that "there's not an executed

20  contract").

21       Critically, MaxSold Ontario and Defendant did not provide any consideration for these

22  assets. *See* Ex. K, 100:8–18 (admitting that "[MaxSold Ontario] did not purchase assets from [U.S.

23  MaxSold]"). After all, U.S. MaxSold was explicitly excluded from the bankruptcy sale. *See* Ex.

24

25
   STRAUSS BORRELLI PLLC
980 N. Michigan Ave., Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100 | F: (872) 263-1109

1  G. Simply put, Defendant schemed to abandon the liabilities of U.S. MaxSold while seizing its

2  assets (and without paying any consideration for those assets).

3  **LEGAL STANDARD**

4  Summary judgment is appropriate only when "viewing the evidence in the light most

5  favorable to the nonmoving party, there is no genuine dispute as to any material fact." *Zetwick v.*

6  *Cty. of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017) (internal quotation omitted). The "moving party

7  bears the initial burden of identifying portions of the record that demonstrate the absence of a fact

8  or facts necessary for one or more essential elements of each claim." *InteliClear, LLC v. ETC*

9  *Glob. Holdings, Inc*., 978 F.3d 653, 657 (9th Cir. 2020).

10  **ARGUMENT**

11  Defendant's strategy in moving for summary judgment hinges on hiding facts from the

12  Court and applying bankruptcy law that does not apply. As explained below, successor liability

13  applies—both as a matter of law and equity—and the record establishes genuine disputes of

14  material fact. *See Zetwick*, 850 F.3d at 440. Thus, Defendant fails to satisfy "the initial burden of

15  identifying portions of the record that demonstrate the absence of a fact or facts necessary for one

16  or more essential elements of each claim." *InteliClear*, 978 F.3d at 657. Thus, the Court should

17  deny the motion.

18  **A. The record establishes genuine disputes of material fact regarding three theories of successor liability.**

19  Normally, the "general rule in Washington is that a corporation purchasing the assets of

20  another corporation does not, by reason of the purchase of assets, become liable for the debts and

21  liabilities of the selling corporation." *Little v. Hardie-Tynes Co., Inc*., 574 P.3d 1066, 1071 (Wash.

22  Ct. App. 2025) (quoting *Hall v. Armstrong Cork*, 692 P.2d 787, 789 (1984)). The "rationale for

23  this rule is a 'bona fide purchaser who gives adequate consideration and who lacks notice of prior

24

25

1   claims . . . acquires no liability[.]'" *Eagle Pac. Ins. Co. v. Christensen*, 959 P.2d 1052, 1055 (1998)

2   (quoting *Hall*, 692 P.2d at 790).

3       However, common law provides for "successor liability" which "is an equitable

4   doctrine[.]"[1] *Carpenters Health & Sec. Tr. W. Wash. v. Paramount Scaffold, Inc.*, 159 F. Supp. 3d

5   1229, 1235 (W.D. Wash. 2016). Courts are clear that "[b]ecause the origins of successor liability

6   are equitable, fairness is a prime consideration in its application." *Id.* (quoting *Resilient Floor*

7   *Covering Pension Tr. Fund Bd. Trs. v. Michael's Floor Covering, Inc.*, 801 F.3d 1079, 1091 (9th

8   Cir. 2015)). And "in light of the difficulty of the successorship question . . . emphasis on the facts

9   of each case as it arises is especially appropriate." *IBEW Pac. Coast Pension Fund v. Harris Elec.,*

10   *Inc.*, No. C18-0181JLR, 2020 U.S. Dist. LEXIS 87069, at *13 (W.D. Wash. May 18, 2020)

11   (quoting *Howard Johnson Co., Inc. v. Detroit Local Joint Exec. Bd.*, 417 U.S. 249, 256 (1974)).

12       Under Washington law, a corporate successor is liable when "(1) the purchaser expressly

13   or impliedly agrees to assume liability; (2) the purchase is a de facto merger or consolidation; (3)

14   the purchaser is a mere continuation of the seller; or (4) the transfer of assets is for the fraudulent

15   purpose of escaping liability." *Stevens v. Jonov*, No. 85148-9-I, 2025 Wash. App. LEXIS 1506, at

16   *12 (Ct. App. Aug. 4, 2025) (quoting *Eagle*, 959 P.2d at 1055).

