— **EXHIBIT K** —

```
                                                        Page 19
 1      BY MR. PHILLIPS:
 2      Q     Is that April of 2025?
 3      A     April of '25?  No.  It would have been shortly
 4            after the US Corp. being formed which was
 5            formed -- I'd have to pull up the corporation
 6            date.
 7      Q     Okay.  I'll represent to you that I have a
 8            contract between the original MaxSold
 9            Incorporated in the United States and
10            Mr. Durnil, and it's dated as of 2017.  I do not
11            have an updated executed contract between the
12            defendants in this action and Mr. Durnil.  Are
13            you testifying that there is an updated executed
14            contract between the defendant and Mr. Durnil?
15      MS. LANGLEY:  Object to form.
16      A     There was a -- sorry.
17      MS. LANGLEY:  You can answer.
18      A     There's an agreement, and we've been making
19            payments under said agreement.  Whether there's
20            an executed contract, there's not an executed
21            contract.
22      BY MR. PHILLIPS:
23      Q     Okay.  And did Mr. Flood tell you anything else
24            about information related to topic number 7?
25      A     No.
```

Page 72

1              people.
2    Q    Okay.  What about the US subsidiary's seller
3         contracts?  Did you consider those to be
4         valuable assets?
5    A    I considered that those contracts were null and
6         void because the US MaxSold Inc. had no ability
7         to service those contracts.
8    Q    Okay.  And can you -- I believe I understand
9         what you're explaining.  This came up in the
10        discovery responses.  But can you please
11        elaborate on what you mean by that, that the
12        contracts were null and void?
13   A    Well, the only -- so when the assets were
14        purchased by the Ontario numbered company, it
15        became the only legal entity who could provide
16        the MaxSold service.  And so no other entity
17        could offer, provide said service.  And so those
18        contracts are clearly frustrated.  Now, I'm not
19        a lawyer, so you can -- you figure out what
20        those contracts mean when there's a shell Corp.
21        with no assets and no ability to fill on them --
22        I'll let you define what that means.  But to me
23        it means the contracts are not really going to
24        do anything.
25   Q    Okay.  You would agree that you in your capacity

Page 73

1          as the CEO of Ontario, MaxSold could have
2          allowed the US subsidiary to fulfill all of its
3          pending seller contracts; correct?
4    MS. LANGLEY:  Object to form.  You can answer.
5    A    So the question is could the Ontario Corp. allow
6          them to fulfill them -- I mean, is it a -- is it
7          a plausible, possible scenario?  Sure.
8    BY MR. PHILLIPS:
9    Q    Did you ever consider doing that?
10   A    So did Chris Reid personally?  Chris Reid
11         personally did not get to make that decision.
12         If you're talking about did Ontario Corp.
13         consider that?  To my knowledge no.
14   Q    Did anybody within Ontario Corp. consider that
15         to your knowledge?
16   MS. LANGLEY:  Object to form.  You can answer.
17   A    So to my knowledge I would have to -- to my
18         knowledge no.
19   BY MR. PHILLIPS:
20   Q    Okay.  Was that ever suggested to you, that
21         idea, by anyone?
22   A    I mean, I don't have knowledge as of this point.
23         It might have been raised.  I mean, it seems --
24         it seems possible that maybe someone at MaxSold
25         might have mentioned that or raised it up.  Or,

```
                                                      Page 74
 1         like, the old MaxSold Incorporated might have
 2         mentioned that.  But as of right now, to my
 3         knowledge, no, that was never taken under any
 4         serious consideration.
 5     Q   Okay.  So following the transaction, the
 6         seller's contracts pending at the time of the
 7         transaction were frustrated in your view.  Do I
 8         understand that correctly?
 9     A   I don't know -- I mean, I know I used the word
10         frustration.  I know that's a legal term.  I'm
11         not a lawyer.  So I can't really say, but
12         it's -- but if -- but they didn't seem
13         fulfillable.
14     Q   And who -- and what company ended up fulfilling
15         the contracts?
16   MS. LANGLEY:  Object to form.  You can answer if you
17         know.
18     A   So, you know, it's my understanding as the
19         US Corp. that, you know, the Ontario Corp. did
20         because it was the only one able to do so.
21   BY MR. PHILLIPS:
22     Q   And what did the Ontario Corp. do with those
23         sellers?  Did it execute new contracts?
24   MS. LANGLEY:  Object to form.  You can answer if you
25         know.
```

