— **EXHIBIT  M** —

## STALKING HORSE ASSET PURCHASE AGREEMENT

This Agreement made this 11th day of March, 2024.

**BETWEEN:**

**MaxSold Incorporated, a corporation existing under the laws of Canada pursuant to the _Canada Business Corporations Act_, RSC 1985, c. C-44**

(the "**Company**")

- and -

**1000822913 Ontario Inc.**

(the "**Purchaser**")

**RECITALS:**

A.  The Company filed a Notice of Intention to Make a Proposal (the "**NOI**") under the _Bankruptcy and Insolvency Act_, RSC 1985, c B-3 (the "**BIA**") on February 15, 2024 (the "**Proposal Proceedings**"). Dodick Landau Inc. was appointed as proposal trustee of the Company (in such capacity, the "**Proposal Trustee**").

B.  The Company has determined it is in the best interest of the creditors and stakeholders of the Company to conduct a sale process ("**Sale Process**") pursuant to which potential offerors may submit offers to purchase the assets of the Company.

C.  The Company will bring a motion for an Order approving a stalking horse sale process (the "**Sale Process Order**") to authorize the Company, with the assistance of the Proposal Trustee conduct a Sale Process with respect to the Purchased Assets and to approve this agreement as the stalking horse bid.

D.  Subject to the conditions set forth herein, the Company has agreed to sell, convey, transfer and deliver to the Purchaser, and the Purchaser has agreed to purchase, acquire, assume and accept from the Company the Purchased Assets and Assumed Obligations, on the terms and subject to the conditions of this Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and confirmed, the Parties agree as follows:

US INC_000365

## **ARTICLE 1 – INTERPRETATION**

### 1.1.1    Definitions

In this Agreement and the Recitals herein, the following terms shall have the meanings set out below:

"**Acceptance Date**" means that date this this Agreement is executed by each of the parties hereto;

"**Affiliate**" means, with respect to any Person, any other Person who directly or indirectly controls, is controlled by, or is under direct or indirect common control with, such Person, and includes any Person in like relation to an Affiliate;

"**Agreement**" means this asset purchase agreement, including all schedules attached hereto and forming part hereof, and all written amendments and written restatements thereto from time to time;

"**Applicable Law**" means, with respect to any Person, property, transaction, event or other matter, all applicable laws, statutes, regulations, rules, by-laws, ordinances, protocols, regulatory policies, codes, guidelines, official directives, orders, rulings, judgments and decrees of any Governmental Authority;

"**Approval and Vesting Order**" means an order of the Court approving this Agreement and the transactions contemplated hereby and vesting, upon the delivery of the Trustee's  Certificate to the Purchaser, all right, title and interest of the Company to the Purchased Assets in the Purchaser, free and clear of all Claims and Encumbrances pursuant to the terms and conditions of this Agreement, substantially in the form of the model order approved by the "Ontario Commercial List Users Committee", and otherwise in form and substance acceptable to the Purchaser and the Company;

"**Article**" or "**Section**" or "**Schedule**" means the specified Article, Section of or Schedule to this Agreement and the expressions "hereof", "herein", "hereto", "hereunder", "hereby" and similar expressions refer to this Agreement and not to any particular Section or other portion of this Agreement;

"**Assignment Order**" means an order of the Court, in form and substance satisfactory to the Company, Proposal Trustee, and the Purchaser, acting reasonably, and obtained on a motion made on notice to such Persons as the Company and the Purchaser determine, to be sought by the Company, authorizing and approving the assignment to the Purchaser of any Assumed Contracts for which the consent, approval or waiver of the party or parties thereto (other than the Company) is required to assign such Assumed Contracts.

"**Assumed Contracts**" has the meaning ascribed thereto in Section 2.9;

"**Assumed Obligations**" has the meaning ascribed thereto in Section 2.7;

"**Bid Deadline**" has the meaning ascribed thereto in the Sale Procedures;

"**Books and Records**" means all of the books and records relating to the Purchased Assets, including, without limitation, all personnel files/records relating to all Transferred Employees and sales books, records, books of account, sales and purchase records, lists of suppliers and customers, business reports, projections and all other documents, surveys, plans, files, records, assessments, correspondence, and other data and information, financial or otherwise, including all data, information and databases stored on computer-related or other electronic media, excluding any of the foregoing as applicable to any Excluded Assets;

"**Break Fee**" has the meaning ascribed thereto in Section 4.1(b);

"**Business**" means the business carried on by the Company being the operating of an online platform to market and auction customer goods;

"**Business Day**" means a day on which banks are open for business in the City of Toronto, but does not include a Saturday, Sunday or statutory holiday recognized in the Province of Ontario;

"**Claims**" means any and all claims, demands, complaints, grievances, actions, applications, suits, causes of action, orders, charges, prosecutions or other similar processes, and "**Claim**" means any one of them;

"**Closing**" means the completion of the purchase and sale of the Purchased Assets, in accordance with the provisions of this Agreement;

"**Closing Date**" has the meaning ascribed thereto in Section 3.1 hereof;

"**Closing Time**" has the meaning ascribed thereto in Section 3.1 hereof;

"**Contracts**" means the right, title and interest of the Company to and in all pending and/or executory contracts, agreements, leases and arrangements Related to the Business to or by which any of the Company or any of the Purchased Assets or Business is bound or affected, and "Contract" means any one of them;

"**Court**" means the Ontario Superior Court of Justice, sitting in Bankruptcy;

"**Critical Supplier Pre-Filing Costs**" means the amounts owed by the Company to certain key suppliers, for pre-filing services, that the Company will pay, with the oversite of the Proposal Trustee, in the exact amounts identified in **Schedule "E".**

"**Critical Supplier Ongoing Costs**" means the amounts owed by the Company to the key suppliers identified in Schedule "E" from the time of filing the NOI to Closing.

"**Cure Costs**" means, save and except for the Critical Supplier Pre-Filing Costs and Critical Supplier Ongoing Costs, a payment required to cure any existing monetary defaults that exist on or before Closing in relation to an Assumed Contract, other than those arising by reason only of the Company's insolvency, the commencement of proceedings under this Proposal Proceeding, or the Company's failure to perform a non-monetary obligation;

"**Deposit**" has the meaning ascribed thereto in Section 2.3(a);

"**Effective Time**" means 12:01 a.m. on the Closing Date;

"**Employee**" means an individual who was formerly employed or engaged by the Company or, as at the Effective Time, is employed or engaged by the Company in connection with the Business, and "**Employees**" means every Employee;

"**Employee Liabilities**" means any and all Liabilities having priority over registered security interests (whether by statute, contract, common law or otherwise) owed to any of the Employees, or otherwise arising out of, or resulting from, the relationship between the Company and any of the Employees, including any Liability arising as a result of such party being deemed to be a successor employer, related employer or otherwise responsible or liable for payment of any amounts owing to, on behalf of, or in respect of, any of the Employees (including, but not limited to, the Transferred Employees), whether pursuant to the *Employment Standards Act, 2000* (Ontario), the *Pay Equity Act* (Ontario) or the *Workplace Safety and Insurance Act, 1997* (Ontario). Without limiting the foregoing, Employee Liabilities shall include:

