# EXHIBIT 1

EXECUTION VERSION

## LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** (this "Agreement") is dated as of the Effective Date between **SILICON VALLEY BANK**, an authorized foreign bank branch under the *Bank Act* (Canada) ("**Bank**"), and the borrowers listed on Schedule I hereto (each, individually and collectively, jointly and severally, referred to as "**Borrower**").  The parties agree as follows:

**1      LOAN AND TERMS OF PAYMENT**

**1.1      Term Loan.**

(a)      <u>Availability</u>.  Subject to the terms and conditions of this Agreement, upon Borrower's request, on or shortly after the Effective Date, Bank shall make a term loan advance equal to the Tranche I Loan Availability Amount (the "**Tranche I Term Loan Advance**").  Upon Borrower's request, during the Draw Period, Bank shall make a term loan advance not exceeding the Tranche II Loan Availability Amount upon Borrower achieving the Tranche II Milestone (the "**Tranche II Term Loan Advance**", and together with the Tranche I Term Loan Advance, each such advance is referred to herein as a "**Term Loan Advance**" and, collectively, as the "**Term Loan Advances**").  Borrower may request Term Loan Advances as set forth on Schedule I hereto.

(b)      <u>Repayment</u>.  Borrower shall repay each Term Loan Advance as set forth in Schedule I hereto.  All outstanding principal and accrued and unpaid interest under each Term Loan Advance, and all other outstanding Obligations with respect to such Term Loan Advance, are due and payable in full on the Term Loan Maturity Date.

(c)      <u>Permitted Prepayment</u>.  Borrower shall have the option to prepay all, but not less than all, of the Term Loan Advances, provided Borrower (i) delivers written notice to Bank of its election to prepay the Term Loan Advances at least ten (10) days prior to such prepayment, and (ii) pays, on the date of such prepayment (A) the outstanding principal plus accrued and unpaid interest with respect to the Term Loan Advances, (B) the Prepayment Fee, and (C) all other sums, if any, that shall have become due and payable with respect to the Term Loan Advances, including interest at the Default Rate with respect to any past due amounts.

(d)      <u>Mandatory Prepayment Upon an Acceleration</u>.  If the Term Loan Advances are accelerated by Bank following the occurrence and during the continuance of an Event of Default, Borrower shall immediately pay to Bank an amount equal to the sum of (i) all outstanding principal plus accrued and unpaid interest with respect to the Term Loan Advances, (ii) the Prepayment Fee, and (iii) all other sums, if any, that shall have become due and payable with respect to the Term Loan Advances, including interest at the Default Rate with respect to any past due amounts.

**1.2      Payment of Interest on the Credit Extensions.**

(a)      <u>Interest Payments</u>.

(i)      <u>Term Loan Advances</u>.  Interest on the principal amount of each Term Loan Advance is payable as set forth on Schedule I hereto.

(b)      <u>Interest Rate</u>.

(i)      <u>Term Loan Advances</u>.  Subject to Section 1.2(c), the outstanding principal amount of any Term Loan Advance shall accrue interest as set forth on Schedule I hereto.

(ii)      <u>All-In Rate</u>.  Notwithstanding any terms in this Agreement to the contrary, if at any time the interest rate applicable to any Obligations is less than zero percent (0.0%), such interest rate shall be deemed to be zero percent (0.0%) for all purposes of this Agreement.

(c)     Default Rate.  Immediately upon the occurrence and during the continuance of an Event of Default, the outstanding Obligations shall bear interest at a rate per annum which is five percent (5.0%) above the rate that is otherwise applicable thereto (the "**Default Rate**").   Fees and expenses which are required to be paid by Borrower pursuant to the Loan Documents (including, without limitation, Bank Expenses) but are not paid when due shall bear interest until paid at a rate equal to the highest rate applicable to the Obligations.  Payment or acceptance of the increased interest rate provided in this Section 1.2(c) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Bank.

(d)     Adjustment to Interest Rate.  Each change in the interest rate applicable to any amounts payable under the Loan Documents based on changes to the Canadian Prime Rate shall be effective on the effective date of any change to the Canadian Prime Rate and to the extent of such change.

(e)     Interest Computation.  Interest shall be computed as set forth on Schedule I hereto.   In computing interest, the date of the making of any Credit Extension shall be included and the date of payment shall be excluded; provided, however, that if any Credit Extension is repaid on the same day on which it is made, such day shall be included in computing interest on such Credit Extension.

(f)     Yearly Rate of Interest.  For the purposes of the *Interest Act* (Canada) and disclosure thereunder, whenever any interest or any fee is paid hereunder or in connection herewith is to be calculated on the basis of a 360-day year, the yearly rate of interest to which the rate used in such calculation is equivalent is the rate so used multiplied by the actual number of days in the calendar year in which the same is to be ascertained and divided by 360.  The rates of interest under this Agreement are nominal rates, and not effective rates or yields.  The principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement. Borrower acknowledges and confirms that:

(i)     the foregoing methodology satisfies the requirements of Section 4 of the *Interest Act* (Canada) to the extent it applies to the expression or statement of any interest payable under any Loan Document;

(ii)     Borrower is able to calculate the yearly rate or percentage of interest payable under any Loan Document based upon such methodology; and

(iii)     Borrower shall not plead or assert, whether by way of defence or otherwise, in any proceeding relating to the Loan Documents, that the interest payable thereunder and the calculation thereof has not been adequately disclosed to Borrower, whether pursuant to Section 4 of the *Interest Act* (Canada) or any other Applicable Law or legal principle.

(g)     Criminal Interest.  If any provision of this Agreement would oblige Borrower to make any payment of interest or other amount payable to Bank in an amount or calculated at a rate which would be prohibited by Applicable Law or would result in a receipt by Bank of "interest" at a "criminal rate" (as such terms are construed under the *Criminal Code* (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by Applicable Law or so result in a receipt by Bank of "interest" at a "criminal rate", such adjustment to be effected, to the extent necessary (but only to the extent necessary), as follows:

(i)     first, by reducing the amount or rate of interest required to be paid to Bank; and

(ii)     thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid to Bank which would constitute interest for purposes of section 347 of the *Criminal Code* (Canada).

**1.3     Fees.**  Borrower shall pay to Bank:

(a)     Term Loan Advance Commitment Fee.  A fully earned, non-refundable commitment fee as set forth on Schedule I hereto;

(b)    Bank Services Fee.  Customary fees and expenses of Bank Services Provider for Bank Services in accordance with the applicable Bank Services Agreement;

(c)    Prepayment Fee.  The Prepayment Fee, when due hereunder, which shall be fully earned and non-refundable as of such date; and

(d)    Bank Expenses.  All Bank Expenses incurred through and after the Effective Date, when due (or, if no stated due date, upon demand by Bank).

Unless otherwise provided in this Agreement or in a separate writing by Bank, Borrower shall not be entitled to any credit, rebate, or repayment of any fees earned by Bank pursuant to this Agreement notwithstanding any termination of this Agreement or the suspension or termination of Bank's obligation to make loans and advances hereunder.  Bank may deduct amounts owing by Borrower under the clauses of this Section 1.3 pursuant to the terms of Section 1.4(c).  Bank shall provide Borrower written notice of deductions made pursuant to the terms of the clauses of this Section 1.3.

**1.4    Payments; Application of Payments; Debit of Accounts.**

(a)    All payments (including prepayments) to be made by Borrower under any Loan Document shall be made in immediately available funds in Canadian Dollars, without setoff, counterclaim, or deduction, before 12:00 p.m. Eastern time on the date when due.  Payments of principal and/or interest received after 12:00 p.m. Eastern time are considered received at the opening of business on the next Business Day.  When a payment is due on a day that is not a Business Day, the payment shall be due the next Business Day, and additional fees or interest, as applicable, shall continue to accrue until paid.

(b)    Bank has the exclusive right to determine the order and manner in which all payments with respect to the Obligations may be applied.  Borrower shall have no right to specify the order or the accounts to which Bank shall allocate or apply any payments required to be made by Borrower to Bank or otherwise received by Bank under this Agreement when any such allocation or application is not specified elsewhere in this Agreement.

(c)    Bank may debit any of Borrower's deposit accounts maintained with SVB U.S., if any, including the Designated Deposit Account, for principal and interest payments or any other amounts Borrower owes Bank when due under the Loan Documents.  These debits shall not constitute a set-off.

**1.5    Change in Circumstances.**

(a)    Increased Costs.  If any Change in Law shall: (i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or advances, loans or other credit extended or participated in by, Bank, (ii) subject Bank to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes, and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitment, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, or (iii) impose on Bank any other condition, cost or expense (other than Taxes) affecting this Agreement or Credit Extensions made by Bank, and the result of any of the foregoing shall be to increase the cost to Bank of making, converting to, continuing or maintaining any Credit Extension (or of maintaining its obligation to make any such Credit Extension), or to reduce the amount of any sum received or receivable by Bank hereunder (whether of principal, interest or any other amount) then, upon written request of Bank, Borrower shall promptly pay to Bank such additional amount or amounts as  will compensate Bank for such additional costs incurred or reduction suffered.

(b)    Capital Requirements.  If Bank determines that any Change in Law affecting Bank regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on Bank's capital as a consequence of this Agreement, any term loan facility, or the Credit Extensions made by Bank to a level below that which Bank could have achieved but for such Change in Law (taking into consideration Bank's policies with respect to capital adequacy and liquidity), then from time to time upon written request of Bank, Borrower shall promptly pay to Bank such additional amount or amounts as will compensate Bank for any such reduction suffered.

3

(c)    <u>Delay in Requests</u>.  Failure or delay on the part of Bank to demand compensation pursuant to this Section 1.5 shall not constitute a waiver of Bank's right to demand such compensation; provided that Borrower shall not be required to compensate Bank pursuant to subsection (a) for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that Bank notifies Borrower of the Change in Law giving rise to such increased costs or reductions (except that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine (9) month period shall be extended to include the period of retroactive effect).

1.6    **Taxes.**

(a)    <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of Borrower under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of Borrower) requires the deduction or withholding of any Tax from any such payment by Borrower, then (i) Borrower shall make such deduction or withholding, (ii) Borrower shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law, and (iii) if such Tax is an Indemnified Tax, the sum payable by Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 1.6) Bank receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    <u>Payment of Other Taxes by Borrower</u>.  Without limiting the provisions of subsection (a) above, Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(c)    <u>Tax Indemnification</u>.  Without limiting the provisions of subsections (a) and (b) above, Borrower shall, and does hereby, indemnify Bank, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 1.6) payable or paid by Bank or required to be withheld or deducted from a payment to Bank and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower by Bank shall be conclusive absent manifest error.

(d)    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by Borrower to a Governmental Authority pursuant to this Section 1.6, Borrower shall deliver to Bank a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Bank.

(e)    <u>Status of Bank</u>.  If Bank (including any assignee or successor) is entitled to an exemption from or reduction of withholding tax with respect to payments made under any Loan Document, it shall deliver to Borrower, at the time or times reasonably requested by Borrower, such properly completed and executed documentation reasonably requested by Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, Bank, if reasonably requested by Borrower, shall deliver such other documentation prescribed by Applicable Law or reasonably requested by Borrower as will enable Borrower to determine whether or not Bank is subject to backup withholding or information reporting requirements.  Without limiting the generality of the foregoing, Bank shall deliver whichever of IRS Form W-9, IRS Form W-8BEN-E, IRS Form W-8ECI or W-8IMY is applicable, as well as any applicable supporting documentation or certifications.

1.7    **Procedures for Borrowing.**

(a)    <u>Term Loan Advances</u>.  Subject to the prior satisfaction of all other applicable conditions to the making of a Term Loan Advance set forth in this Agreement (which must be satisfied no later than 12:00 p.m. Eastern time on the applicable Funding Date), to obtain a Term Loan Advance, Borrower shall notify Bank (which notice shall be irrevocable) by 12:00 p.m. Eastern time on the Funding Date of the applicable Term Loan Advance. Such notice shall be made by electronic mail or by telephone and, together with any such notification, Borrower shall deliver to Bank by electronic mail a completed Payment/Advance Form executed by an Authorized Signer and such other reports and information as Bank may reasonably request.  Bank may rely on any telephone notice given by a person whom Bank believes is an Authorized Signer.  Borrower will indemnify Bank for any loss Bank suffers due to

such belief or reliance. Bank shall have received satisfactory evidence that the Board has approved that such Authorized Signer may provide such notices and request such Term Loan Advance (which requirement may be deemed satisfied by the prior delivery of Borrowing Resolutions or a secretary's certificate that certifies as to such Board approval).

(b)    Bank shall credit proceeds of a Credit Extension to the Designated Deposit Account. Bank may make Term Loan Advances under this Agreement based on instructions from an Authorized Signer or without instructions if such Term Loan Advances are necessary to meet Obligations which have become due.

## 2    CONDITIONS OF CREDIT EXTENSIONS

**2.1    Conditions Precedent to Initial Credit Extension.** Bank's obligation to make the initial Credit Extension is subject to the condition precedent that Bank shall have received, in form and substance satisfactory to Bank, such documents, and completion of such other matters, as Bank may reasonably deem necessary or appropriate, including, without limitation:

(a)    duly executed Loan Documents;

(b)    duly executed Warrant, together with a capitalization table and copies of Canadian Borrower's equity documents;

(c)    duly executed Control Agreement with City National Bank in respect of US Borrower's deposit accounts bearing the following account numbers: 441042612 and 441048424;

(d)    the Operating Documents of each Borrower and certificates of status, certificates of compliance, good standing certificates or analogous certificates of each Borrower from its jurisdiction of formation and from each other jurisdiction in which Borrower is qualified to conduct business, in each case as of a date no earlier than 5 days prior to the Effective Date;

(e)    certificate duly executed by a Responsible Officer or secretary of each Borrower with respect to, for each Borrower (i) Operating Documents and (ii) Borrowing Resolutions;

(f)    duly executed payoff letter from BDC Capital Inc., which payoff letter includes an authorization to discharge any and all Liens filed in favour of BDC Capital Inc., including, but not limited to (i) PPSA lien bearing file no. 755270793 registered against Canadian Borrower; and (ii) UCC lien bearing registration no. 2019 6440601 registered against US Borrower.

(g)    receipt of a duly executed cash collateral confirmation executed by Royal Bank of Canadian in respect of that certain PPSA lien bearing file no. 739499733, which confirmation limits the scope of such lien to $500,000 in cash collateral to secure Canadian Borrower's credit cards held in account numbers 00150183599-0002 and 00150183599-0003 (the "**RBC Confirmation**").

(h)    copies, dated as of a recent date, of all personal property, judgment, bankruptcy, execution and other searches in all jurisdictions selected by Bank and its counsel, accompanied by written evidence (including any financing change statements (discharges), UCC termination statements or similar instruments) that the Liens indicated in any such searches either constitute Permitted Liens or have been or, in connection with the initial Credit Extension, will be terminated or released;

(i)    filings satisfactory to Bank with respect to the Collateral, together with written evidence satisfactory to Bank that the same have been filed in each jurisdiction as is necessary or of advantage, in Bank or Bank's legal counsel's opinion, to perfect and/or protect Bank's first priority security interest in the Collateral (subject to Permitted Liens);

(j)    duly executed Perfection Certificate(s) of each Borrower;

(k)    a Canadian legal opinion of Borrower's counsel dated as of the Effective Date;

(l)    evidence satisfactory to Bank that the insurance policies and endorsements required by Section 5.8 hereof are in full force and effect, together with appropriate evidence showing lender loss payable and additional insured clauses or endorsements in favour of Bank;

(m)    payment of the fees and Bank Expenses then due as specified in Section 1.3 hereof; and

(n)    all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including Anti-Terrorism Laws.

**2.2    Conditions Precedent to all Credit Extensions.** Bank's obligation to make each Credit Extension, including the initial Credit Extension, is subject to the following conditions precedent:

(a)    receipt of Borrower's Credit Extension request and the related materials and documents as required by and in accordance with Section 1.7;

(b)    the representations and warranties in this Agreement shall be true and correct in all material respects as of the date of any Credit Extension request  and as of the Funding Date of each Credit Extension; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true and correct in all material respects as of such date, and no Default or Event of Default shall have occurred and be continuing or result from the Credit Extension.  Each Credit Extension is Borrower's representation and warranty on that date that the representations and warranties in this Agreement remain true and correct in all material respects; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true and correct in all material respects as of such date; and

(c)    a Material Adverse Change shall not have occurred and be continuing.