17       Additionally, federal common law provides successor liability "against even a genuinely

18   distinct purchaser of a business if (1) the successor had notice of the claim before acquisition, and

19   (2) there was a substantial continuity in operations of the business before and after the sale.'"

20

21   ───────────────

22   [1] For successor liability, there is minimal conflict between Washington common law and federal
    common law. *See United States ex rel. Klein v. Omeros Corp.*, 897 F. Supp. 2d 1058, 1065 (W.D.

23   Wash. 2012) (finding that, for successor liability, the "traditional exceptions under federal
    common law are identical to those under Washington law").

24

25
                    **STRAUSS BORRELLI PLLC**
    980 N. Michigan Ave., Suite 1610
    Chicago, Illinois 60611
    T: (872) 263-1100 | F: (872) 263-1109

1   *IBEW*, 2020 U.S. Dist. LEXIS 87069, at *13 (W.D. Wash. 2020) (quoting *Paramount*, 159 F.

2   Supp. 3d at 1234 (W.D. Wash. 2016)).

3          The Court should deny the motion because the record establishes genuine disputes of

4   material fact under three liability theories. First, successor liability applies because  Defendant

5   fraudulently obtained the assets of U.S. MaxSold without paying any consideration and to escape

6   liability. Second, successor liability applies because Defendant is a "mere continuation" of U.S.

7   MaxSold. And third, successor liability applies under federal common law because Defendant had

8   notice of the settlement agreement, and there was "substantial continuity" between U.S. MaxSold

9   and Defendant.

10          **1.    Defendant fraudulently obtained the assets of U.S. MaxSold without paying any consideration and to escape liability.**

11          Under Washington law, a corporate successor is liable when "the transfer of assets is for

12   the fraudulent purpose of escaping liability." *Stevens*, 2025 Wash. App. LEXIS 1506, at *12.

13   However, Washington courts have used somewhat different—but overlapping—formulations of

14   the "fraudulent transfer theory." *See infra*. For completeness, Plaintiff discusses each formulation.

15          **The record is sufficient under *Eagle*.** In *Eagle*, the Washington Supreme Court explained

16   that the "fraudulent transfer theory is usually discussed as having at least two alternative elements."

17   959 P.2d at 1056. For one, "insufficient consideration is . . . a sufficient element" to establish that

18   "the transfer of assets was fraudulent." *Id*. Alternatively, the "intent behind the transfer of assets

19   can render the transaction fraudulent[.]" *Id*. at 1058. For example, in *Eagle*, the first element was

20   *not* satisfied because plaintiff was unable "to establish inadequate consideration[.]" *Id*. at 1056–

21   61. However, the second element was satisfied because "the assets were transferred . . . to avoid

22   the reach of the creditors." *Id*. Based on the second element alone, the Washington Supreme Court

23

24

25   PL'S MEM. IN OPPOSITION TO
     DEF'S MOT. FOR SUMMARY JUDGMENT -  13
     Case No. 2:22-cv-01707-BJR

STRAUSS BORRELLI PLLC
980 N. Michigan Ave., Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100 | F: (872) 263-1109

affirmed the imposition of successor liability—noting that "insufficient consideration is merely a sufficient element" but it is not "a necessary element for a finding of fraud." *Id*.

In other words, if the business paid nothing for the assets or intend fraud when acquiring them, that business incurs liability as a successor. Here, the record establishes liability under both theories. First, the "insufficient consideration" element is satisfied because Defendant obtained the assets of U.S. MaxSold without paying any consideration. *See, e.g.,* Ex. K, 100:8–18; Ex. G. Thus, this case succeeds where the plaintiff in *Eagle* failed. *Id*. And second, the "intent behind the transfer" element is satisfied because the plan for "the class action settlement" was that "plaintiffs would get nothing." *See* Ex. K, 116:21–24. And like the defendant in *Eagle*, Defendant fraudulently transferred the assets so that "the USclass action and any other claims would have no path forward." *See* Ex. C. Thus, the record suffices under *Eagle*, and the Court should deny the motion.