Page 75

| | | |
|---|---|---|
| 1 | A | I would have to look. I mean, we -- you know, |
| 2 | | the numbered Ontario company does hundreds of |
| 3 | | auctions every month. So I'd have to look into |
| 4 | | each specific one. I assume that there is an |
| 5 | | agreement because we provided the service, and |
| 6 | | we -- sorry, we -- Ontario Inc. provided the |
| 7 | | service, and customers are seemingly happy. |
| 8 | BY MR. PHILLIPS: | |
| 9 | Q | So those contracts were -- your testimony is |
| 10 | | those contracts were completed by the Ontario |
| 11 | | MaxSold; is that correct? |
| 12 | A | The USCo did not enter into a contract with |
| 13 | | those -- with those sellers. And to be physical |
| 14 | | therapy, I am not -- like, again, I don't |
| 15 | | know -- USCo doesn't know which contracts |
| 16 | | MaxSold Inc. had or didn't have. The numbered |
| 17 | | US -- the numbered US entity didn't have a |
| 18 | | relationship with MaxSold Inc. So, you know, I |
| 19 | | guess my testimony is that the numbered Ontario |
| 20 | | company fulfilled those contracts. |
| 21 | MR. PHILLIPS: Okay. So I brought up what will be | |
| 22 | | the next exhibit. I believe this is Exhibit |
| 23 | | Number 4; correct me if I'm wrong. |
| 24 | | EXHIBIT 4:  Responses to Interrogatory |
| 25 | BY MR. PHILLIPS: | |

```
 1              Ontario -- like, the Ontario Inc. had the right,
 2              it agreed to provide the service, it contracted
 3              the defendant to provide said services --
 4              without obligation for -- offer and provide --
 5              yeah.  So I could double -- I could double-check
 6              the exact -- the flow of relationship, like,
 7              whether it was Ontario Inc. agreed with the
 8              sellers to still provide the service and then
 9              contracted US Inc. to, you know, do certain
10              things.
11         Q    But as you sit there today, you cannot state
12              with certainty that's what happened?
13         MS. LANGLEY:  Object to form.  You can answer.
14         A    So I think it's important to sort of note that
15              these contracts or these sellers were provided
16              the service, absolutely true.  And they were
17              provided the service that only the Ontario Inc.
18              can provide.  Whether Ontario Inc. -- and,
19              again, like, the document there says that the
20              services were contracted.  And then because USCo
21              has, you know, probably subcontracted those
22              back -- because USCo is just an employment org
23              and actually doesn't run the service.  But the
24              short form is that, yes, we -- the services were
25              provided and -- and if you want the contract
```

Page 79

```
 1          nuances, like, you know, A contracted to B, B
 2          asked them -- like, there's some -- obviously an
 3          interrelationship between the Ontario
 4          corporation and the US corporation.  But I can't
 5          speak right now as to for those auctions who did
 6          what.  But I can say that between both the
 7          Ontario Corp. and the US Corp., the service was
 8          provided.
 9     BY MR. PHILLIPS:
10     Q    Okay.  Was the discovery response that you
11          reviewed accurate from your perspective as you
12          sit there today, or you don't know?
13     A    That the defendant was contracted to provide the
14          services, I mean, that's the way it works today.
15          And I think that's reasonable.  Again, you would
16          have to break apart the services back and forth
17          between the two companies.  If you wanted to
18          know --
19     Q    Mr. Reid, this is an important question.  Is
20          this response to interrogatory 14 accurate?
21     A    Yes.
22     Q    Okay.  Thank you.  What liabilities were you
23          aware of that the US subsidiary had at the time
24          that you were negotiating the 2024 transaction?
25     A    What liabilities?  Really the material liability
```

```
                                                        Page 100
 1      A    That we wanted to avoid burdens of liabilities
 2           and we wanted to acquire the assets required to
 3           operate the business, that's correct.
 4      Q    Okay.  And did that include in your view any
 5           assets from the US subsidiary?
 6      A    So, again, the -- the -- we wanted to acquire
 7           the assets that were necessary to -- sorry --
 8           we.  My knowledge is that Ontario Inc. was to
 9           acquire the assets necessary to run the business
10           and, as it says, avoid the burden of
11           liabilities, which is a rational thing to do as
12           an acquirer.
13      Q    Okay.  And my question is just -- one follow up
14           to that is the assets required, did that include
15           in your view assets from the US subsidiary?
16     MS. LANGLEY:  Object to form.  You can answer.
17      A    So Ontario Inc. did not purchase assets from
18           MaxSold Inc.  Ontario Inc., as you've pointed
19           out, does have a 3.2 million senior security
20           over MaxSold Inc.'s assets.
21     BY MR. PHILLIPS:
22      Q    Right.  I agree there's no evidence that I can
23           find that Ontario paid any value to the US
24           subsidiary for any assets.  But did it acquire
25           any of the US subsidiary's assets in your view?
```

```
                                                    Page 103

1         MS. LANGLEY:  Objection.
2         BY MR. PHILLIPS:
3      Q  No, you were about to give an answer.  Go ahead.
4      A  Well, I don't know what you were about to say.
5         I've lost my train of thought now.
6      Q  Okay.  Would it be fair to say that the Canadian
7         numbered entity to your knowledge wanted to
8         avoid incurring the class action liability?
9         MS. LANGLEY:  Objection.  Form.  You can answer if
10            you know.
11     A  I can say what the Ontario company, to my
12        knowledge, did.  And what it did do to my
13        knowledge, it intended to acquire all the assets
14        necessary to run a business.  It did not acquire
15        any liabilities that would be a burden on it.
16        BY MR. PHILLIPS:
17     Q  Including the class action liability; correct?
18        MS. LANGLEY:  Objection to form.
19     A  Is that a --
20        MS. LANGLEY:  You can answer if you know.
21     A  So to my knowledge there was a threatened
22        lawsuit with MaxSold Inc.  I'm aware that there
23        was -- you know, obviously Ontario Inc. was
24        aware that there was a lawsuit and that that
25        might become a liability.  But it saw no reason
```