> (a) all salaries, wages, bonuses, commissions, vacation pay, public holiday pay and other compensation relating to the employment of the Employees (including accrued but unpaid vacation pay and any retroactive pay) and all Liabilities under employee benefit plans relating to employment of the Employees; and

> (b) all termination pay, severance pay, damages in lieu of reasonable notice and other related Liabilities (under statute, contract, common law or otherwise) in respect of the termination and/or severance of employment of the Employees;

"**Encumbrances**" means any and all security interests (whether contractual, statutory, or otherwise), mortgages, trusts or deemed trusts (whether contractual, statutory, or otherwise), liens, leases, title retention agreements, reservations of ownership, demands, executions, levies, charges, options or other rights to acquire any interest in any assets, or other financial or monetary claims, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured or otherwise, and all contracts to create any of the foregoing, or encumbrances of any kind or character whatsoever, other than Permitted Encumbrances;

"**Equipment**" means all equipment and personal property owned by the Company wherever located, including all fixed and tangible assets, machinery, chattels, tooling, furniture, computer hardware and other tangible assets;

"**Excluded Assets**" means the following:

> (a) all cash, bank balances, deposits, moneys in possession of banks and other depositories, term or time deposits and similar cash items of, owned or held by, or for the account of, the Company, excluding the Company's merchant account bearing Merchant ID no. MID 8032779756 with a reserve of $300,000 held with the Merchant holding reserve Elavon (the "**Merchant Account**"), which shall be transferred to the Purchaser as part of the Purchased Assets;

(b)     all cash, bank balances, deposits, moneys in possession of banks and other depositories, term or time deposits and similar cash items of, held by, or for the account of, the Company in trust for its clients in Royal Bank of Canada account 003 02382 1007095 (the "**Trust Account**");

(c)     the Purchase Price;

(d)     all minute books, share ledgers, corporate seals, capital stock, equity interests and stock certificates of the Company;

(e)     all policies of insurance or assurance (including directors' and officers' insurance and claims against insurance and insurance settlements), except for the right to receive the proceeds of insurance in respect of Purchased Assets and all Books and Records related thereto which shall not constitute Excluded Assets;

(f)     original Tax records and books and records pertaining thereto, minute books, corporate seals, taxpayer and other identification numbers and other documents relating to the organization, maintenance, and existence of the Company, in each case that do not relate to the Business or the Purchased Assets;

(g)     any Books and Records that the Company is required by Applicable Law to retain in its possession, provided however, the Purchaser shall be provided with copies of all such Books and Records that pertain to the Business; and

(h)     any other assets that the Purchaser elects to exclude in writing prior to Closing pursuant to Section 2.5.

"**Excluded Liabilities**" has the meaning ascribed thereto in Section 2.8;

"**Expense Reimbursement Fee**" has the meaning ascribed thereto in Section 4.1(b);

"**Governmental Authorities**" means governments, regulatory authorities, governmental departments, agencies, commissions, bureaus, officials, ministers, Crown corporations, courts, bodies, boards, tribunals or dispute settlement panels or other law or regulation-making organizations or entities: (a) having or purporting to have jurisdiction on behalf of any nation, province, territory, state or other geographic or political subdivision thereof; or (b) exercising, or entitled or purporting to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power, and "**Governmental Authority**" means any one of them;

"**HST**" means all of the harmonized sales tax imposed under Part IX of the *Excise Tax Act* (Canada);

"**Intellectual Property**" means any or all of the following items of the Company, wherever located, domestic or foreign: all patents and patent rights, trademarks and trademark rights, trade names and trade name rights, service marks and service mark rights, service names and service name rights, copyrights and copyright rights, brand names, trade dress, business and product names, domain names, corporate names, logos, slogans, trade secrets, inventions, processes,

US INC_000369

formulae, industrial models, designs, specifications, data, technology, methodologies, computer programs (including all source code), confidential and proprietary information, whether or not subject to statutory registration, all related technical information, manufacturing, engineering and technical drawings, know how, all pending applications for and registrations of patents, trademarks, service marks and copyrights, including all obligations of third parties relating to the protection of the foregoing, the goodwill associated with the foregoing, and the right to sue for past payment, if any, in connection with any of the foregoing, and all documents, disks and other media on which any of the foregoing is stored, including without limitation;

**"Inventory and Supplies"** means all items that are held by the Company for sale, license, rental, lease or other distribution (and includes all supplies used by the Company in the operation of the Business) on hand at Closing;

"**Liability**" means any debt, loss, damage, adverse claim, fines, penalties, liability or obligation (whether direct or indirect, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, matured or unmatured, determined or determinable, disputed or undisputed, liquidated or unliquidated, or due or to become due, and whether in or under statute, contract, tort, strict liability or otherwise), and includes all costs and expenses relating thereto (including all fees, disbursements and expenses of legal counsel, experts, engineers and consultants and costs of investigation), and, "**Liabilities**" means the plural thereof;

"**Licences and Permits**" means all licences, permits, filings, certificates, authorizations, approvals or indicia of authority Related to the Business or the Purchased Assets or necessary for the operation or use of the Purchased Assets;

"**Ordinary Course**" means, with respect to an action taken or omitted to be taken by a Person, that such action is reasonably practicable and generally consistent with the recent past practices of the Person having specific regard to the recent circumstances leading up to and including the transactions contemplated by this Agreement and, as applicable, subject to any Orders in the Proposal Proceeding;

"**Outside Date**" means April 30, 2024;

"**Parties**" means the Company and the Purchaser collectively, and "**Party**" means any one of them;

"**Permitted Encumbrances**" means those Encumbrances listed in **Schedule "A"** attached hereto;

"**Person**" is to be broadly interpreted and includes an individual, a corporation, a partnership, a trust, an unincorporated organization, the government of a country or any political subdivision thereof, or any agency or department of any such government, and the executors, administrators or other legal representatives of an individual in such capacity;

"**Prepaid Amounts**" means all prepayments, prepaid charges, deposits, security deposits, sums and fees Related to the Business or in respect of the Purchased Assets;

"**Proposal Trustee**" has the meaning given to that term in Recital A and shall include Dodick Landau Inc. in its capacity as trustee in bankruptcy of the Company;

"**Purchase Price**" has the meaning ascribed thereto in Section 2.2;

"**Purchased Assets**" means all of the Company's right, title and interest in all of its assets, properties and undertakings, other than the Excluded Assets, including but not limited to, the following assets:

(a) Assumed Contracts;

(b) Books and Records;

(c) Claims of the Company;

(d) Equipment;

(e) The Merchant Account;

(f) Intellectual Property, including but not limited to trademarks, copyrights, trade secrets, patents;

(g) All software owned by the Company including but not limited to application software, executables, databases, scripts, data backups, system software, software platforms, all related source code, object code and other code or data in any form or stage of development;

(h) All online access keys, accounts, admin privileges, passwords, certificates, authorities and access permissions;

(i) All configurations, architectural diagrams, deployment guides, setup documentation necessary for the deployment, operation and maintenance of the software and technology assets;