**2.3    Covenant to Deliver.**  Borrower shall deliver to Bank each item required to be delivered to Bank under this Agreement as a condition precedent to any Credit Extension.  A Credit Extension made prior to the receipt by Bank of any such item shall not constitute a waiver by Bank of Borrower's obligation to deliver such item, and the making of any Credit Extension in the absence of a required item shall be in Bank's sole discretion.

**3    CREATION OF SECURITY INTEREST**

**3.1    Grant of Security Interest.**

(a)    Borrower hereby grants Bank, to secure the payment and performance in full of all of the Obligations, a continuing security interest in, and pledges to Bank, the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof.

(b)    Borrower acknowledges that it previously has entered, or may in the future enter, into Bank Services Agreements with Bank Services Provider.  Regardless of the terms of any Bank Services Agreement, Borrower agrees that any amounts Borrower owes Bank Services Provider thereunder shall be deemed to be Obligations hereunder and that it is the intent of Borrower, Bank, and Bank Services Provider to have all such Obligations secured by the first priority perfected security interest in the Collateral granted herein (subject only to Permitted Liens).

**3.2    Attachment**. Borrower hereby confirms that value has been given by Bank to Borrower, that Borrower has rights in the Collateral existing at the date of this Agreement, and that Borrower and Bank have not agreed to postpone the time for attachment of the security interest to any of the Collateral.  The security interest with

respect to the Collateral created by this Agreement shall have effect and be deemed to be effective whether or not the Obligations or any part thereof are owing or in existence before or after or upon the date of this Agreement.

**3.3    Permitted Liens**. Any reference in any of the Loan Documents to a Permitted Lien is not intended to subordinate or postpone, and shall not be interpreted as subordinating or postponing, or as any agreement to subordinate or postpone, any Lien created by this Agreement or any other Loan Document to any Permitted Lien.

**3.4    Authorization to File Financing Statements.**  Borrower hereby authorizes Bank to file financing statements, without notice to Borrower, in all jurisdictions deemed necessary or appropriate by Bank to perfect or protect Bank's interest or rights hereunder, including a notice that any disposition of the Collateral, by either Borrower or any other Person, shall be deemed to violate the rights of Bank under the Code.  Such financing statements may indicate the Collateral as "all assets of the Debtor" or words of similar effect or check off all collateral classification boxes, as applicable.

**3.5    Acknowledgement of Receipt / Waiver**.  Borrower acknowledges receipt of an executed copy of this Agreement and, to the extent permitted by Applicable Law, waives the right to receive a copy of any financing statement or financing change statement registered in connection with this Agreement or any other Loan Document or any verification statement issued with respect to any such financing statement or financing change statement.

**3.6    Termination**.  If this Agreement is terminated, Bank's Lien in the Collateral shall continue until the Obligations (other than inchoate indemnity obligations) are repaid in full in cash.  Upon payment in full in cash of the Obligations (other than inchoate indemnity obligations) and at such time as Bank's obligation to make Credit Extensions has terminated, Bank shall, at Borrower's sole cost and expense, terminate its security interest in the Collateral and all rights therein shall revert to Borrower.  In the event (a) all Obligations (other than inchoate indemnity obligations), except for Bank Services, are satisfied in full, and (b) this Agreement is terminated, Bank shall terminate the security interest granted herein upon Borrower providing cash collateral acceptable to Bank Services Provider in its sole discretion for Bank Services, if any.

**3.7    ULC Shares**.  Notwithstanding anything else contained in this Agreement or any other Loan Document, Borrower acknowledges that certain of the Collateral may now or in the future consist of ULC Shares, and that it is the intention of Bank and Borrower that neither Bank nor any beneficiary, successor in interest, agent or any other Affiliate of Bank should under any circumstances prior to realization thereon be held to be a "shareholder" or "member", as applicable, of a ULC for the purposes of any ULC Laws.  Therefore, notwithstanding any provisions to the contrary contained in this Agreement or any other Loan Document, where Borrower has granted a Lien in any ULC Shares, Borrower will remain the sole registered and beneficial owner of such ULC Shares until such time as such ULC Shares are effectively transferred into the name of Bank, or any beneficiary, successor in interest, agent or any other Affiliate of Bank, or any other person on the books and records of the applicable ULC.  Accordingly, Borrower shall be entitled to receive and retain for its own account any dividend on or other distribution, if any, in respect of such ULC Shares (except for any dividend or distribution comprised of pledged interests of Borrower, which is required to be delivered to Bank to hold as collateral hereunder) and shall have the right to vote such ULC Shares and to control the direction, management and policies of the applicable ULC to the same extent as Borrower would if such ULC Shares were not pledged to Bank pursuant hereto.  Nothing in this Agreement or any other Loan Document is intended to, and nothing in this Agreement or any other Loan Document shall, constitute Bank, or any beneficiary, successor in interest, agent or any other Affiliate of Bank, or any other person other than Borrower, a member or shareholder of a ULC for the purposes of any ULC Laws (whether listed or unlisted, registered or beneficial), until such time as notice is given to Borrower and further steps are taken pursuant hereto or thereto so as to register Bank, or such other person, as specified in such notice, as the holder of the ULC Shares.  To the extent any provision hereof would have the effect of constituting Bank as a member or a shareholder, as applicable, of any ULC prior to such time, such provision shall be severed herefrom and shall be ineffective with respect to ULC Shares which are collateral of Borrower without otherwise invalidating or rendering unenforceable this Agreement or invalidating or rendering unenforceable such provision insofar as it relates to Collateral of Borrower which is not ULC Shares. Except upon the exercise of rights of Bank to sell, transfer or otherwise dispose of ULC Shares in accordance with this Agreement or any other Loan Document, Borrower shall not cause or permit, or enable any Issuer that is a ULC to cause or permit, Bank or any beneficiary, successor in interest, agent or any other Affiliate of Bank, to: (a) be registered as a shareholder or member of such Issuer; (b) have any notation entered in its favour in the share register of such Issuer; (c) be held out as a shareholder or member of such Issuer; (d) receive, directly or indirectly, any

dividends, property or other distributions from such Issuer by reason of Bank holding a Lien over the ULC Shares; or (e) act as a shareholder of such Issuer, or exercise any rights of a shareholder including the right to attend a meeting of shareholders of such Issuer or to vote the ULC Shares of such Issuer. Borrower, without limiting the generality of any provision of the this Agreement, shall indemnify and hold harmless Bank and its respective officers, directors, agents, employees, advisors, and counsel and their respective affiliates (each such person being an "indemnitee") from and against any and all losses, claims, damages, liabilities, costs or expenses (including legal fees and expenses) imposed on, incurred by or asserted against any of them in connection with any litigation, investigation, claim or proceeding commenced or threatened against an indemnitee in connection with Borrower or Bank being held or deemed to be a shareholder any ULC.

## 4    REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants as follows:

### 4.1    Due Organization, Authorization; Power and Authority.

(a)    Borrower and each of its Subsidiaries are each duly formed, validly existing and in good standing and, in the case of the US Borrower and any Subsidiary organized under the laws of any state of the United States of America or of the District of Columbia, are a Registered Organization, under their respective jurisdiction of formation and are qualified and licensed to do business and is in good standing in any jurisdiction in which the conduct of their respective business or their ownership of property requires that they be qualified except where the failure to do so could not reasonably be expected to have a material adverse effect on Borrower's business or operations.

(b)    All information set forth on the Perfection Certificate pertaining to Borrower and each of its Subsidiaries is true and correct (it being understood and agreed that Borrower may from time to time update certain information in the Perfection Certificate after the Effective Date to the extent permitted by one or more specific provisions in this Agreement and the Perfection Certificate shall be deemed to be updated to the extent such notice is provided to Bank of such permitted update).

(c)    The execution, delivery and performance by Borrower and each of its Subsidiaries of the Loan Documents to which it is a party have been duly authorized, and do not (i) conflict with any of Borrower's or any such Subsidiary's organizational documents, (ii) contravene, conflict with, constitute a default under or violate any material Applicable Law, (iii) contravene, conflict with or violate any applicable order, writ, judgment, injunction, decree, determination or award of any Governmental Authority by which Borrower or any of its Subsidiaries or any of their property or assets may be bound or affected, (iv) require any action by, filing, registration, or qualification with, or Governmental Approval from, any Governmental Authority (except such Governmental Approvals which have already been obtained and are in full force and effect), or (v) conflict with, contravene, constitute a default or breach under, or result in or permit the termination or acceleration of, any material agreement by which Borrower or any of its Subsidiaries is bound. Neither Borrower nor any of its Subsidiaries are in default under any agreement to which it is a party or by which it is bound in which the default could reasonably be expected to have a material adverse effect on Borrower's or any of its Subsidiary's business or operations.

### 4.2    Collateral.

(a)    The security interest granted herein is and shall at all times continue to be a first priority perfected security interest in the Collateral (subject only to Permitted Liens). Borrower has good title to, rights in, and the power to transfer each item of the Collateral upon which it purports to grant a Lien hereunder, free and clear of any and all Liens except Permitted Liens.

(b)    Borrower has no Collateral Accounts at or with any bank or financial institution other than Bank or Bank's Affiliates, except for the Collateral Accounts described in the Perfection Certificate delivered to Bank in connection herewith and for which Borrower has delivered a Control Agreement and has taken such actions as are necessary to give Bank a perfected security interest therein. The Accounts are bona fide, existing obligations of the Account Debtors.

(c)    The Collateral is not in the possession of any third party bailee (such as a warehouse) except as otherwise provided in the Perfection Certificate or as permitted pursuant to Section 6.2.  None of the components of the Collateral shall be maintained at locations other than as provided in the Perfection Certificate or as permitted pursuant to Section 6.2.

(d)    All Inventory is in all material respects of good and marketable quality, free from material defects.

(e)    Borrower owns, or possesses the right to use to the extent necessary in its business, all Intellectual Property, licenses and other intangible assets that are used in the conduct of its business as now operated, except to the extent that such failure to own or possess the right to use such asset would not reasonably be expected to have a material adverse effect on Borrower's business or operations, and no such asset, to the best knowledge of Borrower, conflicts with the valid Intellectual Property, license, or intangible asset of any other Person to the extent that such conflict could reasonably be expected to have a material adverse effect on Borrower's business or operations.

(f)    Except as noted on the Perfection Certificate or for which notice has been given to Bank pursuant to and in accordance with Section 5.11(b), Borrower is not a party to, nor is it bound by, any Restricted License.

(g)    Borrower does not own any consumer goods which are material in value or which are material to the business, operations, property, condition or prospects (financial or otherwise) of Borrower.

**4.3**    [**Reserved**.]

**4.4    Litigation.**  Other than as set forth in the Perfection Certificate or as disclosed to Bank pursuant to Section 5.3(h), there are no actions, investigations or proceedings pending or, to the knowledge of any Responsible Officer, threatened in writing by or against Borrower or any of its Subsidiaries involving more than, individually or in the aggregate, $50,000 not covered by independent third party insurance as to which liability has been accepted by the carrier providing such insurance.

**4.5    Financial Statements; Financial Condition.**  All consolidated financial statements for Borrower and any of its Subsidiaries delivered to Bank by submission to the Financial Statement Repository or otherwise submitted to Bank fairly present in all material respects Borrower's consolidated financial condition and Borrower's consolidated results of operations for the periods covered thereby, subject, in the case of unaudited financial statements, to normal year-end adjustments and the absence of footnote disclosures.  There has not been any material deterioration in Borrower's consolidated financial condition since the date of the most recent financial statements submitted to the Financial Statement Repository or otherwise submitted to Bank.

**4.6    Solvency.**  The fair salable value of Borrower's consolidated assets (including goodwill minus disposition costs) exceeds the fair value of Borrower's liabilities; Borrower is not left with unreasonably small capital after the transactions in this Agreement; and Borrower and each of its Subsidiaries are able to pay their debts (including trade debts) as they mature.  Borrower is not an "insolvent person" within the meaning of the BIA.

**4.7    Regulatory Compliance.**  Borrower is not an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended.  Borrower is not engaged as one of its important activities in extending credit for margin stock (under Regulations X, T and U of the Federal Reserve Board of Governors).  Borrower and each of its Subsidiaries (a) have complied in all material respects with all Applicable Law, and (b) have not violated any Applicable Law the violation of which could reasonably be expected to have a material adverse effect on Borrower's business or operations.  Borrower and each of its Subsidiaries have duly complied with, and their respective facilities, business, assets, property, leaseholds, real property and Equipment are in compliance with, Environmental Laws, except where the failure to do so could not reasonably be expected to have a material adverse effect on Borrower's business or operations; there have been no outstanding citations, notices or orders of non-compliance issued to Borrower or any of its Subsidiaries or relating to their respective facilities, businesses, assets, property, leaseholds, real property or Equipment under such Environmental Laws.  Borrower and each of its Subsidiaries have obtained all consents, approvals and authorizations of, made all declarations or filings

with, and given all notices to, all Governmental Authorities that are necessary to continue their respective businesses as currently conducted, except where the failure to obtain or make or file the same would not reasonably be expected to have a material adverse effect on Borrower's business or operations.

**4.8    Subsidiaries; Investments.**  Borrower does not own any stock, partnership, or other ownership interest or other equity securities except for Permitted Investments.

**4.9    Tax Returns and Payments; Pension Contributions.**

(a)    Borrower and each of its Subsidiaries have timely filed, or submitted extensions for, all required tax returns and reports, and Borrower and each of its Subsidiaries have timely paid all foreign, federal, state, provincial and local taxes, assessments, deposits and contributions owed by Borrower and each of its Subsidiaries except (a) to the extent such taxes are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made therefor, or (b) if such taxes, assessments, deposits and contributions do not, individually or in the aggregate, exceed $50,000.  Borrower is unaware of any claims or adjustments proposed for any of Borrower's or any of its Subsidiary's prior tax years which could result in additional taxes becoming due and payable by Borrower or any of its Subsidiaries in excess of $50,000 in the aggregate.

(b)    Borrower and each of its Subsidiaries have paid all amounts necessary to fund all present pension, profit sharing and deferred compensation plans in accordance with their terms, and neither Borrower nor any of its Subsidiaries has withdrawn from participation in, and has not permitted partial or complete termination of, or permitted the occurrence of any other event with respect to, any such plan which could reasonably be expected to result in any liability of Borrower or any of its Subsidiaries, including any liability to the Pension Benefit Guaranty Corporation or its successors or any other Governmental Authority.  None of Borrower or any of its Subsidiaries sponsors, administers, participates in, contributes to or has any direct or indirect liability under or in respect of any Canadian Defined Benefit Plan.

**4.10    Full Disclosure.**  No written representation, warranty or other statement of Borrower or any of its Subsidiaries in any report, certificate or written statement submitted to the Financial Statement Repository or otherwise submitted to Bank, as of the date such representation, warranty, or other statement was made, taken together with all such reports, certificates and written statements submitted to the Financial Statement Repository or otherwise submitted to Bank, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained in the reports, certificates or written statements not misleading in light of the circumstances under which they were made (it being recognized by Bank that the projections and forecasts provided by Borrower or any of its Subsidiaries in good faith and based upon reasonable assumptions are not viewed as facts and that actual results during the period or periods covered by such projections and forecasts may differ from the projected or forecasted results).

**4.11    Anti-Corruption Laws and Sanctions**.  Neither Borrower nor any of its Subsidiaries is: (a) in violation of any Anti-Corruption Laws or Sanctions; or (b) a Sanctioned Person.  Neither Borrower nor any of its Subsidiaries, directors, officers, employees, agents or Affiliates: (i) conducts any business or engages in any transaction or dealing with any Sanctioned Person, including making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person; (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to any Sanctions; (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Sanctions; or (iv) otherwise engages in any transaction that could cause Bank to violate any Sanctions.  No Credit Extension, use of proceeds or other transaction contemplated by this Agreement will violate any Anti-Corruption Laws or Sanctions.