**The record is sufficient under *Northgate*.** In *Northgate*, the court explained that "[a] fraudulent transfer can be shown by proving (1) fraud or actions otherwise lacking good faith, (2) insufficient consideration received for the assets, and (3) that the predecessor was left unable to respond to creditor's claims." *Northgate Ventures, LLC v. Geoffrey H. Garrett, PLLC*, 450 P.3d 1210, 1218 (Wash. Ct. App. 2019) (citing *Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp*., 934 P.2d 715, 721 (Wash. Ct. App. 1997). In *Northgate*, the plaintiff failed to establish a "fraudulent transfer" theory because there was no transfer of assets at all (all assets were properly liquidated and distributed *pro rata* to the creditors). *Id*. Put another way, the defendant avoided liability because it complied with its obligations to liquidate and pay its creditors.

In sharp contrast to *Northgate*, the U.S. MaxSold never liquidated its assets because Mr. Reid planned to take them for free. *See, e.g.,* Ex. C; Ex. G; Ex. K, 74:6–75:7, 78:5–79:8, 102:3–6.

PL'S MEM. IN OPPOSITION TO
DEF'S MOT. FOR SUMMARY JUDGMENT - 14
Case No. 2:22-cv-01707-BJR

STRAUSS BORRELLI PLLC
980 N. Michigan Ave., Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100 | F: (872) 263-1109

He and Defendant plundered U.S. MaxSold and obtained the assets without paying any consideration. *Id*.

Furthermore, the record here establishes genuine disputes of material fact regarding the "fraudulent transfer theory" as articulated in *Northgate*. First, the "fraud or actions otherwise lacking good faith" element is satisfied because Defendant defrauded Plaintiff Vanderbrug by abandoning U.S. MaxSold during the bankruptcy to create "a zombie company attached to a Canadian shell" so that "the liabilities are left behind" and "the USclass action and any other claims [] have no path forward." *See* Ex. C. Second, the "insufficient consideration" element is satisfied because Defendant obtained the assets of U.S. MaxSold without paying any consideration. *See, e.g.,* Ex. K, 100:8–18; Ex. G. And third, the "predecessor was left unable to respond" element is satisfied because Defendant plundered U.S. MaxSold for its assets and then abandoned the entity. *See, e.g.,* Ex. C; Ex G; Ex. K, 74:6–75:7, 78:5–79:8, 102:3–6. Thus, the record is sufficient under *Northgate*, and the Court should deny the motion.

***Culinary Workers* is analogous and compelling.** Notably, in the analogous *Culinary Workers*, the Washington Supreme Court affirmed a finding of successor liability. *Culinary Workers & Bartenders Union No. 596 Etc v. Gateway Cafe*, 588 P.2d 1334, 1343 (1979).[2] There, the plaintiffs and a corporation named "Gateway" both "agreed to a compromise settlement." *Id*. However, Gateway "began a series of actions which appear to have been designed to avoid their settlement responsibilities." *Id*. Then, Gateway was dissolved—and "Bypass, a new corporation . . . received all Gateway's assets." *Id*. Based on those facts, the Washington Supreme Court concluded that Bypass was liable. *Id*. Indeed, the Washington Supreme Court explained that

---

[2] Later, the Washington Supreme Court explained that the holding of *Culinary Workers* was predicated on "the fraudulent transfer theory." *Eagle*, 959 P.2d at 1057.

STRAUSS BORRELLI PLLC
980 N. Michigan Ave., Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100 | F: (872) 263-1109

to hold otherwise "would in effect place the trial court in the untenable position of assisting in the accomplishment of a breach of duty[.]" *Id*.

Like *Culinary Workers*, the Plaintiff and U.S. MaxSold agreed to settlement—but then U.S. MaxSold and Defendant began a series of actions to abandon the settlement agreement. *See* Ex. K, 116:21–24 (admitting that the plan for "the class action settlement" was that "plaintiffs would get nothing"). Thus, like the defendant in *Culinary Workers*, Defendant now asks the Court to "assist[] in the accomplishment of a breach of duty" so that Defendant can "avoid [its] settlement responsibilities." *See* 588 P.2d at 1343.