Page 104

1  to acquire MaxSold Inc. because there were no
2  assets in it required to run the business.
3  BY MR. PHILLIPS:
4  Q    Right.  You wanted to abandon the US subsidiary;
5       correct?
6  MS. LANGLEY:  Objection.  Form of the question.  You
7       can answer.
8  A    Sorry, "you" as in Chris.  Chris doesn't own it.
9       I can't abandon something I don't own.
10 MR. PHILLIPS:  Okay.  So this will be Exhibit
11      Number 7, Bates number US Inc. 20 through 23.
12      EXHIBIT 7:  Series of emails at Bates
13      number US Inc. 20 through 23
14 BY MR. PHILLIPS:
15 Q    So I'll represent to you that this is a series
16      of emails between Sath, you and Russ Patterson.
17 A    Okay.
18 Q    And I'm going to the first email in the chain,
19      which was sent on March 12th, 2024, from Russ
20      Patterson.  And he states:
21          "Hi, Chris.  I had an opportunity to
22      discuss the USCo situation further with
23      our insolvency counsel.  The news is good.
24      Assuming you don't acquire the USCo, if we
25      were to abandon it in the way that you

Page 107

1  made a suggestion that would indicate that you
2  wanted to abandon the company in your view?
3  A    You keep saying --
4  MS. LANGLEY:  Objection to the form of the question.
5  A    You keep saying me abandoning -- I can't abandon
6  something I don't even.
7  BY MR. PHILLIPS:
8  Q    I'm not asking you whether you had the power to
9  abandon it.  I'm asking whether you made the
10 suggestion to abandon it as indicated from Russ?
11 A    You mean a suggestion that he might -- that
12 MaxSold Incorporated might abandon it?
13 Q    Sure.  Yes.
14 A    So you're saying, did I ever suggest anything to
15 Russ that he interpreted as me saying you might
16 not want to -- you might not sell these shares?
17 These shares might be left hung dry.  Well, it
18 seems to me that as evidence that the assets
19 or -- whatever was in MaxSold Inc. was basically
20 nothing of value.  And so it seems likely that
21 that entity would be left orphaned.  And it
22 seems likely that any buyer would probably not
23 acquire it.  And thus, you know, that sounds
24 like the definition of abandonment.  So if he --
25 if we had a discussion along the nature of, hey,

```
                                                      Page 116

 1              can't speak to the specific time frame that
 2              Ontario Inc. became aware.
 3        Q     When you say -- sorry.  Go ahead.  When you say
 4              Ontario Inc. was aware, who was aware?
 5        A     I guess myself.
 6        Q     Okay.  And you don't remember when you first
 7              became aware?
 8        A     Sorry, no.  Like, I don't -- this is -- again,
 9              is 2024 in March?  This is a long time ago.  I
10              don't know the exact date that I became aware.
11        Q     Well, I'm not asking you about the exact date.
12              I'm asking you if you were aware before Russ
13              sent you this email?
14        A     I'm not -- I don't have knowledge that I was
15              aware.  Maybe I was.  I just -- it would require
16              me to go through emails to verify when I was
17              aware, the exact date, and then I would compare
18              that exact date to this.  But I'm not going to
19              do that.  So what I'm offering you is my
20              knowledge as of today.
21        Q     Apart from this email, what did Russ tell you
22              about the class action settlement?
23        A     The only thing I can offer at this point is that
24              basically the plaintiffs would get nothing.
25        Q     Okay.  And what was the explanation for why the
```

Page 132

```
 1           we've already discussed that US Inc. ended up
 2           completing the seller contracts that were
 3           pending at the time of the closing; correct?
 4      MS. LANGLEY:  Object to form.  You can answer.
 5   A   So it's to my knowledge that US Inc. did not
 6           fulfill those contracts that MaxSold Inc. had.
 7           It -- but it is my knowledge that those
 8           customers, those sellers, were provided to
 9           MaxSold service through the only legal entity
10           entitled to provide said service, which is the
11           numbered Ontario company.
12      BY MR. PHILLIPS:
13   Q   Okay.  Well, you've already confirmed the
14           accuracy of the response to interrogatory
15           number 4, so I'm not going to retread that
16           ground.  It's also true that you started working
17           with Ed Durnil regarding licensure to conduct
18           auctions in the United States; right?
19   A   You said the word "you," so, no, it's not true.
20   Q   Okay.  It's also true that US Inc. formed a
21           relationship with Ed Durnil to use his licensure
22           to conduct auctions in the United States; right?
23   A   Yes.  There's a relationship between US Inc. and
24           Ed Durnil.
25   Q   And I'll represent to you that as of the date of
```