(j) Documentation related to all technology and software, including but not limited to API documentation, code comments, technical specifications and any other documents essential to the ongoing use, development and maintenance of the software assets;

(k) Any licenses, permissions, and authorizations necessary for the use, modification, and distribution of any third-party software or technology integrated with or used in conjunction with the software and systems of the Company, to the extent such licenses, permissions, and authorizations are transferable to the Purchaser;

(l) Any digital assets related to the software business, including but not limited to domain names, websites, web applications, cloud accounts, telephone and facsimile numbers, email addresses, social media accounts and the content therein, along with any associated credentials or access keys;

(m) Inventory and Supplies;

(n) Licenses and Permits;

(o) Prepaid Amounts;

(p)  Receivables;

(q)  Any and all right to receive auction proceeds from auctions that have not been completed on or before the date of Closing, including any deposits held in relation thereto;

(r)  All personal information, within the meaning of applicable privacy legislation, to the extent such information can be transferred to the Purchaser without the consent of any individual which has not been obtained (it being agreed that the Company has no obligation to seek such consent);

(s)  All rights and interests under or pursuant to all warranties, representations and guarantees, express implied or otherwise, of or made by suppliers or others in connection with the Purchased Assets or otherwise Related to the Business;

(t)  All goodwill associated with the Business, including, without limitation, the goodwill associated all names previously and currently operating under including but not limited to "MaxSold" and any variation thereof including the right of the Purchaser to hold itself out as operating the Business as the successor to the Company; and

(u)  all other property, assets and undertakings of the Company used in or Related to the Business of whatsoever nature or kind.

"**Qualified Bid**" has the meaning ascribed thereto in the Sale Procedures;

"**Receivables**" means the right, title and interest of the Company to all accounts receivable, bills receivable, trade accounts, book debts, insurance claims, and choses-in-action, now or hereafter due or owing to the Company, Related to the Business or the Purchased Assets, together with any unpaid interest accrued on such items and any security or collateral for such items, including recoverable deposits, attributable to the period prior to Closing, and without limiting the generality of the foregoing, includes all tax refunds and government subsidies. For clarity, "Receivables" shall not include revenue received by the Company in respect of auctions that are completed on or before the Closing Date;

"**Related to the Business**" means, directly or indirectly, used in, arising from, or relating in any manner to the Business;

"**Sale Procedures**" means the sale and solicitation process approved by the Sale Process Order and on terms substantially similar to those attached as **Schedule "B"** hereto;

"**Sale Process Order**" means an order of the Court approving the execution of this Agreement as a "stalking horse" asset purchase agreement and the Sale Procedures, in form and content acceptable to the Purchaser and the Company;

"**Stalking Horse Bid**" has the meaning ascribed thereto in Section 4.1(a);

"**Taxes**" means all taxes, charges, fees, levies, imposts and other assessments, including all income, sales, use, goods and services, harmonized, value added, capital, capital gains, alternative, net

worth, transfer, profits, withholding, payroll, employer health, excise, franchise, real property and personal property taxes, and any other taxes, customs duties, fees, assessments or similar charges in the nature of a tax, including, Canada Pension Plan and provincial pension plan contributions (or equivalent in the jurisdiction where the Purchased Assets may be located), employment insurance payments and workers compensation premiums, together with any instalments with respect thereto, and any interest, fines and penalties, imposed by any Governmental Authority, and whether disputed or not;

"**Transaction**" means the transaction of purchase and sale and assignment and assumption contemplated by this Agreement;

"**Transferred Employees**" means Employees who have accepted an offer of employment from the Purchaser as of the Closing;

"**Trustee's Certificate**" means a certificate from the Proposal Trustee confirming the Closing of the transactions contemplated hereby, substantially in the form attached to the Approval and Vesting Order; and

"**Winning Bidder**" has the meaning ascribed thereto in Section 4.1(c).

## 1.1.2   Section References

Unless the context otherwise, references in this Agreement to Sections are to Sections of this Agreement.

## 1.1.3   Schedules

The following Schedules shall form an integral part of this Agreement:

> **Schedule "A"** Permitted Encumbrances
> **Schedule "B"** Sale Procedures
> **Schedule "C"** Purchased Assets List
> **Schedule "D"** Assumed Contracts
> **Schedule "E"** Critical Supplier Pre-Filing Costs

## <u>ARTICLE 2 – PURCHASE AND SALE</u>

### 2.1   Purchase and Sale of Purchased Assets

At the Closing Time, subject to the terms and conditions of this Agreement and the Approval and Vesting Order, the Company shall sell, and the Purchaser shall purchase the Purchased Assets and the Purchaser shall assume the Assumed Obligations.

The Purchaser and the Company shall mutually agree upon and finalize a detailed list of the Purchased Assets to be included in **Schedule "C"** hereto (the "**Purchased Assets List**"), which shall be attached hereto and made a part hereof, no later than five (5) business days prior to the

Approval and Vesting Order. Notwithstanding the Purchaser shall retain its right to add assets to the Excluded Assets up until close.

**2.2    Purchase Price**

In consideration of the sale, assignment, transfer and conveyance of the Purchased Assets to the Purchaser, the purchase price payable by the Purchaser to the Company for the Purchased Assets shall be the cash sum of Seven Hundred and Fifty Thousand ($750,000.00) (the "**Purchase Price**") plus the cash sum required to pay the Cure Costs for all of the Assumed Contracts, if any.

In the event that the Merchant Account or the funds therein are determined by the Purchaser, in its sole and absolute discretion, to be non-transferable to the Purchaser, the Purchaser will have the option, but not the obligation, by notice in writing to the Company and the Proposal Trustee prior to Closing to reduce the Purchase Price by $300,000.00, and in such case, the Merchant Account shall form part of the Excluded Assets.

**2.3    Satisfaction of Purchase Price**

The Purchaser shall satisfy the Purchase Price by payment to the Proposal Trustee by way of a certified cheque, wire transfer or bank draft as follows:

    (a)    an amount representing 10% of the Purchase Price will be paid by the Purchaser within 2 business days following the Acceptance Date. This payment will serve as a deposit (the "**Deposit**") to be held by the Proposal Trustee in trust until the Closing and will be credited toward the Purchase Price upon Closing; and

    (b)    the balance on Closing.

The Proposal Trustee agrees to cause the Deposit to be placed into a non-interest-bearing account or certificate of deposit.

The Purchaser will pay the Cure Costs for all of the Assumed Contracts by electronic wire transfer to each counterparty to the Assumed Contract on the Closing Date. The wire transfer information shall be provided by the Company to the Purchaser at least three (3) days prior to Closing.

**2.4    Allocation of Purchase Price**

The Purchase Price shall be allocated among the Purchased Assets in the manner agreed to by the Purchaser and the Company (each acting reasonably) prior to the Closing Date, provided that failure of the Parties to agree upon an allocation shall not result in the termination of this Agreement but rather shall result in the nullity of the application of this section of the Agreement such that each Party shall be free to make its own reasonable allocation.