**5    AFFIRMATIVE COVENANTS**

Borrower shall do all of the following:

**5.1    Use of Proceeds.**  Cause the proceeds of the Credit Extensions to be used solely (a) as working capital, (b) to fund its general business purposes, or (c) prepayment of existing debt and associated early payment penalties, and not for personal, family, household or agricultural purposes.

**5.2    Government Compliance.**

(a)    Maintain its and all of its Subsidiaries' legal existence (except as permitted under Section 6.3 with respect to Subsidiaries only) and good standing in their respective jurisdictions of formation and maintain qualification in each jurisdiction in which the failure to so qualify would reasonably be expected to have a material adverse effect on Borrower's business or operations.  Borrower shall comply, and have each Subsidiary comply, in all material respects, with all laws, ordinances and regulations to which it is subject.

(b)    Obtain all of the Governmental Approvals necessary for the performance by Borrower and each of its Subsidiaries of their obligations under the Loan Documents to which it is a party, including any grant of a security interest to Bank.  Borrower shall promptly provide copies of any such obtained Governmental Approvals to Bank.

**5.3    Financial Statements, Reports, Statements.**  Deliver to Bank by submitting to the Financial Statement Repository:

(a)    <u>Monthly Financial Statements and KPI Metrics</u>.  As soon as available, but no later than 30 days after the last day of each month: (i) a company prepared consolidated balance sheet and income statement covering Borrower's consolidated operations for such month in a form reasonably acceptable to Bank; and (ii) details of key performance indicators including average gross merchandise value, take-rates and gross margins covering Borrower's consolidated operations for such month in a form reasonably acceptable to Bank.

(b)    <u>Compliance Statement</u>.  Within 30 days after the last day of each month and together with the statements set forth in Section 5.3(a), a duly completed Compliance Statement, confirming that as of the end of such month, Borrower was in full compliance with all of the terms and conditions of this Agreement, and setting forth calculations showing compliance with the financial covenants set forth in this Agreement and such other information as Bank may reasonably request;

(c)    <u>Annual Operating Budget and Financial Projections</u>.  Within 30 days prior to the end of each fiscal year of Borrower, and contemporaneously with any updates or amendments thereto, (A) annual operating budgets (including income statements, balance sheets and cash flow statements, by month) for the upcoming fiscal year of Borrower, and (B) annual financial projections for the following fiscal year (on a quarterly basis), in each case as approved by the Board, together with any related business forecasts used in the preparation of such annual financial projections;

(d)    <u>Annual Financial Statements</u>.  As soon as available, and in any event within 180 days following the end of Borrower's fiscal year, reviewed consolidated financial statements; provided, however, if the Board requires audited consolidated financial statements are prepared for any given fiscal year, such audited consolidated financial statements shall be prepared under GAAP, consistently applied, and provided to Bank within 180 days following the end of Borrower's fiscal year, together with an unqualified opinion on the financial statements from an independent auditor of recognized national standing;

(e)    <u>Securities Filings</u>.  In the event that Borrower or any of its Subsidiaries becomes subject to the reporting requirements under the *Securities Act* (Ontario) or the Exchange Act (or, in each case, any comparable legislation in any other applicable jurisdiction) within five (5) days of filing, notification of the filing and copies of all periodic and other reports, proxy statements and other materials filed by Borrower and/or any of its Subsidiaries or any Guarantor with the Securities Commission or SEC (as applicable), any Governmental Authority succeeding to any or all of the functions of the Securities Commission or SEC (as applicable) or with any national securities exchange, if applicable, or distributed to its shareholders, as the case may be.  Documents required to be delivered pursuant to the terms hereof (to the extent any such documents are included in materials otherwise filed with the Securities Commission or SEC) may be delivered electronically and if so delivered, shall be deemed to have been

delivered on the date on which Borrower or any of its Subsidiaries posts such documents, or provides a link thereto, on Borrower's or any of its Subsidiaries' website on the internet at Borrower's or any of its Subsidiaries' website address; provided, however, Borrower shall promptly notify Bank in writing (which may be by electronic mail) of the posting of any such documents;

(f)     <u>Security Holder and Subordinated Debt Holder Reports</u>.  Within five (5) days of delivery, copies of all statements, reports and notices made available to Borrower's security holders or to any holders of Subordinated Debt (solely in their capacities as security holders or holders of Subordinated Debt and not in any other role);

(g)     <u>Beneficial Ownership Information</u>.  Prompt written notice of any changes to the beneficial ownership information set out in Section 14 of the Perfection Certificate.  Borrower understands and acknowledges that Bank relies on such true, accurate and up-to-date beneficial ownership information to meet Bank's regulatory obligations to obtain, verify and record information about the beneficial owners of its legal entity customers;

(h)     <u>Legal Action Notice</u>.  Prompt written notice of any legal actions, investigations or proceedings pending or threatened in writing against Borrower or any of its Subsidiaries that could reasonably be expected to result in damages or costs to Borrower or any of its Subsidiaries of, individually or in the aggregate, $100,000 or more;

(i)     <u>Tort Claim Notice</u>.  If Borrower shall acquire a commercial tort claim, Borrower shall promptly notify Bank in a writing signed by Borrower of the general details thereof and grant to Bank in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to Bank;

(j)     <u>Government Filings</u>.  Within five (5) days after the same are sent or received, copies of all correspondence, reports, documents and other filings by Borrower or any of its Subsidiaries with any Governmental Authority regarding compliance with or maintenance of Governmental Approvals or Applicable Law or that could reasonably be expected to have a material effect on any of the Governmental Approvals or otherwise on the business of Borrower or any of its Subsidiaries;

(k)     <u>Registered Organization</u>.  If US Borrower is not a Registered Organization as of the Effective Date but later becomes one, promptly notify Bank of such occurrence and provide Bank with US Borrower's organizational identification number, if any;

(l)     <u>Default</u>.  Prompt written notice of the occurrence of a Default or Event of Default; and

(m)     <u>Other Information</u>.  Promptly, from time to time, such other information regarding Borrower or any of its Subsidiaries or compliance with the terms of any Loan Documents as reasonably requested by Bank.

Any submission by Borrower of a Compliance Statement or any other financial statement submitted to the Financial Statement Repository pursuant to this Section 5.3 or otherwise submitted to Bank shall be deemed to be a representation by Borrower that (i) as of the date of such Compliance Statement or other financial statement, the information and calculations set forth therein are true and correct, (ii) as of the end of the compliance period set forth in such submission, Borrower is in complete compliance with all required covenants except as noted in such Compliance Statement or other financial statement, as applicable, (iii) as of the date of such submission, no Events of Default have occurred or are continuing, (iv) all representations and warranties other than any representations or warranties that are made as of a specific date in Section 4 remain true and correct in all material respects as of the date of such submission except as noted in such Compliance Statement or other financial statement, as applicable, (v) as of the date of such submission, Borrower and each of its Subsidiaries has timely filed all required tax returns and reports, and Borrower has timely paid all foreign, federal, state, provincial and local taxes, assessments, deposits and contributions owed by Borrower except as otherwise permitted pursuant to the terms of Section 4.9, and (vi) as of the date of such submission, no Liens have been levied or claims made against Borrower or any of its Subsidiaries relating to unpaid employee payroll or benefits of which Borrower has not previously provided written notification to Bank.

5.4    [**Reserved**.]

5.5    [**Reserved**.]

5.6    **Taxes; Pensions.**

(a)    Timely file, and require each of its Subsidiaries to timely file (in each case, unless subject to a valid extension), all required tax returns and reports and timely pay, and require each of its Subsidiaries to timely pay, all foreign, federal, state, provincial and local taxes, assessments, deposits and contributions owed by Borrower and each of its Subsidiaries, except for deferred payment of any taxes contested pursuant to the terms of Section 4.9(a) hereof, and shall deliver to Bank, on demand, appropriate certificates attesting to such payments, and pay, and require each of its Subsidiaries to pay, all amounts necessary to fund all present pension, profit sharing and deferred compensation plans in accordance with their terms.

(b)    To the extent Borrower or any of its Subsidiaries defers payment of any contested taxes, (i) notify Bank in writing of the commencement of, and any material development in, the proceedings, and (ii) post bonds or take any other steps required to prevent the Governmental Authority levying such contested taxes from obtaining a Lien upon any of the Collateral that is other than a "Permitted Lien."

5.7    **Access to Collateral; Books and Records.** At reasonable times, on three (3) Business Day's notice (provided no notice is required if an Event of Default has occurred and is continuing), Bank, or its agents, shall have the right to inspect the Collateral and the right to audit and copy Borrower's Books. Such inspections and audits shall be conducted as frequently as Bank determines in its sole discretion that conditions warrant. The foregoing inspections and audits shall be conducted at Borrower's expense and the charge therefor shall be $1,000.00 per person per day (or such higher amount as shall represent Bank's then-current standard charge for the same), plus out-of-pocket expenses. In the event Borrower and Bank schedule an audit more than eight (8) days in advance, and Borrower cancels or seeks to or reschedules the audit with less than eight (8) days written notice to Bank, then (without limiting any of Bank's rights or remedies) Borrower shall pay Bank a fee of $2,000.00 plus any out-of-pocket expenses incurred by Bank to compensate Bank for the anticipated costs and expenses of the cancellation or rescheduling.

5.8    **Insurance.**

(a)    Keep its business and the Collateral insured for risks and in amounts standard for companies in Borrower's industry and location and as Bank may reasonably request. Insurance policies shall be in a form, with financially sound and reputable insurance companies that are not Affiliates of Borrower, and in amounts that are satisfactory to Bank.

(b)    All property policies shall have a lender's loss payable endorsement showing Bank as first loss payee (or in the case of any insurance policies located in the United States, lender loss payee). All liability policies shall show, or have endorsements showing, Bank as an additional insured. Bank shall be named as first loss payee (or in the case of any insurance policies located in the United States, lender loss payee) and/or additional insured with respect to any such insurance providing coverage in respect of any Collateral.

(c)    Ensure that proceeds payable under any property policy are, at Bank's option, payable to Bank on account of the Obligations.

(d)    At Bank's request, Borrower shall deliver certified copies of insurance policies and evidence of all premium payments. Each provider of any such insurance required under this Section 5.8 shall agree, by endorsement upon the policy or policies issued by it or by independent instruments furnished to Bank, that it will give Bank 30 days prior written notice before any such policy or policies shall be canceled or altered in any material respect. If Borrower fails to obtain insurance as required under this Section 5.8 or to pay any amount or furnish any required proof of payment to third persons and Bank, Bank may make all or part of such payment or obtain such insurance policies required in this Section 5.8, and take any action under the policies Bank deems prudent.

5.9    **Accounts.**

(a)     Borrower may maintain its existing operating and other deposit accounts located in Ontario, Canada with (i) Royal Bank of Canada bearing account numbers 1032374, 1037258, 1037266 and 4004560; and (ii) with TD Canada Trust  bearing account numbers ending in 5222105, 5223888 and 7301743, each  as described in its Perfection Certificate (collectively, the "**Existing Accounts**"). In addition, Borrower may maintain its GIC accounts with Royal Bank of Canada bearing account numbers 00150183599-0001, 00150183599-0002 and 00150183599-XXX, provided that the RBC Confirmation remains in place.

(b)     Maintain all of Borrower's, any of its Subsidiaries', and any Guarantor's operating accounts, depository accounts and excess cash that, in each case, are located in the United States, with Bank or Bank's Affiliates, except accounts permitted in accordance with Section 5.9(d) hereof.

(c)     In addition to and without limiting the restrictions in (a) and (b), Borrower shall provide Bank five (5) days prior written notice before establishing any Collateral Account at or with any bank or financial institution other than Bank or Bank's Affiliates. For each Collateral Account that Borrower at any time maintains, Borrower shall cause the applicable bank or financial institution (other than Bank) at or with which any Collateral Account is maintained to execute and deliver a Control Agreement or other appropriate instrument with respect to such Collateral Account which Control Agreement may not be terminated without the prior written consent of Bank. The provisions of the previous sentence shall not apply to (i) deposit accounts exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrower's employees and identified to Bank by Borrower as such and (ii) the Existing Accounts, unless Bank, acting reasonably, determines that the amounts on deposit in such Existing Accounts are material to the business, operations or condition (financial or otherwise) of Borrower.

(d)     Borrower may maintain its two (2) operating accounts bearing account numbers 441042612 and 441048424 with City National Bank located in the United States (the "**CNB Accounts**") provided that Borrower maintains a Control Agreement in respect of the CNB Accounts, in form and substance satisfactory to Bank.

**5.10**     [**Reserved**.]

**5.11     Protection and Registration of Intellectual Property Rights.**

(a)     (i) Protect, defend and maintain the validity and enforceability of Borrower's and each Subsidiary's Intellectual Property, except to the extent that such failure to do so would not reasonably be expected to have a material adverse effect on Borrower's business or operations; (ii) promptly advise Bank in writing of infringements or any other event that could reasonably be expected to materially and adversely affect the value Borrower's and each Subsidiary's Intellectual Property; and (iii) not allow any Intellectual Property material to Borrower's or any Subsidiary's business to be abandoned, forfeited or dedicated to the public without Bank's written consent.

(b)     Provide written notice to Bank within ten (10) days of entering or becoming bound by any Restricted License (other than over-the-counter software that is commercially available to the public).  Borrower shall take such steps as Bank requests to obtain the consent of, or waiver by, any person whose consent or waiver is necessary for (i) any such Restricted License to be deemed "Collateral" and for Bank to have a security interest in it that might otherwise be restricted or prohibited by law or by the terms of any such Restricted License, whether now existing or entered into in the future, and (ii) Bank to have the ability in the event of a liquidation of any Collateral to dispose of such Collateral in accordance with Bank's rights and remedies under this Agreement and the other Loan Documents.

**5.12     Litigation Cooperation.**  From the date hereof and continuing through the termination of this Agreement, make available to Bank, without expense to Bank, Borrower and its officers, employees and agents and Borrower's books and records, to the extent that Bank may deem them reasonably necessary to prosecute or defend any third-party suit or proceeding instituted by or against Bank with respect to any Collateral or relating to Borrower.

**5.13**     [**Reserved**.]

5.14    [**Reserved**.]

5.15    [**Reserved**.]

5.16    **Formation or Acquisition of Subsidiaries.**  Notwithstanding and without limiting the negative covenants contained in Sections 6.3 and 6.7 hereof, at the time that Borrower or any Guarantor forms any Subsidiary or acquires any Subsidiary after the Effective Date (including, without limitation, pursuant to a Division), Borrower and such Guarantor shall (a) cause such new Subsidiary to provide to Bank a joinder to this Agreement to become a co-borrower hereunder or a guarantee to become a Guarantor hereunder (as determined by Bank in its sole discretion), together with documentation, all in form and substance satisfactory to Bank (including being sufficient to grant Bank a first priority Lien (subject to Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary), (b) provide to Bank appropriate certificates and powers and financing statements, pledging all of the direct or beneficial ownership interest in such new Subsidiary, in form and substance satisfactory to Bank; and (c) provide to Bank all other documentation in form and substance satisfactory to Bank, including one or more opinions of counsel satisfactory to Bank, which in its opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above.  Any document, agreement, or instrument executed or issued pursuant to this Section 5.16 shall be a Loan Document.

5.17    **Inventory; Returns.**  Keep all Inventory, if any, in good and marketable condition, free from material defects.  Returns and allowances between Borrower and its Account Debtors shall follow Borrower's customary practices as they exist at the Effective Date.  Borrower shall promptly notify Bank of all returns, recoveries, disputes and claims that involve more than $50,000.

5.18    **Further Assurances.**  Execute any further instruments and take such further action as Bank reasonably requests to perfect, protect, ensure the priority of or continue Bank's Lien on the Collateral or to effect the purposes of this Agreement.

5.19    **Anti-Corruption Laws and Sanctions.**  (a) Not, and not permit any of its Subsidiaries to, engage in any of the activities described in Section 4.11 in the future; (b) not, and not permit any of its Subsidiaries to, become a Sanctioned Person; (c) ensure that the proceeds of the Obligations are not used to violate any Anti-Corruption Laws or Sanctions; and (d) deliver to Bank any certification or other evidence requested from time to time by Bank in its sole discretion, confirming each such Person's compliance with this Section 5.19.  In addition, have implemented, and will consistently apply while this Agreement is in effect, procedures to ensure that the representations and warranties in Section 4.11 remain true and correct while this Agreement is in effect.