In sum, *Eagle*, *Northgate*, and *Culinary Workers* provide applicable guidance—and the record sufficiently establishes the "fraudulent transfer theory" of successor liability. Thus, the Court should deny the motion.

2. **Successor liability applies because Defendant is a mere continuation of U.S. MaxSold.**

Under Washington law, a corporate successor is liable when "the purchaser is a mere continuation of the seller[.]" *Stevens*, 2025 Wash. App. LEXIS 1506, at *12. Here the record establishes genuine disputes of material fact regarding the continuity between U.S. MaxSold and Defendant. *See infra*.

For example, in *Columbia State Bank v. Invicta Law Grp. PLLC*, the trial court applied successor liability pursuant to the "mere continuation" exception. 402 P.3d 330, 338 (Wash. Ct. App. 2017). There, the initial entity declared bankruptcy and transferred its assets to the successor entity. *Id*. at 335. Thereafter, the successor entity continued to use the same name, inventory, employees, and contracts (e.g., lease and insurance). *Id*. at 339. After a bench trial, the court found the defendant liable under the "mere continuation" exception. *Id*. at 336. On appeal, the Court of Appeals affirmed—and concluded that "when an entity merely changes its entity status but

continues in the same business, with the same clients, that transition meets the requirements for asset transfer under the mere continuation theory." *Id*. at 339. Like *Columbia*, the initial entity (U.S. MaxSold) transferred its assets to a successor entity (here, Defendant), but ran the same business with the same employees and contracts. *See, e.g.,* Ex. C; Ex G; Ex. K, 74:6–75:7, 78:5–79:8, 102:3–6. That included the same name, employees, customer contracts, and vendor contracts (e.g., the auction license contract from 2017 with Ed Durnil). *Id*.; *see also* Ex. B.

Also, in the analogous *Leren v. Kaiser Gypsum Co*., the defendant extracted the assets from a business and left "no more than a mere corporate shell.'"[3] 442 P.3d 273, 281 (Wash. Ct. App. 2019). Thereafter, the defendant "held itself out as a continuation of [the business] post-dissolution" and "continued to use [the] name" and "maintained many of the same employees[.]" *Id*. Based on those facts, the trial court applied successor liability and denied the defendant's motion for summary judgment—which was then affirmed by the Washington Court of Appeals. *Id*. at 282. Like the defendant in *Leren*, Defendant extracted the assets from U.S. MaxSold and left "a zombie company attached to a Canadian shell[.]" *See, e.g.,* Ex. C; Ex G; Ex. K, 74:6–75:7, 78:5–79:8, 102:3–6. Additionally, Defendant held itself out as "MaxSold" and continued to use the same employees and auction licenses. *Id*.

In sum, *Columbia* and *Leren* provide applicable guidance—and the record sufficiently establishes the "mere continuation" theory of successor liability. Thus, the Court should deny the motion.

---

[3] In *Leren*, the court applied the "product line doctrine." 442 P.3d at 279. However, the "continuation" element of the product line doctrine overlaps with the "mere continuation" analysis. *See id*. Thus, Plaintiff respectfully submits that *Leren* is persuasive authority regarding "continuation."

STRAUSS BORRELLI PLLC
980 N. Michigan Ave., Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100 | F: (872) 263-1109

### 3.    Successor liability applies because Defendant had notice of the litigation and there was substantial continuity in operations.

Even if Defendant legitimately obtained the assets of U.S. MaxSold—it did not—Defendant is nonetheless liable because federal common law provides successor liability "against even a genuinely distinct purchaser of a business if (1) the successor had notice of the claim before acquisition, and (2) there was a substantial continuity in operations of the business before and after the sale.'" *IBEW*, 2020 U.S. Dist. LEXIS 87069, at *13 (W.D. Wash. 2020) (quoting *Paramount*, 159 F. Supp. 3d at 1234 (W.D. Wash. 2016)); *see also GCIU-Employer Ret. Fund v. MNG Enters.*, 51 F.4th 1092, 1096, 1101 (9th Cir. 2022) (explaining that "[t]he common-law rule creating successor liability applies when the purchaser is (1) a successor and (2) has notice of the liability" and holding that "the district court abused its discretion by not considering successor liability").