**2.5    Excluded Assets**

Save and except as otherwise expressly set out herein, the Purchaser may, at its option, exclude any of the Purchased Assets from the transaction contemplated hereby at any time prior to Closing upon delivery of prior written notice to the Company, whereupon such assets shall be deemed to form part of the Excluded Assets, provided, however, that there shall be no reduction in the Purchase Price as a result of such exclusion. Any changes, including exclusions, to the list of Purchased Assets agreed upon by the Parties shall be promptly updated in Schedule "C", with the final version to be attached to this Agreement prior to Closing.

**2.6** **Taxes and Elections**

(a)     The Purchaser shall be responsible for the payment on Closing of all Taxes that are required to be paid or remitted in connection with the consummation of the transactions contemplated in this Agreement.

(b)     If applicable, at the Closing, the Receiver and the Purchaser shall jointly execute an election under Section 167 of the *Excise Tax Act* (Canada) to seek to cause the sale of the Purchased Assets to take place on an HST-free basis under Part IX of the *Excise Tax Act* (Canada) and the Purchaser shall file such election with its HST return for the applicable reporting period in which the sale of the Purchased Assets takes place.

(c)     If applicable, at the Closing, the Company and the Purchaser shall execute jointly an election in prescribed form under Section 22 of the *Income Tax Act* (Canada) in respect of the Receivables and shall file such election with their respective tax returns for their respective taxation years that include the Closing Date.

(d)     The Purchaser agrees to indemnify and save the Company harmless from and against all claims and demands for payment of all Taxes payable by Purchaser in connection with the purchase of the Purchased Assets, including penalties and interest thereon and any liability or costs incurred as a result of any failure to pay such Taxes when due.

(e)     The Purchaser shall, at all times, indemnify and hold harmless the Company's directors, officers, and employees, and the Proposal Trustee against and in respect of any and all amounts assessed by any taxing authority in the event that any Tax exemption claimed by the Purchaser was inapplicable, invalid, or not properly made, including all taxes, interest, and penalties assessed and including all reasonable legal and professional fees incurred by the Company's directors, officers, and employees as a consequence of or in relation to any such assessment. Notwithstanding anything else in this Agreement, this indemnity shall survive the Closing Date in perpetuity and shall not be subject to any caps or restrictions.

**2.7** **Assumed Obligations**

At Closing, the Purchaser shall assume and be liable for the following (collectively, the **"Assumed Obligations"**):

(a)     any Liabilities in connection with the Assumed Contracts as set out in Section 2.9;

(b)     all Liabilities and Claims arising or accruing from the use of the Purchased Assets from and after the Closing; and

(c)     all Permitted Encumbrances.

**2.8     Excluded Liabilities**

Except for the Assumed Obligations, the Purchaser is not assuming, and shall not be deemed to have assumed, any Liabilities of the Company not specifically assumed (collectively, the **"Excluded Liabilities"**), which Excluded Liabilities include, but are not limited to, the following:

    (a)    all Liabilities and Claims arising or accruing from the use of the Purchased Assets prior to the Closing;

    (b)    all Employee Liabilities that arise out of, or result from the employment or engagement by the Company (or any predecessor to the Company) of any of the Employees (including the Transferred Employees) (unless otherwise imposed by law) and/or the termination or severance of such engagement or employment; and

    (c)    all Encumbrances, other than Permitted Encumbrances.

**2.9     Assumed Contracts**

The Purchaser shall assume the Contracts which are listed and described in **Schedule "D"** (which Contracts shall be referred to as the **"Assumed Contracts"** and of which any one of them is an **"Assumed Contract"**). Save and except as hereinafter set out, the Purchaser shall be able to add or remove Contracts from Schedule "D" up until at least five (5) Business Days prior to the hearing date for the Approval and Vesting Order, by giving notice to the Company and Proposal Trustee in writing. This Agreement and any document delivered under this Agreement will not constitute an assignment or an attempted assignment of any Contract contemplated to be assigned to the Purchaser under this Agreement which is not assignable without the consent of a third Person if such consent has not been obtained and such assignment or attempted assignment would constitute a breach of such Contract, in which event, the provisions of Section 2.10 hereof shall govern.

**2.10    Assignment of Assumed Contracts**

The Company, in cooperation with the Purchaser, shall take such reasonable steps as necessary to obtain the consent of the counterparties for the assignment of the Assumed Contracts. If necessary, such steps shall include the Company making reasonable efforts to obtain an Assignment Order.


## ARTICLE 3 – CLOSING ARRANGEMENTS

**3.1     Closing**

Closing shall take place at 10:00 a.m. (Toronto, Ontario time) (the **"Closing Time"**) on the third business day following the granting of the Approval and Vesting Order or such other date as the Parties may agree to in writing, but in any event shall not be later than the Outside Date, and if such date falls on a holiday or weekend, it shall be the next Business Day (the **"Closing Date"**).

The Closing shall take place by electronic transmission of documents, or at such other time and location, and in such other manner, as the Parties may agree upon in writing.

**3.2    Tender**

Except as otherwise set out herein, any tender of documents or money under this Agreement may be made upon the Parties or their respective counsel and money may be tendered by official bank draft drawn upon a Canadian chartered bank, by negotiable cheque payable in Canadian funds and certified by a Canadian chartered bank or trust company, or by wire transfer of immediately available funds to the account specified by that Party.

**3.3    Company's Closing Deliveries**

At the Closing, the Company shall deliver to the Purchaser the following, each in form and substance satisfactory to the Purchaser, acting reasonably:

(a)    a copy of the Approval and Vesting Order, issued by the Court;

(b)    a copy of the Assignment Order, if any;

(c)    the Books and Records;

(d)    if applicable, the elections referred to in Section 2.6;

(e)    a general conveyance with respect to the Purchased Assets;

(f)    any assignments, transfers or bills of sale as may be requested by the Purchaser to effect the transfer of the Intellectual Property;

(g)    a bring down certificate dated as of the Closing Date, confirming that all of the representations and warranties of the Company contained in this Agreement are true and correct as of the Closing Date, with the same effect as though made on and as of the Closing Date; and

(h)    such further and other documentation as is referred to in this Agreement or as the Purchaser or its lawyers may reasonably require to complete the transactions provided for in this Agreement.

**3.4    Purchaser's Closing Deliveries**

At the Closing, the Purchaser shall deliver to the Company the following, each in form and substance satisfactory to the Company, acting reasonably:

(a)    the balance of the Purchase Price;

(b)    a bring down certificate dated as of the Closing Date, confirming that all of the representations and warranties of the Purchaser contained in this Agreement are true

and correct as of the Closing Date, with the same effect as though made on and as of the Closing Date;

(c)     a general conveyance with respect to the Purchased Assets;

(d)     a certified resolution of the Purchaser authorizing the Agreement and the purchase of the Purchased Assets;

(e)     a certificate of status of the Purchaser;

(f)     if applicable, the elections referred to in Section 2.6; and

(g)     such further and other documentation as is referred to in this Agreement or as the Company or its lawyers may reasonably require to complete the transactions provided for in this Agreement.

## 3.5    Risk

The Purchased Assets, including all software, intellectual property rights, operational functionalities, and associated services, shall remain at the risk of the Company until the Closing. From and after Closing, such risks shall be assumed by the Purchaser.