6    <u>**NEGATIVE COVENANTS**</u>

Borrower shall not do any of the following without Bank's prior written consent:

6.1    **Dispositions.**  Convey, sell, lease, transfer, assign, or otherwise dispose of (including, without limitation, pursuant to a Division) (collectively, "**Transfer**"), or permit any of its Subsidiaries to Transfer, all or any part of its business or property, except for Transfers (a) of Inventory in the ordinary course of business; (b) of worn-out or obsolete Equipment that is, in the reasonable judgment of Borrower, no longer economically practicable to maintain or useful in the ordinary course of business of Borrower; (c) consisting of Permitted Liens and Permitted Investments; (d) consisting of the sale or issuance of any stock, partnership, membership, or other ownership interest or other equity securities of Borrower permitted under Section 6.2 of this Agreement; (e) consisting of Borrower's or its Subsidiaries' use or transfer of money or Cash Equivalents in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents; and (f) of non-exclusive licenses for the use of the property of Borrower or its Subsidiaries in the ordinary course of business.

6.2    **Changes in Business, Management, Control, or Business Locations.**  (a) Engage in or permit any of its Subsidiaries to engage in any business other than the businesses currently engaged in by Borrower and such Subsidiary, as applicable, or reasonably related thereto; (b) liquidate, wind-up or dissolve or permit any of its Subsidiaries to liquidate, wind-up or dissolve; (c) fail to provide notice to Bank of any Key Persons departing from or ceasing to be employed by Borrower within five (5) days after his, her or their departure from Borrower; (d) permit,

allow or suffer to occur any Change in Control; or (e) without at least 30 days prior written notice to Bank, (i) add any new offices or business locations, including warehouses (unless such new offices or business locations contain less than $50,000 in Borrower's assets or property) or deliver any portion of the Collateral valued, individually or in the aggregate, in excess of $50,000 to a bailee at a location other than to a bailee and at a location already disclosed in the Perfection Certificate, (ii) add any additional jurisdiction outside of the jurisdictions disclosed in the Perfection Certificate in which Borrower carries on business or has tangible personal property, (iii) change its jurisdiction of organization or its location (as determined in accordance with the PPSA), (iv) change its organizational structure or type, (v) change its legal name, (vi) change any organizational number (if any) assigned by its jurisdiction of organization, or (vii) change its chief executive office, registered office or domicile. Borrower shall not effect or permit any of the changes referred to above unless all filings have been made and all other actions taken that are required in order for Bank to continue at all times following such change to have a valid and perfected first priority Security Interest with respect to all of the Collateral (subject only to Permitted Liens). If Borrower intends to add any new offices or business locations, including warehouses, containing in excess of $50,000 of Borrower's assets or property, then Borrower will cause the landlord of any such new offices or business locations, including warehouses, to execute and deliver a landlord consent in form and substance satisfactory to Bank. If Borrower intends to deliver any portion of the Collateral valued, individually or in the aggregate, in excess of $50,000 to a bailee, and Bank and such bailee are not already parties to a bailee agreement governing both the Collateral and the location to which Borrower intends to deliver the Collateral, then Borrower will cause such bailee to execute and deliver a bailee agreement in form and substance satisfactory to Bank.

**6.3    Mergers, Amalgamations or Acquisitions.**  Merge, amalgamate or consolidate, or permit any of its Subsidiaries to merge, amalgamate or consolidate, with any other Person, or acquire, or permit any of its Subsidiaries to acquire, all or substantially all of the stock, partnership, membership, or other ownership interest or other equity securities or property of another Person (including, without limitation, by the formation of any Subsidiary or pursuant to a Division).  A Subsidiary may merge, amalgamate or consolidate into another Subsidiary or into Borrower.

**6.4    Indebtedness.**  Create, incur, assume, or be liable for any Indebtedness, or permit any Subsidiary to do so, other than Permitted Indebtedness.

**6.5    Encumbrance.**  Create, incur, allow, or suffer to exist any Lien on any of its property, or assign or convey any right to receive income, including the sale of any Accounts, or permit any of its Subsidiaries to do so, except for Permitted Liens, permit any Collateral not to be subject to the first priority security interest granted herein, or enter into any agreement, document, instrument or other arrangement (except with or in favour of Bank) with any Person which directly or indirectly prohibits or has the effect of prohibiting Borrower or any Subsidiary from assigning, mortgaging, pledging, granting a security interest in or upon, or encumbering any of Borrower's or any Subsidiary's Intellectual Property, except as is otherwise permitted in Section 6.1 hereof and the definition of "Permitted Liens" herein.

**6.6    Maintenance of Collateral Accounts.**  Maintain any Collateral Account except pursuant to the terms of Section 5.9.

**6.7    Distributions; Investments.**  (a) Pay any dividends or make any distribution or payment or redeem, retire or purchase any stock, partnership, membership, or other ownership interest or other equity securities, except for the repurchase the stock or other equity securities of current or former employees, director or consultants their spouses, trusts, heirs and estates pursuant to or otherwise in connection with stock repurchase agreements, option agreements, incentive plans, shareholder agreements or similar agreements so long as an Event of Default does not exist at the time of any such repurchase and would not exist after giving effect to any such repurchase, provided that the aggregate amount of all such repurchases does not exceed $200,000 per fiscal year; or (b) directly or indirectly make any Investment (including, without limitation, by the formation of any Subsidiary) other than Permitted Investments, or permit any of its Subsidiaries to do so.

**6.8    Transactions with Affiliates.**  Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of Borrower, except for transactions that are in the ordinary course of Borrower's business, upon fair and reasonable terms that are no less favourable to Borrower than would be obtained in an arm's length transaction with a non-affiliated Person.

**6.9    Subordinated Debt.**  Except as expressly permitted under the terms of the subordination, intercreditor, or other similar agreement to which any Subordinated Debt is subject: (a) make or permit any payment on such Subordinated Debt; or (b) amend any provision in any document relating to such Subordinated Debt which would increase the amount thereof, provide for earlier or greater principal, interest, or other payments thereon, or adversely affect the subordination thereof to Obligations owed to Bank.

**6.10    Compliance.**  (a) Become an "investment company" or a company controlled by an "investment company", under the Investment Company Act of 1940, as amended, or undertake as one of its important activities extending credit to purchase or carry margin stock (as defined in Regulation U of the Board of Governors of the Federal Reserve System), or use the proceeds of any Credit Extension for that purpose; (b)(i) fail to meet the minimum funding requirements of ERISA, (ii) permit a Reportable Event or Prohibited Transaction, as defined in ERISA, to occur, (iii) fail to comply with the *Employment Standards Act, 2000* (Ontario), the *Canada Labour Code*, the Federal Fair Labor Standards Act or other Applicable Law or (iv) violate any other law or regulation, if the foregoing subclauses (i) through (iv), individually or in the aggregate, could reasonably be expected to have a material adverse effect on Borrower's business or operations, or permit any of its Subsidiaries to do so; or (c) withdraw or permit any Subsidiary to withdraw from participation in, permit partial or complete termination of, or permit the occurrence of any other event with respect to, any present pension, profit sharing and deferred compensation plan which could reasonably be expected to result in any liability of Borrower, including any liability to the Pension Benefit Guaranty Corporation or its successors or any other Governmental Authority. None of Borrower or any of its Subsidiaries shall sponsor, administer, participate in, contribute to or assume any direct or indirect liability under or in respect of any Canadian Defined Benefit Plan.

**7    <u>EVENTS OF DEFAULT</u>**

Any one of the following shall constitute an event of default (an "**Event of Default**") under this Agreement:

**7.1    Payment Default.**  Borrower fails to (a) make any payment of principal or interest on any Credit Extension on its due date, or (b) pay any other Obligations within three (3) Business Days after such Obligations are due and payable (which three (3) Business Day cure period shall not apply to payments due on the Term Loan Maturity Date).  During the cure period, the failure to make or pay any payment specified under clause (b) hereunder is not an Event of Default (but no Credit Extension will be made during the cure period);

**7.2    Covenant Default.**

(a)    Borrower fails or neglects to perform any obligation in Section 5 (other than Sections 5.2 (Government Compliance), 5.12 (Litigation Cooperation), 5.17 (Inventory; Returns) and 5.18 (Further Assurances)) or violates any covenant in Section 6; or

(b)    Borrower fails or neglects to perform, keep, or observe any other term, provision, condition, covenant or agreement contained in this Agreement or any Loan Documents, and as to any default (other than those specified in this Section 7) under such other term, provision, condition, covenant or agreement that can be cured, has failed to cure the default within ten (10) days after the occurrence thereof; provided, however, that if the default cannot by its nature be cured within the ten (10) day period or cannot after diligent attempts by Borrower be cured within such ten (10) day period, and such default is likely to be cured within a reasonable time, then Borrower shall have an additional period (which shall not in any case exceed 30 days) to attempt to cure such default, and within such reasonable time period the failure to cure the default shall not be deemed an Event of Default (but no Credit Extensions shall be made during such cure period).  Cure periods provided under this section shall not apply, among other things, to financial covenants or any other covenants that are required to be satisfied, completed or tested by a date certain or any covenants set forth in clause (a) above;

**7.3    Material Adverse Change.**  A Material Adverse Change occurs;

**7.4    Attachment; Levy; Restraint on Business.**

(a)    (i) The service of process seeking to attach, by trustee or similar process, any funds of Borrower or any Subsidiary, or (ii) a notice of lien or levy is filed against any of Borrower's or any of its Subsidiaries' assets by any Governmental Authority, and the same under subclauses (i) and (ii) hereof are not, within ten (10) days after the occurrence thereof, discharged or stayed (whether through the posting of a bond or otherwise); provided, however, no Credit Extensions shall be made during any ten (10) day cure period; or

(b)    (i) any material portion of Borrower's or any of its Subsidiaries' assets is attached, seized, levied on, or comes into possession of a trustee or receiver, or (ii) any court order enjoins, restrains, or prevents Borrower or any of its Subsidiaries from conducting all or any material part of its business;

**7.5    Insolvency.**

(a)    Borrower or any of its Subsidiaries:

(i)    admits in writing that it is insolvent or unable to pay its liabilities as they generally become due;

(ii)    commits an act of bankruptcy under the BIA, files a voluntary assignment in bankruptcy under the BIA, makes a proposal (or files a notice of its intention to do so) under the BIA or seeks any other relief in respect of itself under the BIA;

(iii)    institutes any proceedings seeking relief in respect of itself under the CCAA;

(iv)    institutes any proceeding seeking relief in respect of itself under the WURA;

(v)    in addition to the forgoing, institutes any other proceeding seeking: (a) to adjudicate itself an insolvent person or a bankrupt; (b) to liquidate, dissolve or wind-up its business or assets; (c) to compromise, arrange, adjust or declare a moratorium in respect of the payment of, its debts; (d) to stay the rights of creditors generally (or any class of creditors); (e) any other relief in respect of itself under any federal, state, provincial or foreign Applicable Law now or hereafter in effect relating to bankruptcy, winding-up, insolvency, receivership, restructuring of business, assets or debt, reorganization of business, assets or debt or protection of debtors from their creditors (such Applicable Law includes any applicable corporations legislation to the extent the relief sought under such corporations legislation relates to or involves the compromise, settlement, adjustment or arrangement of debt); or (f) any other relief which provides for plans or schemes of reorganization, plans or schemes of arrangement or plans or schemes of compromise, in respect of itself, to be submitted or presented to creditors (or any class of creditors);

(vi)    applies for the appointment of, or has a Receiver (either court or privately appointed), sequestrator, monitor, conservator, custodian, administrator, trustee, liquidator or other similar official appointed in respect of it, or any substantial part of its property; or

(vii)    threatens to do any of the foregoing, or takes any action, corporate or otherwise, to approve, effect, consent to or authorize any of the actions described in this Section 7.5(a);

(b)    any petition is filed, application made or other proceeding instituted against or in respect of Borrower or any of its Subsidiaries:

(i)    seeking to adjudicate it an insolvent person;

(ii)    seeking a bankruptcy order against it under the BIA;

(iii)    seeking to institute proceedings against it under the CCAA;

(iv)    seeking to institute proceedings against it under the WURA;

(v)        seeking, in addition to the forgoing: (a) to adjudicate it an insolvent person or a bankrupt; (b) to liquidate, dissolve or wind-up its business or assets; (c) to compromise, arrange, adjust or declare a moratorium in respect of the payment of, its debts; (d) to stay the rights of creditors generally (or any class of creditors); (e) any other relief in respect of it under any federal, state, provincial or foreign Applicable Law now or hereafter in effect relating to bankruptcy, winding-up, insolvency, receivership, restructuring of business, assets or debt, reorganization of business, assets or debt, or protection of debtors from their creditors (such Applicable Law includes any applicable corporations legislation to the extent the relief sought under such corporations legislation relates to or involves the compromise, settlement, adjustment or arrangement of debt); or (f) any other relief which provides plans or schemes of reorganization, plans or schemes of arrangement or plans or schemes of compromise in respect of it, to be submitted or presented to creditors (or any class of creditors); or

(vi)       seeking the issuance of an order for the appointment of a Receiver, sequestrator, monitor, conservator, custodian, administrator, trustee, liquidator or other similar official in respect of it or any substantial part of its property,

and such petition, application or proceeding continues undismissed, or unstayed and in effect, for a period of 30 days after the institution thereof, provided that: (a) if Borrower or any of its Subsidiaries fails to contest such petition, application or proceeding the 30 day grace period shall cease to apply; (b) if an order, decree or judgment is issued (whether or not entered or subject to appeal) against Borrower or any of its Subsidiaries thereunder within the 30 day period, such grace period will cease to apply, and (c) Borrower or any of its Subsidiaries files an answer or other responding materials admitting the material allegations of a petition, application or other proceeding filed against it, such grace period will cease to apply (but no Credit Extensions will be made during such 30-day period);

(c)        any other event occurs which, under the Applicable Laws of any applicable jurisdiction, has an effect equivalent to any of the events referred to in either of Sections 7.5(a) or 7.5(b);

(but no Credit Extensions shall be made while any of the conditions described in clauses (a), (b) or (c) exist);

**7.6      Other Agreements.**  There is, under any agreement to which Borrower, any of Borrower's Subsidiaries, or any Guarantor is a party with a third party or parties, (a) any default resulting in a right by such third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount individually or in the aggregate in excess of $50,000; or (b) any breach or default by Borrower, any of Borrower's Subsidiaries, or Guarantor, the result of which could have a material adverse effect on Borrower's, any of Borrower's Subsidiaries', or any Guarantor's business or operations;

**7.7      Judgments; Penalties.**  One or more fines, penalties or final judgments, orders or decrees for the payment of money in an amount, individually or in the aggregate, of at least $300,000 (not covered by independent third-party insurance as to which liability has been accepted by such insurance carrier) shall be rendered against Borrower or any of its Subsidiaries by any Governmental Authority, and the same are not, within ten (10) days after the entry, assessment or issuance thereof, discharged, or after execution thereof, or stayed pending appeal, or such judgments are not discharged prior to the expiration of any such stay (provided that no Credit Extensions will be made prior to the discharge, or stay of such fine, penalty, judgment, order or decree);

**7.8      Misrepresentations.**  Borrower or any of its Subsidiaries or any Person acting for Borrower or any of its Subsidiaries makes any representation, warranty, or other statement now or later in this Agreement, any Loan Document or in any writing delivered to Bank or to induce Bank to enter this Agreement or any Loan Document, and such representation, warranty, or other statement is incorrect in any material respect when made (it being agreed and acknowledged by Bank that the projections and forecasts provided by Borrower or any of its Subsidiaries in good faith and based upon reasonable assumptions are not viewed as facts and that actual results during the period or periods covered by such projections and forecasts may differ from the projected or forecasted results);

**7.9      Subordinated Debt.**  If: (a) any document, instrument, or agreement evidencing any Subordinated Debt shall for any reason be revoked or invalidated or otherwise cease to be in full force and effect, or any Person (other than Bank) shall be in breach thereof or contest in any manner the validity or enforceability thereof or deny that it has any further liability or obligation thereunder; (b) a default or event of default (however defined) has occurred

19

under any document, instrument, or agreement evidencing any Subordinated Debt, which default shall not have been cured or waived within any applicable grace period; or (c) the Obligations shall for any reason be subordinated or shall not have the priority contemplated by this Agreement or any applicable subordination or intercreditor agreement;

**7.10    Lien Priority**.  There is a material impairment in the perfection or priority of Bank's security interest in the Collateral;

**7.11    Guarantee.**  (a) Any guarantee of any Obligations terminates or ceases for any reason to be in full force and effect; (b) any Guarantor does not perform any obligation or covenant under any guarantee of the Obligations; (c) any circumstance described in Sections 7.3, 7.4, 7.5, 7.6, 7.7, or 7.8 of this Agreement occurs with respect to any Guarantor, (d) the death, liquidation, winding up, or termination of existence of any Guarantor; or (e)(i) a material impairment in the perfection or priority of Bank's Lien in the collateral provided by Guarantor or in the value of such collateral or (ii) a material adverse change in the general affairs, management, results of operation, condition (financial or otherwise) or the prospect of repayment of the Obligations occurs with respect to any Guarantor; or

**7.12    Governmental Approvals.**  Any Governmental Approval shall have been (a) revoked, rescinded, suspended, modified in an adverse manner or not renewed in the ordinary course for a full term or (b) subject to any decision by a Governmental Authority that designates a hearing with respect to any applications for renewal of any of such Governmental Approval or that could result in the Governmental Authority taking any of the actions described in clause (a) above, and such decision or such revocation, rescission, suspension, modification or non-renewal (i) causes, or could reasonably be expected to cause, a Material Adverse Change, or (ii) adversely affects the legal qualifications of Borrower or any of its Subsidiaries to hold such Governmental Approval in any applicable jurisdiction and such revocation, rescission, suspension, modification or non-renewal could reasonably be expected to affect the status of or legal qualifications of Borrower or any of its Subsidiaries to hold any Governmental Approval in any other jurisdiction.