For example, in *Paramount*, the court denied the defendant's motion for summary judgment and found that the defendant was "a successor corporation[.]" 159 F. Supp. 3d at 1234, 1238. In fact, the court granted summary judgment for the plaintiffs regarding successor liability. *Id.* at 1238 ("Having determined that [defendant] is a successor . . . [and] that it had pre-sale knowledge . . . the Court finds it appropriate to enter Judgment in favor of Plaintiffs[.]").

In doing so, the court considered the "'substantial continuity' between the old and new enterprise." *Id.* at 1234 (quoting *Haw. Carpenters Trust Funds v. Waiola Carpenter Shop, Inc.*, 823 F.2d 289, 294 (9th Cir. 1987)). There, the defendant purchased the assets of a corporation named "Paramount" during a bankruptcy sale. *Id.* at 1234. Then, the bankruptcy court entered an order approving the sale—declaring the defendant "free and clear" of liability. *Id.*

At summary judgment, the defendant highlighted "the differences between the two companies[.]" *Id.* at 1232. For one, Paramount "was a unionized company; had more than 400 employees; owned 50-60 vehicles; held locations in Washington, Nevada, Louisiana, as well as

STRAUSS BORRELLI PLLC
980 N. Michigan Ave., Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100 | F: (872) 263-1109

Northern and Southern California . . . [and] had approximately 4,044 customers[.]" *Id*. at 1232. In sharp contrast, the defendant was "a non-union company" that leased "about 70 individuals from a Professional Employer Organization" and had "25 vehicles . . . a single location in Southern California . . . approximately 1,500 customers" and did "not perform any work in Nevada, Washington, Louisiana, or any other state outside California[.]" *Id*.

Despite these substantial differences, the court concluded that defendant was "a successor to Paramount" after considering the "totality of the circumstances" including the "significant cross-over in the services formerly offered by Paramount and now offered by [defendant]" and that many of the employees and managers were "largely the same[.]" *Id*. at 1235–36. Moreover, the court emphasized that the new entity was created "to address outstanding debt and move forward under a model more attractive to investors with less risk[.]" *Id*.

Like *Paramount*, the record establishes both prongs of the federal common law exception. *See* 159 F. Supp. 3d at 1234. First, Defendant "had notice" of the class action lawsuit and the settlement agreement with Plaintiff Vanderbrug. *See* Ex. H (stating that the lawsuit "has to do with US Do Not Call list violations"); Ex. C (planning to abandon the settlement agreement). And second, as discussed above, there was "substantial continuity" between U.S. MaxSold and Defendant including the same name, employees, customer contracts, and vendor contracts (e.g., the auction license contract from 2017 with Ed Durnil). *See, e.g.,* Ex. C; Ex G; Ex. K, 74:6–75:7, 78:5–79:8, 102:3–6.

In sum, the record establishes genuine disputes of material fact regarding three alternative theories of successor liability—and each theory is sufficient, by itself, to render summary judgment improper. Thus, the Court should deny the motion.

STRAUSS BORRELLI PLLC
980 N. Michigan Ave., Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100 | F: (872) 263-1109

**B. Defendant misconstrues the bankruptcy order and fails to address the factual record.**

Defendant hinges much of its argument on the "free and clear" language in the order of the Canadian bankruptcy court. *See* Dkt. No. 76, at 4, 5, 7, 8, 9, and 10. However, the bankruptcy order—including the "free and clear" language—does not apply to U.S. MaxSold because it was excluded from the bankruptcy sale. *See, e.g.,* Ex. C; Ex. G. In other words, the bankruptcy order preserved the liabilities of U.S. MaxSold—which necessarily include the claims of Plaintiff Vanderbrug and the settlement agreement. On this point, Defendant fails to explain why the bankruptcy of a Canadian parent corporation necessarily releases the debts (and liabilities) of a distinct United States subsidiary.