In the event that any of the Purchased Assets are subject to material impairment prior to Closing, including but not limited to operational disruptions exceeding 48 consecutive hours, intellectual property disputes that call into question the ownership and the ability to operate the service, or any other circumstances that significantly impair the business's value or operations, the Company/Seller shall notify the Purchaser in writing within twenty-four (24) hours upon becoming aware of such material impairment.

In the event of such material impairment to the Purchased Assets prior to Closing, the Purchaser shall, at its sole and absolute discretion, have the right to elect to terminate this Agreement by providing written notice to the Company, upon which, the Parties shall each be released from all obligations under this Agreement except that the Company shall promptly return the Deposit to the Purchaser without interest, subject to further written agreement of the Parties.

For purposes of this Agreement, 'material impairment' shall include any event or condition that significantly disrupts the functionality, marketability, or the Company's rights and obligations in respect of the Purchased Assets, rendering the business's continuous operation or the value of the Purchased Assets substantially compromised.

## 3.6    Conduct Prior to Closing

Prior to the Closing, the Company shall conduct the Business in the Ordinary Course, except to the extent required to allow the Company to comply with its obligations under this Agreement or as may be permitted with the written consent of the Purchaser (such consent not to be unreasonably conditioned, withheld, or delayed), subject in all cases to any Court orders granted

in the Proposal Proceedings. Without limiting the generality of, but subject to, the foregoing, the Company shall:

(a)     maintain, preserve and protect the Purchased Assets in the condition in which they exist on the date hereof, other than ordinary wear and tear and other than replacements, dispositions, modifications or maintenance in the Ordinary Course;

(b)     use reasonable commercial efforts in the circumstances to preserve the goodwill of the Company and maintain satisfactory relationships with suppliers and customers;

(c)     not terminate any Employees without the prior written consent of the Purchaser, such consent not to be unreasonably withheld;

(d)     not convey, encumber or otherwise dispose of any of the Purchased Assets except in the Ordinary Course;

(e)     not amend or modify any Assumed Contract in any material respect, waive any material rights in respect of any Assigned Agreement or disclaim any Assigned Agreement;

(f)     not enter into any material contract or agreement in respect of the Business without the prior written consent of the Purchaser, such consent not to be unreasonably withheld;

(g)     use reasonable commercial efforts to maintain any insurance currently in effect respecting the Purchased Assets until Closing; and

(h)     comply in all material respects with all Applicable Laws relating to the conduct of the Business and the ownership and use of the Purchased Assets.

## 3.7     Delivery of the Trustee 's Certificate

When the conditions set out in Article 5 below have been satisfied and/or waived by the Vendor and/or the Purchaser, as applicable, the Vendor and the Purchaser or their respective counsel will each deliver to the Proposal Trustee confirmation that such conditions of Closing, as applicable, have been satisfied and/or waived (the "**Conditions Certificates**"). Upon receipt of the Conditions Certificates, the Proposal Trustee shall: (a) issue the Trustee's Certificate to the Purchaser and the Vendor, at which time the Closing will be deemed to have occurred; and (b) file a copy of the Trustee's Certificate with the Court and provide a copy of same to the service list in the Proposal Proceedings. In the case of (a) and (b), the Proposal Trustee will be relying exclusively on the Conditions Certificates without any obligation whatsoever to verify the satisfaction or waiver of the applicable conditions. The Parties hereby acknowledge and agree that the Proposal Trustee shall have no liability to the Parties in connection with the Trustee's Certificate or otherwise in connection with this Agreement.

## ARTICLE 4 – SALE PROCEDURE

**4.1**    **Sale Procedures**

(a)    The Company shall bring a motion on or before March 14, 2024, for approval of the Sale Procedures. The Sale Process Order shall recognize the Purchase Price as a baseline or "stalking horse bid" (the "**Stalking Horse Bid**"), and shall also provide for a marketing process of the Purchased Assets by the Company with the potential for competitive bidding. The Purchaser acknowledges and agrees that the aforementioned process is in contemplation of determining whether a superior bid can be obtained for the Purchased Assets;

(b)    In consideration for the Purchaser's expenditure of time and money and agreement to act as the initial bidder through the Stalking Horse Bid, and the preparation of this Agreement, and subject to Court approval, the Purchaser shall be entitled to a break fee of $30,000  (the **"Break Fee"**) and an expense reimbursement fee in the amount of a maximum of $20,000 (inclusive of HST, if any) (the **"Expense Reimbursement Fee"**) payable by the Company to the Purchaser only in the event that a successful bid other than the Stalking Horse Bid is accepted by the Company, approved by the Court and completed. The payment of the foregoing amounts shall be approved in the Sale Process Order and shall be payable to the Purchaser out of the sale proceeds derived from and upon completion of the winning bid. The Parties acknowledge and agree that the foregoing amounts represent a fair and reasonable estimate of the expenses that will be incurred by the Purchaser as a result of preparing for and entering into this Agreement, and is not intended to be punitive in nature nor to discourage competitive bidding for the Purchased Assets. For certainty, the Break Fee and the Expense Reimbursement Fee do not form part of the Purchase Price.

(c)    Notwithstanding anything contained herein to the contrary, in the event that the Purchaser is not the selected winning bid in the Sale Process (the "**Winning Bidder**"), then upon the closing of a transaction with such Winning Bidder, this Agreement shall be terminated and the Purchaser shall be entitled to the Break Fee, the Expense Reimbursement Fee and a return of the Deposit and neither Party hereto shall have any further liability or obligation, except as expressly provided for in this Agreement.

(d)    If no Qualified Bids other than the Stalking Horse Bid are received by the Bid Deadline, the Company shall forthwith bring a motion to the Court to obtain the Approval and Vesting Order and, if granted, shall proceed with completing the transaction contemplated hereby forthwith.

**4.2**    **Approval and Vesting Order**

The Approval and Vesting Order shall approve this Agreement and the transactions contemplated hereby and vest, upon the delivery of the Trustee's Certificate to the Purchaser, all right, title and interest of the Company in and to the Purchased Assets to the Purchaser, or as it may direct, free and clear of all Claims and Encumbrances pursuant to the terms and conditions of this Agreement, other than Permitted Encumbrances.