## 8    BANK'S RIGHTS AND REMEDIES

**8.1    Rights and Remedies.**  Upon the occurrence and during the continuance of an Event of Default, Bank may, without notice or demand, do any or all of the following:

(a)    declare all Obligations immediately due and payable (but if an Event of Default described in Section 7.5 occurs all Obligations are immediately due and payable without any action by Bank);

(b)    stop advancing money or extending credit for Borrower's benefit under this Agreement or under any other agreement between Borrower and Bank;

(c)    demand that Borrower (i) provide cash collateral acceptable to Bank Services Provider in its sole discretion for any Bank Services, and (ii) pay in advance to Bank Services Provider all Bank Services fees scheduled to be paid or payable over the remaining term of any Bank Services;

(d)    terminate any Bank Services Agreement;

(e)    verify the amount of, demand payment of and performance under, and collect any Accounts and Intangibles, settle or adjust disputes and claims directly with Account Debtors for amounts on terms and in any order that Bank considers advisable, and notify any Person owing Borrower money of Bank's security interest in such funds;

(f)    make any payments and do any acts it considers necessary or reasonable to protect the Collateral and/or its security interest in the Collateral.  Borrower shall assemble the Collateral if Bank requests and make it available as Bank designates.  Bank may enter premises where the Collateral is located, take and maintain possession of any part of the Collateral, and pay, purchase, contest, or compromise any Lien which appears to be prior or superior to its security interest and pay all expenses incurred. Borrower grants Bank a license to enter and occupy any of its premises, without charge, to exercise any of Bank's rights or remedies;

(g)　　apply to the Obligations any (i) balances and deposits of Borrower any Bank Entity holds, or (ii) amount held by any Bank Entity owing to or for the credit or the account of Borrower;

(h)　　ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell the Collateral.  For use solely upon the occurrence and during the continuation of an Event of Default, Bank is hereby granted a non-exclusive, royalty-free license or other right to use, without charge, Borrower's labels, Patents, Copyrights, mask works, rights of use of any name, trade secrets, trade names, Trademarks, and advertising matter, or any similar property as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Bank's exercise of its rights under this Section 8.1, Borrower's rights under all licenses and all franchise agreements inure to Bank's benefit;

(i)　　place a "hold" on any account maintained by Bank and/or deliver a notice of exclusive control, any entitlement order, or other directions or instructions pursuant to any Control Agreement or similar agreements providing control, if applicable, of any Collateral;

(j)　　demand and receive possession of Borrower's Books;

(k)　　appoint by instrument in writing one or more Receivers of Borrower or any or all of the Collateral with such rights, powers and authority (including any or all of the rights, powers and authority of Bank under this Agreement) as may be provided for in the instrument of appointment or any supplemental instrument, and remove and replace any such Receiver from time to time and, to the extent permitted by Applicable Law, any Receiver appointed by Bank shall (for purposes relating to responsibility for the Receiver's acts or omissions) be considered to be the agent of Borrower, and not of Bank;

(l)　　obtain from any court of competent jurisdiction an order for the appointment of a Receiver of Borrower; and

(m)　　exercise all rights and remedies available to Bank under the Loan Documents or at law or equity, including all remedies provided under the Code or any Applicable Law (including disposal of the Collateral pursuant to the terms thereof).

**8.2**　　**Power of Attorney.**  Borrower hereby irrevocably appoints Bank as its true and lawful attorney-in-fact, (a) exercisable upon the occurrence and during the continuance of an Event of Default, to: (i) sign Borrower's name on any invoice or bill of lading for any Account or drafts against Account Debtors; (ii) demand, collect, sue, and give releases to any Account Debtor for monies due, settle and adjust disputes and claims about the Accounts directly with Account Debtors, and compromise, prosecute, or defend any action, claim, case, or proceeding about any Collateral (including filing a claim or voting a claim in any bankruptcy case in Bank's or Borrower's name, as Bank chooses); (iii) make, settle, and adjust all claims under Borrower's insurance policies; (iv) pay, contest or settle any Lien, charge, encumbrance, security interest, or other claim in or to the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; and (v) transfer the Collateral into the name of Bank or a third party as the Code permits; and (b) regardless of whether an Event of Default has occurred, to sign Borrower's name on any documents necessary to perfect or continue the perfection of Bank's security interest in the Collateral. Bank's foregoing appointment as Borrower's attorney in fact, and all of Bank's rights and powers, coupled with an interest, are irrevocable until such time as all Obligations (other than inchoate indemnity obligations) have been satisfied in full, Bank is under no further obligation to make Credit Extensions and the Loan Documents have been terminated. Bank shall not incur any liability in connection with or arising from the exercise of such power of attorney and shall have no obligation to exercise any of the foregoing rights and remedies.

**8.3**　　**Protective Payments.**  If Borrower fails to obtain the insurance called for by Section 5.8 or fails to pay any premium thereon or fails to pay any other amount which Borrower is obligated to pay under this Agreement or any other Loan Document or which may be required to preserve the Collateral, Bank may obtain such insurance or make such payment, and all amounts so paid by Bank are Bank Expenses and immediately due and payable, bearing interest at the then highest rate applicable to the Obligations, and secured by the Collateral.  Bank will make reasonable efforts to provide Borrower with notice of Bank obtaining such insurance at the time it is obtained or within a reasonable time thereafter.  No payments by Bank are deemed an agreement to make similar payments in the future or Bank's waiver of any Event of Default.

**8.4     Application of Payments and Proceeds.**  Bank may apply any funds in its possession, whether from Borrower account balances, payments, proceeds realized as the result of any collection of Accounts or other disposition of the Collateral, or otherwise, to the Obligations in such order as Bank shall determine in its sole discretion.  Any surplus shall be paid to Borrower or other Persons legally entitled thereto; Borrower shall remain liable to Bank for any deficiency.  If Bank, in its commercially reasonable discretion, directly or indirectly, enters into a deferred payment or other credit transaction with any purchaser at any sale of Collateral, Bank shall have the option, exercisable at any time, of either reducing the Obligations by the principal amount of the purchase price or deferring the reduction of the Obligations until the actual receipt by Bank of cash therefor.

**8.5     Bank's Liability for Collateral.**  Bank's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession or under its control, under the Code or otherwise, shall be to deal with it in the same manner as Bank deals with its own property consisting of similar instruments or interests.  Borrower bears all risk of loss, damage or destruction of the Collateral.

**8.6     No Waiver; Remedies Cumulative.**  Bank's failure, at any time or times, to require strict performance by Borrower of any provision of this Agreement or any other Loan Document shall not waive, affect, or diminish any right of Bank thereafter to demand strict performance and compliance herewith or therewith.  No waiver hereunder shall be effective unless signed by the party granting the waiver and then is only effective for the specific instance and purpose for which it is given.  Bank's rights and remedies under this Agreement and the other Loan Documents are cumulative.  Bank has all rights and remedies provided under the Code, by law, or in equity.  Bank's exercise of one right or remedy is not an election and shall not preclude Bank from exercising any other remedy under this Agreement or other remedy available at law or in equity, and Bank's waiver of any Event of Default is not a continuing waiver.  Bank's delay in exercising any remedy is not a waiver, election, or acquiescence.

**8.7     Demand Waiver.**  Borrower waives demand, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents of title, instruments, chattel paper, and guarantees held by Bank on which Borrower is liable.

**8.8     Borrower Liability.**  Any Borrower may, acting singly, request Credit Extensions hereunder.  Each Borrower hereby appoints each other as agent for the other for all purposes hereunder, including with respect to requesting Credit Extensions hereunder.  Each Borrower hereunder shall be liable for the Credit Extensions and Obligations as set forth on Schedule I hereto.  Each Borrower waives (a) any suretyship defences available to it under the Code or any other Applicable Law, and (b) any right to require Bank to: (i) proceed against any Borrower or any other person; (ii) proceed against or exhaust any security; or (iii) pursue any other remedy.  Bank may exercise or not exercise any right or remedy it has against any Borrower or any security it holds (including the right to foreclose by judicial or non-judicial sale) without affecting any Borrower's liability.  Notwithstanding any other provision of this Agreement or other related document, each Borrower irrevocably waives all rights that it may have at law or in equity (including, without limitation, any law subrogating Borrower to the rights of Bank under this Agreement) to seek contribution, indemnification or any other form of reimbursement from any other Borrower, or any other Person now or hereafter primarily or secondarily liable for any of the Obligations, for any payment made by Borrower with respect to the Obligations in connection with this Agreement or otherwise and all rights that it might have to benefit from, or to participate in, any security for the Obligations as a result of any payment made by Borrower with respect to the Obligations in connection with this Agreement or otherwise.  Any agreement providing for indemnification, reimbursement or any other arrangement prohibited under this Section 8.8 shall be null and void.  If any payment is made to a Borrower in contravention of this Section 8.8, such Borrower shall hold such payment in trust for Bank and such payment shall be promptly delivered to Bank for application to the Obligations, whether matured or unmatured.

**9     NOTICES**

All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail or Canada Post, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address or email address indicated below; provided that, for clause (b), if such notice, consent,

request, approval, demand or other communication is not sent during the normal business hours of the recipient, it shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.  Bank or Borrower may change its mailing or electronic mail address by giving the other party written notice thereof in accordance with the terms of this Section 9.

If to Borrower:    MaxSold Incorporated
                   178 Ontario Street, Suite 203
                   Kingston, ON, K7L 2Y8
                   Attn: President
                   Email: president@maxsold.com

with a copy (which shall not constitute notice) to:

                   LaBarge Weinstein LLP
                   Attention: Shane McLean
                   515 Legget Drive Suite 800
                   Ottawa, ON K2K 3G4
                   Telephone: 613-599-9600 ext 262
                   Email: smclean@lwlaw.com

If to Bank:        Silicon Valley Bank
                   161 Bay Street, Suite 4410
                   Toronto, ON, M5J2S1

                   Attn: Michelle Sabourin
                   Email: msabourin@svb.com

with a copy to (which
shall not constitute
notice):           Aird & Berlis LLP
                   181 Bay Street, Suite 1800
                   Toronto, Ontario  M5J 2T9, Canada

                   Attn:    Tony Gioia
                   Email:   tgioia@airdberlis.com

**10      CHOICE OF LAW, VENUE AND JURY TRIAL WAIVER; JUDICIAL REFERENCE**

Except as otherwise expressly provided in any of the Loan Documents, the laws of the Province of Ontario and the federal laws of Canada applicable therein govern the Loan Documents without regard to principles of conflicts of law that would require the application of the laws of another jurisdiction.  Borrower and Bank each irrevocably and unconditionally submit to the non-exclusive jurisdiction of the Courts of the Province of Ontario, and any appellate court thereof; provided, however, that nothing in this Agreement shall be deemed to operate to preclude Bank from bringing suit or taking other legal action in any other jurisdiction with respect to the Loan Documents or to realize on the Collateral or any other security for the Obligations, or to enforce a judgment or other court order in favour of Bank. Borrower expressly, irrevocably and unconditionally submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and Borrower hereby irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may have based upon lack of personal jurisdiction,

improper venue, or forum non conveniens and hereby irrevocably and unconditionally consents to the granting of such legal or equitable relief as is deemed appropriate by such court. Borrower hereby waives personal service of the summons, complaints, and other process issued in such action or suit and agrees that service of such summons, complaints, and other process may be made by registered or certified mail addressed to Borrower at the address set forth in, or subsequently provided by Borrower in accordance with, Section 9 of this Agreement and that service so made shall be deemed completed upon the earlier to occur of Borrower's actual receipt thereof or three (3) days after deposit in the U.S. mails or Canada Post, proper postage prepaid.

**TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND BANK EACH WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR THE PARTIES HERETO TO ENTER INTO THIS AGREEMENT. EACH PARTY HERETO HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

This Section 10 shall survive the termination of this Agreement and the repayment of all Obligations.

## 11     GENERAL PROVISIONS

**11.1     Termination Prior to Maturity Date; Survival.** All covenants, representations and warranties made in this Agreement shall continue in full force until this Agreement has terminated pursuant to its terms and all Obligations (other than inchoate indemnity obligations) have been satisfied. So long as Borrower has satisfied the Obligations (other than inchoate indemnity obligations, and any other obligations which, by their terms, are to survive the termination of this Agreement and the repayment of all Obligations, and any Obligations under Bank Services Agreements that are cash collateralized in accordance with Section 3.6 of this Agreement), this Agreement may be terminated prior to the Term Loan Maturity Date by Borrower, effective three (3) Business Days after written notice of termination is given to Bank. Those obligations that are expressly specified in this Agreement as surviving this Agreement's termination and the repayment of all Obligations shall continue to survive notwithstanding this Agreement's termination and the repayment of all Obligations.

**11.2     Successors and Assigns.** This Agreement binds and is for the benefit of the successors and permitted assigns of each party. Borrower may not assign or transfer this Agreement or any rights or obligations under it without Bank's prior written consent (which may be granted or withheld in Bank's sole discretion) and any other attempted assignment or transfer by Borrower shall be null and void. Bank has the right, without the consent of or notice to Borrower, to sell, transfer, assign, negotiate, or grant participation in all or any part of, or any interest in, Bank's obligations, rights, and benefits under this Agreement and the other Loan Documents (other than the Warrant, as to which assignment, transfer and other such actions are governed by the terms thereof).

**11.3     Indemnification.**

(a)     General Indemnification. Borrower shall indemnify, defend and hold Bank and its Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of Bank and its Affiliates (each, an "**Indemnified Person**") harmless against: all losses, claims, damages, liabilities and related expenses (including Bank Expenses and the reasonable fees, charges and disbursements of any counsel for any Indemnified Person) (collectively, "**Claims**") arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Credit Extension or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of hazardous materials on or from any property owned or operated by Borrower or any of its Subsidiaries, or any environmental liability related in any way to Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Borrower, and regardless of whether any Indemnified Person is a party thereto; provided that such indemnity shall not, as to any Indemnified Person, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final

and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnified Person.  All amounts due under this Section 11.3 shall be payable promptly after demand therefor.

(b)    Waiver of Consequential Damages, Etc.  To the fullest extent permitted by Applicable Law, Borrower shall not assert, and hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) or any loss of profits arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Credit Extension, or the use of the proceeds thereof.  No Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

This Section 11.3 shall survive the termination of this Agreement and the repayment of all Obligations until all statutes of limitation with respect to the Claims, losses, and expenses for which indemnity is given shall have run.