Courts recognize that the bankruptcy of one legal entity does not release a separate legal entity that was excluded from the bankruptcy. *See, e.g., In re Eastman Kodak Co*., 624 B.R. 46, 54 (Bankr. S.D.N.Y. 2020) (denying motion to enjoin lawsuits against a subsidiary because its liabilities were not discharged through the bankruptcy of its parent company); *Cortes v. Juquila Mexican Cuisine Corp*., No. 17-CV-3942, 2020 U.S. Dist. LEXIS 266558, at *6 (E.D.N.Y. July 30, 2020) (finding that "the fact that a non-debtor defendant is wholly owned by a debtor should not result in the extension of the bankruptcy to that third-party defendant").

For example, even if a parent entity and its subsidiary are intertwined debtors for the same debt, the bankruptcy of the parent does not discharge the non-filing subsidiary. *See Copelin v. Spirco, Inc*., 182 F.3d 174, 182 (3d Cir. 1999) ("Generally, independent obligations of a parent corporation are not discharged by its subsidiary's bankruptcy absent a general discharge provision. . . . it does not follow that a discharge in bankruptcy alters the right of the creditor to collect from third parties. Section 524(e) specifically limits the effect of a discharge. It provides

that '. . . discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.'") (internal quotation omitted).

Like the United States, courts in Canada also respect the corporate form in bankruptcy. *See Coast-To-Coast Produce, LLC v. Lakeside Produce USA, Inc*., 709 F. Supp. 3d 413, 442 (E.D. Mich. 2023) ("A similar standard prevails in Canada, although the test appears less settled. A court may pierce the corporate veil where '[the corporation] is completely dominated, controlled, and being used as a shield for fraudulent or improper conduct.' . . . 'Generally, a subsidiary, even a wholly owned subsidiary, will not be found to be the alter ego of its parent unless the subsidiary is under the complete control of the parent and is nothing more than a conduit used by the parent to avoid liability.'") (quoting *Transamerica Life Ins. Co of Canada v Canada Life Assurance Co*. (1996), 28 O.R. 3d 423, 433-34, (Can. Ont. Gen Div. Ct)). And Defendant never explains why a U.S.-based subsidiary would benefit from a Canadian-based parent's bankruptcy.

Moreover, Washington courts recognize that bankruptcy proceedings do not *per se* extinguish successor liability, even for the bankrupt entity. *See, e.g., Columbia*, 402 P.3d at 335–41 (Wash. Ct. App. 2017) (applying successor liability when an entity declared bankruptcy and transferred assets to a successor); *Paramount*, 159 F. Supp. 3d at 1234 (W.D. Wash. 2016) (denying motion for summary judgment and applying successor liability because "a second chance is precisely the point of successor liability, and it is not clear why an intervening bankruptcy proceeding, in particular, should have a *per se* preclusive effect") (internal quotation omitted).

Even if U.S. MaxSold was included in the bankruptcy order—it was not—such "free and clear" language is immaterial when successor liability applies. *See Paramount*, 159 F. Supp. 3d at 1234–36. For example, in *Paramount*, the defendant argued for summary judgment when the "bankruptcy court entered an order approving the sale of [] assets . . . free and clear[.]" *Id*. The court rejected that argument and denied the motion for summary judgment—declaring that "the

STRAUSS BORRELLI PLLC
980 N. Michigan Ave., Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100 | F: (872) 263-1109

Court agrees with Plaintiffs that [defendant] is a successor to [the bankrupt entity]." *Id*. Like the defendant in *Paramount*, Defendant is subject to successor liability, and the "free and clear" language is not dispositive.

Similarly, in *IBEW*, the plaintiff sought "delinquent contributions" from a corporation named "Harris." 2020 U.S. Dist. LEXIS 87069, at *2 (W.D. Wash. 2020). However, Harris entered receivership in Washington state court—and then sold some assets to a third-party corporation named "Mackay." *Id*. at *3. The Washington court ordered that Mackay received the assets "free and clear" and "shall have no liability for any Liens, Claims, Encumbrances and Interests." *Id.* at *4. Then, Harris sold its remaining assets to "various other businesses" and was then "administratively dissolved[.]" *Id*. at *2, fn. 2, 5. Thereafter, the plaintiff sought to collect the "delinquent contributions" from the successor corporation Mackay. *Id*. at *9.