## **ARTICLE 5 – CONDITIONS PRECEDENT**

**5.1     Conditions Precedent of the Purchaser**

The Purchaser shall not be obliged to complete the transactions contemplated by this Agreement unless, at or before the Closing Time, each of the following conditions has been satisfied, it being understood that the following conditions are included for the exclusive benefit of the Purchaser and may be waived, in whole or in part, in writing, by the Purchaser at any time; and the Company agrees with the Purchaser to take all such commercially reasonable actions, steps and proceedings within its reasonable control as may be necessary to ensure that the following conditions are fulfilled at or before the Closing Time:

(a)     *Execution of this Agreement*. The Company shall deliver a fully executed copy of this Agreement to the Purchaser on or before March 8, 2024;

(b)     *Representations and Warranties*. The representations and warranties of the Company in Section 6.1 shall be true and correct at the Closing Time;

(c)     *Sale Process Order*. The Sale Process Order shall have been issued by the Court, shall not be stayed, varied, superseded or under appeal, and the applicable time for appealing the Sale Process Order shall have expired;

(d)     *Winning Bidder*. The Company shall have determined in accordance with the Sale Procedure that this Agreement is a successful bid and the Purchaser is the Winning Bidder;

(e)     *Approval and Vesting Order Final*: The Approval and Vesting Order shall have been issued by the Court, shall not be stayed, varied, superseded or under appeal, and the applicable time for appealing the Approval and Vesting Order shall have expired if the hearing for the Approval and Vesting Order was contested;

(f)     *Assignment of Assumed Contracts:* The Company shall have the authorization to assign all of the Assumed Contracts whether by the terms of the Assumed Contracts, the consent, approval, waiver of the counterparty to the Assumed Contract, or the Assignment Order;

(g)     *Company's Compliance*. The Company shall have performed and complied with all of the terms and conditions in this Agreement on its part to be performed or complied with at or before the Closing Time and shall have executed and delivered to the Purchaser at the Closing Time all the deliveries contemplated in Section 3.3;

(h) *Post-Filing Obligations*. All post-filing obligations of the Company have been paid, including but not limited to, the Critical Supplier Ongoing Costs prior to Closing; and

(i) *No Legal Action:* No action or proceeding a will be pending or threatened by any Person (other than the Purchaser), and there is no order or notice from any Person to (or seeking to) enjoin, restrict or prohibit, on a temporary or permanent basis any of the transactions contemplated by this Agreement or imposing any terms or conditions on the transactions contemplated by this Agreement, the Business or the business of the Purchaser or otherwise limiting the right of the Purchaser to conduct the Business after Closing on substantially the basis as heretofore operated.

## 5.2    Conditions Precedent of the Company

The Company shall not be obliged to complete the transactions contemplated by this Agreement unless, at or before the Closing Time, each of the following conditions has been satisfied, it being understood that the following conditions are included for the exclusive benefit of the Company, and may be waived, in whole or in part, in writing by the Company at any time; and the Purchaser agrees with the Company to take all such commercially reasonable actions, steps and proceedings within its reasonable control as may be necessary to ensure that the following conditions are fulfilled at or before the Closing Time:

(a) *Purchaser's Compliance*. The Purchaser shall have performed and complied with all of the terms and conditions in this Agreement on its part to be to be performed by or complied with at or before the Closing Time and shall have executed and delivered to the Company at the Closing Time all the deliveries contemplated in Section 3.4 in this Agreement;

(b) *Sale Process Order*. The Sale Process Order shall have been issued by the Court, shall not be stayed, varied, superseded or under appeal, and the applicable time for appealing the Sale Procedure Order shall have expired;

(c) *Approval and Vesting Order Final*: The Approval and Vesting Order shall have been issued by the Court, shall not be stayed, varied, superseded or under appeal, and the applicable time for appealing the Approval and Vesting Order shall have expired if the hearing for the Approval and Vesting Order was contested; and

(d) *Representations and Warranties*. The representations and warranties of the Purchaser in Section 6.2 shall be true and correct at the Closing Time.

## 5.3    Non-Satisfaction of Conditions

If any condition precedent set out in Section 5.1 or 5.2 is not satisfied or performed at or before the Closing Time, the Party for whose benefit the condition precedent is inserted may:

(a) waive compliance with the condition, in whole or in part, in its sole discretion by written notice to the other Party (but may not claim for any matter waived) and

without prejudice to any of its rights of termination in the event of non-fulfilment of any other condition in whole or in part; or

(b)    elect on written notice to the other Party to terminate this Agreement, in which event each Party shall be released from all obligations under this Agreement. Notwithstanding the foregoing, the Proposal Trustee shall retain the Purchaser's deposit if the Purchaser fails to perform or satisfy the condition precedents in Subsection 5.2(a) and/or 5.2(d). If the Company fails to perform its condition precedents in Section 5.1, the Proposal Trustee shall promptly return the Deposit to the Purchaser.

## ARTICLE 6 – REPRESENTATIONS AND WARRANTIES

### 6.1    Representations and Warranties of the Company

As a material inducement to the Purchaser entering into this Agreement and completing the transactions contemplated by this Agreement and acknowledging that the Purchaser is entering into this Agreement in reliance upon the representations and warranties of the Company set out in this Section 6.1, the Company hereby represents and warrants to the Purchaser as follows:

(a)    *Due Authorization*. Subject to the granting of the Approval and Vesting Order, the Company has all necessary authority and capacity to enter into this Agreement and all other agreements and instruments to be executed by it as contemplated by this Agreement and to carry out its obligations under this Agreement and such other agreements and instruments.

(b)    *Enforceability of Obligations*. Subject to the granting of the Approval and Vesting Order, this Agreement constitutes a valid and binding obligation of the Company, enforceable against the Company, in accordance with its terms.

(c)    *HST*. The Company is a registrant under Part IX of the *Excise Tax Act* (Canada), and its Business Number is 1 - 835321050RT0001.

(d)    *Residency*. The Company is not a non-resident within the meaning of section 116 of the *Income Tax Act* (Canada).

(e)    *Intellectual Property*. The Company has valid rights to use all intellectual property used in connection with the business, including software, trademarks, patents, and copyrights, free and clear of all liens, encumbrances, and disputes. For further clarity with respect to intellectual property of the core software assets required to run the business, the Company hereby represents and warrants that it:

(i) owns all intellectual property of the following systems: maxsold.com including subdomains (including but not limited to pages, support, static,maxsold), android and ios apps, seller portal/platform and admin site, all databases, image processing server, pzn, catgor, data warehouse, integrations/etl server, max360 service; and

US INC_000383

(ii) licenses the auction method systems code, data and APIs from AuctionMethod and has in its possession the code, systems and data and the right to modify and use said code, data and APIs in perpetuity, subject to the terms of the Software Source Code License Agreement between the Company and AuctionMethod, Inc. dated June 12, 2020, to carry out the Business without further payment due and owing to AuctionMethod.

(f) *Critical Supplier Pre-Filing Costs.* The Critical Supplier Pre-Filing Costs will be paid by the Company prior to Closing and the amounts owed by the Company to certain key suppliers for pre-filing services, as identified in Schedule "E", are true and accurate.

## 6.2    Representations and Warranties of the Purchaser

As a material inducement to the Company entering into this Agreement and completing the transactions contemplated by this Agreement and acknowledging that the Company is entering into this Agreement in reliance upon the representations and warranties of the Purchaser set out in this Section 6.2, the Purchaser hereby represents and warrants to the Company as follows:

(a) *Incorporation of the Purchaser.* The Purchaser is a corporation duly incorporated under the laws of the jurisdiction of its incorporation and is duly organized, validly subsisting and in good standing under such laws;

(b) *Due Authorization.* The Purchaser has all necessary corporate power, authority and capacity to enter into this Agreement and all other agreements and instruments to be executed by it as contemplated by this Agreement and to carry out its obligations under this Agreement and such other agreements and instruments;

(c) *Enforceability of Obligations.* This Agreement constitutes a valid and binding obligation of the Purchaser, enforceable against the Purchaser, in accordance with its terms;

(d) *Approvals and Consents.* Except as otherwise provided herein, no authorization, consent or approval of or filing with or notice to any Governmental Authority or other Person is required in connection with the execution, delivery or performance of this Agreement by the Purchaser or the purchase of any of the Purchased Assets hereunder;

(e) *HST.* The Purchaser is or will on Closing be a registrant under Part IX of the *Excise Tax Act* (Canada); and

(f) *Residency.* The Purchaser is not a non-resident within the meaning of section 116 of the *Income Tax Act* (Canada).