**11.4    Time of Essence.**  Time is of the essence for the performance of all Obligations in this Agreement.

**11.5    Severability of Provisions.**  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability and shall be severed from the balance of this Agreement, all without affecting the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

**11.6    Amendments in Writing; Waiver; Integration.**  No purported amendment or modification of any Loan Document, or waiver, discharge or termination of any obligation under any Loan Document, shall be effective unless, and only to the extent, expressly set forth in a writing signed by each party hereto.  Without limiting the generality of the foregoing, no oral promise or statement, nor any action, inaction, delay, failure to require performance or course of conduct shall operate as, or evidence, an amendment, supplement or waiver or have any other effect on any Loan Document.  Any waiver granted shall be limited to the specific circumstance expressly described in it, and shall not apply to any subsequent or other circumstance, whether similar or dissimilar, or give rise to, or evidence, any obligation or commitment to grant any further waiver.  The Loan Documents represent the entire agreement about this subject matter and supersede prior negotiations or agreements.  All prior agreements, understandings, representations, warranties, and negotiations between the parties about the subject matter of the Loan Documents merge into the Loan Documents.

**11.7    Counterparts.**  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, is an original, and all taken together, constitute one Agreement.  Delivery of an executed signature page of this Agreement by electronic mail transmission shall be effective as delivery of a manually executed counterpart hereof.

**11.8    Confidentiality.**  Bank agrees to maintain the confidentiality of Information (as defined below), except that Information may be disclosed (a) to Bank's Subsidiaries and Affiliates and their respective employees, directors, agents, attorneys, legal counsel, accountants and other professional advisors (collectively, "**Representatives**"); (b) to prospective transferees, assignees, credit providers or purchasers of Bank's interests under or in connection with this Agreement and their Representatives (provided, however, Bank shall use commercially reasonable efforts to obtain any such prospective transferee's, assignee's, credit provider's, purchaser's or their Representatives' agreement to the terms of this provision); (c) as required by law, regulation, subpoena, or other order; (d) to Bank's regulators or as otherwise required or requested in connection with Bank's examination or audit; (e) in connection with the exercise of remedies under the Loan Documents or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; and (f) to third-party service providers of Bank so long as such service providers have executed a confidentiality agreement with Bank with terms no less restrictive than those contained herein.  "**Information**" means all information received from Borrower regarding Borrower or its business, in each case other than information that is either: (i) in the public domain or in Bank's possession when disclosed to Bank, or becomes part of the public domain (other than as a result of its disclosure by Bank in violation of this Agreement) after disclosure to Bank; or (ii) disclosed to Bank by a third party, if Bank does not know that the third party is prohibited from disclosing the information.

**11.9    Electronic Execution of Documents.**  The words "execution," "signed," "signature" and words of like import in any Loan Document shall be deemed to include electronic signatures, including any "electronic signature" as defined in the *Electronic Commerce Act* (Ontario), or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any Applicable Law, including, without limitation, the *Electronic Commerce Act* (Ontario).

**11.10    Right of Setoff.**  Borrower hereby grants to each Bank Entity a Lien and a right of setoff as security for all Obligations to each Bank Entity, whether now existing or hereafter arising upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of any Bank Entity or in transit to any of them, and other obligations owing to any Bank Entity.  At any time after the occurrence and during the continuance of an Event of Default, without demand or notice, any Bank Entity may setoff the same or any part thereof and apply the same to any liability or Obligation of Borrower even though unmatured and regardless of the adequacy of any other collateral securing the Obligations.  ANY AND ALL RIGHTS TO REQUIRE ANY BANK ENTITY TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF BORROWER, ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

**11.11    Captions and Section References.**  The headings used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.  Unless indicated otherwise, section references herein are to sections of this Agreement.

**11.12    Construction of Agreement.**  The parties hereto mutually acknowledge that they and their legal counsel have participated in the preparation and negotiation of this Agreement.  In cases of uncertainty this Agreement shall be construed without regard to which of the parties caused the uncertainty to exist.

**11.13    Relationship.**  The relationship of the parties to this Agreement is determined solely by the provisions of this Agreement.  The parties do not intend to create any agency, partnership, joint venture, trust, fiduciary or other relationship with duties or incidents different from those of parties to an arm's-length contract.

**11.14    Third Parties.**  Nothing in this Agreement, whether express or implied, is intended to: (a) confer any benefits, rights or remedies under or by reason of this Agreement on any Persons other than the express parties to it and their respective permitted successors and assigns; (b) relieve or discharge the obligation or liability of any Person not an express party to this Agreement; or (c) give any Person not an express party to this Agreement any right of subrogation or action against any party to this Agreement.

**11.15    Anti-Terrorism Law.**  Bank hereby notifies Borrower that, pursuant to the requirements of Anti-Terrorism Law, Bank may be required to obtain, verify and record information that identifies Borrower, which information may include the name and address of Borrower and other information that will allow Bank to identify Borrower in accordance with Anti-Terrorism Law. Borrower hereby agrees to take any action necessary to enable Bank to comply with the requirements of Anti-Terrorism Law.

**11.16    Québec Matters.**  For purposes of any assets, liabilities or entities located in the Province of Québec and for all other purposes pursuant to which the interpretation or construction of this Agreement may be subject to the laws of the Province of Québec or a court or tribunal exercising jurisdiction in the Province of Québec, (a) "personal property" shall include "movable property", (b) "real property" or "real estate" shall include "immovable property", (c) "tangible property" shall include "corporeal property", (d) "intangible property" shall include "incorporeal property", (e) "security interest", "mortgage" and "lien" shall include a "hypothec", "right of retention", "prior claim" , "reservation of ownership" and a resolutory clause, (f) all references to filing, perfection, priority, remedies, registering or recording under the Uniform Commercial Code or a Personal Property Security Act shall include publication under the Civil Code of Québec, (g) all references to "perfection" of or "perfected" liens or security interest shall include a reference to an "opposable" or "set up" hypothec as against third parties, (h) any "right of offset", "right of setoff" or similar expression shall include a "right of compensation", (i) "goods" shall include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, (j) an "agent" shall include a "mandatary", (k) "construction liens" or "mechanics, materialmen, repairmen, construction contractors or

26

other like Liens" shall include "legal hypothecs" and "legal hypothecs in favour of persons having taken part in the construction or renovation of an immovable", (l) "joint and several" shall include "solidary", (m) "gross negligence or wilful misconduct" shall be deemed to be "intentional or gross fault", (n) "beneficial ownership" shall include "ownership on behalf of another as mandatary", (o) "easement" shall include "servitude", (p) "priority" shall include "rank" or "prior claim", as applicable (q) "survey" shall include "certificate of location and plan", (r) "state" shall include "province", (s) "fee simple title" shall include "absolute ownership" and "ownership" (including ownership under a right of superficies), (t) "accounts" shall include "claims", (u) "legal title" shall be including "holding title on behalf of an owner as mandatary or prete-nom", (v) "ground lease" shall include "emphyteusis" or a "lease with a right of superficies, as applicable, (w) "leasehold interest" shall include "rights resulting from a lease", (x) "lease" shall include a "leasing contract" and (y) "guarantee" and "guarantor" shall include "suretyship" and "surety", respectively.  The parties hereto confirm that it is their wish that this Agreement and any other document executed in connection with the transactions contemplated herein be drawn up in the English language only and that all other documents contemplated thereunder or relating thereto, including notices, may also be drawn up in the English language only.  *Les parties aux présentes confirment que c'est leur volonté que cette convention et les autres documents de crédit soient rédigés en langue anglaise seulement et que tous les documents, y compris tous avis, envisagés par cette convention et les autres documents peuvent être rédigés en langue anglaise seulement.*

## 12    ACCOUNTING TERMS AND OTHER DEFINITIONS

### 12.1    Accounting and Other Terms.

(a)    Accounting terms not defined in this Agreement shall be construed following GAAP. Calculations and determinations must be made following GAAP (except for with respect to unaudited financial statements for the absence of footnotes and subject to year-end audit adjustments), provided that if at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either Borrower or Bank shall so request, Borrower and Bank shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP; provided, further, that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) Borrower shall provide Bank financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

(b)    As used in the Loan Documents: (i) the words "shall" or "will" are mandatory, the word "may" is permissive, the word "or" is not exclusive, the words "includes" and "including" are not limiting, the singular includes the plural, and numbers denoting amounts that are set off in brackets are negative; (ii) the term "continuing" in the context of an Event of Default means that the Event of Default has not been remedied (if capable of being remedied) or waived; and (iii) whenever a representation or warranty is made to Borrower's knowledge or awareness, to the "best of" Borrower's knowledge, or with a similar qualification, knowledge or awareness means the actual knowledge, after reasonable investigation, of any Responsible Officer. Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or replaced (subject to any restrictions on such modifications set out herein) and (b) any reference herein to any law, rule or regulation or any section thereof shall, unless otherwise expressly stated, be deemed to be a reference to such law, rule or regulation or section as amended, restated or re-enacted from time to time.

### 12.2    Definitions.  Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in this Section 12.2.  All other terms contained in this Agreement, unless otherwise indicated, shall have the meaning provided by the Code to the extent such terms are defined therein.  As used in this Agreement, the following capitalized terms have the following meanings:

"**Account**" is, as to any Person, any "account" of such Person as "account" is defined in the Code with such additions to such term as may hereafter be made, and includes, without limitation, all accounts receivable and other sums owing to such Person.

"**Account Debtor**" is any "account debtor" as defined in the Code with such additions to such term as may hereafter be made.

"**Affiliate**" is, with respect to any Person, each other Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, that Person's managers and members.

"**Agreement**" is defined in the preamble hereof.

"**Anti-Corruption Laws**" means all laws, rules, and regulations of any jurisdiction applicable to Borrower and its Subsidiaries from time to time concerning or relating to bribery or corruption, including without limitation the *Corruption of Foreign Public Officials Acts* (Canada) and the U.S. Foreign Corrupt Practices Act.

"**Anti-Terrorism Law**" means any law relating to terrorism or money-laundering, including the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada), Executive Order No. 13224 and the USA Patriot Act.

"**Applicable Law**" means all applicable provisions of constitutions, laws, statutes, ordinances, rules, treaties, regulations, permits, licenses, registrations, certifications, approvals, interpretations and orders of courts or Governmental Authorities and all orders and decrees of all courts and arbitrators.

"**ASPE**" means the Canadian accounting standards for private enterprises, as required by the Handbook of Canadian Institute of Chartered Accountants, effective December 1, 2011.

"**Authorized Signer**" means any individual listed in Borrower's Borrowing Resolution who is authorized to execute the Loan Documents, including making (and executing if applicable) any Credit Extension request, on behalf of Borrower.

"**Bank**" is defined in the preamble hereof.

"**Bank Entity**" is, collectively, Bank, SVB U.S. and their Subsidiaries and Affiliates.

"**Bank Expenses**" are all audit fees, costs and reasonable expenses (including reasonable, out-of-pocket and documented legal counsel fees and expenses) for preparing, amending, negotiating, administering, defending and enforcing the Loan Documents (including, without limitation, those incurred in connection with appeals or Insolvency Proceedings) or otherwise incurred with respect to Borrower or any Guarantor.

"**Bank Services**"  are any products, credit services, and/or financial accommodations previously, now, or hereafter provided to Borrower or any of its Subsidiaries by Bank Services Provider, including, without limitation, any letters of credit, cash management services (including, without limitation, merchant services, direct deposit of payroll, business credit cards, and cheque cashing services), interest rate swap arrangements, and foreign exchange services as any such products or services may be identified in Bank Service Provider's various agreements related thereto (each, a "**Bank Services Agreement**").

"**Bank Services Agreement**" is defined in the definition of Bank Services.

"**Bank Services Provider**" is SVB U.S.

"**BIA**" is the *Bankruptcy and Insolvency Act* (Canada).

"**Board**" is Borrower's board of directors or equivalent governing body.

"**Borrower**" is set forth on Schedule I hereto.

"**Borrower's Books**" are all Borrower's books and records including ledgers, foreign, federal, state, provincial and local tax returns, records regarding Borrower's assets or liabilities, the Collateral, business operations or financial condition, and all computer programs or storage or any equipment containing such information.

"**Borrowing Resolutions**" are, with respect to any Person, those resolutions adopted by such Person's board of directors (and, if required under the terms of such Person's Operating Documents, shareholders) and delivered by such Person to Bank approving the Loan Documents to which such Person is a party and the transactions contemplated thereby, together with a certificate executed by its secretary on behalf of such Person certifying (a) such Person has the authority to execute, deliver, and perform its obligations under each of the Loan Documents to which it is a party, (b) that set forth as a part of or attached as an exhibit to such certificate is a true, correct, and complete copy of the resolutions then in full force and effect authorizing and ratifying the execution, delivery, and performance by such Person of the Loan Documents to which it is a party, (c) the name(s) of the Person(s) authorized to execute the Loan Documents, including making (and executing if applicable) any Credit Extension request, on behalf of such Person, together with a sample of the true signature(s) of such Person(s), and (d) that Bank may conclusively rely on such certificate unless and until such Person shall have delivered to Bank a further certificate canceling or amending such prior certificate.

"**Business Day**" is a day other than a Saturday, Sunday or other day on which commercial banks in the Province of Ontario or the State of California are authorized or required by law to close.

"**Canadian Borrower**" is set forth on Schedule I hereto.

"**Canadian Defined Benefit Plan**" is a "registered pension plan" which contains a "defined benefit provision", as those terms are defined in the *Income Tax Act* (Canada).

"**Canadian Dollars**", **CDN Dollars**", "**Dollars**" or use of the signs "**CDN$**" or "**$**" means only lawful money of Canada and not any other currency, regardless of whether that currency uses the "$" sign to denote its currency or may be readily converted into lawful money of Canada.

"**Canadian Prime Rate**" is set forth on Schedule I.

"**Cash Equivalents**" are (a) marketable direct obligations issued or unconditionally guaranteed by the United States or any agency or any State thereof having maturities of not more than one (1) year from the date of acquisition; (b) marketable direct obligations issued or unconditionally guaranteed by the Government of Canada or any agency or any province thereof having maturities of not more than one (1) year from the date of acquisition; (c) commercial paper maturing no more than one (1) year after its creation and having the highest rating from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc.; (d) SVB U.S.'s certificates of deposit issued maturing no more than one (1) year after issue; and (e) money market funds at least 95.0% of the assets of which constitute Cash Equivalents of the kinds described in clauses (a) through (d) of this definition.

"**CCAA**" is the *Companies' Creditors Arrangement Act* (Canada).

"**Change in Control**" means (a) at any time, any person or group of persons acting jointly or otherwise in concert shall become, or obtain rights (whether by means of warrants, options or otherwise) to become, the owner, directly or indirectly, beneficially or of record, of 25.0% or more of the ordinary voting power for the election of directors, partners, managers and members, as applicable, of Borrower (determined on a fully diluted basis) other than by the sale of Borrower's equity securities in a public offering or to venture capital or private equity investors so long as Borrower identifies to Bank the venture capital or private equity investors at least seven (7) Business Days prior to the closing of the transaction and provides to Bank a description of the material terms of the transaction; (b) during any period of 12 consecutive months, a majority of the members of the Board of Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body; or (c) at any time, Borrower shall cease to own and control, of record and beneficially, directly or indirectly, 100.0% of each class of outstanding stock, partnership, membership, or other ownership interest or other equity securities of each Subsidiary of Borrower free and clear of all Liens (except Permitted Liens).

"**Change in Law**" means the occurrence, after the Effective Date, of: (a) the adoption or taking effect of any law, rule, regulation or treaty; (b) any change in Applicable Law or in the administration, interpretation, implementation or application thereof by any Governmental Authority; or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or Canada, the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Claims**" is defined in Section 11.3.

"**Code**" is (a) with respect to the Canadian Borrower or any assets located in Canada, the PPSA, and (b) with respect to the US Borrower or any assets located in the United States, the Uniform Commercial Code, as the same may, from time to time, be enacted and in effect in the State of California; provided, that, to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, or priority of, or remedies with respect to, Bank's Lien on any Collateral is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of California, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies and for purposes of definitions relating to such provisions.