Like Defendant does here, Mackay argued that plaintiff was "barred from asserting successor liability . . . because Mackay purchased free and clear [the] assets[.]" *Id*. Critically, Judge Robart rejected this argument—and analogized to the bankruptcy-focused decision *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Independent) Pension Fund v. Tasemkin*, 59 F.3d 48 (7th Cir. 1995). There, "the Seventh Circuit first recognized the successor relationship between the two businesses involved, including notice of the plaintiff's claim and continuity of the business when the entity at issue changed ownership and morphed from what the *Tasemkin* court referred to as the 'Old Tasemkin' into the 'New Tasemkin.'" 2020 U.S. Dist. LEXIS 87069, at *17–21 (quoting 59 F.3d at 49–50).

Initially in *Tasemkin*, the district court "refus[ed] application of the successorship doctrine due to the intervening bankruptcy of the 'Old Tasemkin[.]'" *Id*. (quoting 59 F.3d at 50). But the Seventh Circuit reversed and remanded—reasoning that successor liability applied because the bankruptcy "had the effect, intended or no, of frustrating [claimants] while resurrecting virtually

STRAUSS BORRELLI PLLC
980 N. Michigan Ave., Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100 | F: (872) 263-1109

the identical enterprise." *Id*. Following *Tasemkin*, Judge Robart concluded that "the court rejects Mackay's argument that the Harris Receivership or the sale . . . 'cut[s] off' any possibility of successor liability[.]" *Id*. (quoting 59 F.3d at 50). However, Judge Robart granted dismissal—with leave to amend—because the plaintiff failed to establish that Mackay "had notice" of the plaintiff's claim. *Id*. at *21.

In sharp contrast to *IBEW*, the record decisively establishes that Defendant "had notice" of the class action litigation and the settlement agreement with Plaintiff Vanderbrug. *See, e.g.,* Ex. C; Ex H. Thus, Plaintiff Vanderbrug succeeds precisely where the plaintiff in *IBEW* failed—and the record sufficiently establishes that successor liability applies to Defendant.

In sum, *Columbia*, *Paramount*, *IBEW*, and *Tasemkin* provide applicable guidance—and Defendant's reliance on the bankruptcy order is fatally misplaced. Thus, the Court should deny the motion.p

### CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court deny the motion for summary judgment.

DATE: December 19, 2025

Respectfully submitted,

By: /s/ *Alex Phillips*
Alex Phillips (*pro hac vice*)
Samuel J. Strauss, WSBA No. #46971
Raina C. Borrelli (*pro hac vice*)
**STRAUSS BORRELLI PLLC**
980 N. Michigan Ave., Ste. 1610
Chicago, Illinois 60611
T: (872) 263-1100
aphillips@straussborrelli.com
sam@straussborrelli.com
raina@straussborrelli.com

*Attorneys for Plaintiff*

1

## CERTIFICATE OF COMPLIANCE

2        Pursuant to LCR 7(e), I certify that this memorandum contains 7,142 words, in compliance

3  with the Local Civil Rules.

4                                        Respectfully submitted,

5                                        By: /s/ *Alex Phillips*
                                          Alex Phillips (*pro hac vice*)
6                                        **STRAUSS BORRELLI PLLC**
                                          980 N. Michigan Ave., Ste. 1610
7                                        Chicago, Illinois 60611
                                          T: (872) 263-1100
8                                        F: (872) 263-1109
                                          aphillips@straussborrelli.com
9

10

## CERTIFICATE OF SERVICE

11        I hereby certify that on December 19, 2025, I electronically filed the foregoing with the

12

13  Court using the CM/ECF system, which will send notification of such filing to all counsel of

14  record.

15                                       Respectfully submitted,

16                                       By: /s/ *Alex Phillips*
                                          Alex Phillips (*pro hac vice*)
17                                       **STRAUSS BORRELLI PLLC**
                                          980 N. Michigan Ave., Ste. 1610
18                                       Chicago, Illinois 60611
                                          T: (872) 263-1100
19                                       F: (872) 263-1109
                                          aphillips@straussborrelli.com

20

21

22

23

24

25  PL'S MEM. IN OPPOSITION TO
    DEF'S MOT. FOR SUMMARY JUDGMENT - 24
    Case No. 2:22-cv-01707-BJR