## 6.3    Acquisition of Purchased Assets on "As Is, Where Is" Basis

The Purchaser acknowledges that the Company is selling the Purchased Assets on an "as is, where is basis" as they shall exist on the Closing Date, subject to the terms of the Approval and Vesting Order. The Purchaser further acknowledges that it has entered into this Agreement on the basis that the Company does not guarantee title to the Purchased Assets and that the Purchaser has conducted such inspections of the condition of and title to the Purchased Assets as it deemed appropriate and has satisfied itself with regard to these matters. No representation, warranty or condition is expressed or can be implied as to title, encumbrances, description, fitness for purpose, merchantability, condition, quantity or quality or in respect of any other matter or thing whatsoever concerning the Purchased Assets or the right of the Company to sell or assign same save and except as expressly represented or warranted herein. Without limiting the generality of the foregoing, any and all conditions, warranties or representations, expressed or implied, pursuant to the *Sale of Goods Act* (Ontario) or similar legislation do not apply hereto and have been waived by the Purchaser. The Purchaser further acknowledges that all written and oral information (including analyses, financial information and projections and studies) obtained by the Purchaser from the Company or any of its directors, officers, employees, professional consultants or advisors with respect to the Purchased Assets or otherwise relating to the transactions contemplated in this Agreement has been obtained for the convenience of the Purchaser only and is not warranted to be accurate or complete.

**6.4     No Additional Representations and Warranties**

(a)     None of the Company and the Purchaser, nor their respective Representatives, have made or shall be deemed to have made any other representation or warranty, express or implied, at law or in equity, in respect of the Company, the Purchaser, the Purchased Assets or the Transactions other than those stated expressly herein.

(b)     None of representations and warranties contained in this Article 6 shall survive Closing and, other than in the case of fraud, the Purchaser's sole recourse for any material breach of representation or warranty in this Article 6 shall be for the Purchaser to not complete the Transactions in accordance with Section 8.1 of this Agreement.

## ARTICLE 7 – EMPLOYEES

**7.1     Offers to Employees**

The Purchaser may offer new employment, conditional upon Closing and effective as of the Effective Time, to such of the Employees as determined by the Purchaser in its sole discretion, on such terms as the Purchaser and each of the Transferred Employees may agree.

**7.2     Transferred Employees**

The Purchaser shall provide to the Company a list five (5) Business Days before Closing, indicating:

(a)     those Employees to whom offers of employment or expressions of interest have been made;

(b)     those Employees who have accepted any such offer; and

(c)     those Employees who the Purchaser has determined will not be offered employment with the Purchaser.

The Purchaser shall assume and be responsible for all Employee Liabilities in respect of Transferred Employees following the Closing Date.

## ARTICLE 8 – TERMINATION

### 8.1    Termination by the Parties

This Agreement may be terminated:

(a)     upon the mutual written agreement of the Company and the Purchaser;

(b)     pursuant to Section 5.3(b) by either Party;

(c)     pursuant to Section 4.1(c); or

(d)     pursuant to Section 3.5.

### 8.2    Deposit

If this Agreement is terminated through no fault of the Purchaser, such as Sections 3.5 and 4.1(c), the Parties shall each be released from all obligations under this Agreement, and the Deposit shall be immediately refunded to the Purchaser by the Company without interest.

### 8.3    Breach by Purchaser

If the Purchaser fails to comply with its obligations under this Agreement, the Company may by notice to the Purchaser elect to treat this Agreement as having been repudiated by the Purchaser. In that event, other than as provided for in 8.2, the Deposit and any other payments made by the Purchaser will be forfeited to the Company on account of its liquidated damages and the Purchaser shall have no further obligations to the Company, and the Purchased Assets may thereafter be sold by the Company to any other party.

## ARTICLE 9 – POST-CLOSING MATTERS

### 9.1    Post-Closing Receipts

If, following the Closing Date, any of the Purchased Assets are paid to or otherwise received by the Company or Proposal Trustee, or if any of the Excluded Assets are paid to or otherwise received by the Purchaser, then the Company, the Proposal Trustee or the Purchaser, as the case may be, shall hold such assets in trust for the other and shall promptly deliver such assets to the Company or the Purchaser, as the case may be.

**9.2    Books and Records**

The Purchaser shall preserve and keep the Books and Records which relate to the Purchased Assets for a period of six years from the Closing Date or for any longer period as may be required by any Applicable Law or Governmental Authority. Upon reasonable advance notice, after the Closing Date, the Purchaser will grant the Company, the Proposal Trustee or any trustee in bankruptcy of the Company reasonable access during normal business hours, to use such Books and Records included in the Purchased Assets, including, without limitation, any personnel files/records of the Transferred Employees relating to the period up to the Closing and any Employees engaged by the Company at or in respect of the Purchased Assets up to and including the Closing Date, and computer systems, tapes, disks, records and software acquired as part of the Purchased Assets.

**9.3    Use of Business Name**

If requested by the Purchaser, on or promptly following the Closing Date, the Company shall discontinue use of the name "MaxSold" and any variation thereof and shall, subject to the Court's approval, as soon as is reasonably practicable file articles of amendment to change the corporate name of MaxSold to another name not confusingly similar to its present name.


## ARTICLE 10 – GENERAL CONTRACT PROVISIONS

**10.1    Headings and Sections**

The division of this Agreement into Articles and Sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Agreement.

**10.2    Number and Gender**

Unless the context requires otherwise, words importing the singular include the plural and vice versa, and words importing gender include all genders. Where the word "including" or "includes" is used in this Agreement, it means "including (or includes) without limitation".

**10.3    Currency**

Except as otherwise expressly provided in this Agreement, all dollar amounts referred to in this Agreement are stated in Canadian dollars.

**10.4    Statutory References**

All references in this Agreement to any statute or regulation is to that statute or regulation as now enacted or as may from time to time be amended, re-enacted or replaced and includes all

regulations made thereunder, unless something in the subject matter or context is inconsistent therewith or unless expressly provided otherwise in this Agreement.

### 10.5    No Strict Construction

The language used in this Agreement is the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any Party, including, without limitation, the doctrine of *contra proferentum*.

### 10.6    Entire Agreement

This Agreement and the agreements and other documents required to be delivered pursuant to this Agreement, constitute the entire agreement between the Parties and sets out all the covenants, promises, warranties, representations, conditions, understandings and agreements between the Parties relating to the subject matter of this Agreement and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written. There are no covenants, promises, warranties, representations, conditions, understandings or other agreements, oral or written, express, implied or collateral between the Parties in connection with the subject matter of this Agreement except as specifically set forth in this Agreement. Subject to the Approval and Vesting Order being issued by the Court, this Agreement is intended to create binding obligations on the part of the Company as set forth herein and on acceptance by the Purchaser, is intended to create binding obligations on the part of the Purchaser, as set out herein.