"**Collateral**" consists of all of Borrower's right, title and interest in and to all of its personal property, including, without limitation:

(a)    (i) all goods, Accounts (including health-care receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, Intangibles, Intellectual Property (except as provided below), commercial tort claims, documents of title, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, certificates of deposit, fixtures, rights under letters of credit (whether or not the letter of credit is evidenced by a writing), securities, securities accounts, securities entitlements and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and (ii) all Borrower's Books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

(b)    Notwithstanding the foregoing, the Collateral does not include any Intellectual Property; provided, however, the Collateral shall include all Accounts and all proceeds of Intellectual Property.  If a judicial authority (including any applicable bankruptcy court) would hold that a security interest in the underlying Intellectual Property is necessary to have a security interest in such Accounts and such property that are proceeds of Intellectual Property, then the Collateral shall automatically, and effective as of the Effective Date, include the Intellectual Property to the extent necessary to permit perfection of Bank's security interest in such Accounts and such other property of Borrower that are proceeds of the Intellectual Property.

(c)    Pursuant to the terms of a certain negative pledge arrangement with Bank, Borrower has agreed not to encumber any of its Intellectual Property without Bank's prior written consent.

"**Collateral Account**" is any Deposit Account, Securities Account, or Commodity Account.

"**Commodity Account**" is any (a) in respect of the Canadian Borrower or any assets located in Canada, "futures account" and (b) in respect of the US Borrower or any assets located in the United States, "commodity account", in each case, as defined in the Code with such additions to such term as may hereafter be made.

"**Compliance Statement**" is that certain statement in the form attached hereto as Exhibit A.

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Contingent Obligation**" is, for any Person, any direct or indirect liability of that Person for (a) any direct or indirect guarantee by such Person of any indebtedness, lease, dividend, letter of credit, credit card or other obligation of another, (b) any other obligation endorsed, co-made, discounted or sold with recourse by that Person, or for which that Person is directly or indirectly liable; (c) any obligations for undrawn letters of credit for the account of that Person; and (d) all obligations from any interest rate, currency or commodity swap agreement, interest rate cap or collar agreement, or other agreement or arrangement designated to protect a Person against fluctuation in interest rates, currency exchange rates or commodity prices; but "Contingent Obligation" does not include endorsements in the ordinary course of business. The amount of a Contingent Obligation is the stated or determined amount of the primary obligation for which the Contingent Obligation is made or, if not determinable, the maximum reasonably anticipated liability for it determined by the Person in good faith; but the amount may not exceed the maximum of the obligations under any guarantee or other support arrangement.

"**Control Agreement**" is any control or blocked account agreement entered into among the depository institution at which Borrower maintains a Deposit Account or the securities intermediary, commodity intermediary or futures intermediary at which Borrower maintains a Securities Account or a Commodity Account, Borrower, and Bank pursuant to which Bank obtains administrative control or control (within the meaning of the Code), as applicable, over such Deposit Account, Securities Account, or Commodity Account.

"**Copyrights**" are any and all copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work thereof, whether published or unpublished and whether or not the same also constitutes a trade secret.

"**Credit Extension**" is any Bank Service, Term Loan Advance or any other extension of credit by Bank for Borrower's benefit.

"**Currency**" is coined money and such other banknotes or other paper money as are authorized by law and circulate as a medium of exchange.

"**Default**" means any event which with notice or passage of time or both, would constitute an Event of Default.

"**Default Rate**" is defined in Section 1.2(c).

"**Deposit Account**" is any demand, time, savings, passbook, or similar account maintained with a bank with such additions to such term as may hereafter be made.

"**Designated Deposit Account**" is the deposit account maintained by Borrower with a bank located in Canada as designated by Borrower to Bank from time to time for purposes of receiving Credit Extensions.

"**Division**" means, in reference to any Person which is an entity, the division of such Person into two (2) or more separate Persons, with the dividing Person either continuing or terminating its existence as part of such division, including, without limitation, as contemplated under Section 18-217 of the Delaware Limited Liability Company Act for limited liability companies formed under Delaware law, Section 17-220 of the Delaware Revised Uniform Limited Partnership Act for limited partnerships formed under Delaware law, or any analogous action taken pursuant to any other Applicable Law with respect to any corporation, limited liability company, partnership or other entity.

"**Draw Period**" is set forth on Schedule I hereto.

"**Effective Date**" is set forth on Schedule I hereto.

"**Environmental Laws**" means any Applicable Law (including any permits, concessions, grants, franchises, licenses, agreements or governmental restrictions) relating to pollution or the protection of health, safety or the environment or the release of any materials into the environment (including those related to hazardous materials, air emissions, discharges to waste or public systems and health and safety matters).

"**Equipment**" is all "equipment" as defined in the Code with such additions to such term as may hereafter be made, and includes without limitation all machinery, fixtures, goods, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing.

"**ERISA**" is the Employee Retirement Income Security Act of 1974, as amended, and its regulations.

"**ETA**" means Part IX of the *Excise Tax Act* (Canada).

"**Event of Default**" is defined in Section 7.

"**Exchange Act**" is the Securities Exchange Act of 1934, as amended.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to Bank or required to be withheld or deducted from a payment to Bank, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of Bank being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of Bank with respect to an applicable interest in a Credit Extension pursuant to a law in effect on the date on which (i) Bank acquires such interest in the Credit Extensions or (ii) Bank changes its lending office, except in each case to the extent that, pursuant to Section 1.6, amounts with respect to such Taxes were payable either to Bank's assignor immediately before Bank became a party hereto or to Bank immediately before it changed its lending office, (c) Taxes attributable to Bank's failure to comply with Section 1.6(e), and (d) any withholding Taxes imposed under FATCA.

"**Existing Accounts**" is defined in Section 5.9(a).

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Internal Revenue Code.

"**Financial Statement Repository**" is Bank's email address as specified in Section 9 hereof or such other means of collecting information approved and designated by Bank after providing notice thereof to Borrower from time to time.

"**Funding Date**" is any date on which a Credit Extension is made to or for the account of Borrower which shall be a Business Day.

"**GAAP**" is generally accepted accounting principles in Canada as in effect from time to time, including IFRS and ASPE, as applicable.

"**Governmental Approval**" is any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

"**Governmental Authority**" is any nation or government, any province, state, local, municipal or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity

DocuSign Envelope ID: 73B09093-3626-4443-B5BC-CC5341E617A3

exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"**Guarantee**" is any guarantee of all or any part of the Obligations, as the same may from time to time be amended, restated, modified or otherwise supplemented.

"**Guarantor**" is any Person providing a Guarantee in favour of Bank.

"**IFRS**" are the International Financial Reporting Standards, a collection of guidelines and rules set by the International Accounting Standards Board (www.iasb.org) which are applicable to the circumstances as of the date of determination.

"**Indebtedness**" is (a) indebtedness for borrowed money or the deferred price of property or services, such as reimbursement and other obligations for surety bonds and letters of credit, (b) obligations evidenced by notes, bonds, debentures or similar instruments, (c) capital lease obligations, (d) Contingent Obligations and (e) other short- and long-term obligations under debt agreements, lines of credit and extensions of credit.

"**Indemnified Person**" is defined in Section 11.3.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Information**" is defined in Section 11.8.

"**Insolvency Proceeding**" is any petition, application or other proceeding instituted by, against, or in respect of any Person: (a) seeking to adjudicate it an insolvent person; (b) seeking a bankruptcy order against it under the BIA; (c) seeking to institute proceedings against it under the CCAA; (d) seeking to institute proceedings against it under the WURA; (d) seeking, in addition to the forgoing: (i) to adjudicate it an insolvent person or a bankrupt, (ii) to liquidate, dissolve or wind-up its business or assets, (iii) to compromise, arrange, adjust or declare a moratorium in respect of the payment of, its debts, (iv) to stay the rights of creditors generally (or any class of creditors), (v) any other relief in respect of it under any federal, state, provincial or foreign Applicable Law now or hereafter in effect relating to bankruptcy, winding-up, insolvency, receivership, restructuring of business, assets or debt, reorganization of business, assets or debt, or protection of debtors from their creditors (such Applicable Law includes any applicable corporations legislation to the extent the relief sought under such corporations legislation relates to or involves the compromise, settlement, adjustment or arrangement of debt), or (vi) any other relief which provides plans or schemes of reorganization, plans or schemes of arrangement or plans or schemes of compromise in respect of it, to be submitted or presented to creditors (or any class of creditors); or (e) seeking the issuance of an order for the appointment of a Receiver, sequestrator, monitor, conservator, custodian, administrator, trustee, liquidator or other similar official in respect of it or any substantial part of its property.

"**Intangibles**" is all (a) in respect of the Canadian Borrower or any assets located in Canada, "intangibles" or "general intangibles", as applicable, and (b) in respect of the US Borrower or any assets located in the United States, "general intangibles", in each case, as defined in the Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation, all Intellectual Property, claims, income and other tax refunds, security and other deposits, payment intangibles, contract rights, options to purchase or sell real or personal property, rights in all litigation presently or hereafter pending (whether in contract, tort or otherwise), insurance policies (including without limitation key man, property damage, and business interruption insurance), payments of insurance and rights to payment of any kind.

"**Intellectual Property**" means, with respect to any Person, all of such Person's right, title, and interest in and to the following:

(a)      its Copyrights, Trademarks and Patents;

(b)      any and all trade secrets and trade secret rights, including, without limitation, any rights to unpatented inventions, know-how and operating manuals;

(c)      any and all source code;

(d)      any and all design rights which may be available to such Person;

(e)      any and all claims for damages by way of past, present and future infringement of any of the foregoing, with the right, but not the obligation, to sue for and collect such damages for said use or infringement of the Intellectual Property rights identified above; and

(f)      all amendments, renewals and extensions of any of the Copyrights, Trademarks or Patents.

"**Internal Revenue Code**" means the U.S. Internal Revenue Code of 1986, and the rules and regulations promulgated thereunder, each as amended or modified from time to time.

"**Inventory**" is all "**inventory**" as defined in the Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such inventory as is temporarily out of Borrower's custody or possession or in transit and including any returned goods and any documents of title representing any of the above.

"**Investment**" is any beneficial ownership interest in any Person (including stock, partnership, membership, or other ownership interest or other equity securities), and any loan, advance or capital contribution to any Person.

"**Issuer**" has the meaning given to such term in the *Securities Transfer Act, 2006* (Ontario) and includes all regulations from time to time made under such legislation.

"**Key Person**" (a) Chief Executive Officer, who is Sushee Perumal, and (b) Chief Financial Officer, who is Paul Vickers, as at the Effective Date.

"**Lien**" is a claim, mortgage, deed of trust, levy, attachment charge, pledge, hypothecation, security interest, hypothec or other encumbrance of any kind, whether voluntarily incurred or arising by operation of law or otherwise against any property.

"**Loan Documents**" are, collectively, this Agreement and any schedules, exhibits, certificates, notices, and any other documents related to this Agreement, the Perfection Certificate, the Warrant, Control Agreements, any Bank Services Agreement, any subordination agreement, any note, or notes or guarantees executed by Borrower or any Guarantor, landlord waivers and consents, bailee waivers and consents, and any other present or future agreement by Borrower and/or any Guarantor with or for the benefit of Bank or Bank Services Provider in connection with this Agreement or any Bank Services, all as amended, restated, or otherwise modified in accordance with the terms thereof.

"**Material Adverse Change**" is (a) a material impairment in the perfection or priority of Bank's Lien in the Collateral or in the value of such Collateral; (b) a material adverse change in the business, operations, or condition (financial or otherwise) of Borrower; or (c) a material impairment of the prospect of repayment of any portion of the Obligations.

"**Obligations**" are Borrower's obligations to pay when due any debts, principal, interest, fees, Bank Expenses, the Prepayment Fee, the Term Loan Advance Commitment Fee, and other amounts Borrower owes Bank or Bank Services Provider now or later, whether under this Agreement, the other Loan Documents (other than the Warrant), or otherwise, including, without limitation, all obligations relating to Bank Services and interest accruing after Insolvency Proceedings begin and debts, liabilities, or obligations of Borrower assigned to Bank, and to perform Borrower's duties under the Loan Documents (other than the Warrant).

DocuSign Envelope ID: 73B09093-3626-4443-B5BC-CC5341E617A3

"**OFAC**" is the Office of Foreign Assets Control of the United States Department of the Treasury and any successor thereto.

"**Operating Documents**" are, (x) for the US Borrower, the US Borrower's formation documents, as certified by the Secretary of State (or equivalent agency) of the US Borrower's jurisdiction of organization on a date that is no earlier than thirty (30) days prior to the Effective Date, or (y) for any other Person, such Person's constating documents and, in each case, (a) if such Person is a corporation, its articles and bylaws in current form, (b) if such Person is a limited liability company, its limited liability company agreement (or similar agreement), and (c) if such Person is a partnership or limited partnership, its partnership agreement or limited partnership agreement (or similar agreement) and declaration of limited partnership (or similar document), each of the foregoing with all current amendments or modifications thereto.

"**Other Connection Taxes**" means, with respect to Bank, Taxes imposed as a result of a present or former connection between Bank and the jurisdiction imposing such Tax (other than connections arising from Bank having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Credit Extension or Loan Document).

"**Other Taxes**" means all present or future stamp, court, documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Patents**" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"**Payment Date**" is set forth on Schedule I hereto.

"**Payment/Advance Form**" is that certain form in the form attached hereto as Exhibit B.

"**Perfection Certificate**" is each Perfection Certificate delivered by each Borrower in connection with this Agreement.

"**Permitted Indebtedness**" is:

(a)    Borrower's Indebtedness to Bank under this Agreement and the other Loan Documents;

(b)    Indebtedness existing on the Effective Date which is shown on the Perfection Certificate;

(c)    Subordinated Debt;

(d)    unsecured Indebtedness to trade creditors incurred in the ordinary course of business;

(e)    Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business;

(f)    Indebtedness secured by Liens permitted under clauses (a) and (c) of the definition of "Permitted Liens" hereunder; and

(g)    extensions, refinancings, modifications, amendments and restatements of any items of Permitted Indebtedness (a) through (f) above, provided that the principal amount thereof is not increased or the terms thereof are not modified to impose more burdensome terms upon Borrower or its Subsidiary, as the case may be.

"**Permitted Investments**" are: Investments (including, without limitation, Subsidiaries) existing on the Effective Date which are shown on the Perfection Certificate;

DocuSign Envelope ID: 73B09093-3626-4443-B5BC-CC5341E617A3

(a)    Investments consisting of Cash Equivalents,

(b)    Investments consisting of the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of Borrower's business;

(c)    Investments consisting of deposit accounts (but only to the extent that Borrower is permitted to maintain such accounts pursuant to Section 5.9 of this Agreement) in which Bank has a first priority perfected security interest (subject to Permitted Liens);

(d)    Investments accepted in connection with Transfers permitted by Section 6.1;

(e)    Investments consisting of the creation of a Subsidiary for the purpose of consummating a merger transaction permitted by Section 6.3 of this Agreement, which is otherwise a Permitted Investment;

(f)    Investments (i) by Borrower in Subsidiaries for the ordinary and necessary current operating expenses of such Subsidiaries in an amount not to exceed $50,000 in the aggregate in any fiscal year and (ii) by Subsidiaries (that are not a Borrower) in other Subsidiaries for the ordinary and necessary current operating expenses of such Subsidiaries in an amount not to exceed $50,000 in the aggregate in any fiscal year or in Borrower;

(g)    Investments consisting of (i) travel advances and employee relocation loans and other employee loans and advances in the ordinary course of business, and (ii) loans to employees, officers, directors, partners, managers and members relating to the purchase of equity securities of Borrower or its Subsidiaries pursuant to employee equity purchase plans or similar agreements approved by the Board;

(h)    Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers and in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of business; and

(i)    Investments consisting of notes receivable of, or prepaid royalties and other credit extensions, to customers and suppliers who are not Affiliates, in the ordinary course of business; provided that this paragraph (i) shall not apply to Investments of Borrower in any Subsidiary.