### 10.7    Expenses

Subject to Section 4.1(b), each Party shall pay their respective legal, accounting, and other professional advisory fees, costs and expenses incurred in connection with the transactions contemplated in this Agreement, and the preparation, execution and delivery of this Agreement and all documents and instruments executed pursuant to this Agreement.

### 10.8    Notices

Any notice, consent or approval required or permitted to be given in connection with this Agreement shall be in writing and shall be sufficiently given if delivered (whether in person, by courier service or other personal method of delivery), or if transmitted by email as follows:

(a)    in the case of notice to the Company at:

    Russ Patterson, email: russ.patterson@maxsold.com

    With a copy to:

    Sharon Kour, email: skour@reconllp.com

(b)     in the case of a notice to the Purchaser at:

Chris Reid, email: chris@reids.co

With a copy to:

Ian Klaiman, email: iklaiman@szklaw.ca

(d)      in the case of the Proposal Trustee at:

Rahn Dodick, email: rahn.dodick@dodick.ca

With a copy to:

Philip Cho, email: pcho@weirfoulds.com

Any notice delivered or transmitted to a Party as provided above shall be deemed to have been given and received on the day it is delivered or transmitted, provided that it is delivered or transmitted on a Business Day prior to 5:00 p.m. local time in the place of delivery or receipt. However, if the notice is delivered or transmitted after 5:00 p.m. local time or if such day is not a Business Day then the notice shall be deemed to have been given and received on the next Business Day.

Any Party may, from time to time, change its address by giving notice to the other Party in accordance with the provisions of this Section.

## 10.9    Successors and Assigns

This Agreement shall ensure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

## 10.10    Third Party Beneficiaries

Unless where provided to the contrary by the specific terms hereof, this Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

## 10.11    Time of the Essence

Time shall be of the essence in respect of the obligations of the Parties arising prior to Closing under this Agreement.

## 10.12    Amendment

US INC_000389

No amendment, supplement, modification or waiver or termination of this Agreement and, unless otherwise specified, no consent or approval by any Party, shall be binding unless executed in writing by the Party to be bound thereby.

**10.13  Further Assurances**

The Parties shall, with reasonable diligence, do all such things and provide all such reasonable assurances as may be required to consummate the transactions contemplated by this Agreement, and each Party shall provide such further documents or instruments required by any other Party as may be reasonably necessary or desirable to effect the purpose of this Agreement and carry out its provisions, whether before or after the Closing Date, provided that the reasonable costs and expenses of any actions taken after the Closing Date at the request of a Party shall be the responsibility of the requesting Party.

**10.14  Paramountcy**

In the event of any conflict or inconsistency between the provisions of this Agreement and any other agreement, document or instrument executed or delivered in connection with this Transaction or this Agreement, the provisions of this Agreement shall prevail to the extent of such conflict or inconsistency.

**10.15  Severability**

Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability and shall be severed from the balance of this Agreement, all without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

**10.16  Governing Law**

This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein and each of the Parties irrevocably attorns to the non-exclusive jurisdiction of the Courts of the Province of Ontario. The Parties consent to the jurisdiction and venue of the Court for the resolution of any disputes under this Agreement.

**10.17  Non-Merger**

The representations, warranties and covenants of each Party contained in this Agreement will not merge on and will survive the closing of the Transaction and will continue in full force and effect, notwithstanding the closing of the Transaction or any investigation or knowledge acquired by or on behalf of the other Party.

**10.18  Independent Legal Advice**

The Purchaser warrants that it has received independent legal advice in connection with this Agreement.

**10.19   Execution and Delivery**

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute one and the same instrument. Counterparts may be executed and delivered either in original form or by electronic delivery in portable document format (PDF).

**10.20   Damages**

Under no circumstance shall any of the Parties or their representatives be liable for any special, punitive, exemplary, consequential, or indirect damages (including loss of profits) that may be alleged to result, in connection with, arising out of, or relating to this Agreement or the transactions contemplated herein.

**10.21   No Brokers**

It is understood and agreed that the Purchaser shall not be liable for any commission or other remuneration payable or alleged to be payable to any broker, agent or other intermediary who purports to act or have acted for the Company. It is further understood and agreed that the Company shall not be liable for any commission or other remuneration payable or alleged to be payable to any broker, agent or other intermediary who purports to act or have acted for the Purchaser.

**[Remainder of page left blank intentionally. Signature page follows.]**

US INC_000391

**IN WITNESS OF WHICH** the Parties have executed this Agreement.

**MaxSold Incorporated**


Per:_____

     Name: Russ Patterson
     Title: President and Chief Executive
     Officer


I have the authority to bind the Corporation.

**1000822913 Ontario Inc.**

Per:_____

     Name: Chris Reid
     Title: CEO


I have the authority to bind the Corporation.

## SCHEDULE "A" – PERMITTED ENCUMBRANCES

None.

US INC_000393

## SCHEDULE "B" – SALE PROCEDURES

US INC_000394

## **SCHEDULE "C" – PURCHASED ASSETS LIST**

To be delivered by the Purchaser on or before the Bid Deadline.

US INC_000395

## SCHEDULE "D" – ASSUMED CONTRACTS

All Contracts of the Company with the following counterparties:

| |
|---|
| Auction Method |
| AYESHA FATIMA |
| BELIZE VIRTUAL CENTER |
| BUCUR, MARIUS (BITFORGE) |
| Datadog Inc |
| FLAT PLANET PTY LTD |
| HOMEWORK (GORDO, JANUARY) |
| INNOVATIVE SOLUTIONS |
| KALPA SERVICES |
| KPMG |
| LABARGE WEINSTEIN |
| NIVED.IO |
| Paul Vickers |
| PAUL VICKERS, CPA |
| PERIMETER 81 LLC |
| S&E CLOUD EXPERTS |
| TWILIO INC |
| ZENDESK |

US INC_000396

**SCHEDULE "E" – CRITICAL SUPPLIER PRE-FILING COSTS**

| VENDOR | CDN $ |
|---|---|
| Auction Method | 14,905.05 |
| AYESHA FATIMA | 1,228.56 |
| BELIZE VIRTUAL CENTER | 17,493.80 |
| BUCUR, MARIUS (BITFORGE) | 5,066.54 |
| Datadog Inc | 5,105.13 |
| FLAT PLANET PTY LTD | 8,087.19 |
| HOMEWORK (GORDO, JANUARY) | 6,013.29 |
| INNOVATIVE SOLUTIONS | 33,555.91 |
| KALPA SERVICES | 8,142.55 |
| KPMG | 7,062.50 |
| LABARGE WEINSTEIN | 2,497.87 |
| NIVED.IO | 5,747.49 |
| Paul Vickers | 18,780.78 |
| PAUL VICKERS, CPA | 2,021.25 |
| PERIMETER 81 LLC | 1,701.46 |
| S&E CLOUD EXPERTS | 114,761.15 |
| TWILIO INC | 86.35 |
| ZENDESK | 19,317.83 |
| **Grand Total** | **271,574.70** |