"**Permitted Liens**" are:

(a)    Liens existing on the Effective Date which are shown on the Perfection Certificate or arising under this Agreement or the other Loan Documents;

(b)    Liens for taxes, fees, assessments or other government charges or levies, either (i) not due and payable or (ii) being contested in good faith and for which Borrower maintains adequate reserves on Borrower's Books, but only to the extent such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation, provided that no notice of any such Lien has been filed or recorded under the Internal Revenue Code;

(c)    purchase money Liens (i) on Equipment acquired or held by Borrower incurred for financing the acquisition of the Equipment securing no more than $100,000 in the aggregate amount outstanding, or (ii) existing on Equipment when acquired, if the Lien is confined to the property and improvements and the proceeds of the Equipment;

(d)    Liens of carriers, warehousemen, suppliers, or other Persons that are possessory in nature arising in the ordinary course of business so long as such Liens attach only to Inventory, securing liabilities in the aggregate amount not to exceed $100,000 and which are not delinquent or remain payable without penalty or which are being contested in good faith and by appropriate proceedings which proceedings have the effect of preventing the forfeiture or sale of the property subject thereto;

(e)        Liens to secure payment of workers' compensation, employment insurance, old-age pensions, social security and other like obligations incurred in the ordinary course of business (other than Liens imposed by ERISA);

(f)        Liens incurred in the extension, renewal or refinancing of the Indebtedness secured by Liens described in (a) through (c), but any extension, renewal or replacement Lien must be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness may not increase;

(g)        leases or subleases of real property granted in the ordinary course of Borrower's business (or, if referring to another Person, in the ordinary course of such Person's business), and leases, subleases, non-exclusive licenses or sublicenses of personal property (other than Intellectual Property) granted in the ordinary course of Borrower's business (or, if referring to another Person, in the ordinary course of such Person's business), if the leases, subleases, licenses and sublicenses do not prohibit granting Bank a security interest therein;

(h)        non-exclusive licenses of Intellectual Property granted to third parties in the ordinary course of business, and licenses of Intellectual Property that could not result in a legal transfer of title of the licensed property that may be exclusive in respects other than territory and that may be exclusive as to territory only as to discreet geographical areas outside of Canada and the United States;

(i)        Liens arising from attachments or judgments, orders, or decrees in circumstances not constituting an Event of Default under Sections 7.4 and 7.7;

(j)        easements, rights-of-way, restrictions and other similar encumbrances affecting real property which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person; and

(k)        customary Liens of any bank in connection with statutory, common law and contractual rights of setoff and recoupment with respect to any deposit account or securities account of Borrower, provided that (i) Bank has a first priority perfected security interest in such account (subject only to Permitted Liens) and (ii) such account is permitted to be maintained pursuant to Section 5.9 of this Agreement.

"**Person**" is any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"**PPSA**" is the *Personal Property Security Act* (Ontario), as such legislation may be amended, renamed or replaced from time to time, and includes all regulations from time to time made under such legislation; provided, that, in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, or priority of, or remedies with respect to, Bank's Lien on any Collateral is governed by the *Personal Property Security Act* in effect in a jurisdiction other than the Province of Ontario, the term "**PPSA**" shall mean the *Personal Property Security Act* or equivalent personal property security legislation as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies and for purposes of definitions relating to such provisions.

"**Prepayment Fee**" shall be an additional fee, payable to Bank, with respect to each Term Loan Advance, in an amount equal to (i) two percentage points (2.0%) of the prepaid amount if prepayment occurs on or prior to the first anniversary of the Effective Date; or (ii) one percentage point (1.0%) of the prepaid amount if prepayment occurs any time after the first anniversary of the Effective Date but on or before the second anniversary of the of the Effective Date; or (iii) half of one percentage point (0.5%) of the prepaid amount if prepayment occurs at any time after the second anniversary of the Effective Date but on or prior to the Term Loan Maturity Date; or (iv) zero percentage points (0.0%) of the prepaid amount if prepayment is refinanced by another credit facility established by Bank.

"**Prime Rate Margin**" is set forth on Schedule I hereto.

DocuSign Envelope ID: 73B09093-3626-4443-B5BC-CC5341E617A3

"**Receiver**" means an interim receiver, a receiver, a manager or a receiver and manager.

"**Registered Organization**" is any "registered organization" as defined in the Code with such additions to such term as may hereafter be made.

"**Representatives**" is defined in Section 11.8.

"**Responsible Officer**" is any of the Chief Executive Officer and Chief Financial Officer of Borrower.

"**Restricted License**" is any material license or other material agreement with respect to which Borrower is the licensee (a) that prohibits or otherwise restricts Borrower from granting a security interest in Borrower's interest in such license or agreement or any other property, or (b) for which a default under or termination of could interfere with Bank's right to sell any Collateral.

"**Sanctioned Person**" means a Person that: (a) is listed on any Sanctions list maintained by OFAC or any similar Sanctions list maintained by any other Governmental Authority having jurisdiction over Borrower; (b) is located, organized, or resident in any country, territory, or region that is the subject or target of Sanctions; or (c) is 50.0% or more owned or controlled by one (1) or more Persons described in clauses (a) and (b) hereof.

"**Sanctions**" means the economic sanctions laws, regulations, embargoes or restrictive measures administered, enacted or enforced by the Canadian government, the United States government and any of their respective agencies, including, without limitation, OFAC and the U.S. State Department, or any other Governmental Authority having jurisdiction over Borrower.

"**SEC**" is the Securities and Exchange Commission, any successor thereto, and any analogous Governmental Authority.

"**Securities Account**" is any "securities account" as defined in the Code with such additions to such term as may hereafter be made.

"**Securities Commission**" is the Ontario Securities Commission (or any comparable agency in any other applicable jurisdiction), any successor thereto, and any analogous Governmental Authority.

"**Subordinated Debt**" is indebtedness incurred by Borrower or any of its Subsidiaries subordinated to all of Borrower's or any of its Subsidiaries' now or hereafter indebtedness to Bank (pursuant to a subordination, intercreditor, or other similar agreement in form and substance satisfactory to Bank entered into between Bank and the other creditor), on terms acceptable to Bank.

"**Subsidiary**" is, as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock, partnership, membership, or other ownership interest or other equity securities having ordinary voting power (other than stock, partnership, membership, or other ownership interest or other equity securities having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless the context otherwise requires, each reference to a Subsidiary herein shall be a reference to a Subsidiary of Borrower.

"**SVB U.S.**" is Silicon Valley Bank, a California corporation.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Term Loan Advance**" and "**Term Loan Advances**" are each defined in Section 1.1(a) of this Agreement.

"**Term Loan Amortization Date**" is set forth on Schedule I hereto.

DocuSign Envelope ID: 73B09093-3626-4443-B5BC-CC5341E617A3

"**Term Loan Availability Amount**" is set forth on Schedule I hereto.

"**Term Loan Maturity Date**" is set forth on Schedule I hereto.

"**Tranche II Milestone**" is set forth on Schedule I hereto.

"**Trademarks**" means, with respect to any Person, any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of such Person connected with and symbolized by such trademarks.

"**Transfer**" is defined in Section 6.1.

"**ULC**" means an Issuer that is an unlimited company, unlimited liability company or unlimited liability corporation.

"**ULC Laws**" means the *Business Corporations Act* (Alberta), the *Companies Act* (Nova Scotia), the *Business Corporations Act* (British Columbia) and any other present or future laws governing ULCs.

"**ULC Shares**" means shares or other equity interests in the capital stock of a ULC.

"**US Borrower**" is set forth on Schedule I hereto.

"**USA Patriot Act**" means the "Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001" (Public Law 107-56, signed into law on October 26, 2001), as amended from time to time.

"**Warrant**" is that certain Warrant to Purchase Shares dated as of the Effective Date between Canadian Borrower and Bank, as amended, modified, supplemented and/or restated from time to time.

"**WURA**" means *Winding Up and Restructuring Act* (Canada).

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Effective Date.

BORROWERS:

**MAXSOLD INCORPORATED**

By: _Sushee Perumal_
F7A581F2DD38457...

Name: Sushee Perumal
Title: President and Chief Executive Officer

**MAXSOLD INC.**

By: _Sushee Perumal_
F7A581F2DD38457...

Name: Sushee Perumal
Title: President

BANK:

**SILICON VALLEY BANK**

By: _Michelle Sabourin_
D619AD50A1EB4C5...

Name: Michelle Sabourin

Title: Vice President

Signature Page to Loan and Security Agreement

**SCHEDULE I**
**LSA PROVISIONS**

| LSA Section | LSA Provision |
|---|---|
| 1.1(a) – Term Loan – Availability | The Tranche I Term Loan Advance must be in an amount equal to the Tranche I Term Loan Availability Amount. The Tranche II Term Loan Advance may be made in one or more draws in an amount up to the Tranche II Term Loan Availability Amount. The Tranche I Term Loan Availability Amount and the Tranche II Term Loan Availability Amount are collectively referred to as the "**Term Loan Availability Amount**". After repayment, no Term Loan Advance (or any portion thereof) may be reborrowed. |
| 1.1(b) – Term Loan – Repayment | Commencing on the Term Loan Amortization Date and continuing on each Payment Date thereafter, Borrower shall repay each Term Loan Advance in thirty-six (36) equal monthly installments of principal and accrued interest, which interest shall be calculated at the rate set forth in Section 1.2(b)(i). |
| 1.2(a)(i) – Interest Payments – Term Loan Advances | Interest on the principal amount of each Term Loan Advance is payable in arrears monthly (A) on each Payment Date commencing on the first Payment Date following the Funding Date of each such Term Loan Advance, (B) on the date of any prepayment and (C) on the Term Loan Maturity Date. |
| 1.2(b)(i) – Interest Rate – Term Loan Advances | The outstanding principal amount of any Term Loan Advance denominated in Canadian Dollars shall accrue interest at a floating rate per annum equal to the greater of (1) 4.25% and (2) the Canadian Prime Rate plus the Prime Rate Margin, which interest shall be payable in accordance with Section 1.2. |
| 1.3(a) – Term Loan Advance Commitment Fee | A fully earned, non-refundable commitment fee of CDN$10,000 on the Effective Date. |
| 8.8 – Borrower Liability | Each Borrower hereunder shall be jointly and severally obligated to repay all Credit Extensions made hereunder and any other Obligations related thereto, regardless of which Borrower actually receives said Credit Extension, as if each Borrower hereunder directly received all Credit Extensions. |
| 12.2 – "Borrower[s]" | "**Borrowers**" means each of, individually and collectively, jointly and severally, MaxSold Incorporated, a corporation organized under the federal laws of Canada (also referred to as the "**Canadian Borrower**") and MaxSold Inc., a Delaware corporation (also referred to as the "**US Borrower**"). |
| 12.2 – "Canadian Prime Rate" | "**Canadian Prime Rate**" means, on any day, the rate equal to the PRIMCAN Index rate that appears on the Bloomberg screen at 10:15 a.m. Toronto time on such day (or, in the event that the PRIMCAN Index is not published by Bloomberg, any other information service that publishes such index from time to time, as selected by the Bank in its reasonable discretion); provided, that if the above rate shall be less than zero, such rate shall be deemed to be zero. Any change in the Canadian Prime Rate due to a change in the PRIMCAN Index shall be effective from and including the effective date of such change in the PRIMCAN Index. |

| 12.2 – "Draw Period" | **Draw Period**" is the period commencing on the Effective Date and ending on the earlier to occur of (a) February 28, 2023 and (b) an Event of Default. |
|---|---|
| 12.2 – "Effective Date" | "**Effective Date**" is March 16, 2022 |
| 12.2 – "Payment Date" | "**Payment Date**" is the first (1st) calendar day of each month. |
| 12.2 – "Prime Rate Margin" | "**Prime Rate Margin**" is one point eight percent (1.80%). |
| 12.2 – "Term Loan Amortization Date" | "**Term Loan Amortization Date**" is, for each Term Loan Advance, March 1, 2023. |
| 12.2 – "Tranche I Loan Availability Amount" | "**Tranche I Loan Availability Amount**" is an aggregate principal amount equal to Four Million Canadian Dollars (CDN$4,000,000). |
| 12.2 – "Tranche II Loan Availability Amount" | "**Tranche II Loan Availability Amount**" is an aggregate principal amount equal to One Million Canadian Dollars (CDN$1,000,000). |
| 12.2 – "Tranche II Milestone" | "**Tranche II Milestone**" means at any time on or before August 31, 2022, delivery by Borrower to bank of evidence satisfactory to Bank in its sole discretion, that Borrower has achieved gross transaction revenue on a consolidated basis, determined in accordance with GAAP, of at least Nine Million Canadian Dollars (CDN$9,000,000) on a trailing three (3) month basis. |
| 12.2 – "Term Loan Maturity Date" | "**Term Loan Maturity Date**" is February 1, 2026. |

**EXHIBIT A**
COMPLIANCE STATEMENT

TO:      SILICON VALLEY BANK                Date: _____

FROM:   MAXSOLD INCORPORATED AND MAXSOLD INC.

           Under the terms and conditions of the Loan and Security Agreement between Borrower and Bank (as amended, modified, supplemented and/or restated from time to time, the "**Agreement**"), Borrower is in complete compliance for the period ending _____ with all required covenants except as noted below.   Attached are the required documents evidencing such compliance, setting forth calculations prepared in accordance with GAAP consistently applied from one period to the next except as explained in an accompanying letter or footnotes.  Capitalized terms used but not otherwise defined herein shall have the meanings given them in the Agreement.

    **Please indicate compliance status by circling Yes/No under "Complies" column.**

| Reporting Covenants | Required | Complies |
|---|---|---|
| | | |
| Monthly financial statements with Compliance Statement and KPI Metrics | Monthly within 30 days | Yes  No |
| Annual reviewed financial statements or CPA Audited, as required by s.5.3(d) of the Agreement | FYE within 180 days | Yes  No |
| Securities filings | Within 5 days after filing with the Securities Commission or SEC, as applicable | Yes  No |
| Board approved projections | 30 days prior to FYE and as amended/updated | Yes  No |

| |
|---|
| |
| Has the Tranche II Milestone been achieved? If so, please provide applicable calculations and supporting documentation to Bank for review._____ |

    The following are the exceptions with respect to the statements above: (If no exceptions exist, state "No exceptions to note.")_____.

| Account Balances | | | | |
|---|---|---|---|---|
| | | | | |
| **Financial Institution** | **Country** | **Denomination** | **Amount** | **mm/dd/yyyy** |
| | | | | |
| | | | | |
| | | | | |

**EXHIBIT B**
**LOAN PAYMENT/ADVANCE REQUEST FORM**

**DEADLINE FOR SAME DAY PROCESSING IS NOON [EASTERN/PACIFIC] TIME**

Date: _____

---

**LOAN PAYMENT:**

MAXSOLD INCORPORATED AND MAXSOLD INC.

From Account #_____   To Account #_____
            (Deposit Account #)                              (Loan Account #)
Principal $_____   and/or Interest $_____

Authorized Signature:_____   Phone Number: _____
Print Name/Title: _____

---

**LOAN ADVANCE:**

Complete *Outgoing Wire Request* section below if all or a portion of the funds from this loan advance are for an outgoing wire.

From Account #_____   To Account #_____
            (Loan Account #)                              (Deposit Account #)

Amount of Term Loan Advance $_____

All Borrower's representations and warranties in the Loan and Security Agreement are true, correct and complete in all material respects on the date of the request for an advance; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true and correct in all material respects as of such date:

Authorized Signature:_____   Phone Number: _____
Print Name/Title: _____

---

**OUTGOING WIRE REQUEST:**
**Complete only if all or a portion of funds from the loan advance above is to be wired.**
Deadline for same day processing is noon, Eastern Time

Beneficiary Name: _____   Amount of Wire: $_____
Beneficiary Bank: _____   Account Number: _____
City and State: _____

Beneficiary Bank Transit (ABA) #: _____   Beneficiary Bank Code (Swift, Sort, Chip, etc.): _____
                                                      **(For International Wire Only)**

Intermediary Bank: _____   Transit (ABA) #: _____
For Further Credit to: _____

Special Instruction: _____

*By signing below, I (we) acknowledge and agree that my (our) funds transfer request shall be processed in accordance with and subject to the terms and conditions set forth in the agreements(s) covering funds transfer service(s), which agreements(s) were previously received and executed by me (us).*

Authorized Signature: _____    2nd Signature (if required): _____

Print Name/Title: _____    Print Name/Title: _____

Telephone #: _____    Telephone #: _____

47944628.1